THOMAS L. LAUGHLIN, IV (*pro hac* vice)
DEBORAH CLARK-WEINTRAUB (*pro hac* vice)
JEFFREY P. JACOBSON (*pro hac* vice)
JONATHAN M. ZIMMERMAN (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
tlaughlin@scott-scott.com
dweintraub@scott-scott.com
jjacobson@scott-scott.com
jzimmerman@scott-scott.com

*Counsel for Plaintiffs Vinod Sodha and Amee Sodha
and the Proposed Class*

[Additional Counsel on Signature Page.]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP GOLUBOWSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br> v.<br><br>ROBINHOOD MARKETS, INC., VLADIMIR TENEV, JASON WARNICK, BAIJU BHATT, JAN HAMMER, PAULA LOOP, JONATHAN RUBENSTEIN, SCOTT SANDELL, ROBERT ZOELLICK, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., WELLS FARGO SECURITIES, LLC, MIZUHO SECURITIES USA LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., PIPER SANDLER & CO., ROSENBLATT SECURITIES INC., BMO CAPITAL MARKETS CORP., BTIG, LLC, SANTANDER INVESTMENT SECURITIES INC., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC,<br><br>    Defendants. | Case No. 3:21-cv-09767<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Vinod Sodha and Amee Sodha ("Lead Plaintiffs") make the following allegations, individually and on behalf of all others similarly situated, by and through Lead Plaintiffs' counsel, upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by Robinhood Markets, Inc. ("Robinhood" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Company; (iii) analyst reports and media reports; and (iv) interviews with former employees and contractors of Robinhood, as well as other publicly available information about the Company. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.    Lead Plaintiffs bring this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") against: (i) Robinhood; and (ii) certain of the Company's senior executives and directors who signed the Registration Statement, effective July 28, 2021, issued in connection with the Company's initial public offering (the "IPO" or the "Offering"), and the underwriters of the Offering. Plaintiffs allege that the Registration Statement and Prospectus (collectively, the "Offering Documents"), contained materially false and misleading statements and omitted material information that was required by law to be disclosed. Defendants are each strictly liable for such misstatements and omissions (subject only to their ability to establish a "due diligence" affirmative defense).

2.    Robinhood Markets, Inc. is a financial services company headquartered in Menlo Park, California. It is primarily known for its brokerage services, which customers typically access through apps installed on their mobile devices.

3.    On or about July 30, 2021, Robinhood conducted a large IPO premised on the representation that the Company was successfully executing a revolutionary strategy to

"democratize" investing and thereby achieving massive growth as measured by revenue and the Company's Key Performance Indicators" ("KPI").  On the basis of these claims in the Offering Documents, Robinhood and the other Defendants offered 55 million shares of common stock to the public at a price of $38 per share (the "Offering Price") for proceeds of over $2 billion.

4.     According to the Offering Documents, Robinhood's mission was to "democratize finance for all."  The Company claimed to be riding a profound transformation in how people think about money driven by the emergence of younger investors and non-traditional investors such as "gig economy workers."  The pillars of Robinhood's strategy to reach these new and/or non-traditional investors supposedly were:  (i) a primary focus on the safety and reliability of Robinhood's trading platform; (ii) a focus on the needs of smaller investors; (iii) a "radical" focus on responding to customer problems and feedback; and (iv) a willingness to make "bold bets" that challenge the status quo.

5.     Robinhood claimed that its strategy allowed it to achieve massive growth.  In its words, "Our mission to democratize finance for all drives our revenue model" and "We have grown rapidly and achieved significant scale in recent periods."  As proof of its successful strategy, Robinhood presented its revenue and KPI performance data through June 30, 2021, filling the Offering Documents with charts and tables depicting exponential growth.  For example, the Offering Documents heavily touted the growth in Robinhood's number of Monthly Active Users ("MAU"), which, rose from 4.3 million by year end 2019, to 11.7 million by year end 2020, to 17.7 million by March 31, 2021, and which Robinhood stated would be 21.3 million for the three months ended June 30, 2021, the quarter that ended the month before the IPO:



6.    Likewise, the Offering Documents emphasized the Company's revenue growth, which rose nearly sequentially quarter over quarter.  For example, from $224.2 million for the three months ended June 30, 2020, to $269.5 million for the three months ended September 30, 2020, to $317.5 million for the three months ended December 31, 2020, to $522.2 million for the three months ended March 31, 2021, and to approximately $560 million (at the midpoint of the range provided by management) for the three months ended June 30, 2021, as illustrated below:



7.    Similarly, the Offering Documents hyped the substantial increases observed in Robinhood's total assets under custody ("AUC"), a figure representing the fair value of all equities, options, cryptocurrency and cash held by users in their accounts, net of customer margin balances.

Specifically, the Offering Documents frequently noted how Robinhood's AUC grew from approximately $14.1 billion in 2019 to nearly $63 billion in 2020 to $80.9 billion in the first quarter of 2021 alone, before then stating that Robinhood's AUC for the second quarter of 2021 is expected to be approximately $102.04 billion, as illustrated by the charts below:





8.    Moreover, the Offering Documents touted the growth Robinhood experienced in its net funded cumulative accounts ("NCFA"), a metric Robinhood uses to assess customer engagement.  In fact, as illustrated by the graph below, the Offering Documents repeatedly note that Robinhood's NCFA increased from 5.1 million to 12.5 million to 18 million for the period

ended December 31, 2019, December 31, 2020 and March 31, 2021, respectively, and further that, Robinhood expected its NCFA to reach 22.5 million by June 30, 2021:



9. Lastly, and relatedly, the Offering Documents play up the Company's rising average revenues per user ("ARPU"), which Robinhood contends correlates positively with deepening user engagement, by repeatedly noting the increases observed from, for example, $65.70 for the year ended December 31, 2019, to $108.9 for the year ended December 31, 2020, to $137 for the three months ended March 31, 2021.

10. Unbeknownst to investors, the truth was that Robinhood was not successfully generating massive growth by executing its strategy. Rather, Robinhood was completely failing to follow the stated principles of its strategy and, in the months prior to the IPO, Robinhood's performance metrics were plummeting as traders left the Company in droves, and revenue cratered.

11. Former employees at Robinhood explain that the Company completely abandoned its stated principles. Rather than prioritize safety and reliability, Robinhood knowingly operated with insufficient controls or personnel, allowing fraud to run rampant on the platform and imperiling investor accounts. Rather than cater to the needs of small customers, Robinhood commodified them, deliberately undermining their decision-making process through app features designed to trigger rapid trading that generated fees for Robinhood at the expense of investors.

Robinhood exposed inexperienced customers to more complex and dangerous trading products, such as options and margin trading because those products were lucrative for Robinhood and ignored the protests of Robinhood employees that such decisions were causing customers staggering losses.  In the run-up to the IPO, Robinhood's predatory tactics drove a swell of investor anger and attrition.  Robinhood also saw a decline in its "net promote score" ("NPS"), reflecting the willingness of Robinhood investors to recommend Robinhood to new users, undermining a key driver of future growth.

12.    Furthermore, in June and July 2021, the two months prior to the IPO, Robinhood's revenue and KPIs *experienced severe deterioration*.  In fact, as discussed in greater detail herein, Robinhood's:  (1) MAUs *declined* nearly *11.62%* between May 2021 and June 2021 and by *8.45%* between June 2021 and July 2021; (2) crypto trading volume *declined over 76%* between May 2021 and June 2021 and by *56.67%* between June 2021 and July 2021; (3) AUC *declined overall by nearly 4.25%*; and (4) customer base and usage, as measured by its NCFA, had completely stagnated, as Robinhood's ARPU declined by at least $25.30, if not likely more.   This deterioration, which was a matter of historical fact at the time of the IPO, directly contradicted Robinhood's claims regarding the success of its strategy and the Company's growth.

13.    Robinhood was able to track these metrics in real-time or nearly so using an analytics platform that it developed and operates.  Multiple confidential witnesses confirmed Robinhood tracked this performance data ahead of the IPO, observing, for example, that Robinhood's MAU, net new customer, and funded account metrics were deteriorating while its customer attrition was increasing.

14.    The truth began to emerge on October 27, 2021, when the Company revealed the sharp declines in its KPIs during its third quarter 2021 earnings call, resulting in the Company's stock dropping sharply.  Jim Cramer commented that the earnings call made him "depressed" because "if you read the conference call, you'd think it was a fad . . . and if it's a fad, well what can I say?  They've got a lot of people, 22 million, but they don't have a lot of money in their accounts."   The market learned more about the dismal state of Robinhood's strategy in the

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

following months as the Company continued to report declining KPIs and revenue.  Commenting on the trend in January 2022, JP Morgan concluded that Robinhood is "***a growth company without the growth***."  [Emphasis added.]

15.    As shown in the below chart, the Company's shares have traded as low as $6.81 per share since the IPO, representing a decline of more than 82% from the Offering Price of $38.



16.    By this action, Lead Plaintiffs, on behalf of themselves and other members of the Class (defined below) who also acquired Robinhood's shares pursuant and traceable to the Offering, now seek to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

**JURISDICTION AND VENUE**

17.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*(a)(2), and 77o, respectively.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §22 of the Securities Act, 15 U.S.C. §77v.

19.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the acts and transactions giving rise to the violations of law complained of herein occurred, in part, in this District, including the dissemination of false and misleading statements into this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

<b><u>PARTIES</u></b>

**A.     Lead Plaintiffs**

21.     Lead Plaintiffs purchased shares of the Company's common stock that were issued pursuant and traceable to the Registration Statement and Offering and were damaged thereby.

**B.     Defendants**

**1.     The Company**

22.     Defendant Robinhood is a Menlo Park, California-based company that provides a vehicle through which people can buy and sell stocks, ETFs and cryptocurrencies.  Incorporated under the laws of the state of Delaware, Robinhood maintains its principle executive offices at 85 Willow Road, Menlo Park, California 94025.  Robinhood's common stock is listed on the NASDAQ under the ticker symbol "HOOD."

**2.     The Individual Defendants**

23.     Defendant Vladimir Tenev ("Tenev") is, and was at all relevant times, Co-Founder, Chief Executive Officer ("CEO"), and President of Robinhood, as well as a director on the Company's Board of Directors (the "Board").  Defendant Tenev reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

24.     Defendant Jason Warnick ("Warnick") is, and was at all relevant times, Robinhood's Chief Financial Officer ("CFO").  Defendant Warnick reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

25.     Defendant Baiju Bhatt ("Bhatt") is, and was at all relevant times, Co-Founder and Chief Creative Officer of Robinhood, as well as a director on the Board.  Defendant Bhatt reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

AMENDED CLASS ACTION COMPLAINT<br>Case No. 3:21-cv-09767

26.     Defendant Jan Hammer ("Hammer") is, and was at all relevant times, a director on the Board.  Defendant Hammer reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

27.     Defendant Paula Loop ("Loop") is, and was at all relevant times, a director on the Board.  Defendant Loop reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

28.     Defendant Jonathan Rubenstein ("Rubenstein") is, and was at all relevant times, a director on the Board.  Defendant Rubenstein reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

29.     Defendant Scott Sandell ("Sandell") is, and was at all relevant times, a director on the Board.  Defendant Sandell reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

30.     Defendant Robert Zoellick ("Zoellick") is, and was at all relevant times, a director on the Board.  Defendant Zoellick reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

31.     Defendants Tenev, Warnick, Bhatt, Hammer, Loop, Rubenstein, Sandell, and Zoellick are collectively referred to herein as the "Individual Defendants."

### 3.     The Underwriter Defendants

32.     The Underwriter Defendants were also instrumental in soliciting investors and in making the Robinhood shares that were offered and sold in or traceable to the IPO available to Lead Plaintiffs and the other members of the Class.  The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold in the IPO:

| Name | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 16,716,315 |
| J.P. Morgan Securities LLC | 15,671,645 |
| Barclays Capital Inc. | 6,268,680 |
| Citigroup Global Markets Inc. | 6,268,680 |
| Wells Fargo Securities, LLC | 6,268,680 |
| Mizuho Securities USA LLC | 568,040 |
| JMP Securities LLC | 426.030 |
| KeyBanc Capital Markets Inc. | 426.030 |

9

| Name | Number of Shares |
|---|---|
| Piper Sandler & Co. | 426.030 |
| Rosenblatt Securities Inc. | 426.030 |
| BMO Capital Markets Corp. | 284,020 |
| BTIG, LLC | 284,020 |
| Santander Investment Securities Inc. | 284,020 |
| Academy Securities, Inc. | 170,445 |
| Loop Capital Markets LLC | 170,445 |
| Samuel A. Ramirez & Company, Inc. | 170,445 |
| Siebert Williams Shank & Co., LLC | 170,445 |

33. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents. Goldman Sachs acted as a representative of all the underwriters. Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Goldman Sachs' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant Goldman Sachs conducts business in this District.

34. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents. J.P. Morgan acted as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. J.P. Morgan's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant J.P. Morgan conducts business in this District.

35. Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

1    Company's material inaccurate, misleading, and incomplete Offering Documents.    Barclays
2    participated in conducting and promoting the roadshow for the IPO and paying for the expenses
3    of the Individual Defendants who participated in the roadshow, including lodging and travel,
4    among other expenses.  Barclays' participation in and its solicitation of offers in connection with
5    the IPO was motivated by its financial interests.  Defendant Barclays conducts business in this
6    District.

7            36.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the
8    Company's IPO, serving as a financial advisor for and assisting in the preparation and
9    dissemination of the Company's material inaccurate, misleading, and incomplete Offering
10   Documents.  Citigroup participated in conducting and promoting the roadshow for the IPO and
11   paying for the expenses of the Individual Defendants who participated in the roadshow, including
12   lodging and travel, among other expenses.  Citigroup's participation in and its solicitation of offers
13   in connection with the IPO was motivated by its financial interests.  Defendant Citigroup conducts
14   business in this District.

15           37.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the
16   Company's IPO, serving as a financial advisor for and assisting in the preparation and
17   dissemination of the Company's material inaccurate, misleading, and incomplete Offering
18   Documents.  Wells Fargo participated in conducting and promoting the roadshow for the IPO and
19   paying for the expenses of the Individual Defendants who participated in the roadshow, including
20   lodging and travel, among other expenses.  Well Fargo's participation in and its solicitation of
21   offers in connection with the IPO was motivated by its financial interests.  Defendant Wells Fargo
22   conducts business in this District.

23           38.    Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the
24   Company's IPO, serving as a financial advisor for and assisting in the preparation and
25   dissemination of the Company's material inaccurate, misleading, and incomplete Offering
26   Documents.  Mizuho participated in conducting and promoting the roadshow for the IPO and
27   paying for the expenses of the Individual Defendants who participated in the roadshow, including
28

1   lodging and travel, among other expenses.  Mizuho's participation in and its solicitation of offers

2   in connection with the IPO was motivated by its financial interests.  Defendant Mizuho conducts

3   business in this District.

4        39.    Defendant JMP Securities LLC ("JMP") was an underwriter of the Company's IPO,

5   serving as a financial advisor for and assisting in the preparation and dissemination of the

6   Company's material inaccurate, misleading, and incomplete Offering Documents.    JMP

7   participated in conducting and promoting the roadshow for the IPO and paying for the expenses

8   of the Individual Defendants who participated in the roadshow, including lodging and travel,

9   among other expenses.  JMP's participation in and its solicitation of offers in connection with the

10  IPO was motivated by its financial interests.  Defendant JMP conducts business in this District.

11       40.    Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the

12  Company's IPO, serving as a financial advisor for and assisting in the preparation and

13  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

14  Documents.  KeyBanc participated in conducting and promoting the roadshow for the IPO and

15  paying for the expenses of the Individual Defendants who participated in the roadshow, including

16  lodging and travel, among other expenses.  KeyBanc's participation in and its solicitation of offers

17  in connection with the IPO was motivated by its financial interests.  Defendant KeyBanc conducts

18  business in this District.

19       41.    Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter of the

20  Company's IPO, serving as a financial advisor for and assisting in the preparation and

21  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

22  Documents.  Piper Sandler participated in conducting and promoting the roadshow for the IPO and

23  paying for the expenses of the Individual Defendants who participated in the roadshow, including

24  lodging and travel, among other expenses.  Piper Sandler's participation in and its solicitation of

25  offers in connection with the IPO was motivated by its financial interests.  Defendant Piper Sandler

26  conducts business in this District.

27

28

42.    Defendant Rosenblatt Securities Inc. ("Rosenblatt") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Rosenblatt participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Rosenblatt's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Rosenblatt conducts business in this District.

43.    Defendant BMO Capital Markets Corp. ("BMO") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  BMO participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  BMO's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant BMO conducts business in this District.

44.    Defendant BTIG, LLC ("BTIG") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  BTIG participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  BTIG's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant BTIG conducts business in this District.

45.    Defendant Santander Investment Securities Inc. ("Santander") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Santander participated in conducting and promoting the roadshow for the IPO and

1    paying for the expenses of the Individual Defendants who participated in the roadshow, including

2    lodging and travel, among other expenses.  Santander's participation in and its solicitation of offers

3    in connection with the IPO was motivated by its financial interests.  Defendant Santander conducts

4    business in this District.

5         46.    Defendant Academy Securities, Inc. ("Academy") was an underwriter of the

6    Company's IPO, serving as a financial advisor for and assisting in the preparation and

7    dissemination of the Company's material inaccurate, misleading, and incomplete Offering

8    Documents.  Academy participated in conducting and promoting the roadshow for the IPO and

9    paying for the expenses of the Individual Defendants who participated in the roadshow, including

10   lodging and travel, among other expenses.  Academy's participation in and its solicitation of offers

11   in connection with the IPO was motivated by its financial interests.  Defendant Academy conducts

12   business in this District.

13        47.    Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the

14   Company's IPO, serving as a financial advisor for and assisting in the preparation and

15   dissemination of the Company's material inaccurate, misleading, and incomplete Offering

16   Documents.  Loop Capital participated in conducting and promoting the roadshow for the IPO and

17   paying for the expenses of the Individual Defendants who participated in the roadshow, including

18   lodging and travel, among other expenses.  Loop Capital's participation in and its solicitation of

19   offers in connection with the IPO was motivated by its financial interests.  Defendant Loop Capital

20   conducts business in this District.

21        48.    Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter

22   of the Company's IPO, serving as a financial advisor for and assisting in the preparation and

23   dissemination of the Company's material inaccurate, misleading, and incomplete Offering

24   Documents.  Ramirez participated in conducting and promoting the roadshow for the IPO and

25   paying for the expenses of the Individual Defendants who participated in the roadshow, including

26   lodging and travel, among other expenses.  Ramirez's participation in and its solicitation of offers

27

28

in connection with the IPO was motivated by its financial interests.  Defendant Ramirez conducts business in this District.

49.    Defendant Siebert Williams Shank & Co., LLC ("Siebert") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Siebert participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Siebert's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Siebert conducts business in this District.

50.    Defendants listed in ¶¶32-49 are collectively referred to herein as the "Underwriter Defendants."

51.    Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  In addition, although not an element of Lead Plaintiffs' claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.  Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

52.    Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities.  As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

53.    As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or

1  omitted to disclose material information required to be disclosed under the federal securities laws

2  and applicable regulations promulgated thereunder.

3      54.    Representatives of the Underwriter Defendants also assisted Robinhood and the

4  Individual Defendants in planning the IPO.  They further purported to conduct an adequate and

5  reasonable investigation into the business, operations, products, and plans of the Company, an

6  undertaking known as a "due diligence" investigation.  During the course of their "due diligence,"

7  the Underwriter Defendants had continual access to confidential corporate information concerning

8  the Company's business, financial condition, products, plans, and prospects.

9      55.    In addition to having access to internal corporate documents, the Underwriter

10  Defendants and/or their agents, including their counsel, had access to Robinhood's management,

11  directors, and lawyers to determine:  (i) the strategy to best accomplish the IPO; (ii) the terms of

12  the IPO, including the price at which Robinhood's common stock would be sold; (iii) the language

13  to be used in the Offering Documents; (iv) what disclosures about Robinhood would be made in

14  the Offering Documents; and (v) what responses would be made to the SEC in connection with its

15  review of the Offering Documents.  As a result of those constant contacts and communications

16  between the Underwriter Defendants' representatives and Robinhood's management, directors,

17  and lawyers, at a minimum, the Underwriter Defendants should have known of Robinhood's

18  undisclosed then-existing problems and plans, and the Offering Documents' materially inaccurate,

19  misleading, and incomplete statements and omissions, as detailed herein.

20      56.    The Underwriter Defendants also demanded and obtained an agreement from

21  Robinhood under which Robinhood agreed to indemnify and hold the Underwriter Defendants

22  harmless from any liability under the Securities Act.

23      57.    The Underwriter Defendants caused the Registration Statement to be filed with the

24  SEC and declared effective in connection with the IPO, so that they, and the Individual Defendants,

25  could offer to sell, and sell, Robinhood shares to Lead Plaintiffs and other members of the Class

26  pursuant (or traceable) to the Offering Documents.

27

28

# BACKGROUND

A.     **Robinhood Promoted Itself as the Innovative, Safety-First, Customer-Centric, Brokerage Platform for the Retail Investor**

58.     Robinhood is an online brokerage firm founded in 2013.  Robinhood markets itself almost exclusively to retail investors, many of whom are first-time traders.  Robinhood offers these individuals the ability to invest in stocks and exchange-traded funds, as well as more risky and complex products like cryptocurrencies, options and margin trading, both online and through a mobile application.

59.     Robinhood's customers engage with the financial markets through an application and user interface that are intentionally designed by the Company to be both appealing and easy to understand.  The Company's investing interface provides customers with trading functionality and market information such as historical prices, valuation multiples, recent news, analyst ratings, and more.   The Robinhood application also enables:   (i) fractional share trading, allowing customers to invest in fractions of a share of stock, rather than requiring them to buy and sell whole shares; (ii) recurring investments, giving customers the ability to automatically buy shares of equities and certain ETFs on a set schedule; and (iii) IPO access, affording customers the ability to buy shares in participating IPOs at the IPO price and before trading begins on public exchanges.

60.     For customers interested in accessing more premium features, Robinhood offers a monthly subscription service called "Robinhood Gold."  With this program, after the initial 30-day free trial, customers pay a flat monthly rate to be able to immediately access:  (i) up to $50,000 depending on a user's brokerage account balance and status (*i.e.*, Robinhood will not require Gold members to wait up to five days for their funds to settle before allowing them to trade); (ii) in-depth stock research reports on approximately 1,000 stocks through Morningstar; (iii) Nasdaq Level II market data that shows greater depth of orders for any given stock or option; and (iv) upon meeting certain eligibility criteria set by Robinhood, margin investing, which provides subscribers the ability to borrow a specific amount of funds to use as additional investing capital.

61.    Finally, Robinhood offers a variety of educational tools and resources that are marketed as aids to customers to achieve their financial goals, including: "Robinhood Snacks," a curated digest of top business news and stories; "Robinhood Learn," a collection of over 650 articles designed to provide everyone with access to a breadth of financial education; "Newsfeeds," a facility that aggregates and presents news from financial and business websites and/or publications; and "Robinhood Lists," a utility that affords customers the ability to monitor specific securities, ETFs or cryptocurrencies.

**B.    Robinhood Primarily Earns Revenue by Routing Customer Transactions to Market Makers in Exchange for Payments, a Process Known as "Pay for Order Flow"**

62.    Unlike many traditional brokers, Robinhood does not charge customers a fee for executing a trade.  Rather, Robinhood is a commission-free broker that earns its revenue through a process known as "payment for order flow" ("PFOF").  PFOF is a process in which market makers or exchanges pay broker-dealers such as Robinhood to route trades to the market maker or the exchange for execution.

63.    For example, once a trade is placed on Robinhood's application, the customer's cash and securities are custodied by Robinhood Financials' clearing brokers, Robinhood Securities, which services the customers' account by executing, clearing, and settling the customer's trade.

64.    In order to execute the trade, Robinhood Securities typically routes the trade to a market maker, such as Citadel Securities ("Citadel").  Market makers pay or provide rebates to Robinhood in exchange for Robinhood routing its customers trades to them, hence "payment for order flow."

65.    As a market maker, Citadel's job, for example, is to provide bid prices (*i.e.*, the price investors are willing to purchase at) and ask prices (*i.e.*, the price investors are willing to sell at) for the securities.  The difference between the two is known as the "spread."

66.    Market makers maintain an inventory of securities from their own trading and matches incoming buy and sell orders in order to fill those orders.  Once an order is filled, the spread is pocketed by the market maker as a profit.

67.    Market makers may also execute an order routed to it by Robinhood by taking the other side of the transaction, a process known as "internalization."  For example, if Citadel receives an order to buy certain security, it may route that order to an exchange or it may execute the order in its capacity as a dealer by transacting against the buy order with contra-side sell orders, either from its own inventory or by selling the security "short."

68.    Once the trade is executed, Robinhood relays the trade information to the Depository Trust & Clearing Corporation's (DTCC) affiliated clearinghouse entity, the NSCC for clearinghouse and settling services.  Trades do not settle instantaneously.  Rather, trades submitted to the NSCC settle at the end of the second business day after submission, in what is known as T+2 settlement.  This means that when a trade is executed on a Monday, the cash and the securities related to that trade are electronically transferred on Wednesday.

69.    PFOF comprises the majority of Robinhood's revenue.  For example, for 2020, revenue derived from PFOF (and Transaction Rebates, which are paid to Robinhood in exchange for flowing its customers' cryptocurrency trades) represented 75% of the Company's total revenues, or approximately $719 million.

70.    PFOF has been highly criticized by the United States Securities and Exchange Commission because it creates a potential conflict of interest in that brokers are incentivized to sell flow to market makers who pay more even if those market makers have worse spreads.  For example, SEC Commissioner Gary Gensler has stated PFOF "provides an opportunity for the market maker to make more, and for ultimately the investing public to get a little less when they sell, or have to pay more when they buy," adding further, "I think it also affects companies raising money," because it could be a barrier to "fair, orderly and efficient markets."  In earlier speeches, Gensler even called out Robinhood directly for having "explicitly offered to accept less price

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

1  improvement for its customers in exchange for receiving higher payment for order flow for itself.

