JOHN T. JASNOCH (CA 281605)
HAL CUNNIGHAM (CA 243048)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Lead Plaintiffs Dr. Vinod Sodha*
*and Dr. Amee Sodha, and the Proposed Class*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PHILIP GOLUBOWSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD MARKETS, INC., VLADIMIR TENEV, JASON WARNICK, BAIJU BHATT, JAN HAMMER, PAULA LOOP, JONATHAN RUBENSTEIN, SCOTT SANDELL, ROBERT ZOELLICK, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., WELLS FARGO SECURITIES, LLC, MIZUHO SECURITIES USA LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., PIPER SANDLER & CO., ROSENBLATT SECURITIES INC., BMO CAPITAL MARKETS CORP., BTIG, LLC, SANTANDER INVESTMENT SECURITIES INC., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC,<br><br>Defendants. | Case No. 3:21-cv-09767<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**<br><br>Judge: Hon. Edward M. Chen<br>Dept.:  5, 17th Floor<br>Date:   December 8, 2022<br>Time:  1:30 p.m. |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

    A.      Robinhood.............................................................................................................3

    B.      Prior to the IPO, Robinhood Engaged in Numerous Problematic Business Practices, Severely Damaging Its Customer Relationships...................................4

    C.      In the Months Prior to the IPO, MAU and Other Key Metrics Plummeted ...........9

    D.      Defendants Failed to Disclose the Serious Pre-IPO Deterioration in Robinhood's Business and Misleadingly Claimed That the Company's Strategy Was Successfully Driving Growth ...........................................................10

    E.      The Market Begins to Learn About the Massive Customer Retention Problems, Asset Losses and Revenue Declines at Robinhood..............................12

LEGAL STANDARD.................................................................................................................13

ARGUMENT...............................................................................................................................13

I.      PLAINTIFFS HAVE ADEQUATELY STATED SECTION 11 CLAIMS......................13

    A.      The Offering Documents Violated the Affirmative Duties to Disclose Imposed by Items 105 and 303...............................................................................14

        1.      Defendants Violated Item 105 ..................................................................14

        2.      Defendants Violated Item 303 ..................................................................19

    B.      The Offering Documents Made Numerous Misleading Representations..............21

        1.      The Offering Documents Represented that a Decline in MAU and Other KPIs Was Only a Contingent Possibility When It Had, In Fact, Occurred.....................................................................................................21

        2.      The Offering Documents Misleadingly Represented That Robinhood's User Base Was Growing When, In Fact, It Was Plummeting...................................................................................................22

        3.      Robinhood Misleadingly Claimed to Be Building Deep, Loyal Customer Relationships ...........................................................................24

II.      PLAINTIFFS HAVE STATED A SECTION 15 CLAIM .............................................25

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................................13

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009)...................................................................................22

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...........................................................................................21, 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...................................................................................................13

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................................21

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)......................................................................................18

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................................18

*Gerneth v. Chiasma, Inc.*,
    No. 16-11082, 2018 WL 935418 (D. Mass. Feb. 15, 2018) .....................................................15

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................................................14

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)......................................................................................18

*In re Apple Inc. Sec Litig.*,
    No. 19-CV-02033, 2020 WL 2857397 (N.D. Cal. June 2, 2020).........................21, 22, 23, 25

*In re CPI Card Grp. Inc. Sec. Litig.*,
    No. 16-cv-4531, 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017).............................................20

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) .................................................................................................14

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)..............................................................17, 19, 20, 21

*In re Lyft Inc. Sec. Litig.*,
    484 F. Supp. 3d 758 (N.D. Cal. 2020) ....................................................................................13

*In re OmniVision Techs., Inc. Sec. Litig.*,
    937 F. Supp. 2d 1090 (N.D. Cal. 2013) ..................................................................................22

*In re PMA Cap. Corp. Sec. Litig.*,
    No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) .....................................................18

*In re Progenity, Inc.*
    No. 20-cv-1683, 2021 WL 3929708 (S.D. Cal. Sept. 1, 2021)................................................16

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..................................................................................................21

*In re Twitter, Inc. Secs. Litig.*,
    No. 16-5314, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020)..............................................15, 22

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*,
    604 F. Supp. 2d (N.D. Ill. 2009) .............................................................................................24

*In Re Violin Memory Sec. Litig.*,
    No. 13-CV-5486-YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)...................................20

*Jaroslawicz v. M&T Bank Corp.*,
    962 F.3d 701,713-16 (3d Cir. 2020) .......................................................................................14

*Khoja v. Orexigen Therapeutics*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................................................23

*Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008).....................................................................................17

*Litwin v. Blackstone Grp.*,
    L.P., 634 F.3d 706 (2d Cir. 2011)...........................................................................................20

*McKenna v. SMART Techs. Inc.*,
    No. 11 CIV. 7673, 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) .........................................20

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ..................................................................................................23

*Mingbo Cai v. Switch, Inc.*,
    No. 218CV01471, 2019 WL 3065591 (D. Nev. July 12, 2019)..............................................15

*Mulligan v. Impax Lab'ys Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................18, 25

*Murphy v. Precision Castparts Corp.*,
    No. 3:16-cv-00521, 2017 WL 3084274 (D. Or. June 27, 2017)..............................................25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ..............................................................................................17

iii

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)..................................................................................13, 20, 24

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    No. 18 Civ. 9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ...........................................15

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ...................................................................................20

*Rafton v. Rydex Series Funds*,
    No. 10-cv-1171, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011)......................................................14

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013).............................................................................................14, 15

*Steckman v. Hart Brewing*,
    143 F.3d 1293 (9th Cir. 1998) .....................................................................................14, 19, 20

*United States v. Smith*,
    155 F.3d 1051 (9th Cir. 1998) .................................................................................................24

*Westley v. Oclaro Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ....................................................................................23

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 8(a)(2)............................................................................................................................13
    Rule 12(b)(6)..........................................................................................................................13

15 U.S.C.
    §77k........................................................................................................................................25
    §77k(a) ...................................................................................................................................13
    §77l ........................................................................................................................................25
    §77o........................................................................................................................................25

17 C.F.R.
    §229.105..........................................................................................................................2, 14, 15
    §229.303......................................................................................................................2, 19, 20, 21
    §229.303(b)(2)(ii) ...................................................................................................................19

iv

Lead Plaintiffs Dr. Vinod Sodha and Dr. Amee Sodha ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss (ECF No. 78).

## PRELIMINARY STATEMENT

This is a securities class action asserting claims under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") alleging that the registration statement and prospectus for Robinhood Markets Inc.'s ("Robinhood" or the "Company") July 30, 2021 initial public offering ("IPO") made false and misleading statements and omissions.  In the IPO, Robinhood (an online investment platform and brokerage) offered 55 million shares at a price of $38 per share for proceeds over $2 billion.