2  As a result, many Robinhood customers shouldered the costs of inferior executions."[1]

3      71.    In December 2020, the SEC charged Robinhood for repeated misstatements that

4  failed to disclose the firm's receipt of payments from trading firms for routing customer orders to

5  them, and with failing to satisfy its duty to seek the best reasonably available terms to execute its

6  customer orders.

7      72.    As a registered broker-dealer, Robinhood is required under SEC and Financial

8  Industry Regulatory Authority ("FINRA") regulations to obtain the best reasonably available terms

9  for customer orders.  In part, this requires Robinhood to use reasonable diligence so that the price

10  to the customer is as favorable as possible under prevailing market conditions, taking into account,

11  among other things, the character of the market for the security, the size and type of the transaction,

12  the number of markets checked, accessibility of quotations and the terms and conditions of the

13  order as communicated by the broker-dealer's customer.

14      73.    Although Robinhood is not required to examine every customer order individually

15  for compliance with its duty of best execution, it must undertake regular and rigorous reviews of

16  the quality of its customer order executions.  *See Payment for Order Flow*, Securities and

17  Exchange Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed. Reg. 55006,

18  at 55009 (Oct. 27, 1994).

19      74.    Despite not admitting to any wrongdoing, Robinhood agreed to pay $65 million to

20  settle the SEC's charges.  Additionally, in June 2021, FINRA extracted a nearly $70 million

21  penalty from Robinhood for a sweeping set of allegations, including misleading investors about

22  trading with borrowed money and lacking sufficient controls in its technology and options trading

23  approval process.

24  **C.**    **The Security and Reliability of Robinhood's Platform Is Critical**

25      75.    Robinhood has experienced significant platform failures due, in large part, to its

26  lack of sufficient infrastructure.  From January 1, 2020 through November 30, 2020, Robinhood

27  _____

28  [1]    Testimony of SEC Chairman Gensler before the House Committee on Financial Services May 6, 2021.

1   experienced as many as 70 outages or disruptions on its trading platform, with six occurring in

2   April 2020, 15 occurring in June 2020, and seven occurring in August 2020.

3       76.     One of the most notable outages occurred March 2, 2020 and March 3, 2020.  On

4   March 2, 2020, the Dow Jones Industrial Average experienced what was at the time the largest

5   point gain in its history.  Robinhood's trading platform collapsed at market open on March 2, 2020,

6   leaving its millions of customers unable to benefit from the historic market gains.  The collapsed

7   platform remained inoperative for the entire day and part of the next day, March 3, 2020.

8       77.     On March 9, 2020, in the midst of a stock market plunge, Robinhood experienced

9   another outage on its trading platform that prevented customers from making trades in their

10  accounts for a portion of that day.

11      78.     To make matters worse, during these outages, Robinhood's help center either shut

12  down, or otherwise failed to properly serve its customers and address their concerns.

13      79.     Unfortunately, these service outages continued to plague the Company in 2021,

14  with Robinhood, for example, experiencing partial service outages and further degrading service

15  in mid-April 2021 and again in early May 2021, in both instances resulting from surging customer

16  demand for cryptocurrency trading.

17      **D.     Robinhood's Key Performance Metrics**

18      80.     In addition to revenue and profits, Robinhood uses (and directs the market's

19  attention to) certain "Key Performance Indicators" to evaluate its business, identify trends

20  affecting the business, formulate business plans and make strategic decisions.  These KPIs are

21  "Monthly Active Users (MAU)," "Assets Under Custody (AUC)," "Average Revenues Per User

22  (ARPU)," and "Net Cumulative Funded Accounts ("NCFA")"

23      81.     Robinhood defines "MAU" as the number of Monthly Active Users during a

24  specified calendar month.  A "Monthly Active User" is a unique user who makes a transaction,

25  transitions between two different screens on a mobile device while logged into their account, or

26  who loads a page in a web browser, at any point during the relevant month.  A user need not satisfy

27  these conditions on a monthly or recurring basis or have a Funded Account to be included in MAU.

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

82.     Robinhood utilizes MAU to measure how many customers interact with its products and services during a given month.  MAU does not measure the frequency or duration of the interaction, but Robinhood considers it a useful indicator for engagement.  Additionally, MAUs are positively correlated with the performance of revenue and other key performance indicators.

83.     Robinhood defines "AUC" as the sum of the fair value of all equities, options, cryptocurrency and cash held by users in their accounts, net of customer margin balances, as of a stated date or period end on a trade date basis.

84.     Robinhood defines "ARPU" as total revenue for a given period (or, in the case of ARPU for a given cohort, total revenue generated by that cohort during a given year or period) divided by the average of Net Cumulative Funded Accounts (or, in the case of ARPU for a given cohort, the Net Cumulative Funded Accounts included in that cohort) as of the last day of that period and as of the last day of the immediately preceding period.  In the case of ARPU for a three-month period, this figure is multiplied by four to annualize the figure for comparability.

85.     And, finally, Robinhood defines "Net Cumulative Funded Accounts" as the total of Net Funded Accounts from inception to a stated date or period end.  "Net Funded Accounts" is the total number of Funded Accounts for a stated period, excluding "churned users" and including "resurrected users" as of the end of that period.  A "Funded Account" is a Robinhood account into which the account user makes an initial deposit or money transfer of any amount during the relevant period, which account is designed to provide a customer with access to any and all of the products offered on Robinhood's platform.

86.     Robinhood's ability to track these metrics is in real-time or nearly so.  In that regard, the Offering Documents state that Robinhood tracks "certain operational metrics using internal company data gathered on an analytics platform that we developed and operate, including metrics such as MAU, AUC and Net Cumulative Funded Accounts."  The Offering Documents further state that Robinhood has focused on developing the "real-time" capabilities of its technology systems.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

87.     The confidential witnesses corroborate that Robinhood's ability to analyze its performance data was instantaneous or nearly so.  For example, Confidential Witness #1 ("CW1") worked in reviewing customer analytics at Robinhood from 2018 to late 2021.  CW1 observed that Robinhood used Looker, a data platform, to track its performance data and create performance data dashboards.  Looker advertises itself as a platform that allows "for real-time dashboards for in-depth, consistent analysis."[2]  CW1 had access to some of Robinhood's Looker dashboards, including those that displayed Robinhood's MAU, customer attrition, net new customer and funded account metrics.  Moreover, CW1 as well as Confidential Witness #2 ("CW2"), a trading specialist who worked at the Company from late 2020 to August 2021, both observed that MAU and other corporate metrics were discussed by Robinhood's top officers, including Defendants Tenev and Bhatt, at weekly all-hands meetings.

### E.     Robinhood's July 30, 2021 IPO

88.     On July 1, 2021, Robinhood filed with the SEC a draft registration statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments.

89.     On July 25, 2021, Robinhood filed its final amendment to the Registration Statement, which registered 60.5 million Robinhood shares for public sale, including 5.5 million shares that the Underwriter Defendants had the option to purchase, solely to cover over-allotments.

90.     The SEC declared the Registration Statement effective on July 28, 2021.

91.     On July 30, 2021, Defendants priced the IPO at $38 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

### ADVERSE FACTS THAT EXISTED AT THE TIME OF THE IPO THAT WERE NOT DISCLOSED IN THE OFFERING DOCUMENTS

92.     Robinhood's claim to be executing a ground-breaking new strategy to grow its business by bringing in new investors was false and misleading in two respects.  **First**, Robinhood was not following its stated strategy.  Robinhood was not trying to build a secure and robust

---

[2]     www.looker.com.

platform and was not trying to cater to the needs and concerns of small investors.  Rather, as detailed by Robinhood's former employees and contractors, Robinhood was operating without sufficient internal controls in many important respects, including as to fraud prevention. Robinhood also treated its customers as a commodity to be ground down and exposed to massive costs and risk in the quest for Robinhood's short term gain.  In the run-up to the IPO, Robinhood's customers responded to these tactics with a torrent of negative feedback, attrition, and a decline in the number of customers willing to recommend Robinhood to others, a key marketing metric for Robinhood.

93.    **Second**, Robinhood failed to disclose a massive amount of hard data showing that the Company's strategy was not working.  For months ahead of the IPO, Defendants possessed data showing that Robinhood's MAU, crypto total trading volumes, ARPU, and AUC, were all sharply declining, undermining many statements made in the Offering Documents and confirming that Robinhood's "innovative," "revolutionary" business strategy was (to the extent it was even being executed) not working.

94.    Many former Robinhood employees witnessed Robinhood's divergence from its stated strategy.  Confidential Witness #3 ("CW3") was a contract fraud analyst who worked at Robinhood from mid-2020 through July 2021.  CW3 observed the operations of the Robinhood fraud department during two weekly meetings, one attended by the entire department, and one attended by a smaller group.  CW3 reported that Robinhood's fraud department was "extremely poorly managed, not sophisticated" and that there was a "ridiculous backlog" during CW3's "whole tenure."

95.    One area CW3 was working on was ACH fraud, which involves funds being withdrawn from a customer account without authorization, for example, when someone other than the authorized user takes over or compromises a customer account.  The perpetrators of such activity are usually hackers.

96.    CW3 observed that there was no automated surveillance system in place that flagged signs of fraudulent activity in customer accounts.  Moreover, Robinhood did not make it

1    easy to resolve fraud.  If a hacker gained access to an account and performed unauthorized trades,

2    the account owner could not access their account and withdraw the remaining funds in order to

3    protect themselves.  Rather, in order for Robinhood to make the customer whole, the customer

4    would have to later redeposit the funds in an account; at that point, Robinhood would reverse the

5    trades.

6          97.    Robinhood also made it "hard to close accounts," even where suspicious activity

7    was occurring.  The policy was that an account would only be closed if there was "conclusive

8    evidence" of fraud.

9          98.    CW3 witnessed a surge of fraud activity beginning in the Christmas 2020 through

10   January 2021 timeframe that reached overwhelming levels.  CW3 raised with the manager of ACH

11   fraud that the Company should try to streamline the identification of fraudulent ACH incidents,

12   but CW3's manager was not interested in the idea.  CW3 offered to design a system to automate

13   ACH-fraud identification but was told that "software engineers are expensive."   CW3 also

14   observed that "there were concerns that safeguards would ruin the streamlined experience of the

15   app."  The whole idea of Robinhood was to make it easy and fast for retail investors to trade.

16   Robinhood's managers discouraged CW3 from discussing ways to "stop" or "slow [ ] down" fraud

17   on the Company's platform.

18         99.    Confidential Witness #4 ("CW4") was a contract fraud analyst at Robinhood from

19   mid-2020 to August 2021.  Over the course of that period, CW4 observed that the pressures placed

20   upon fraud analysts expended exponentially, leading to significant frustration among employees.

21   CW4 reviewed customer accounts that were displaying signs of potentially fraudulent activity.

22   The accounts were escalated to the fraud department via the internal CRX department.  CW4

23   observed that the CRX department was unable to do its job of parsing through the accounts and

24   ended up escalating everything to the fraud department.  Part of the reason for the CRX

25   department's failure was that they were overwhelmed themselves, a common complaint among

26   Robinhood employees.  CW4 explained that the Company tended to add responsibilities to already

27   overloaded employees instead of taking the time to establish protocols or creating new roles.

28

100.    The fraud department met weekly as a whole.  In the months prior to the IPO, the meetings were attended by the Vice President of Operations.  CW4 witnessed in the months leading up to the IPO an extreme backlog of reviews.  CW4 witnessed fraud trends with Robinhood debit cards and service disruptions.  These led to customer losses.

101.    CW4 observed that Robinhood did not have any protocols in place to deal with the rising inflow of fraud reviews.  CW4 observed that there were barely any established protocols regarding fraud protection, let alone rules to help further the process of examining potential fraud.

102.    In CW4's view, Robinhood perceived fraud reviews as "minor" and was much more concerned with driving revenue.  CW4 recalled that, as a result of the backlog, he worked on fraud reviews that were 30 days old, which he remembered was well after the federally mandated time period for conducting a fraud assessment.  In the months before the IPO, Robinhood's review backlog began to increase due to third-party access disruptions.  Robinhood accounts were being accessed by third parties at increasing rates, which in turn raised the number of fraud reviews.

103.    Aside from the backlogs, Robinhood customers experienced several disruptions to the platform.  After customers complained that their accounts were frozen or disrupted, those complaints would go to the fraud department for analysis.  CW4 recalled how frustrated customers were at how slow the process was for Robinhood to respond to them.

104.    CW4 also recalled that a concerning number of customers asked for their accounts to be closed due to the combination of the foregoing issues, including the disruptions and backlog.  In the November 2020 through January 2021 time period, management commented on the customer losses during weekly fraud department meetings.