The sales pitch for the IPO was that Robinhood had developed a breakthrough business strategy that had "changed the landscape of retail investing" through a combination of (i) a safe and reliable investment platform (ii) a focus on the needs of small investors, young people and gig economy workers, and (iii) a "radical" emphasis on responding to customer feedback.  According to Defendants, this strategy allowed Robinhood to achieve massive, durable growth as measured by monthly active users ("MAU"), assets under custody ("AUC") and other key performance indicators ("KPIs").  Robinhood claimed that its strategy fostered "deep, loyal customers relationships" leaving it "well-positioned to serve an increasing portion of the population."

To further demonstrate the ongoing success of its strategy, Robinhood packed the Offering Documents with charts and data depicting Robinhood's supposed ongoing success.  For example, investors were told that Robinhood's MAU had skyrocketed from 11.7 million in 2020 to 17.7 million as of March 31, 2021 to 21.3 million as of June 30, 2021.   Also, investors were told that Robinhood's AUC had likewise jumped from $63 billion in 2020 to $81 billion as of March 31, 2021, to $102 billion as of June 30, 2021.

The truth was that, undisclosed to investors, Robinhood's business had been struggling for months and was experiencing a sharp downturn, that Robinhood's management was aware of at the time of the IPO.  This downturn directly contradicted the Offering Documents' representations concerning the ongoing success of the Company's business strategy.  Indeed, by the end of May 2021, two months before the IPO, Robinhood's customers had begun abandoning the platform in

droves. MAU, which had peaked in May 2021 at 24.1 million, declined by 4.6 million in June and July, an incredible 19 percent decrease in users, to only 19.5 million at the time of the IPO. At the same time, AUC had declined from $102 billion, to $94.7 billion by the time of the IPO. And, cryptocurrency trading, the sector whose growth had been a major contributor to Robinhood's 2Q21 results, had declined by 90 percent from $127 billion in May, to just $13 billion in July.

Moreover, far from having built "deep, lasting" relationships with its customers through an innovative strategy, Robinhood had enraged its customer base by operating without adequate internal controls and by deliberately exposing customers to heightened risk of loss to generate short-term revenue for itself. For these reasons, in the months leading up to the IPO, Robinhood's internal metrics showed rising customer dissatisfaction with Robinhood, an issue that was the focus of discussions among Robinhood's top management before the IPO.

In the months after the IPO, the market learned that Robinhood had lost millions of investors and was having severe difficulties holding on to or growing its user base. Analysts deemed Robinhood a "fad" and a "growth company without the growth," and the Company' stock price declined precipitously.

The Securities Act required Defendants to disclose in the Offering Documents the steep pre-IPO declines in its business and divergence from its stated business practices. The Securities Act imposes stringent affirmative duties to disclose risks, trends and uncertainties pursuant to 17 C.F.R. §229.105 ("Item 105") and 17 C.F.R. §229.303 ("Item 303"). This action alleges that both the pre-IPO business deterioration and lack of internal controls at Robinhood were significantly undisclosed risks under Item 105 and undisclosed trends and uncertainties under Item 303. The Securities Act also forbids the making of untrue and misleading statements. Here, Plaintiffs have identified numerous misleading statements that represented Robinhood's growth was ongoing and that its strategy was succeeding when neither was the case.

Defendants' arguments in support of their motion to dismiss are unpersuasive. With respect to Items 105 and 303, Defendants primarily argue that they did disclose the anticipated declines and problematic business practices. However, Defendants never disclosed that MAU or the other KPIs touted in the Offering Documents were declining and nothing in the Offering

Documents can be read as alerting a reasonable investor to the fact that these metrics had been falling fast. The cornerstone of Defendants' argument is a statement in the Offering Documents that the Company expected "revenue" to be lower in 3Q2021 than in 2Q2021 due to "seasonality" and "decreased levels of trading activity relative to the record highs" in 2Q21. But that statement says nothing about MAU, AUC or the other KPIs. Besides, even with respect to revenue, the statement is an inadequate misleading half-truth because it suggested revenue would dip slightly from a "record high" due to "seasonality," which was not true and did not put investors on notice that cryptocurrency trading had collapsed by 90% in only two months.

Defendants' challenges to the actionability of the affirmative misstatements likewise fail because they are not consistent with the facts or the law for the reasons stated herein.

Accordingly, the Court should deny the motion to dismiss in full.

## STATEMENT OF FACTS[1]

### A.    Robinhood

Robinhood is a financial services company primarily known for its brokerage services, which customers typically access through an app installed on their mobile devices. ¶2. Unlike traditional brokers, Robinhood does not charge customers a fee for executing a trade. ¶62. Rather, Robinhood is a commission-free broker that earns its revenue through a process known as "payment for order flow" ("PFOF"). *Id.* PFOF is the practice of market makers or exchanges paying broker-dealers such as Robinhood to route trades to a particular market maker or exchange for execution. *Id.* PFOF comprises the majority of Robinhood's revenue. For example, for 2020, revenue derived from PFOF represented 75% of the Company's total revenues. ¶69.

PFOF has been highly criticized by the United States Securities and Exchange Commission ("SEC") because it creates a potential conflict of interest in that brokers are incentivized to sell flow to market makers who pay more even if those market makers have worse spreads. ¶70. SEC Commissioner Gary Gensler ("Gensler") has stated PFOF "provides an opportunity for the market maker to make more, and for ultimately the investing public to get a little less when they sell, or

---

[1]    All "¶" or "¶¶" citations herein are to the Amended Class Action Complaint (the "Complaint") (ECF No. 75).

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

have to pay more when they buy." *Id.* Gensler specifically criticized Robinhood for having "explicitly offered to accept less price improvement for its customers in exchange for receiving higher payment for order flow for itself. As a result, many Robinhood customers shouldered the costs of inferior executions." *Id.* In December 2020, the SEC charged Robinhood for repeated misstatements that failed to disclose the firm's receipt of payments from trading firms for routing customer orders to them, and with failing to satisfy its duty to seek the best reasonably available terms to execute its customer orders. ¶71. Robinhood agreed to pay $65 million to settle the SEC's charges. ¶74.

### B. Prior to the IPO, Robinhood Engaged in Numerous Problematic Business Practices, Severely Damaging Its Customer Relationships

Prior to and at the time of the IPO, Robinhood was engaged in numerous problematic business practices and was operating without sufficient controls leading to widespread customer dissatisfaction as evidenced by data provided to the Company's management.