105.    Robinhood also put its revenue needs ahead of the well-being of its customers.  CW1 recalls that he repeatedly asked Robinhood's C-Suite, including Defendants Tenev and Bhatt, to implement protocol changes that would educate Robinhood customers to the benefits of long-term trading, but was shut down by upper management and "actively disincentivized" from working towards this goal.  CW1, who worked with Robinhood customer data to analyze behavior, recalled that Robinhood permitted investors to access advanced trading methods even when the

1    Company's internal data showed that customers were not capable of comprehending those trading

2    methods.  For example, the Company studied margin trading in early 2020.  Robinhood granted

3    customers, even novice ones, access to margin trading.  To assess the capabilities of its customers,

4    Robinhood sent a survey to customers asking basic questions about margin trading.  The data

5    showed that customers with access to margin trading answered correctly at a rate "worse than

6    chance."  Given the risk entailed in margin trading, CW1 recommended installing more barriers

7    to entry for complex trading or lowering the interest rates for customers borrowing on margin.

8    CW1 discussed the results of this analysis with Defendants Tenev and Bhatt.

9        106.    CW1 pointed out other ways that Robinhood's platform selectively presented

10   information to customers to affect their decision-making process.  By presenting customers with

11   certain types of information in their home screen, Robinhood made it more likely that investors

12   would use that specific information to make decisions.  CW1 pointed out that Robinhood's home

13   screen displayed each customer's results for that day.  The one-day view was a very short time-

14   horizon that encouraged customers to trade based on that information.  There was even a blinking

15   dot that flashed every second, updating and displaying portfolio differences as minor as one cent.

16   This encouraged customers to trade frequently and created a sense of urgency.  CW1 raised these

17   concerns to management to no avail.

18       107.    CW1 took part in monthly management meetings attended by all members of the

19   C-Suite and other managers, including all who were director level and above.  Defendants Tenev

20   and Bhatt attended these meetings.  The meetings covered many topics, including Robinhood's

21   Net Promoter Score ("NPS").  The NPS represented how likely Robinhood customers were to

22   recommend the product to others and was seen as an important metric.  It was measured by

23   subtracting the percentage of customers that would not recommend Robinhood from the

24   percentage of customers that would.  This data was collected in surveys sent out to Robinhood

25   users.  In the months prior to the IPO, Robinhood's NPS suffered, as with other growth metrics.

26       108.    CW1 observed that MAU data was frequently reviewed in these meetings.  The

27   metric was also discussed in weekly all-hands meetings.  CW1 witnessed that MAU declined in

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

1  the months leading up to the IPO. Defendants Tenev and Bhatt presented the data and

2  acknowledged the declining metric.

3      109. CW1 also recalls that other features of Robinhood's app were discussed during

4  monthly meetings. For example, the behavioral department's analysis of the so-called "blinking

5  dot" was presented at a meeting attended by Defendants Tenev and Bhatt. It was explained that

6  the analysis showed that the dot increased user trading activity. CW1 suggested that the dot should

7  be removed, but Robinhood executives opted to keep the feature.

8      110. CW1 also recalls discussing with executives that Robinhood customers had a

9  terrible rate of return. CW1 was informed that for 2020, Robinhood customers had an average rate

10  of return of -9%. That was dismal compared to the S&P average for the year.[3] CW1 raised this

11  in a monthly meeting and was told that he was not to bring it up again, and that no one cared.

12      111. In mid-2020, CW1 met with members of Robinhood's C-Suite to discuss the

13  concerning trends and topics CW1 had uncovered in CW1's research. CW1 advised Robinhood's

14  C-Suite that encouraging long-term investing would be a better strategy for Robinhood because it

15  would increase its customer's returns, encouraging them to stay with the Company and bring other

16  investors to the Company. Defendant Bhatt said he would think about the proposal but did not

17  follow up. CW1 recalls that Robinhood's CFO, Defendant Warnick, challenged the notion that

18  Robinhood was focused only on short term revenue. When CW1 asked for evidence supporting

19  Defendant Warnick's claim, Defendant Warnick "threw a fit" and gave a sweeping "libertarian

20  talk" about how he did not want to restrict customers' choices.

21      112. The work of Robinhood's researchers did not seem important to Robinhood's C-

22  Suite. Whenever the behavioral research was published to the C-Suite, they invariably focused on

23  whether a particular change would increase the amount of trading engaged in by investors on the

24  platform, and thereby affect revenue.

25      113. As part of CW1's research, he sent questionnaires to customers regarding security.

26  The responses were always "really bad." Customers were aware of the pre-IPO security hacks and

27

28  [3]    The S&P returned 16.26% in 2020.

breaches and knew it continued to be a problem after the IPO. As a direct result of this knowledge, Robinhood's NPS decreased significantly. Sometime around February 2021, Robinhood hired a "red hat" team whose job was to try and hack into Robinhood's platform to expose weaknesses. The red hat team was successful.

114. CW2 stated that in her experience, Robinhood was a "reckless" company that "targets naïve traders." CW2 was an options trading specialist whose job was to answer customer complaints, concerns, or questions pertaining to options trades. Options trading involves complexities that stock and bond trading do not.

115. But Robinhood made it very easy for customers to access options trades. As CW1 points out, options trading was Robinhood's most profitable area. Per CW2, customers simply had to answer a trading quiz to gain access. There were no controls if a customer lied or exaggerated his or her trading ability. A customer could also override the quiz by calling a customer representative, even if the customer had given a "red flag" answer in the quiz that raised concerns about the customer's trading knowledge.

116. It was "very easy" for customers to get in trouble. CW2 often dealt with "disaster cases" resulting from novice traders having the highest level of trading access. Two or three times a week, CW2 dealt with really bad situations where a Robinhood customer was in serious peril. For example, CW2 assisted a customer who had entered into a naked short sale, which is extremely risky. In a typical short sale, an investor sells short, borrowed shares of a stock. In a naked short sale, the shares are not confirmed to exist, and the investor sells short shares that he does not possess. The customer in question owed somewhere between $30,000 and $40,000.

117. Customer frustration with their losses drove attrition at Robinhood. In the months before the IPO, CW2 noticed that the cancellation requests increased.

118. CW2 attended weekly all-hands meetings with Defendants Tenev and Bhatt present. During these meetings, employees were often shown recent analyses of the Company's performance trends, including as to MAU, new customer sign-ups, customer attrition and customer complaints.

119.    CW2 recalls looking at these numbers between January 2021 and July 2021 in particular.  CW2 recalls this time period specifically because it was bookmarked by the "GameStop incident" and the IPO.  During this period, CW2 recalls that there was a decrease in new customers and that attrition increased.  Customer complaints also increased.  Defendants Tenev and Bhatt acknowledged these issues but said that Robinhood "had plenty of money" and the numbers were "nobody's fault."  CW2 recalls that the decrease in new customers and increase in attrition was "a lot."

120.    CW2 also recalls that during weekly all-hands meetings, employees submitted questions to Defendants Tenev and Bhatt about Robinhood's incentives to engage in risky trading, but that Defendants Tenev and Bhatt ignored these questions.

121.    Confidential Witness #5 ("CW5") worked on the customer experience team from mid-2020 to early 2022.  During this time, Robinhood operated with a lack of sufficient infrastructure.  In mid-2020, for example, Robinhood did not have an operable phone system for customers to call.  Instead, Robinhood had an email system that served as the sole form of communication with customers.

122.    Also, in late November 2020, there was a "mini firestorm" at Robinhood related to "B Notices."  CW5 explained that B Notices were tax notices that customers had to respond to.  Despite knowing that customers had to respond, Robinhood was not prepared to assist customers leading to lengthy ques of tens of thousands of customer inquiries.  The experience underlined for CW5 that Robinhood was not capable of operating at scale.

123.    CW1 likewise observed that Robinhood had serious training problems.  Customer service training was much less in depth, for example, then at competitors such as Charles Schwab.  Robinhood only put customer representatives through basic training and did not have any dedicated teams (except for a white glove team that handled cases where there was a threatened lawsuit).

124.    Representatives often struggled to deal with complicated questions from investors, making them less productive and leading to both a backlog of, and untimely responses to,

1    complaints.  CW5 raised these concerns to CW5's manager multiple times but was ignored.  CW5

2    recalls that customers were irate with how long their complaints and questions took to process.

3         125.    The training issues were never ratified.  When a customer was not satisfied with a

4    scripted answer provided by a representative, the customer was escalated to CW5.  These

5    customers were often irate and asked for their accounts to be closed.  These cancellations were

6    occurring in the lead up to the IPO and CW5 raised them repeatedly in management meetings.

7    Despite the attention provided by CW5, the Company provided no meaningful response.

8         126.    In the aftermath of the GameStop incident in January 2021, during which

9    Robinhood suspended trading of GameStop shares, Robinhood experienced a surge of customer

10   cancellations.  Prior to GameStop, attrition was not a substantial problem.  Afterwards, there was

11   a "huge uptick."  The cancellations continued at an elevated level throughout 2021 and into 2022.

12        127.    Again, CW5 attended weekly all-hands meetings where Defendants Tenev and

13   Bhatt were present.  CW5 recalls that during one meeting, an employee asked if new customer

14   requests could be put on hold for a time until employees could catch up and felt ready to take them

15   on.  The question was "up voted" but ultimately turned down and not answered by either Defendant

16   Tenev or Defendant Bhatt.

17        128.    Just as importantly, at the time of the IPO, Robinhood's rapacious, short-sighted

18   tactics were failing miserably.  As the Company recently admitted, at the time of the IPO,

19   Robinhood's performance metrics and revenue had been cratering for months, directly

20   contradicting the Offering Documents' claims of growth and a successful business strategy.

21        129.    For example, as was later revealed, Robinhood was witnessing a negative trend in

22   its MAU in the lead up to the IPO.  Specifically, Robinhood's MAU, which is used by the

23   Company to measure "engagement" as it reflects the number of unique users who make a

24   transaction, transition between two different screens on a mobile device, or load a page in a web

25   browser while logged into their account, ***was declining precipitously and substantially between***

26   ***May 2021 and July 2021***, as illustrated by the chart below:

27

28



130.    The percentage declines were considerable with Robinhood observing a nearly ***11.62% decline and an additional 8.45% decline*** between May 2021 and June 2021 and June 2021 and July 2021, respectively.  Robinhood lost 4.6 million users.  This loss was highly material to investors because it showed that Robinhood was not bringing in droves of new customers by "democratizing" investing.   Quite the opposite, investors were leaving Robinhood in large numbers, calling into question Robinhood's strategy and future.

131.    Similarly, Robinhood's total crypto trading volume ***absolutely cratered*** between May 2021 and June 2021, before declining even further in July 2021, the month Robinhood went public, as illustrated in the graph below:



32

132.    Specifically, between May 2021 and June 2021, Robinhood **lost $97B** worth of crypto trading volume, representing a ***decline of over 76%*** in this 30-day period.  To make matters worse, Robinhood then lost an additional ***$17B*** in crypto trading volume between June 2021 and July 2021, representing a ***56.67% decline*** from its already depleted June 2021 figure.  In all, between May 2021 and July 2021, Robinhood **lost $114B** in crypto trading volume.

133.    As explained above, Robinhood makes its money by selling order flow to market makers.  Consequently, the revenues Robinhood earned from selling its crypto customers' trades to market makers for execution, *i.e.*, payment for order flow in the form of Transaction Rebates, hemorrhaged at the time of the IPO.  This was particularly significant because crypto revenue made an outsized contribution to Robinhood's bottom line in 2Q21, accounting for approximately $320.7 million of the approximately $871.6 million Robinhood generated in total transaction-based revenues for the period.  As a percentage of total net revenues, this amount represented 30%.

134.    Further, the Company's ARPU was steeply declining during the three months between March and July 2021, falling from $137 at its peak to somewhere between $111.70 and $65[4] by the time of the Offering, as illustrated below:



---

[4]     Robinhood's ARPU for the 3Q21 was $65.  Though Robinhood does not provide its ARPU monthly, by the time of the IPO, the Company had already experienced the disastrous June and July trading months, causing Robinhood's ARPU to decline even more.

135.     In addition, the sum of fair value of all equities, options, cryptocurrency and cash held by users in their accounts (net of receivables), or AUC, was also trending down from April 2021 through July 2021, as illustrated by the graph below:



136.     But for the one-time bump Robinhood experienced in June 2021, which the Company said "exceptionally strong interest in trading, particularly in cryptocurrencies" drove, Robinhood's AUC was deteriorating, falling from $98.9 billion in April 2021, to $98.5 billion in May 2021, to $94.7 billion in July 2021 when the Company went public.

137.     According to Defendants, AUC is correlated to revenue and is also affected by customer engagement with the Robinhood platform.  Therefore, this negative trend in AUC, as well as the nearly 4.25% overall decline observed, which Robinhood was tracking in the lead up to the IPO, suggests that Robinhood's business strategy was failing as it was going public.