*First*, Robinhood exposed customers to heightened risk of losses in order to generate more revenue for itself. CW1, who worked in customer analytics from 2018 to late 2021, reported that Robinhood permitted investors to access riskier trading methods even though the Company's internal data showed that customers did not understand them. ¶¶87, 105. For example, Robinhood granted customers, even novice ones, access to margin trading. ¶105. To assess the capabilities of its customers, in early 2020, Robinhood sent a survey to customers asking basic questions about margin trading. *Id.* The data showed that customers with access to margin trading answered correctly at a rate "worse than chance." *Id.* CW1 discussed the results of this analysis with Defendants Tenev and Bhatt and, given the risk entailed in margin trading, recommended installing more barriers to entry for complex trading or lowering the interest rates for customers borrowing on margin. *Id.* In addition, CW1 asked Defendants Tenev and Bhatt to make changes that would educate Robinhood customers about the benefits of long-term trading. However, CW1 was shut down by upper management and "actively disincentivized" from working towards this goal. *Id.*

Relatedly, CW1 also recalls discussing with executives that Robinhood customers had a terrible rate of return. ¶110. CW1 was informed that for 2020, Robinhood customers had an

4

average rate of return of -9%. *Id.* That was dismal compared to the S&P average for the year.[2] *Id.* CW1 raised this in a monthly meeting and was told that he was not to bring it up again, and that no one cared. *Id.* In mid-2020, CW1 met with members of Robinhood's C-Suite to discuss the concerning trends and topics CW1 had uncovered in CW1's research. CW1 advised Robinhood's C-Suite that encouraging long-term investing would be a better strategy for Robinhood because it would increase customer's returns, encouraging them to stay with the Company and bring other investors to the Company. ¶111. Defendant Bhatt said he would think about the proposal but did not follow up; Robinhood's CFO Jason Warnick "threw a fit" and gave a sweeping talk about how he did not want to restrict customers' choices. *Id.*

CW2 stated that in her experience, Robinhood was a "reckless" company that "targets naïve traders." ¶114. CW2 was an options-trading specialist whose job was to answer customer complaints, concerns, or questions pertaining to options trades. *Id.* Options trading involves complexities that stock and bond trading do not. *Id.* But Robinhood made it very easy for customers to access options trades. ¶115. Per CW2, customers simply had to answer a trading quiz to gain access. *Id.* There were no controls if a customer lied or exaggerated his or her trading ability. *Id.* A customer could also override the quiz by calling a customer representative, even if the customer had given a "red flag" answer in the quiz that raised concerns about the investor's trading knowledge. *Id.* Two or three times a week, CW2 dealt with "disaster cases" resulting from novice traders having the highest level of trading access. *Id.*

In the months prior to the IPO, Robinhood recognized that its practices were hurting customer relationships. CW1 took part in monthly management meetings attended by all members of the C-Suite and other managers, including all who were director level and above. ¶107. Defendants Tenev and Bhatt attended these meetings. *Id.* The meetings covered many topics, including Robinhood's Net Promoter Score ("NPS"). *Id.* The NPS represented how likely Robinhood customers were to recommend the product to others and was seen as an important metric. *Id.* It was measured by subtracting the percentage of customers that would not recommend Robinhood from the percentage of customers that would. *Id.* This data was collected in surveys

---

[2]    The S&P returned 16.26% in 2020.

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

sent out to Robinhood users.  *Id*.  In the months prior to the IPO, Robinhood's NPS suffered together with other growth metrics.  *Id*.  CW1 also sent questionnaires to customers regarding security.  ¶113.  The responses were always "really bad."  *Id*.  Customers were concerned about security at Robinhood, which led to lower NPS.  *Id*.  CW2 also noticed these negative customer sentiment trends in the months leading up to the IPO.  ¶¶117-20.

*Second*, Robinhood operated without sufficient internal controls.  Confidential Witness #3 ("CW3") was a contracted fraud analyst who worked at Robinhood from mid-2020 through July 2021.  ¶94.  CW3 reported that Robinhood's fraud department was "extremely poorly managed, not sophisticated" and that there was a "ridiculous backlog" during CW3's "whole tenure."  *Id*.

One area CW3 was working on was ACH fraud, which involves funds being withdrawn from a customer account without authorization, for example, when someone other than the authorized user takes over or compromises a customer account.  ¶95.

CW3 observed that there was no automated surveillance system in place that flagged signs of fraudulent activity in customer accounts.  ¶96.  Moreover, Robinhood did not make it easy to resolve fraud.  *Id*.  If a hacker gained access to an account and performed unauthorized trades, the account owner could not access their account and withdraw the remaining funds in order to protect themselves.  *Id*.  Rather, in order for Robinhood to make the customer whole, the customer would have to later redeposit the funds in an account.  *Id*.  Robinhood also made it "hard to close accounts" where suspicious activity was occurring.  ¶97.  The policy was that an account would only be closed if there was "conclusive evidence" of fraud.  *Id*.

CW3 witnessed a surge of fraud activity beginning in the Christmas 2020 through January 2021 timeframe that reached overwhelming levels.  ¶98.  CW3 raised with the manager of ACH fraud that the Company should try to streamline the identification of fraudulent ACH incidents, but CW3's manager was not interested in the idea.  *Id*.  CW3 offered to design a system to automate ACH-fraud identification but was told that "software engineers are expensive."  *Id*.  CW3 also observed that "there were concerns that safeguards would ruin the streamlined experience of the app."  *Id*.  The whole idea of Robinhood was to make it easy and fast for retail investors to trade.

*Id.* Robinhood's managers discouraged CW3 from discussing ways to "stop" or "slow [ ] down" fraud on the Company's platform. *Id.*

Confidential Witness #4 ("CW4") was a contracted fraud analyst at Robinhood from mid-2020 to August 2021. Over the course of that period, CW4 observed that the pressures placed upon fraud analysts expanded exponentially, leading to significant frustration among employees. ¶99. CW4 reviewed customer accounts that were displaying signs of potentially fraudulent activity. *Id.* The accounts were escalated to the fraud department via the internal CRX department. *Id.* CW4 observed that the CRX department was unable to do its job of parsing through the accounts and ended up escalating everything to the fraud department. *Id.* Part of the reason for the CRX department's failure was that they were overwhelmed themselves, a common complaint among Robinhood employees. *Id.* CW4 explained that the Company tended to add responsibilities to already overloaded employees instead of establishing protocols or creating new roles. *Id.*

The fraud department met every other week as a whole. In the months prior to the IPO, the meetings were attended by the Vice President of Operations. ¶100. CW4 witnessed in the months leading up to the IPO an extreme backlog of reviews. *Id.* CW4 witnessed fraud trends related to Robinhood debit cards and service disruptions. These led to customer losses. *Id.* CW4 also observed that Robinhood did not have any protocols in place to deal with the rising inflow of fraud reviews. ¶101. CW4 observed that there were barely any established protocols regarding fraud protection, let alone rules to help further the process of examining potential fraud. *Id.*

In CW4's view, Robinhood perceived fraud reviews as "minor" and was much more concerned with driving revenue. ¶102. CW4 recalled that, as a result of the backlog, he worked on fraud reviews that were 30 days old, which he remembered was well after the federally mandated time period for conducting a fraud assessment. *Id.* In the months before the IPO, Robinhood's review backlog began to increase due to third-party access disruptions. *Id.* Robinhood accounts were being accessed by third parties at increasing rates, which in turn raised the number of fraud reviews. *Id.* Aside from the backlogs, Robinhood customers experienced several disruptions to the platform. ¶103. After customers complained that their accounts were frozen or disrupted, those complaints would go to the fraud department for analysis. *Id.* CW4

7

recalled how frustrated customers were at how slow the process was for Robinhood to respond to them. *Id*. CW4 also recalled that a concerning number of customers asked for their accounts to be closed due to the combination of the foregoing issues, including the disruptions and backlog. ¶104. In the November 2020 through January 2021 time period, management commented on the customer losses during fraud department meetings. *Id*.