138.     Finally, Robinhood's customer base and usage, as measured by "net cumulative funded accounts," remained almost flat throughout May, June, and July 2021:

1
2
3
4
5
6
7
8



**2021 MONTHLY NET CUMULATIVE FUNDED ACCOUNTS (NCFA) (IN MILLIONS)**

9       139.    These numbers showed that Robinhood's "innovative" and "revolutionary"

10   business strategy, which at the time of the IPO supposedly drove (and was continuing to drive)

11   people to the platform and which set Robinhood up to "serve an increasing portion of the

12   population and the broader financial services ecosystem," was, in fact, not working.

13                **THE MATERIALLY FALSE AND MISLEADING OFFERING DOCUMENTS**

14       140.    The Offering Documents used to effectuate Robinhood's IPO, as well as the road

15   show talking points and script used in conjunction with presenting the road show PowerPoint

16   presentation for the IPO, contained materially untrue or misleading statements of material facts

17   and/or omitted to state various facts necessary to make the statements made therein not materially

18   misleading or incomplete in violation of the Securities Act.    The Offering Documents told

19   investors that Robinhood has a visionary strategy that it was successfully executing to achieve

20   ongoing growth.  The truth was that Robinhood was not even trying to execute much of its strategy

21   and for months prior to the IPO, Robinhood's business strategy – such as it was – was undeniably

22   failing as evidenced by the sharp decline in Robinhood's KPIs and revenue.

23       141.    According to the Offering Documents, Robinhood's "***new way*** for people to

24   interact with the financial system," started with "***a revolutionary, bold brand and design***" which,

25   at the time of the IPO, made "investing approachable for millions."  It also purportedly resulted in

26   Robinhood transforming the financial industry forever and positioned Robinhood for continued

27   growth:

28

*We* built a market-leading financial technology platform with an intuitive customer interface that has ***changed the landscape of retail investing***.   While we have already achieved significant growth, we believe ***we are well-positioned to serve an increasing portion of the population*** and the broader financial services ecosystem.

*Id.*  [Emphasis added.]

142.    Robinhood's strategy purportedly put customers' long-term interest first, ahead of short-term revenue:

We will continue to make bold multi-year investments when we believe they will lead to the opportunity to deliver lower prices and a 10x better experience.   At times, we may sacrifice short-term profitability, but we'll never sacrifice what's in our customers' long-term best interest in order to "make our quarter."  *Id.*

143.    Robinhood's strategy also was supposedly, "***empowering*** a new generation of financial consumers," all of whom Robinhood made certain commitments to, such as "***maintain[ing] strong relationships with our loyal customer base and earning customers' trust when they choose our platform on their financial journey***," "***keeping our customers' accounts safe . . . promis[ing] to reimburse direct losses that happen due to unauthorized activity***," and "***helping our customers build sustainable, long-term financial success***." *Id.*  [Emphasis added.]

144.    Robinhood's purported focus on customers and customer-safety also supposedly set it up well for continued and long-lasting success:

By taking ***a fresh, people-centric approach and creating a delightful, engaging customer experience***, we believe we have built a trusted, category-defining brand that has made investing socially relevant for the next generation.

The excitement around Robinhood demonstrates how our ***innovative*** approach to financial products ***has built deep, loyal customer relationships*** and positioned us well to continue attracting new people to our platform, and sharing new product experiences with our customers.

***Our people-centric approach has driven customer enthusiasm and engagement, resulting in rapid adoption of our products***.  We designed our platform to provide our customers with relevant, accessible information when they need it most.  Being an investor involves following a regular cycle of events – news releases, earnings announcements, transaction executions – that creates a regular cadence of content and information.   We use our platform, from push notifications to widgets, to provide seamless customized updates to our customers.  This ***engenders trust, creates enduring long-term relationships and has resonated with our customers***.

*Id.*  [Emphasis added.]

145.    The Offering Documents continued, in pertinent part:

*Robinhood is a safety-first company*.    This starts with *the reliability of our platform, which is of paramount importance*.

We've had our growing pains as we've navigated the acceleration of our business at scale, and *over the last 3 years we've made wholesale changes to our infrastructure to add redundancy and capacity* and to make it easier for our engineers to test and release product updates.    *As a result of these investments, we believe we are prepared to handle over 30x the volumes that we struggled with back in 2020, and we systematically prepare for 3x the highest load we've seen in the past, so that we're there when our customers need us most*.

We also understand that sometimes customers will have questions or encounter unexpected issues.    *For that, we've increased and accelerated our investments in customer support*.    We've rolled out live phone support for the most pressing issues, opened three new service centers, and more than tripled the size of our full-time customer support team in 2020 alone.    We're employing machine learning and natural language processing to improve our triage and routing, and *we're constantly making upstream product improvements to prevent the most acute customer support interactions from happening in the first place*.    You will see us continue to make significant investments to ensure that customers can get support quickly and conveniently when they need it.

Finally, *we provide education and build safeguards into our products so that our customers are in the best position to succeed*. . . .    We will continue to experiment with new content and mediums in an effort to meet you where you are, and *we commit to speaking clearly and transparently* to you.

*Customer feedback is at the heart of product development at Robinhood*. . . . Today, *we continue . . .[to] seek[] customer perspectives to inform our priorities and inspire our innovation*. . . .    Their insights help us focus on what is important and *this approach enables us to expand our offering centered on their needs*. . . . *We have replaced confusing jargon with simplicity and slang.    Our tools are delightful and engaging.*

*Id.*  [Emphasis added.]

146.    The statements identified in paragraphs 141 through 145 above, however, were false and/or materially misleading because, as detailed above, these statements are completely inconsistent with Robinhood's actual policies and procedures.    Robinhood did not put investors' long-term interests first, it prioritized its own short-term interest in revenue by exposing customers to products they were not ready for and rigging the app to encourage trading that was profitable for Robinhood but ruinous for its customer investors.    Robinhood's internal systems were completely inadequate.    The Company's staff was woefully undertrained, unable to respond to customer complaints or questions, or the staggering losses that Robinhood's own practices

1    encouraged.  The Company was not creating long-term relationships built on trust, it was stoking

2    customer rage that was leading to significant attrition, the loss of millions of users and a declining

3    NPS.  The Company was not putting safety first, it allowed fraud to run rampant on the platform

4    and turned a blind eye to the concerns repeatedly raised by the Company's own employees.

5           147.    For these same reasons, the Offering Documents generalized "Risk Factors" were

6    themselves false and misleading, or otherwise wholly inadequate.  For example, the Offering

7    Documents warned that Robinhood's business and reputation ***could*** be negatively affected or

8    damaged from technical failures or interruptions, cybersecurity breaches or attacks, or because of

9    Robinhood's failure to protect personal data, stating in relevant part:

> Our platform has been, and ***may in the future be***, subject to interruption and
> instability due to operational and technological failures, whether internal or
> external.
>
> Our business ***could*** be materially and adversely affected by a cybersecurity breach
> or other attack involving our computer systems or data or those of our customers
> or third-party service providers.
>
> We collect, store, share, disclose, transfer, use and otherwise process customer
> information and other data, including personal data, and ***an actual or perceived
> failure by us or our third-party service providers to protect such information and
> data or respect customers' privacy could*** damage our reputation and brand,
> negatively affect our ability to retain customers and harm our business, financial
> condition, operating results, cash flows and prospects.

*Id.*  [Emphasis added.]

19           148.    Significantly, this discussion above was misleading because these risks had come

20    to fruition for the reasons discussed above.  Robinhood's customer surveys document that the

21    Company's disregard for the safety of its customers was negatively impacting customers'

22    willingness to recommend the Company to others or even keep their accounts open at the time of

23    the IPO.

24           149.    The Offering Documents also misleadingly claimed that as a result of Robinhood's

25    supposedly successful strategy, the Company was experiencing growth:

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18



19    150.    The Offering Documents complement these illustrations with the tables below. The

20 first shows that Robinhood's four KPIs have been increasing yearly since (at least) 2017. The

21 second affirms, according to "***preliminary information currently available to management***," that

22 Robinhood's Net Cumulative Funded Accounts, MAU, and AUC were each ***continuing to***

23 ***increase in the current quarter*** (*i.e.*, the second quarter of 2021):

24

25

26

27

28

| (in millions except for ARPU) | Year or Month Ended December 31, | | | | Three Months or Month Ended March 31, | |
|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2020 | 2021 |
| Net Cumulative Funded Accounts(1) | 1.9 | 3.3 | 5.1 | 12.5 | 7.2 | 18.0 |
| Monthly Active Users (MAU)(2) | 1.8 | 3.3 | 4.3 | 11.7 | 8.6 | 17.7 |

39

| | | | | | | |
|---|---|---|---|---|---|---|
| Assets Under Custody (AUC)(3) | $ 4,505.7 | $ 8,359.5 | $ 14,135.6 | $ 62,978.5 | $ 19,220.1 | $ 80,932.4 |
| Average Revenues Per User (ARPU)(4) | $ 37.0 | $ 66.5 | $ 65.7 | $ 108.9 | $ 82.9 | $ 137.0 |

| | Three Months or Month Ended | |
|---|---|---|
| | June 30, 2020 | June 30, 2021 |
| | Actual | Estimate |
| **Key Performance Metrics** | | |
| Net Cumulative Funded Accounts | 9.8 | 22.5 |
| Monthly Active Users (MAU) | 10.2 | 21.3 |
| Assets Under Custody (AUC) | $ 33,422 | 102,035 |

151.    These illustrations and tables led prospective investors to believe that Robinhood was thriving.  As does the Offering Documents' explanation that Robinhood's preliminary estimates for Net Cumulative Funded Accounts, MAU and AUC *for the current quarter*, of 22.5M, 21.3M, and $102B, respectively, is based on "an increase in new users joining [the] platform, driven by general market interest trading."

152.    Even the Offering Documents' heads-up that the "rate of growth" in these KPIs *will be lower* in the third quarter of 2021 due to the "exceptionally strong interest in trading, particularly in cryptocurrencies, [Robinhood] experienced in the three months ended June 30, 2021," suggests that the KPIs will nonetheless continue to grow.

153.    The statements identified in paragraphs 149 through 152 above, however, were false and/or materially misleading because at the time of the IPO, Robinhood's KPIs had been in sharp decline for months.  Between May 2021 and July 2021, Robinhood lost 4.6 million users. It's MAU declined nearly 11.62% by June 2021 and by another 8.45% by July 2021.  Between May 2021 and July 2021, Robinhood also lost $114B in crypto trading volume.  Its crypto trading volume declined by over 76% by June 2021 and by another 56.67% by July 2021.  And, between May 2021 and July 2021, Robinhood's AUC suffered an overall decline of nearly 4.25%.  In addition, Robinhood's net cumulative funded accounts had completely flatlined while its ARPU declined by at least $25.30.  Thus, Robinhood's KPIs were not growing, they were sharply falling,

a major reversal in trend that called into question Robinhood's strategy, growth, and future as a Company.

154.    For these same reasons, the following generalized "Risk Factor" concerning Robinhood's recent growth and the potential that Robinhood "***may not continue to grow on pace with historical rates***," is itself false and misleading, or otherwise wholly inadequate:

> ***We may not continue to grow on pace with historical rates.***
>
> We have grown rapidly over the last few years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance.  In particular, since March 2020, we have experienced a significant increase in revenue, MAU, AUC and Net Cumulative Funded Accounts.
>
> *        *        *
>
> The circumstances that have accelerated the growth of our business **may** not continue in the future, and we ***expect the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts to decline in future periods***, and such declines <u>could</u> be significant.

*Id.*  [Emphasis added.]

155.    The foregoing was false and misleading because it indicates that Robinhood is still growing when, in fact, Robinhood's performance data had been cratering for months.

156.    What is more, even the Offering Documents' attempt at handicapping Robinhood's cryptocurrency growth for its upcoming quarters, suggested growth, nonetheless:

> Trading activity was particularly high during the first two months of the 2021 period, ***returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter***.
>
> *        *        *
>
> We anticipate ***the rate of growth*** in these Key Performance Metrics [*i.e.*, Net Cumulative Funded Accounts, MAUs, and Assets Under Custody (AUC)] ***will be lower for the period ended September 30, 2021***, as compared to the three months ended June 30, 2021, ***due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021*** and seasonality in overall trading activities.

*Id.*  [Emphasis added.]

157.    The foregoing was false and misleading because it indicates that Robinhood's performance metrics were continuing to grow, albeit at a slower rate.  But that was not the case. Robinhood's reference to trading activity returning to a more "normal" level was also misleading in light of the fact that crypto trading declined by nearly 90% in only two months, to rates that were far below those in April 2021.