Also, in late November 2020, there was a "mini firestorm" at Robinhood related to "B Notices." ¶122. CW5 explained that B Notices were tax notices that customers had to respond to. *Id*. Despite knowing that customers had to respond, Robinhood was not prepared to assist customers leading to lengthy ques of tens of thousands of customer inquiries. *Id*. The experience underlined for CW5 that Robinhood was not capable of operating at scale. *Id*. CW5 likewise observed that Robinhood had serious training problems. ¶123.[3] Customer service training was much less in depth, for example, then at competitors such as Charles Schwab. *Id*. Robinhood only put customer representatives through basic training and did not have any dedicated teams (except for a white glove team that handled cases where there was a threatened lawsuit). *Id*. Representatives often struggled to deal with complicated questions from investors, making them less productive and leading to both a backlog of, and untimely responses to, complaints. ¶124. CW5 raised these concerns to CW5's manager multiple times but was ignored. *Id*. CW5 recalls that customers were irate with how long their complaints and questions took to process. *Id*.

The training issues were never corrected. When a customer was not satisfied with a scripted answer provided by a representative, the customer was escalated to CW5. ¶125. These customers were often irate and asked for their accounts to be closed. *Id*. These cancellations were occurring in the lead up to the IPO and CW5 raised them repeatedly in management meetings. *Id*. Despite the attention provided by CW5, the Company provided no meaningful response. *Id*. In the aftermath of the GameStop incident in January 2021, Robinhood experienced a surge of customer cancellations. ¶126. Prior to GameStop, attrition was not a substantial problem. *Id*. Afterwards, there was a "huge uptick." *Id*. The cancellations continued at an elevated level throughout 2021 and into 2022. *Id*.

---

[3] Due to a typo, the Complaint mistakenly attributes this to CW1.

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

Again, CW5 attended weekly all-hands meetings where Defendants Tenev and Bhatt were present.  CW5 recalls that during one meeting, an employee asked if new customer requests could be put on hold for a time until employees could catch up and felt ready to take them on.  ¶127.  The question was "up voted" but ultimately turned down and not answered by either Defendant Tenev or Defendant Bhatt.  *Id.*

In June 2021, FINRA applied a nearly $70 million penalty on Robinhood for a sweeping set of allegations, including misleading investors about trading with borrowed money and lacking sufficient controls in its technology and options trading approval process.  ¶74.  FINRA issued a release entitled "Firm ordered to pay approximately $70 million for systemic supervisory failures and significant harm suffered by millions of customers."  See Exhibit 1 to the Declaration of Thomas Laughlin filed concurrently herewith ("Laughlin Decl").  FINRA stated that the fine was the "highest ever" levied by FINRA, reflecting the "scope and seriousness of Robinhood's violations, including FINRA's finding that Robinhood communicated false and misleading information to millions of its customers."  *Id.*

### C.    In the Months Prior to the IPO, MAU and Other Key Metrics Plummeted

Undisclosed to investors, Robinhood witnessed a major decline in MAU in the lead up to the IPO.  MAU was a KPI that Robinhood touted as measuring customer "engagement."  ***Between May 2021 and July 2021***, MAU declined by 4.6 million users, a 19% decline (¶129).



Similarly, Robinhood's total crypto trading volume ***cratered*** between May 2021 and the IPO.  ¶131.  As shown in the chart below, in June 2021, Robinhood ***lost $97 billion*** worth of crypto

trading volume, representing a ***decline of over 76%*** in this 30-day period.  ¶¶131-32.  To make matters worse, Robinhood then lost an additional ***$1 billion*** in crypto trading volume in July 2021, representing a total decline of approximately 90 percent.  *Id*.  This was significant because crypto revenue had made an outsized contribution to Robinhood's bottom line in 2Q21, accounting for approximately $320.7 million of the approximately $871.6 million Robinhood generated in total transaction-based revenues for the period.  ¶133.

**2021 TOTAL CRYPTO TRADING VOLUME (IN BILLIONS)**

| Apr | May | Jun | Jul |
|-----|-----|-----|-----|
| $76 | $127 | $30 | $13 |

AUC were likewise falling before the IPO from $102 billion to $94.7 billion.  ¶135.  The Company's Average Revenue Per User ("ARPU") was also falling fast, from $137 at the end of March to $65 at the end of September 2021.  ¶134 and ¶134 n. 4.

Robinhood's ability to analyze the foregoing performance data was instantaneous, or was nearly so.  CW1 reported that Robinhood used Looker, a data platform, to track its performance data and create performance data dashboards.  ¶87.  Looker advertises itself as a platform that allows "for real-time dashboards for in-depth, consistent analysis."  *Id*.  CW1 had access to some of Robinhood's Looker dashboards, including those that displayed Robinhood's MAU, customer attrition, net new customer and funded account metrics.  *Id*.  CW1 and CW2 observed that Robinhood's top officers, including Defendants Tenev and Bhatt, discussed the pre-IPO decline of MAU at weekly all-hands meetings.  ¶¶108, 118-19.

**D.    Defendants Failed to Disclose the Serious Pre-IPO Deterioration in Robinhood's Business and Misleadingly Claimed That the Company's Strategy Was Successfully Driving Growth**

Though Robinhood had been hemorrhaging users, assets under custody and revenue for months by the time of the IPO, those facts were absent from the Offering Documents. Absent too was the fact that customers were turning away from Robinhood in the wake of security concerns, steep losses encouraged by Robinhood's churning of investors, non-responsiveness to customer concerns and rampant miscommunication.

Instead, according to the Offering Documents, Robinhood's strategy was a resounding success that was driving Robinhood to ever greater growth in terms of customers and assets under custody. According to the Offering Documents, Robinhood's "mission to democratize finance for all [drove its] revenue model" and the Company had "grown rapidly and achieved significant scale in recent periods." ¶5. By "chang[ing] the landscape of retail investing," Robinhood had supposedly "positioned" itself to "serve an increasing portion of [the] population." ¶141. Further, Robinhood's purported extensive investment in security and responsiveness to customer complaints had supposedly built "deep, loyal customer relationships" and "positioned" the Company to "continue attracting new people to [its] platform." ¶144.

As proof of its successful strategy, the Offering Documents was filled with charts and tables of KPI data depicting enormous growth. For example, the Offering Documents heavily touted growth in MAU, which, rose from 4.3 million by year end 2019, to 11.7 million by year end 2020, to 17.7 million by March 31, 2021, and which Robinhood stated would be 21.3 million for the three months ended June 30, 2021, the quarter that ended the month before the IPO. ¶5.



Likewise, the Offering Documents emphasized the Company's revenue growth, from $224.2 million for the three months ended June 30, 2020, to $269.5 million for the three months ended September 30, 2020, to $317.5 million for the three months ended December 31, 2020, to $522.2 million for the three months ended March 31, 2021, and to approximately $560 million (at the midpoint of the range provided by management) for the three months ended June 30, 2021, as illustrated below.  ¶6.