158.    For these same reasons, the Offering Documents generalized "Risk Factors" concerning the potential implications of changes in the volume of cryptocurrency trading on Robinhood's platform, were themselves false and misleading, or otherwise wholly inadequate.  For example, the Offering Documents warned:

> **Our business and reputation <u>may</u> be harmed by changes in business, economic or political conditions that impact global financial markets, or by a systemic market event.**
>
> As a financial services company, **our business, results of operations and reputation are directly affected by elements beyond our control, such as** economic and political conditions, changes in the volatility in financial markets (including volatility as a result of the COVID-19 pandemic), significant increases in the volatility or trading volume of particular securities or cryptocurrencies, broad trends in business and finance, **changes in volume of securities or cryptocurrencies trading generally**, changes in the markets in which such transactions occur and changes in how such transactions are processed.  These elements can arise suddenly and the full impact of such conditions can remain uncertain.  A prolonged weakness in equity markets, such as **a slowdown causing reduction in trading volume in** securities, derivatives or **cryptocurrency markets**, **<u>may</u> result in reduced revenues** and would have an adverse effect on our business, financial condition and results of operations.
>
> *          *          *
>
> In addition, **a prolonged weakness in** the U.S. equity markets or in **specific cryptocurrencies** or equity securities or a general economic downturn **<u>could</u>** cause our customers to incur losses, which in turn **<u>could</u>** cause our brand and reputation to suffer.

*Id.*  [Emphasis added.]

159.    The Offering Documents also stated:

> **The prices of cryptocurrencies are extremely volatile.  Fluctuations in the price of various cryptocurrencies <u>may</u> cause uncertainty in the market and <u>could</u> negatively impact trading volumes of cryptocurrencies, which would adversely affect the success of RHC's business, financial condition and results of operations.**

1

2

3

4

5

6

 The cryptocurrency markets are volatile, and **changes** in the prices and/**or trading volume of cryptocurrencies _may_ adversely impact RHC's growth strategy and business**.  **In addition, while we have observed a positive trend in the total market capitalization of cryptocurrency assets historically, driven by increased adoption of cryptocurrency trading by both retail and institutional investors as well as continued growth of various non-investing use cases, historical trends are not indicative of future adoption, and _it is possible that the adoption of cryptocurrencies may slow_, take longer to develop or never be broadly adopted, which would negatively impact our business, financial condition and results of operations**.

7

*Id.*  [Emphasis added.]

8

 160.    The Offering Documents also stated:

9

10

11

12

13

14

15

For the three months ended March 31, 2021, 17% of our total revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months year ended December 31, 2020.  While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020.  As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, **RHC's business _may_ be adversely affected, and growth in our net revenue earned from cryptocurrency transactions _may slow or decline_, _if the markets for Dogecoin deteriorate or _if the price of Dogecoin declines, including as a result of factors such as negative perceptions of Dogecoin or the increased availability of Dogecoin on other cryptocurrency trading platforms**.

16

*Id.*  [Emphasis added.]

17

18

19

 161.    In fact, all of these supposed risks identified in paragraph 158 through 160 above, had already come to pass.  Cryptocurrency trading on Robinhood's platform in the months leading up to the IPO **was down more than 90%**.

20

21

### THE OFFERING DOCUMENTS FAILED TO COMPLY WITH APPLICABLE SEC REGULATIONS

22

23

24

25

26

 162.    In addition, Item 303 imposed an independent duty on Defendants to disclose in the Offering Documents any known events, trends, or uncertainties that Robinhood, as of the IPO, "reasonably expect[ed] will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The Offering Documents violated Item 303 by failing to disclose that, as of the IPO:  (1) Robinhood was not following its stated strategy; and

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

1   (2) that Robinhood's stated strategy was not working as evidenced by massive pre-IPO declines

2   in Robinhood's revenue and key performance metrics.

3       163.    Similarly, Item 105 required Robinhood to adequately describe and discuss, in the

4   "Risk Factor" section of the Offering Documents, the most significant factors that make the

5   offering risky or speculative.  The Offering Documents violated Item 105 by failing to adequately

6   describe, if even described at all, that:  (1) Robinhood was not following its stated strategy; and

7   (2) Robinhood's stated strategy was not working as evidenced by massive pre-IPO declines in

8   Robinhood's revenue and key performance metrics.

9                   **ADDITIONAL FACTS DEMONSTRATING MATERIALITY**

10      164.    In the months following Robinhood's IPO, news concerning the aforementioned

11  adverse facts and conditions that existed prior to and at the time of the Offering leaked out to the

12  market.  The responses from investors and securities analysts further demonstrates the significance

13  of the information.

14      165.    The market began to see the impact of Robinhood's pre-IPO business declines on

15  October 26, 2021, when, after market close, Robinhood reported its financial results for the third

16  quarter ended September 30, 2021 ("3Q21").  Notably, Robinhood's MAU experienced a massive

17  decline from 21.3 million in 2Q21 to 18.9 million in 3Q21.  Robinhood also reported that its

18  revenue had declined from $565 million in 2Q21 to $365 million in 3Q21, with revenue from

19  crypto trading declining from $233 million to $51 million, respectively.  In addition, Robinhood

20  reported that its net cumulative funded accounts had dropped from 22.5 million in the second

21  quarter to 22.4 million in the third quarter and that its ARPU also decreased quarter over quarter

22  by 41.8% to $65.Securities analysts were quick to characterize the quarter as "disappointing" and

23  warned that the results were likely to be poorly received by investors.  For example, commenting

24  on the results, Mizuho analyst Dan Dolev stated:

25          With top-line results ***significantly below expectations*** (ours as well as consensus),
            ***lower MAUs***, ***declining ARPU***, very negative adjusted EBITDA . . . and
26          ***disappointing 4Q guidance including <u>no uptick in new funded accounts</u>***, we
            believe 3Q may be poorly received and we expect a negative stock reaction.

27

28  *Id.*  [Emphasis added.]

166.    In a note, Piper Sandler analyst, Richard Repetto, recognized how the $51 million of crypto trading revenue Robinhood reported fell $112 million short of Piper Sandler's estimate and represented a "***far sharper drop*** than the 35% reduction in total crypto trading volume across the industry."

167.    Financial reporters likewise viewed Robinhood's results negatively.  For example, shortly after the release of Robinhood's 3Q21 8-K, *CNBC* published an article entitled, "Robinhood shares tank as ***revenue falls way short of expectations on lighter crypto trading***," noting:

> For the third quarter, total net revenue came in at $365 million, missing a Refinitiv estimate of $431.5 million.  ***Revenues . . . were well below the second quarter's revenue of $565 million, which was bolstered by a massive surge in crypto trading***.
>
> ***Third-quarter transaction based revenue totaled $267 million, with only $51 million coming from cryptocurrency trading.  Revenue from crypto trading totaled $233 million in the second quarter, helped by interest in meme-inspired dogecoin***.
>
> *                    *          *
>
> ***Net cumulative accounts dropped to 22.4 million in the third quarter from 22.5 million in the second quarter.  Monthly active users totaled 18.9 million, down from 21.3 million in the second quarter***.

*Id.*  [Emphasis added.]

168.    The Company's disappointing third quarter results also led CNBC anchor Jim Cramer to tell viewers during the October 27, 2021 airing of Squawk on the Street, that it appears, "Robinhood ***is a fad***," suggesting further that the market "hit the pause button" on the so-called, "Robinhood revolution."

169.    Robinhood's stock price fell $4.13 per share, or approximately 10.44%, to close at $35.44 per share on October 27, 2021.

170.    On November 8, 2021, Robinhood disclosed that in the evening of November 3, 2021, an unauthorized third party socially engineered a Robinhood customer service representative to gain access to the email addresses and other personal information of millions of Robinhood customers, stating in relevant part:

Late in the evening of November 3, we experienced a data security incident. An unauthorized third party obtained access to a limited amount of personal information for a portion of our customers. Based on our investigation, the attack has been contained and we believe that no Social Security numbers, bank account numbers, or debit card numbers were exposed and that there has been no financial loss to any customers as a result of the incident. ***The unauthorized party socially engineered a customer support employee by phone and obtained access to certain customer support systems***. At this time, we understand that ***the unauthorized party obtained a list of email addresses for approximately five million people, and full names for a different group of approximately two million people***. We also believe that ***for a more limited number of people approximately 310 in total-additional personal information, including name, date of birth, and zip code, was exposed, with a subset of approximately 10 customers having more extensive account details revealed***. We are in the process of making appropriate disclosures to affected people.

*Id.* [Emphasis added.]

171. This significant lapse and the impact it were certain to have on Robinhood's reputation and continued use by customers was not lost on Robinhood nor its Chief Security Officer, Caleb Sima, who quickly went into damage control, characterizing its disclosure to the entire Robinhood community as the "right thing to do," stating in relevant part: "As a safety first company, we owe it to our customers to be transparent and act with integrity. Following a diligent review, putting the entire Robinhood community on notice of this incident now is the right thing to do."

172. Reporters took note. After the market closed on November 8, 2021, for example, *Vice* published an article entitled, "Robinhood Says It Was Hacked and Extorted But Nobody Lost Any Money," which recounted the story of one Robinhood customer whose information was improperly accessed by the hacker. According to the article, Erin Gallagher ("Gallagher"), a social media and disinformation researcher, told Motherboard (*i.e.*, *Vice*) that "she previously asked Robinhood to delete her account," which "Robinhood [had] confirmed it [did] in January," but that "she received the notice saying her email address was exposed in this latest breach . . . raising questions on what data Robinhood has kept on previous users."

173. Users also were quick to denounce the Company with many voicing their disdain on Reddit, a social news aggregator and discussion website, which had previously been a primary driver of the Company's apparent pre-IPO success. For example, The_Count_99 wrote, "Karma

for staying with hood when you knew better," and tax_evading_apple said they are surprised the Company still has millions of customers, while torytechlead colorfully recommending that users stop using "this sh*tty backstabbing piece of sh*t company."

174.    The next day, *Dealbreaker*, published an article claiming that Robinhood's cybersecurity defenses "***appear to be as porous as ever***."  [Emphasis added.]  In "*Company That Wants to Guard Your Cryptos Can't Keep Your Personal Information Safe*," *Dealbreaker* writes:

> Back in July, Robinhood raised a tidy $1.89 billion in its initial public offering. Apparently, however, none of this money found its way to the company's cybersecurity effort, as its defenses appear to be as porous as ever.
>
> *                *                *
>
> Sounds like just the kind of company you'd want to entrust with your not-at-all-susceptible-to-hackers cryptocurrency fortune.

*Id.*

175.    Of all coverage, however, *Bloomberg's* November 9, 2021 report entitled, "*Why 310 of Robinhood's Cyber-Attack Victims Should Really Worry*," put the significance of the data breach in context most succinctly, stating in relevant part, "***The company's 'safety first' maxim, oft repeated by executives, will ring hollow*** to the millions of users who are now a little more vulnerable to phishing attacks and the smaller group who'll have to be extra vigilant."  *Id.* [Emphasis added.]

176.    At the same time, Robinhood also revealed it was investigating reports that "some customers are having issues with transferring money into and out of the app."  "We're working to resolve this as soon as possible," the Company said on its status page in a message with a 7:06 AM PT (10:06 AM ET) time stamp.  An hour later, the status page listed bank transfers as operational.  Notwithstanding, Robinhood users' use of the application for their intended purposes, was yet again disrupted.

177.    Following the Company's announcement of the November 3, 2021 data breach and the November 9, 2021 disruption, as well as the publication of multiple media reports reporting on both failures, Robinhood's stock declined 3.37%, to close at $36.70 per share on November 9, 2021.

1        178.    The next day, *Vice* continued its coverage of the data breach by publishing an article

2    entitled "*Robinhood Hackers Accessed Internal Tool for Removing Account Security Features,*

3    *Screenshots Show*," which included screenshots of what additional information the Robinhood

4    hackers were able to (and did) access, as well as the critical back-end account features they had

5    the option of tampering with.  Specifically, the article states and shows:

> **The hackers** behind the recent breach of customer data from app-based broker
> Robinhood **had access to an internal tool that presented them the option of**
> **tampering with user accounts, including removing specific users' multi-factor**
> **authentication protections**, according to screenshots of the tool obtained by
> Motherboard.
>
> *        *        *
>
> The news highlights the potential risks that hackers can pose beyond simply
> stealing sensitive data.  **The screenshots of the tool also show buttons for logging**
> **a user out of their account, adding a trusted device, and blocking certain sessions**
> **from accessing the Robinhood account**.  **The screenshots also show the hackers**
> **could view sensitive information on users, such as their balances and trades**.

[Emphasis added.]

> A source who presented themselves as a proxy for the hackers provided
> Motherboard with the screenshots.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    179.    As this new information reached the market, Robinhood's stock sank further,

17  closing on November 10, 2021 at $34.49 per share, representing a decline of 6.02%.

18    180.    On November 19, 2021, Deutsche Bank analyst Brian Bedell ("Bedell") opened a

19  sell "Catalyst Call" on Robinhood before the market opened.  His call was based on concerns about

20  "near-term growth and profitability headwinds," which were mainly driven by the fact that "***the***

21  ***meme stock phenomenon we witnessed en masse earlier in the year was more applicable to***

22  ***Robinhood's recent customer growth and likely resulted in overestimation of the company's***

23  ***core fundamentals and growth trajectory***."  He separately noted how the November security

24  incident could further negatively impact the Company by "driv[ing] some customer attrition."  On

25  November 19, 2021, the price of Robinhood's stock fell over 5%, to close at $28.99 per share.

26  [Emphasis added.]