**TOTAL REVENUE (IN MILLIONS)**

| Quarter | Revenue |
|---|---|
| 1Q19 (A) | 56.1 |
| 2Q19 (A) | 71.7 |
| 3Q19 (A) | 77.5 |
| 4Q19 (A) | 72.2 |
| 1Q20 (A) | 127.6 |
| 2Q20 (A) | 244.2 |
| 3Q20 (A) | 269.5 |
| 4Q20 (A) | 317.5 |
| 1Q21 (A) | 522.2 |
| 2Q21 (E) | 560.0 |

Similarly, the Offering Documents hyped the substantial increases in Robinhood's AUC, from approximately $14.1 billion in 2019, to nearly $63 billion in 2020, to $80.9 billion in the first quarter of 2021 alone, to an expected $102.04 billion in 2Q21.  ¶7.

**E.    The Market Begins to Learn About the Massive Customer Retention Problems, Asset Losses and Revenue Declines at Robinhood**

On October 26, 2021, after the market closed, Robinhood revealed that for 3Q21, MAU had fallen from 21.3 million reported as of June 2021 to 18.9 million.  ¶165.  The vast bulk of the decline in MAU – the fall from 21.3 million to 19.5 million – had occurred prior to the IPO.  ¶163. The Company also reported much lower revenue and worse KPI data.  ¶165.  An analyst at Mizuho commented that "top-line results" were "significantly below expectations" and highlighted lower "MAUs."  *Id*.  The analyst wrote, "we expect a negative stock reaction."  *Id*.  Jim Cramer, an analyst on the financial news network CNBC, commented that the earnings call made him "depressed" because "if you read the conference call, you'd think it was a fad . . . and if it's a fad,

12

well what can I say?"  ¶14.  The market continued to learn more about the dismal state of Robinhood's security, internal controls and customer retention issues over the next few months. Commenting on the trend in January 2022, JP Morgan concluded that Robinhood is "***a growth company without the growth***."  *Id.*

As shown in the below chart, the Company's shares have traded as low as $6.87 per share since the IPO, representing a decline of nearly 82% from the Offering Price of $38.



## LEGAL STANDARD

Securities Act claims are governed by a Rule 8(a)(2) notice pleading standard, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 624 (9th Cir. 2017).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, the Court should accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See, e.g., In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 765 (N.D. Cal. 2020).

## ARGUMENT

## I.    PLAINTIFFS HAVE ADEQUATELY STATED SECTION 11 CLAIMS

Section 11 of the Securities Act ("Section 11") imposes liability on Defendants if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a).  Section 11 imposes liability on Defendants for negligence, and places a minimal burden on Plaintiffs: "[i]f a plaintiff purchased a security issued pursuant to a

registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "No scienter is required for liability under §11[.]" *See In re Daou Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005).[4]

### A. The Offering Documents Violated the Affirmative Duties to Disclose Imposed by Items 105 and 303

Defendants violated affirmative duties to disclose imposed by Items 105 and 303 by failing to disclose the massive pre-IPO declines in Robinhood's business.[5] Defendants also violated Items 105[6] and 303 by failing to disclose that the Company had materially departed from its stated business strategy. A failure to comply with Items 105 and 303 states a claim under Section 11. *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("Allegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)."); *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) ("Because the Complaint alleged that [the company] failed to disclose [adverse data points], even though it knew about them, we cannot conclude that it failed to state plausible §11 claims for omissions of Item 303 uncertainties and Item 503 risks"); *see also Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701,713-16 (3d Cir. 2020).[7]

#### 1. Defendants Violated Item 105

---

[4] Section 12(a)(2) "contain[s] roughly parallel elements" to Section 11 but holds liable those who sell securities to investors by means of a materially false and misleading prospectus. Accordingly, Plaintiffs' Section 12 claims should be sustained for the same reasons as their Section 11 claims. *See generally Rafton v. Rydex Series Funds,* No. 10-cv-1171, 2011 WL 31114, at *6-7 (N.D. Cal. Jan. 5, 2011).

[5] Defendants try to rewrite the complaint with their baseless claim that Plaintiffs' "primary" challenge is to Robinhood's claim that it is "democratiz[ing]" investing. *See* Def. Br. at 2. Defendants' attempt to create a straw man argument is both wrong and irrelevant.

[6] Item 503(c) was relocated to Item 105. FAST Act Modernization and Simplification of Regulation S-K, 84 FR 12674-01.

[7] Defendants argue that violations of Items 105 and 303 do not state a claim under the Securities Act. *See* ECF No. 78 at 16 n. 49. However, Defendants also admit that their position conflicts with controlling Ninth Circuit authority and state that they are not seeking dismissal on this ground. *Id.* Should Defendants raise this issue again, Plaintiffs will address it in further detail.

14

Item 105 requires "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." Item 105 "is intended to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Silverstrand*, 707 F.3d at 103. "[T]he inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid." *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 Civ. 9848, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020). An issuer violates Item 105 when its risk disclosures present a risk as contingent when it has come to fruition. *Mingbo Cai v. Switch, Inc.*, No. 218CV01471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) ("Although the prospectus includes over thirty pages of risk disclosures, defendants identify only general statements that the company faced risks associated with long selling and implementation cycles…. These kinds of boilerplate risk factors do not satisfy the requirements set forth in item 503.") *Gerneth v. Chiasma, Inc.*, No. 16-11082, 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018).

Here, the Offering Documents were not "accurate and candid" as required by Item 105. The premise of Robinhood's IPO was that it had captured a broad swath of new investors through innovative business practices as proven by Robinhood's massive growth, which Robinhood touted in numerous charts and discussions throughout the Offering Documents. ¶¶5-9, 58-61, 80, 140-161. But the Offering Documents failed to disclose major negative facts that existed at the time of the IPO that powerfully undercut this narrative, including that MAU had begun falling sharply in May. ¶¶129-30. This trend was highly material because Robinhood's growth was its proof of concept, *i.e.,* the evidence that the Company had "changed the landscape of retail investing," had "built deep, loyal customer relationships" and was "well positioned to serve an increasing portion of the broader population." *See* ¶¶141-44. Conversely, the true facts – a major ongoing decline in MAU – indicated that Robinhood was potentially a "fad." ¶168. Accordingly, reasonable investors would certainly consider this decline to be material. *See In re Twitter, Inc. Secs. Litig.*, No. 16-5314, 2020 WL 4187915, **9-10 (N.D. Cal. Apr. 17, 2020) (discussing materiality of MAU data and denying summary judgment). Indeed, the SEC has interpreted the Securities Act disclosure obligations to mean that "an erosion in the registrant's market share" is a material fact that needs to be disclosed. *See* Management's Discussion and Analysis of Fin. Condition &

15

Results of Operations; Certain Investment Company Disclosures, SEC Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

Relatedly, the Offering Documents failed to disclose a 90% reduction in the volume of crypto currency trading volume, from $127 billion in May 2021, to $13 billion in July 2021. ¶131. This too was highly material because increased cryptocurrency revenue was the principal driver of Robinhood's increased revenue at the time of the IPO. ¶¶69, 133. Further, Robinhood's AUC and other KPI's, the critical metrics that Robinhood touted to investors as useful indicators of its business, were all falling or stagnating at the time of the IPO. ¶¶128-139.