27
28

181. On December 3, 2021, *SeekingAlpha* published an article entitled, "Where Will Robinhood Stock Be In 5 Years?  Potentially Still Down Here," characterizing "the Q3 report [as] unequivocally a disaster."  On December 3, 2021, Robinhood's stock declined 10.95%, to close at $21.55 per share.

182. After the market closed on December 7, 2021, the *Wall Street Journal* published an article entitled, "*Investors Are Using Robinhood, Other Platforms to Jump Into Options Trades, Worrying U.S. Regulators,*" reporting that the "flood of everyday Americans into options trading has drawn a skeptical eye from U.S. regulators, who are considering possible rule changes for the era of smartphone brokerage apps."  Noting that "options give the holder the right, but not the obligation, to buy or sell an underlying security, such as shares of a public company," and that "they have long been used by experienced traders for sophisticated strategies such as hedging portfolios or betting that certain stocks will experience a burst of volatility," the *Wall Street Journal* explains that "brokers have long been required to perform extra due diligence before approving someone to trade options.  This includes obtaining information about the customer's financial background and investment experience and making sure the customer has been apprised of the risks."

183. The *Wall Street Journal* also recounts how "in June, Robinhood agreed to pay nearly $70 million to resolve sweeping allegations by Finra that focused in part on its options-approval procedures."  "According to the regulator, Robinhood qualified thousands of accounts to trade options even though clients didn't meet the eligibility criteria."  Critically, the *Wall Street Journal* concludes that "***gaining approval to buy and sell options through some brokerages, such as Robinhood Markets Inc., [continues to be] significantly easier than others***."  As stated in the report:

> [Robinhood's] app, still asks new users if they would like to enable commission-free options trading once their account is opened.  The 'Yes' button is highlighted in green; the 'No' button is white.  Approval can be obtained in a few minutes by clicking through a set of questions about one's assets and income, investment experience, and by attesting to having read a 100-page document.

\*          \*          \*

> The company said at the time of the Finra settlement that ***it had enhanced its oversight of customers' use of options***, including through conducting monthly reviews to ensure clients meet eligibility rules.
>
> Still, other brokers are more rigorous in reviewing customers' applications to trade options.  Some large brokerages, such as Charles SchwabCorp., manually review all applications, a process that can take days even for people seeking the most basic level of options trading.
>
> ***Robinhood, by contrast, approves investors' applications instantly*** if their responses to the questionnaire meet the company's criteria.

*Id.*  [Emphasis added.]

184.    The next day, on December 8, 2021, the *Motley Fool* published an article entitled, "5 Red Flags for Robinhood Markets' Future," identifying Robinhood's "decelerating growth in users and revenue" as well as its "dependence on dogecoin," as two areas of particular concern.

185.    After the market closed on December 8, 2021, additional articles were published warning that the risk of regulators restricting options trading was rising, posing a significant problem for Robinhood who relied heavily on options trading as payments received for flowing options orders to market makers are "far higher" than for equities or crypto.  For example, in "*The risk of regulators restricting options trading is rising, and that could be a problem for Robinhood and others*," *SeekingAlpha* News Editor, David Jackson, notes how:

> Recent comments by FINRA and the SEC suggest that regulator may be considering restricting the ability of brokerages to promote options trading to retail investors.  If that were to happen, it could negatively impact the revenue of trading platforms including Robinhood. . . .
>
> *                 *                 *
>
> Restrictions on the ability of brokerages to promote options trading could significantly reduce the payments for order flow the brokerages receive, because payments for order flow are far higher for options than for equities.  A 2020 analysis of SEC filings by Piper Sandler found that Robinhood (HOOD) makes the most from payment for order flow, receiving $0.17 per 100 equity shares and $0.58 per 100 options.  Schwab (SCHW) receives $0.11 per 100 equity shares and $0.37 per 100 options, while E*Trade receives $0.15 per 100 equity shares and $0.46 per 100 options, and Ameritrade $0.15 per 100 equity shares and $0.58 per 100 options.

*Id.*

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

186.    As the market learned that Robinhood's supposed enhancements in oversight were, in fact, simply window-dressing, and that, as a result, regulators were increasingly considering imposing strict regulations on its (and others) ability to promote options trading to retail investors, Robinhood's stock price declined 7.63% to close at $21.91 per share on December 9, 2021.

187.    The next day, the *Wall Street Journal* published an article, entitled "Robinhood's Stock Fizzles After Splashy Public Offering," which was then published in the print edition of the *Wall Street Journal* on December 10, 2021 under the headline "*Robinhood Fizzles After Hot Start*" noting how the "***slowdown in cryptocurrency trading***, particularly in the meme cryptocurrency dogecoin, ***weighed heavily on [Robinhood's] results***."  [Emphasis added.]

188.    Following this news, Robinhood's shares fell another 8.12%, closing  at $20.13 per share on December 10, 2021.

189.    Later, on December 15, 2021, after the markets closed, Bank of America initiated its coverage of Robinhood with an underperform rating and a price objective of $22 per share.  In its initial report, Bank of America advised that the market, based on Robinhood's then-current stock price, "***may be underappreciating . . . [Robinhood's] overstated growth trajectory in 2020-21***," which was driven by the "'***meme' stock phenomenon [&] crypto appreciation***."  [Emphasis added.]  Bank of America expressed its concern that "***HOOD's cryptocurrency offering triggered significant growth in 1H21***, ***but after clients realized that its crypto offering was inferior to the crypto exchanges*** (no digital wallet, less currencies) ***and the coins' rapid appreciation reversed***, ***HOOD's momentum in crypto faded for at least a few quarters***."  [Emphasis added.]  Bank of America also determined that HOOD's declining cryptocurrency trading activity, "***caused HOOD to experience a deceleration in its funded accounts and [to] report significantly lower revenues as trading activity declined***," offering the following illustration to show how the decline in ARPU *began* in March 2021 (*i.e*., before the IPO):

1
2
3
4
5
6
7
8
9



10    190.    On December 16, 2021, Robinhood's shares declined 6.97% to close at $18.14 per

11    share.

12    191.    Robinhood's business strategy was placed further under the microscope on January

13    18, 2022, when the media began reporting on the results of a study looking at the impact of trading

14    platform gamification on retail traders' risk taking, first published on Sunday, November 28, 2021

15    (the "Gamification Study").[5]  According to the Gamification Study, online brokers have needed to

16    find new ways to differentiate, for example, "by offering investors sleek interfaces aimed to

17    stimulate trading volume and engagement with the platform," as competition on fees has reached

18    a zero lower bound with, for example, Charles Schwab, TD Ameritrade Holding Corp, and

19    E*Trade Financial Corp. each eliminating trading fees on equities, ETFs and options within a week

20    from one another.  So, they have increasingly gamified their apps by featuring bright flashing

21    colors, "achievements," and others features such as confetti to celebrate a trade.  Assistant

22    professor of finance at the University of Toronto, Marius Zoican ("Zoican"), among others, set out

23    to determine whether "the gamification of trading apps exacerbate[s] risk-taking by individual

24    traders.  In the randomized online experiment, participants – on average, 31 or 32 years old, which

25    is in line with the demographic who typically use commission-free trading apps, like Robinhood

26    – were assigned to either a simple trading app, or a gamified app that mimicked features found on

27

28    _____
      [5]    *Available at*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3971868.

1   existing platforms such as bursts of confetti after a trade, animations and other prompts.  The

2   Gamification Study found that the investors using the gamified apps, like Robinhood, took on

3   more risk, especially when training high-volatility assets.  Indeed, traders using gamified apps

4   were "***more likely to gamble their money away***," especially when "***given [ ] more risky securities***

5   ***to trade***."  [Emphasis added.]  On January 18, 2022, the price of Robinhood's stock declined

6   5.08%.[6]

7        192.    A week later, before the market opened on January 26, 2022, *Reuters* ran another

8   article warning of increasing regulation related to Robinhood's gamification of trading.   In

9   "*Analysis: Will the games stop? SEC mulls crackdown on trading apps*," *Reuters* notes how the

10  SEC is studying ways to crack down on psychological prompts used by Robinhood and others to

11  promote frequent stock trading.  Why?  Because "noises, bright colors and other sensory details

12  'steer users to act,'" and that is a "big deal" when "real money is on the line," especially since

13  "investors generally lose money when they churn their portfolio."  Stated differently, according to

14  the SEC, Robinhood's video game-like features and other behavioral prompts, including, but not

15  limited to, its "trading contests, points and rewards, as well as lively sound, bright colors,

16  notifications, social networking tools, [or] curated lists of trading and investment ideas," likely

17  require greater oversight, as they could be (and are) extremely dangerous to investors.  On this

18  news, Robinhood's shares declined 4.90%, to close at $12.41 per share on January 26, 2022.

19       193.    The next day, after the market closed, Robinhood reported its financial results for

20  the fourth quarter and full year ended December 31, 2021 ("4Q 2021" and "FY 2021,"

21  respectively).  In its January 27, 2021, 4Q 2021 earnings release, Robinhood reported another

22  round of financials that substantially missed analyst estimates: Robinhood's MAU ***declined nearly***

23  8.5% quarter over quarter, missing estimates by 2.6 million; Robinhood's net revenues of $362.7

24  million fell short of the $370.9 million expected; Robinhood's transaction-based revenue of $263.9

25  million came in below the $269.3 million expected; Robinhood's crypto transaction revenue of

26  $48 million fell short of the $55 million expected, which also represented a decline of 5.9% quarter

27

28  _____
    [6]    *See*, *e.g.*, https://www.thestar.com/business/2022/01/18/gamified-apps-push-diy-traders-
    to-make-riskier-investments-study.html.

over quarter; and Robinhood's ARPU **declined** 1.5% quarter over quarter, missing estimates by $2.63. Robinhood's revenue outlook for the first quarter of the year likewise came in below expectations, with the Company forecasting $340 million as compared to the $447 million analysts projected.

194. As with Q3 2021, Analysts reacted adversely to Robinhood's fourth quarter earnings release. Hugh Tallents ("Tallents"), senior partner at management consultancy cg42, for example, told *Yahoo Finance*, "Robinhood had all of the tailwinds that you could want running up to their IPO. ***The problem that they've had is that all of those basically have unwound in the last eight to 10 months***." In other words, Robinhood's business turned in March or May 2021, months before the IPO. That Robinhood failed to disclose that shift so it could demand a premium for its shares during the IPO was not lost on Tallents who noted, "***They had five years of business plan success baked into that IPO price***. Now you're starting to see it valued more like a 'fin' than a 'tech,' and that multiple isn't attractive necessarily." [Emphasis added.]

195. Jesse Cohen ("Cohen"), senior analyst at *Investing.com*, likewise characterized Robinhood's results as "awful." Despite Defendant Warnick's claim during the Company's January 27, 2022 analyst call that the Company sees "nothing to suggest [its] customers are disengaging," Cohen found that Robinhood's results, "highlight the several challenges the trading platform company currently faces, ***mainly a slowdown in user growth, as well as weaker retail trading activity in stocks and crypto***." [Emphasis added.]

196. The financial media also recognized the significance of the continuing decline in Robinhood's cryptocurrency trading with, for example, *Bloomberg* noting that the 4Q21 print "mark[s] a second-consecutive quarter-over-quarter decline," the *Associated Press* recognizing that "Growth ***keeps slowing***," and *CNBC* observing, in an article entitled, "***Robinhood loses active users*** in the fourth quarter, forecasts weak revenue," that, "revenue from crypto ***has been declining since the second quarter of 2021***," and that "Thursday's report shows ***its continuing to decline***." [Emphasis added.]

197.    Following Robinhood's release of its 4Q21 earnings and the publication of numerous securities analysts' and financial reporters' views on those results, Robinhood's stock price declined approximately 6.45%, to close at $11.61 per share on January 27, 2022.

198.    Days later, on February 1, 2022, the *Motley Fool* published an article entitled, "Robinhood Stock is Down 85%, and it Could Get Worse," which, after assessing the Company's KPIs from each quarter, concludes that Robinhood's shift towards cryptocurrencies in early 2021 *only worked for a short time*, stating in relevant part:

> Late 2020 into early 2021 was a bumper period for Robinhood, as the meme-stock frenzy was driven primarily by younger investors, its target demographic . . . . ***To maintain momentum, Robinhood made a pivot from its stock and options products into cryptocurrencies***, as these assets were in high demand from its audience.  ***While this worked for <u>a short period of time</u>, the company has since suffered sequential declines across most of the important financial metrics used to measure its business***.  *Id.*  [Emphasis added.]

| Metric | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 |
|---|---|---|---|---|
| Monthly active users | 17.7 million | 21.3 million | 18.9 million | 17.3 million |
| Assets under custody | $81 billion | $102 billion | $95 billion | $98 billion |
| Average revenue per user | $137 | $112 | $65 | $64 |
| Total revenue | $522 million | $565 million | $365 million | $363 million |

199.    By market close on February 2, 2022, Robinhood's stock had declined 4.30%, to $14.02 per share.

200.    Then, author Michael Lewis ("Lewis"), known for his non-fiction writing about Wall Street culture, quickly put a stop to the notion that Robinhood is "disrupting Wall Street," during an interview with Andrew Ross Sorkin ("Sorkin"), columnist and the founder and editor at large of *Dealbook*.  According to an article entitled, "*Michael Lewis Revisits 'Liar's Poker*," printed in the *New York Times* on February 7, 2022, which covered the conversation, in response to Sorkin's question about whether Robinhood was "smashing the aisles" or otherwise "disrupting Wall Street in all kinds of ways," Lewis stated:

> ***I'm not sure what Robinhood upends*** – preserving both a fiction and the guts of a screwed up stock market without making a real dent on anything meaningful.  And the fiction is that people can go into the market and systematically beat the market and you should be doing this with your money.  I understand it's fun if you're

treating it like a casino.  It is not a very healthy one.  ***I think of Vanguard as being more useful, disruptive than Robinhood, teaching people not to do that***.