With respect to the undisclosed deterioration in MAU and the other KPIs, Defendants' only argument in support of dismissal is the dubious claim that the Offering Documents disclosed that Robinhood "anticipated declines in the Company's financial results relative to the beginning of 2021." Def. Br. 24-25. This argument fails because Defendants disclosed nothing about the sharp declines in MAU or the other KPIs that occurred in the months prior to the IPO. Thus, no investor could have discerned that an ongoing major loss of customers was a risk. The disclosure that Defendants rely on merely stated that "revenue" in the next quarter was expected to be lower than in 2Q21 due to "decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies" and "expected seasonality." *See Id*. at 23. A disclosure that "revenue" may dip due to lower trading and seasonality does not adequately warn investors about a 90% decline in the category of trading volume that had fueled Robinhood's revenue growth, let alone a decline in MAU, or the other KPIs which were not even mentioned at all.

The one authority cited by Defendants – *In re Progenity, Inc.* No. 20-cv-1683, 2021 WL 3929708 (S.D. Cal. Sept. 1, 2021) – actually demonstrates the inadequacy of their disclosures here. In that case, the company explicitly disclosed "significant declines in the volumes of our molecular tests . . . due to the impact of the COVID-19 pandemic." *Id*. at *7; *id.* at *12 ("the Registration Statement actually discloses negative trends in Progenity's revenue that Defendants had observed by the time the Registration Statement took effect"). In contrast, here, Defendants cannot point to any part of the Offering Documents that actually disclosed that a "significant decline" in MAU or any other KPI had occurred prior to the IPO. The generic warnings about hypothetical problems

that were included in the Offering Documents certainly does not justify dismissal because "no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred." *Lin v. Interactive Brokers Grp., Inc*., 574 F. Supp. 2d 408 (S.D.N.Y. 2008).

With respect to crypto trading volumes, the statement regarding lower revenue in 3Q21 is a misleading half-truth at best because it (i) did not allow an investor to understand the magnitude of the risk that had already occurred and (ii) misleadingly blamed other factors such as "seasonality" for the expected decline.  Discussion of a problem in "generalized and indefinite terms . . . fail[s] to constitute sufficient disclosure where [the company] knew of the certainty of the trends" at the time of the IPO.  *In re Facebook, Inc. IPO Sec. and Derivative Litig*., 986 F. Supp. 2d 487, 511 (S.D.N.Y. 2013).  Also, by blaming "seasonality" and couching the issue as a decline "relative" to "record highs," the Offering Documents masked the extent of the problem and was inadequate for that reason as well.  *Id*.  ("Thus, the Registration Statement did not provide the extent increasing mobile users would affect the Company's overall revenues at a time this trend was already affecting the Company's revenues as a result of the Company's product decisions. Facebook should have disclosed more of this relationship to investors.").   At the time of the IPO, Robinhood was not seeing a "seasonal" dip from record high results.  To the contrary, it was seeing a total collapse in the sector that had been instrumental in the Company's 2Q21 results.  ¶¶69, 131, 133.  An investor could not have discerned these facts from the Offering Documents.

Market reactions also provide additional evidence that Robinhood's disclosures with respect to the decline in cryptocurrency revenue were inadequate.  For example, analysts expressed surprise in October 2021 at Robinhood's results, remarking that they were "significantly below expectations" and a "far sharper drop than the 35% reduction in total crypto trading volume across the industry."  ¶¶165-66; *see also* ¶167 ("Robinhood shares tank as revenue falls way short of expectations on lighter crypto trading.").   Similarly, Robinhood's stock price declined significantly, undercutting Robinhood's claim it was "transparent" with investors and adequately disclosed all material information regarding the decline in its crypto currency business. *See, e.g*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (citing

"precipitous decrease" in share price that occurred after disclosure of truth as evidence of materiality); *see also Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("significant stock drop further supports an inference of materiality").

Finally, the Offering Documents were not candid about the Company's widespread departure from its stated business strategy or the damage this was doing to the Company's customer relationships. It is material and actionable when a company abandons stated business practices or mispresents the basis for its success. *See e.g. Mulligan v. Impax Lab'ys Inc.*, 36 F. Supp. 3d 942, 960-8 (N.D. Cal. 2014); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.,* 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) (holding that it was misleading to tout its "engineering capabilities and experience" as a reason for its success when another reason for its success was an alleged bribery scheme); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271-72 (S.D.N.Y. 2010) (statements emphasizing "cautious" and "conservative" underwriting were actionable); *In re PMA Cap. Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *16-17 (E.D. Pa. July 27, 2005). That is particularly true when, as is the case here, the divergence between representation and fact affects a company's core business. *Impax*, 36 F.Supp.3d at 968.

At the time of the IPO, rather than continuing to expand its customer base through its innovative business strategy, Robinhood was actively driving away customers through a slew of destructive decisions that prioritized its own short-term revenue gains over building the "deep, loyal customer relationships" the Offering Documents touted as key to Robinhood's success. Among other things, the Company: (i) structured its platform to encourage frequent trading and undermine customers' ability to earn profits (ii) under invested in security (iii) under invested in customer relations and anti-fraud personnel and (iv) exposed unsophisticated investors to complicated financial products that could cause heavy losses. *See, e.g.* ¶¶11, 94-127. Many of the Confidential Witnesses ("CWs") reported that these issues were actively driving large numbers of customers away from the Company in the run up to the IPO, including CW1, who worked in customer analytics and who had access to Robinhood's customer survey data showing declining views of Robinhood. ¶¶104-05, 108, 111, 117-19, 125-6, 148.

Defendants dismiss the CWs as "low level" employees who could not see the whole picture. But Defendants ignore that CW1 had a Company-wide view of customer feelings through his review of survey data. ¶¶105, 107. Moreover, the CWs' accounts are buttressed by the June 2021 FINRA penalty, which was based on a finding that Robinhood's bad practices had affected "millions" of customers. *See* Ex.1 to the Laughlin Decl.

Defendants also say they disclosed all of their bad practices. But Defendants certainly did not disclose the extent or severity of these problems or the fact that, at the time of the IPO, these practices had undermined Robinhood's ability to grow its customer base, which was critical to Robinhood's core business. To the contrary, the thrust of the Offering Documents was that the Company had put its bad practices behind it, was making large investments in security and customer service, and was successfully building "deep, loyal customer relationships." ¶144; ¶143 (stating that Robinhood was "maintain[ing] strong relationships with our loyal customer base and earning customers trust" and was "keeping our customers accounts safe" and "helping our customers build sustainable, long-term financial success."); ¶142 ("well never sacrifice what's in our customers' long-term beset interest in order to 'make a quarter'"). Moreover, the discussion of problems that existed in the past is not a sufficient disclosure. *See Facebook*, 986 F. Supp. 2d at 511 ("Identification of a past trend does not satisfy a company's disclosure obligations").