*Id.* [Emphasis added.]

201.    On this news, Robinhood's shares declined 8.37%, to close on February 7, 2022 at $13.91 per share.

202.    Similar sentiments (and more) were published before the market opened on March 11, 2022, by *Motley Fool* in an article entitled, "***The hidden danger of trading apps: how investing can quickly become gambling***," which cited views from senior trading analyst at BrokerChooser, Kirsztian Gatonyi ("Gatonyi"), who argued that "'***the slogan for Robinhood should be changed to: Gambling for Everyone***'!"  According to Gatonyi, "***users should be warned about the game-like features that are offered by the Robinhood mobile app***[,]" because "[g]***ame-like features can manipulate beginners to increase the number of their transactions, which is good for Robinhood's Payment for Order Flow model.  But not for user***."  The article continues, in relevant part:

> Due to the nature of the app, ***Robinhood traders are prompted to increase the frequency of their trades and spend less time analysing the market.  This leads to a lack of informed decisions***.

> According to Gatonyi, "***The more frequently beginners trade, the more likely they end up losing money***."

*Id.* [Emphasis added.]

203.    The *Motley Fool* article also quotes Gatonyi explaining how "[t]he incentives in Robinhood's app get young customers impatient and makes them believe investing is about pressing the 'buy' button on mobile phones[,]" which "involves making fewer quality decisions." *Id.* Gatonyi goes on to warn that "this can quickly become addictive – and dangerous," recounting a tragic story from 2020, when a "20-year-old student committed suicide after losing $730,000 (£558,000) using his Robinhood account." *Id.*

204.    On this news, Robinhood's stock declined approximately 8.55%, to close at $11.02 per share on March 11, 2022.

205.     Robinhood's ineffective business strategy and the resulting poor performance of its crypto business, also led to the resignation of the Company's top crypto executive Christine Brown who, during the evening of March 29, 2022, announced on Twitter that she was stepping down from her role as Robinhood Crypto's COO, a position she had started less than a year earlier. Robinhood's stock declined 8.49% the next trading day.

206.     Even Robinhood's introduction of new cryptocurrencies to its platform could not distract the financial media from acknowledging the negative trends resulting from Robinhood's deteriorating business as of the IPO.  For example, on April 13, 2022, the *Motley Fool* ran an article entitled, "3 reasons Robinhood's addition of Shiba Inu doesn't matter," which noted not only that "crypto traders have already cleared out" of Robinhood, but that "Robinhood lost traction as 2021 played out," according to the following key metrics:

- The number of monthly transacting users slipped from 21.3 million in the second quarter to 18.9 million in the third quarter, and then 17.3 million in the fourth quarter.

- Average revenue per user has fallen in three consecutive quarters. Robinhood has gone from generating $137 per user during the first quarter to $64 in the fourth quarter.

- Assets under custody were lower by the end of the year than where they were at the midpoint of 2021.

207.     The April 13, 2022 *Motley Fool* article continued:

The pressure points are everywhere.  Fewer people are trading, and people are trading less.  That's a bad look for a trading platform, and we haven't even gotten to the most problematic metric.

*Id.*

\*          \*          \*

Robinhood reported transactions-based crypto revenue of $233 million in the second quarter, followed by $51 million in the third and $48 million in the fourth quarter.  Put another way, Crypto transactions revenue went from 52% of Robinhood's business in the second quarter to just 18% by the end of year.

*Id.*

208.   On this news, Robinhood's stock declined 4.29%, closing on April 14, 2021 at $11.38 per share.

209.   Then, after the market closed on April 28, 2022, the Company announced its 1Q 2022 financial results, which were again disappointing.  Robinhood's MAU of 15.9 million represented an 8% decline from the previous quarter, AUC of $93.1 billion represented a 5% decline from the previous quarter, and ARPU of $53 represented an 18% declined from the previous quarter.  Robinhood's total net revenues of $299 million and transaction-based revenues of $218 million, of which crypto revenue only totaled $54 million, was likewise disappointing.

210.   In addition, Robinhood reported its KPIs on a monthly basis, showing for the first time the truth about Robinhood's fledgling business in the months leading up to the IPO.  *See supra.*

211.   As this news reached the market, the price of Robinhood's stock dropped approximately 2.78%, with shares closing on April 29, 2022 at $9.81 per share.

## CLASS ACTION ALLEGATIONS

212.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

213.   Lead Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Robinhood common stock issued in connection with the Company's IPO.

214.   Excluded from the Class are:  (i) Defendants; (ii) present or former executive officers of Robinhood, members of the Robinhood's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Robinhood.

215.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this

1   time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there

2   are hundreds or thousands of members in the Class.  During the relevant time, millions of

3   Robinhood shares were publicly traded on the NASDAQ, a national exchange.  Record owners

4   and other members of the Class may be identified from records maintained by Robinhood or its

5   transfer agent and may be notified of the pendency of this action by mail, using a form of notice

6   similar to that customarily used in securities class actions.

7        216.   Lead Plaintiffs' claims are typical of the claims of Class members, who were all

8   similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

9   Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have

10  retained counsel competent and experienced in class and securities litigation.

11       217.   Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class.  Among the

13  questions of law and fact common to the members of the Class are:

14       (a)    whether Defendants violated the Securities Act;

15       (b)    whether statements made by Defendants to the investing public

16  misrepresented material facts about the business, operations, and prospects of Robinhood;

17       (c)    whether statements made by Defendants to the investing public omitted

18  material facts necessary in order to make the statements made, in light of the circumstances

19  under which they were made, not misleading; and

20       (d)    the extent of damage sustained by Class members and the appropriate

21  measure of damages.

22       218.   A class action is superior to all other available methods for the fair and efficient

23  adjudication of this controversy, since joinder of all members is impracticable.  Further, as the

24  damages suffered by individual Class members may be relatively small, the expense and burden

25  of individual litigation makes it impossible for Class members to individually redress the wrongs

26  done to them.  There will be no difficulty in the management of this action as a class action.

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

# CLAIM ONE

### For Violations of §11 of the Securities Act
### (Against All Defendants)

219.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

220.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Lead Plaintiffs do not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

221.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

222.    The Company is the registrant of the securities purchased by Lead Plaintiffs and the Class.  As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Robinhood is liable under §11 of the Securities Act to Lead Plaintiffs and the Class.

223.    The Individual Defendants each signed the Offering Documents and caused its issuance.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

1  material misstatements and omissions contained in the Offering Documents and also should have

2  known of the omissions of material fact necessary to make the statements made therein not

3  misleading. Accordingly, the Individual Defendants are liable to Lead Plaintiffs and the Class.

4       224.    The Underwriter Defendants each served as underwriters in connection with the

5  IPO. As such, each is strictly liable for the materially inaccurate statements contained in the

6  Offering Documents and the failure of the Offering Documents to be complete and accurate, unless

7  they are able to carry their burden of establishing an affirmative "due diligence" defense. The

8  Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the

9  truthfulness and accuracy of the statements contained in the Offering Documents. They had a duty

10 to ensure that such statements were true and accurate, there were no omissions of material facts

11 that would make the Offering Documents misleading, and the documents contained all facts

12 required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should

13 have known of the material misstatements and omissions contained in the Offering Documents

14 and also should have known of the omissions of material facts necessary to make the statements

15 made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Lead

16 Plaintiffs and the Class.

17      225.    Defendants acted negligently in preparing the Offering Documents. None of the

18 Defendants named in this Claim made a reasonable investigation or possess reasonable grounds

19 for the belief that the statements contained in the Offering Documents were true and without

20 omission of any material facts and were not misleading. In alleging the foregoing, Lead Plaintiffs

21 specifically disclaim any allegation of fraud.

22      226.    By reasons of the conduct herein alleged, each Defendant named in this claim

23 violated §11 of the Securities Act.

24      227.    None of the untrue statements or omissions of material fact in the Offering

25 Documents alleged herein was a forward-looking statement. Rather, each such statement

26 concerned existing facts. Moreover, the Offering Documents did not properly identify any of the

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

228.    Lead Plaintiffs acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Lead Plaintiffs sustained damages, and the price of the Company's shares declined substantially, due to material misstatements in the Offering Documents.

229.    This Claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

230.    By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## CLAIM TWO

### For Violations of §12(a) of the Securities Act
### (Against All Defendants)

231.    Lead Plaintiffs repeat and reallege each and every allegation contained above, as if fully set forth herein.

232.    By means of the defective Prospectus, Defendants promoted, solicited, and sold Robinhood shares to Lead Plaintiffs and other members of the Class.

233.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Lead Plaintiffs, and the other members of the Class who purchased Robinhood shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading.    Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

234.    Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could Lead Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiffs acquired Robinhood shares.

235.    By reason of the conduct alleged herein, Defendants violated §12(a)(2), 15 U.S.C. §77*l*(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiffs and the other members of the Class who purchased Robinhood securities, pursuant to the Prospectus, sustained substantial damages in connection with their purchases of the shares. Accordingly, Lead Plaintiffs and the other members of the Class who hold Robinhood securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Robinhood shares to Defendants sued herein.  Class members who have sold their Robinhood securities seek damages to the extent permitted by law.

## CLAIM THREE

### For Violations of §15 of the Securities Act
### (Against the Individual Defendants)

236.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

237.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants.

238.    The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein.  Similarly, each of the other Individual Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, they directly participated in controlling Robinhood by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of Robinhood securities to Lead Plaintiffs and members of the Class.

1    239.    As control persons of Robinhood, each of the Individual Defendants are jointly and

2 severally liable pursuant to §15 of the Securities Act with and to the same extent as Robinhood for

3 its violations of §11 of the Securities Act.

## PRAYER FOR RELIEF

5    WHEREFORE, Lead Plaintiffs, on Lead Plaintiffs' own behalf and on behalf of the Class,

6 pray for relief and judgement as follows:

7    A.    Declaring that this action is a proper class action, pursuant to Fed. R. Civ. P. 23,

8 certifying Lead Plaintiffs as representatives of the Class, and designating Lead Plaintiffs' counsel

9 as Class Counsel;

10    B.    Awarding Lead Plaintiffs and the other members of the Class compensatory

11 damages;

12    C.    Awarding Lead Plaintiffs and the other members of the Class rescission on their

13 §12(a)(2) claims;

14    D.    Awarding Lead Plaintiffs and the other members of the Class pre-judgment and

15 post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs

16 and disbursements; and

17    E.    Awarding Lead Plaintiffs and the other members of the Class such other and further

18 relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

20    Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiffs hereby demand a trial by jury of all issues

21 that may be so tried.

22 DATED:  June 20, 2022                 **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

23                                        *s/ Thomas L. Laughlin, IV*
                                          THOMAS L. LAUGHLIN, IV (*pro hac vice*)
24                                        DEBORAH CLARK-WEINTRAUB (*pro hac vice*)
                                          JEFFREY P. JACOBSON (*pro hac vice*)
25                                        JONATHAN M. ZIMMERMAN (*pro hac vice* forthcoming)
                                          The Helmsley Building
26                                        230 Park Avenue, 17th Floor
                                          New York, NY 10169
27                                        Telephone: 212-233-6444

28

1

Facsimile: 212-233-6334
tlaughlin@scott-scott.com

2

dweintraub@scott-scott.com
jjacobson@scott-scott.com

3

jzimmerman@scott-scott.com

4

-and-

5

JOHN T. JASNOCH (CA 281605)

6

HAL CUNNIGHAM (CA 243048)
600 W. Broadway, Suite 3300

7

San Diego, CA 92101
Telephone: 619-233-4565

8

jjasnoch@scott-scott.com

9

hcunningham@scott-scott.com

10

*Counsel for Lead Plaintiffs Vinod Sodha and Amee Sodha and Lead Counsel for the Class*

11

**THE SCHALL LAW FIRM**

12

Brian J. Schall
2049 Century Park East, Suite 2460

13

Los Angeles, CA 90067
Telephone: 310-301-3335

14

Facsimile: 310-388-0192
brian@schallfirm.com

15

16

*Additional Counsel for Lead Plaintiffs Vinod Sodha and Amee Sodha*

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

1

## **<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that on June 20, 2022, I caused the foregoing document to be filed with the

3   Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

4   email addresses denoted on the Electronic Mail Notice List.

5                                             _s/ *Thomas L. Laughlin*_____
                                              Thomas L. Laughlin, *pro hac vice*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767