### 2.   Defendants Violated Item 303

Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Under Item 303, "a disclosure duty exists where a trend, demand, commitment, event or uncertainty is ***both*** [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation" (emphasis in original). *Steckman*, 143 F.3d at 1296-97.

Here, Plaintiffs have alleged that the decline in KPIs and divergence from business strategy was known to Robinhood management. ¶¶87, 107-8. (CW1 observed that MAU data was frequently reviewed in management meetings, including in weekly all-hands meetings, that MAU

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

declined in the months leading up to the IPO, and that Defendants Tenev and Bhatt presented the data and acknowledged the declining metric); *see also* ¶¶104-05, 110-13, 118-20, 127.  Plaintiffs have also pled that they were reasonably likely to have material effects on Robinhood's results as a decline in MAU or cryptocurrency trading volumes was reasonably likely to directly impact Robinhood's results given its payment for order flow business model.  ¶¶62-4, 69, 82.  With respect to the internal control issues, these are the factors that accounted for the undisclosed negative changes in MAU and other KPIs and, therefore, needed to be disclosed.[8]  ¶¶87, 92, 104-05, 110-13, 118-20, 125, 127, 146.  Therefore, Plaintiffs have adequately stated a claim under Item 303.  *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020); *In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-cv-4531, 2017 WL 4941597, at *3-4 (S.D.N.Y. Oct. 30, 2017).

Defendants also argue that the two-month trend in declining financial metrics is too short to require disclosure under Item 303.  Def. Br. at 25.  However, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage."  *Id.,* at 386.  Two months is certainly long enough to constitute a trend.  Indeed, *Steckman* held that a "slowdown" that arose in the "middle of the IPO quarter" was a trend or uncertainty under Item 303.  143 F.3d at 197.[9]

Defendants also make the novel argument that Item 303 does not apply to the Company's most recent financial information.  Def. Br. at 24.  The argument does not cite to any supporting case law and only vaguely cites "generally" to Item 303 in its entirety and to another regulation.  *Id*.  Moreover, it is seemingly inconsistent with *Steckman* and case law elsewhere holding that a company must disclose trends that exist at the time of the IPO.  *See also Facebook*, 986 F. Supp. 2d at 509 ("[A]ll Item 303 requires in order to trigger a disclosure obligation [is] a known trend that [defendant] reasonably expected would materially affect its investments and revenues.") (*Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 715 (2d Cir. 2011)); *Id*. at 512 ("disclosures under

_____

[8]    Thus, Defendants' characterization of these issues as "strategy plans" outside the scope of Item 303 fails.  Def. Mem. at 16-17.

[9]    Many other courts have issued similar rulings.  *See, e.g*., *Panther*, 681 F.3d at 116-17, 121; *In Re Violin Memory Sec. Litig.*, No. 13-CV-5486-YGR, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014); *Facebook*, 986 F. Supp. 2d 524, 538 (S.D.N.Y. 2014); *McKenna v. SMART Techs. Inc.*, No. 11 CIV. 7673, 2012 WL 3589655, at *4 (S.D.N.Y. Aug. 21, 2012).

20

Item 303 were required to be accurate and complete as of the time Registration Statement became effective. Defendants' duty under Item 303 was triggered before the Registration Statement became effective: Facebook was aware of the material negative impact on Facebook's revenues the Company had suffered as a result of increasing mobile usage and the Company's product decisions ten days before the IPO. That Facebook identified the trend intra-quarter is of no issue; under Item 303, Defendants were required to disclose the issues even though it arose intra-quarter.").

### B.    The Offering Documents Made Numerous Misleading Representations

#### 1.    The Offering Documents Represented that a Decline in MAU and Other KPIs Was Only a Contingent Possibility When It Had, In Fact, Occurred

The Offering Documents misleadingly stated that a decline in MAU was only a possibility when, in fact, it had occurred. In this regard, the Offering Documents stated, "We *may* not continue to grow on pace with historical rates," and noted that "since March 2020, we have experienced a significant increase in revenue" and "MAU" and other KPIs. ¶154. This statement was misleading because Robinhood had lost 4.6 million users in the months before the IPO and its other KPIs were falling or stagnating. ¶¶129-39, 153. It is a "deceit" to "'caution that it is only possible for the unfavorable events to happen when they have already occurred.'" *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Defendants also argue that reasonable investors wouldn't have been misled because federal regulations warned them that [the company's] customers might issue stop-work orders. . . . But learning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently."); *In re Apple Inc. Sec Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *17 (N.D. Cal. June 2, 2020) ("when the risks have already materialized, disclosing them 'in the abstract' while omitting that they have 'already come to fruition' is misleading"); *Constr. Laborers Pension Tr. for S. California  v. CBS Corp.*, 433 F. Supp. 3d 515, 536 (S.D.N.Y. 2020) ("Risk disclosures are actionable half-truths when the company warns about

a risk that could have an impact on its business when, in fact, that risk has already materialized."). Notably, Defendants do not specifically argue that ¶154 fails to state a claim.

### 2.    The Offering Documents Misleadingly Represented That Robinhood's User Base Was Growing When, In Fact, It Was Plummeting

Defendants misleadingly represented that Robinhood's user base was growing when, in fact, customers had been abandoning the Company for months in a startling reversal of a key trend relied on by Robinhood to market its IPO.  The Offering Documents contained numerous charts showing explosive user and account growth, and advised investors that "preliminary information currently available to management" showed that the growth had continued through June 30, 2021, with MAU going from 17.7 million users to 21.3 million users.  ¶¶149-151.  While the Offering Documents indicated that the "rate of growth" for MAU may slow, these statements were themselves misleading because, in context, they imply continued growth – or at least stability – with respect to MAU when, in fact, Defendants knew these metrics were declining.  ¶¶152 and 156.  The statements that Robinhood was "well" "positioned" to "continue attracting new people" to its "platform" (¶144) and that the Company was "well-positioned" to serve an "increasing portion of the population", were misleading for the same reason.  ¶141.

For this reason, numerous courts have found allegations that a company represented that its customer base was growing or stable when, in fact, it was falling, sufficient to plead falsity. *See, e.g.*, *Twitter*, 2020 WL 4187915, **9-10 (denying summary judgment regarding alleged misstatement "our MAU trend has already turned around" when defendants allegedly failed to disclose negative MAU data because, in context, the statement implied "a positive trend" that was misleading in light of the failure to disclose adverse MAU data); *see id.* (discussing materiality of MAU data); *Apple*, 2020 WL 2857397, *11 (holding that plaintiff had adequately pled it was false for *Apple* to represent that "iPhone sales in Greater China were increasing" when, it was alleged that "market share" was "declining"); *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1106 (N.D. Cal. 2013) (holding that plaintiff had adequately pled that it was false to represent that "'in terms of market share, OmniVision's OEM relationships remained unchanged'"

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

when, in fact, it was alleged that the company had lost a contract); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009).

Defendants argue that these statements are not actionable because they "merely restate" accurate "historical information." Def. Br. at 20. That argument fails for two reasons. First, Defendants are doing more than restating "historical results," they are representing that Robinhood had strong MAU growth through 2Q21, while failing to disclose that MAU was declining at the time of the Offering. As Defendants state, the "Offering Documents… must be read as a whole." Def. Br. at 13. Plaintiffs agree. The context for these representations was a calculated effort to convince investors that Robinhood's growth story was continuing at the time of the IPO. Among other things, Defendants (i) included charts and tables showing skyrocketing growth in the Offering Documents. ¶¶149-51; (ii) told investors they should believe in Robinhood's growth story because Robinhood had an innovative, highly successful, strategy for gaining new users (see infra pgs. 24-25); and, (iii) included risk disclosures that only discussed MAU and other KPI declines as contingent possible risks, not facts that were actually occurring (see supra pgs. 21-23). The touting of 2Q21 results and the discussion of continued "growth" in 3Q21 was part and parcel of the same misleading effort, and these representations were misleading in light of the failure to disclose a months-long decline in MAU that began in the middle of 2Q21.[10]

Second, "[L]iteral truth is not the standard for determining whether statements ... are misleading. . . Even if a statement is technically accurate, a party may be obligated to disclose additional adverse information that cuts against the positive information if it chooses to tout the positive data." *Apple*, 2020 WL 2857397, *10 (quoting *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) and *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1015 (9th Cir. 2018)). Accordingly, Robinhood cannot tout its stale positive data without disclosing the months of MAU data that directly contradicted positive data. *Id.* For example, in *Khoja*, a company was found to have misled the market by touting earlier trial results without disclosing a later set of less favorable

---

[10]    Defendants' argument regarding the bespeaks caution doctrine fails because (i) statements regarding ongoing growth are not forward looking and because (ii) Robinhood did not include meaningful cautionary language informing investors of the massive declines that had already occurred. *See Westley v. Oclaro Inc.*, 897 F. Supp. 2d 902, 917-919 (N.D. Cal. 2012).

data.  *Id.*  ("Although the 25 percent interim results were still technically accurate, the issue is whether, having learned new information that diminished the weight of those results, Orexigen was obligated to share that information.  We conclude that Orexigen was so obligated."); *In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d at 1196 (N.D. Ill. 2009).[11]

Defendants argue that they had no duty to disclose "intra-quarter" results.  However, that argument is a red herring because Plaintiffs are not arguing that Robinhood had a general duty to disclose intra-quarter results.  Rather, Plaintiffs argue that Defendants made affirmative misstatements regarding Robinhood's ongoing success in growing its user base that were mislieading in light of their failure to disclose the rapid decline in MAU that directly contradicted that representation.  When a company makes a positive statement about an issue, it incurs a duty to disclose adverse facts undercutting that statement.  *Berson*, 527 F.3d at 987.   An intra-quarter fact can certainly be a material adverse fact.  *See also Panther Partners Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 122 (2d Cir. 2012) (finding "little difficulty" in concluding that defendant failed to fully disclose the significance of a chip defect because it "knew at the time [*i.e.*, in the three weeks before the IPO].");  *United States v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998) ("We have never held - nor even hinted - that …intra-quarter data cannot, *as a matter of law*, be material.  No has any other court for that matter, at least to the best of our knowledge.").

### 3.   Robinhood Misleadingly Claimed to Be Building Deep, Loyal Customer Relationships

Over and over again, Robinhood told investors that it was building deep, loyal customer relationships through a series of investments in customer relations and security.  ¶¶141-5.  These statements were misleading because Robinhood ran its business without sufficient infrastructure, was actively exposing its customers to greater investment risks to squeeze out short term profits and, at the time of the IPO, knew that its bad practices were causing investors to sour on the

---

[11]    *Irving Firemen's Relief & Ret. Fund v. Uber Techs.,* (998 F.3d 397 (9th Cir. 2021)), upon which Defendants rely (*See* Def. Br. at 20), provides no solace.  Unlike in *Uber*, here, Defendants possessed facts about Robinhood's declining MAU and other KPIs, as well as its departure from its stated business strategy, which directly contradicted the Offering Document statements.  The pre-*Khoja* district court opinions cited by Defendants likewise do not stand for the proposition that a company may misleading tout stale data.  Def. Br. 20-21.

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

Company.  ¶¶87, 92, 104-05, 110-13, 118-20, 125, 127, 146.  Such misstatements are actionable. "[W]here a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors."  A*pple*, 2020 WL 2857397, at *10; *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521, 2017 WL 3084274, at *8-9 (D. Or. June 27, 2017).   Separately, it is misleading for a company to claim to be following a stated strategy and then to depart from that strategy.  *See* supra pgs. 4-9, 18.

Defendants argue that these statements are non-actionable puffery, but they face a high burden to dismiss on these grounds at the pleading stage and that burden is far from satisfied here. "[D]etermining whether a given statement is material entails fact-intensive assessments that are more properly left to the jury. . . Thus, in deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution."  *Impax,* 36 F. Supp. 3d at 966.  Accordingly, "this Court will only grant Defendants' motion to dismiss on the ground that the statements are 'puffery' only if it concludes that the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance."  *Id.*  Here, the statements at issue are not unimportant.  They describe Robinhood's stated strategy for growing its business and multiple assurances that the strategy was succeeding in building long-term relationships. ¶¶141-45.  Unlike the cases cited by Defendants, these statements "contain factual representations at their core" as they show:  (i) that the stated investments are being made and (ii) that they were successfully building long term relationships with customers.  *See Impax*, 36 F. Supp.3d at 967. These representations were verifiably wrong if, as Plaintiff pleads, the investments were not being made in sufficient amounts and customers were turning against Robinhood as measured by customer survey data and plummeting MAU.  Therefore, these statements are actionable.

## II.    PLAINTIFFS HAVE STATED A SECURITIES ACT §15 CLAIM

Section 15 makes an issuer's "control persons" liable for primary violations of §11 and §12(a)(2). 15 U.S.C. §77o.  Because Plaintiffs adequately allege primary violations under §11 and §12(a)(2) of the Securities Act, Plaintiffs have also stated a §15 claim.

### CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in full.

25

Dated: October 14, 2022

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  s/ *Thomas L. Laughlin*

Thomas L. Laughlin, IV (admitted *pro hac vice*)
Rhiana Swartz (*pro hac vice* forthcoming)
Jonathan M. Zimmerman (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile:  212-233-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com
jzimmerman@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (CA 281605)
Hal Cunningham (CA 243048)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Lead Plaintiffs Dr. Vinod Sodha and Dr. Amee Sodha and Proposed Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs Dr. Vinod Sodha and Dr. Amee Sodha*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2022, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on October 14, 2022, at New York, New York.


         s/ *Thomas L. Laughlin*
         Thomas L. Laughlin (admitted *pro hac vice)*

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS