UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, District Judge

GOLUBOWSKI,                     )
                                )
        Plaintiff,              )
                                )
vs.                             )   C 21-09767-EMC
                                )
ROBINHOOD MARKETS, INC.,        )
et al.,                         )
                                )
        Defendants.             )
_____ )


                                San Francisco, California
                                Thursday, January 26, 2023


 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
           RECORDING 3:09 - 4:18 = 69 MINUTES

APPEARANCES:

For Plaintiff:
                          Scott & Scott Attorneys at
                            Law, LLP
                          The Helmsley Building
                          230 Park Avenue, 17th Floor
                          New York, New York 10169
                    BY:   DEBRA CLARK-WEINTRAUB, ESQ.

For Defendants:
                          Cravath, Swaine & Moore, LLP
                          825 Eighth Avenue
                          New York, New York 10019
                    BY:   ANTONY L. RYAN, ESQ.
                    BY:   KEVIN J. ORSINI, ESQ.


            (APPEARANCES CONTINUED ON NEXT PAGE)

*Echo Reporting, Inc.*

2

APPEARANCES:  (Cont'd.)

For Defendants:

Conrad Metlitzky Kane
Four Embarcadero Center
Suite 14500
San Francisco, California
  94111
BY:  MARK CONRAD, ESQ.

Orrick Herrington & Sutcliffe,
  LLP
51 West 52nd Street
New York, New York 10019
BY:  DARRELL CAFASSO, ESQ.

Orrick Herrington & Sutcliffe,
  LLP
The Orrick Building
405 Howard Street
San Francisco, California
  94105
BY:  JAMES KRAMER, ESQ.

Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
                         Transcriber
                         echoreporting@yahoo.com

3

Thursday, January 26, 2023                         3:09 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  The Court is now calling the case Golubowski versus Robinhood Markets, Inc., et al., case number 21-9767.

Counsel, please state your appearance for the record, beginning with the Plaintiff.

MS. CLARK-WEINTRAUB (via Zoom):  Good afternoon, your Honor.  Debra Clark-Weintraub from Scott and Scott for the Plaintiffs.

THE COURT:  All right.  Thank you, Ms. Weintraub.

MR. ORSINI (via Zoom):  Good afternoon, your Honor.  Kevin Orsini and Antony Ryan from Cravath, Swaine and Moore, on behalf of Robinhood and the Robinhood individual Defendants, along with our co-counsel, Mark Conrad from Conrad Metlitzky and Kane.

THE COURT:  All right.  Thank you, Mr. Orsini and counsel.

MR. KRAMER (via Zoom):  Good afternoon, your Honor.  James Kramer and Darryl Cafasso from Orrick Herrington and Sutcliffe, and we are here on behalf of the Underwriter Defendants.

THE COURT:  All right.  Thank you.

Let me -- I've got some specific questions.  There's --

4

one question is when you're talking about an IPO and there's disclosure about -- on a quarterly and annual basis of historic information but that IPO happens intra-quarter, whether there is a duty and under what circumstances there is a duty to disclose material information.  And is there some contention that under no circumstances is there any duty ever to disclose something that is intra-quarter but prior to the IPO, prior to the public disclosure?  I assume that's not the case.  That would be an extreme position to take.   But if there is such a duty, is that a duty that's -- is there a specialized burden?  Is there a special kind of burden of proof to show that that duty obtains when you're talking about something that's in that time period, intra-quarter, or is it the general Section 11 kind of duty about, you know, to disclose material information, et cetera, cetera that would -- would not be misleading?

So, let me ask the Defendants whether -- what your view is on that, sort of a legal question before we get into the facts.

MR. ORSINI:  Yes, your Honor.  Kevin Orsini, I'll be presenting argument on behalf of all Defendants, subject to anything that Mr. Kramer might add for the underwriters.

Your Honor, I think with respect to your question, we have to look at the different sources of potential disclosure obligations.  In most Section 11 cases, certainly

5

most Section 11 cases I've ever seen, the allegations are that there was something the issuer said that was itself misleading because of information that was omitted, and in a scenario in which there are specific disclosures that are rendered misleading by some omitted information, there may very well be an ongoing disclosure obligation.

That's not what this case currently turns on, your Honor.  This case is narrowed quite a bit by virtue of the opposition.  So, what the Plaintiffs here are really focused on are the item 105 and item 303 affirmative disclosure obligations.  And -- and with respect to those issues, your Honor, under item 105, as we set out in the briefing, it's -- it's an obligation to disclose risk factors, not specific financial results.  And -- and in that scenario, your Honor, the corporation issuer does have an obligation as of the time they issue the registration statement to list all current risk factors.  We did that here.

Under item 103, the obligation is, as we've argued, specifically with respect to the financial statements that are required to be part of the disclosure.  So, that would not include the -- the intra-quarter disclosure because those -- that quarter was not part of the mandated financial disclosure, and obviously if item 103 triggers a requirement to disclose an ongoing trend, which has to be something much longer than we're dealing with here, then there would be an

6

obligation to disclose the trend because that trend would have -- would have preexisted even the -- the quarter in issue.  I think I may have said 103, your Honor.  I meant -- I meant --

THE COURT:  303.

MR. ORSINI:  -- 303, right.

THE COURT:  Right.  Let me hear from the Plaintiffs.

MS. CLARK-WEINTRAUB:  Thank you, your Honor. Debra Weintraub from Scott and Scott.

First, I would take issue with Mr. Orsini's assertion that we narrowed the case in our briefing.  It has all along been our position and remains our position that the duty to disclose in this cases rises from two things, one, the independent duty to disclose under items 303 and 105 because the requirements for disclosure under those rules have been met, but also because the statements that are material statements in the offering documents that would have been -- that were misleading without disclosure of the omitted facts.  So, we haven't narrowed the case at all.

THE COURT:  And let me --

MS. CLARK-WEINTRAUB:  To your Honor --

THE COURT:  Let me ask you as to that.  I understand your argument about representations about the nature of the business and the quality of its controls, et

7

cetera, et cetera.  Are you making that argument with respect to the -- the KPI's care or is that -- is that misleading affirmative statement relative to the qualitative representations about the business?

MS. CLARK-WEINTRAUB:  Well, the omission of the -- of the information about the declining KPI's was required to be disclosed both under items 303 and 105 and because of the statements that were made in the offering materials, including the information about the historical performance of the business and the estimated performance through the second quarter of 2021.  There are numerous cases recognize that disclosure is required when the available information in the offering documents would leave investors with a incorrect belief about the state of the business, and that's precisely what happened here, because this offering -- these offering materials were filled with positive statqements about Robinhood's financial performance, the expectation of continued financial -- good financial performance in the future and the -- the foundations of the business that gave them -- made them expect financial performance to be good in the future, and what was omitted was the fact that in the 60 days prior to the offering, crypto currency trading volume, which is what had driven growth in the business all along, had fallen off a cliff and had declined by 90 percent in the two months prior to the offering.  And, also, KPI's, most

8

importantly, the MAU, were also declining correspondingly during that period of time.

So, to turn to your Honor's original question, was there a duty to disclose this intra-quarter data, yes, there was for those reasons.  Without disclosing that data, investors were certainly left with a misleading impression of the state of the business on the date of the offering, and that is the date by which the nature -- misleading nature of the offering documents must be decided.

THE COURT:  All right.  So, it seems, however you cut it, the how significantly off or how significantly indicative of a -- if a serious downturn is important in this case because it goes to materiality, it goes to -- it may even affect whether there's a duty or not.  You know, the more significant and the more substantial the deviation in the trend may -- may affect that duty.

So, for instance, under 303, you know, courts have opined in various ways about whether there's -- you know, what constitutes a trend, how long do you need.  Seems to me that's probably not answered by one answer like, "Oh, there's a minimum of three months or six months."  It may depend on how big that trend is, you know, how substantial. If it's a huge drop, if it's a cliff, maybe you don't need to wait six months.  Is it due -- what's the causal factors here?  Is it due to seasonal variations, due to the things

9

that we expect normally?  Well, maybe that's not really -- you need a lot longer trend to show something.

On the other hand, if it's something fundamentally shifted in the business model and the demand, the bottom has fallen out of this market because of X, Y and Z in the world and not going to come back, well, maybe you don't need, again, six months.

So, my view is that the trend is a bit of an elastic concept, and I don't think there's a hard and fast rule, but it does put a premium on how big, how long, how substantial, how far off the mark these KPI's were.

And one question I have is -- I understand your point about MAO -- MAU's and AUC.  I didn't see something here about, at the end of the day, the actual revenue.  I mean, these are all indicators of financial performance, but, you know, the -- the offering document showed total revenues, growth from, you know, 2019 all the way through 2021, second quarter of 2021 had 60 mil.  I didn't -- I didn't see revenue.

Was there a fall off in revenue in June or July -- June and July?  Was there some trend there in revenue?  What's the answer to that?

MR. ORSINI:  So, your Honor, I don't know if that question's addressed to us or the Plaintiff.

THE COURT:  Oh, both -- both of you.

MR. ORSINI:  I'm happy to start first, your Honor.

THE COURT:  Yeah.

MR. ORSINI:  I think the answer is -- you know, the question you're asking, your Honor, gets to the fundamental issue that the complaint completely mischaracterizes what we actually disclosed and what was actually going on.  They say repeatedly throughout the complaint, as well as in their briefing, that there were months of decline and there had been a substantial fall off in the business.  And the basic point, as counsel just articulated again, is that a reasonable investor, they claim, reading these offering documents, would think that the company was engaged in unbridled growth and would continue unbridled growth.  And both the facts as to the alleged decline are overstated, and the notion that a reasonable investor would have read this and not understood that there was an ongoing decline also blinks at reality.

So, your Honor, I don't know if the Court has the slides that we emailed last night to -- to your deputy, your Honor.

THE COURT:  Why don't you put those up.  I haven't seen them.  But can you answer my first question?

MR. ORSINI:  So -- so --

THE COURT:  What do the facts show on the revenue question?

11

MR. ORSINI:  So, with respect to revenue, so, let's -- let's remember that the offering documents became effective in July, mid to late July of 2021.  So, the most recent completed quarter was -- was the third quarter --

THE COURT:  Yeah, no, I understand that.  Is there revenue by month?

MR. ORSINI:  So, we -- there's not revenue by month, your Honor, but there is revenue -- an estimated revenue result for the second quarter of 2021.  That is contained on page 30 of the prospectus, which was page 52, your Honor, of the --

THE COURT:  Yeah, it's 560 million.

MR. ORSINI:  Yes.  And, so, we give estimated revenue numbers.  And -- and if you fast forward to the allegation the Plaintiffs themselves include in their complaint, when we issued the actual results after the IPO for the second quarter, they were spot on in the range that we had estimated.  And -- and what we further described, your Honor, in the disclosure documents on the net page is that this estimated revenue figure for the second quarter of 2021 was reflecting a decline in trading activity, right. We specifically say on page 53 of Exhibit 2 that trading activity was particularly high during the first two months of the period, returning to levels more in line with prior periods during the last weeks of the quarter ended June 30,

2021 and remained at similar levels, i.e., the decline levels, into the early part of the third quarter.

We then go on to say --

THE COURT:  You're reading from where -- which now?

MR. ORSINI:  Yes, your Honor, Exhibit 2 to our opening -- to my declaration in our opening brief, your Honor.  It's the prospectus, and it's at page 53 if you use the pages from the docket entry.

THE COURT:  All right.  Hold on here.  I'm -- all right.  So, it's Exhibit 2?

MR. ORSINI:  Exhibit 2, your Honor, yes.

THE COURT:  And page -- which page?

MR. ORSINI:  So, let's start on page 52.

THE COURT:  There's a section two as indicated at the top there?

MR. ORSINI:  That's correct.

THE COURT:  Fifty-two oh three eighty-nine?

MR. ORSINI:  That's correct, your Honor.

THE COURT:  Okay.

MR. ORSINI:  And, so, what you see on page 62, your Honor, are the estimated preliminary results.  There's a chart down at the bottom.  It shows a low and high estimated preliminary results for that quarter, the last quarter that was closing before the IPO.  As alleged in the

13

complaint itself when we subsequently published results for the -- for the second quarter, we finalized them, they're right within this range.

We then disclose directly below that what our estimate is for three of the KPI's, right, which, as your Honor noted, are not financial results themselves but indicators of potential financial results. And you see that we estimate certain numbers for net cumulative funded accounts, MAU and AUC. Those numbers, your Honor, also are pretty much spot on when we disclose the actuals later.

But the critical point I was making, your Honor, picks up on the following page. So, that's page 53 of 389. And -- and what you see here immediately after we provide our estimated financial results, in the first big paragraph, about halfway through, you see a sentence that begins "Trading Activity", your Honor?

THE COURT: This is on 53?

MR. ORSINI: Yes, your Honor.

THE COURT: And the first paragraph?

MR. ORSINI: First paragraph, almost exactly in the middle, the sentence beginning "Trading Activity."

THE COURT: Yeah.

MR. ORSINI: So, what we say is trading activity, which, of course, these KPI's are indicators of:

"Trading activity was particularly

14

high during the first two months of the 2021 period, i.e., April and May, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, i.e., June, and remained at similar levels into the early part of the third quarter."

So, what we're saying there, your Honor, is exactly what the Plaintiffs claim we didn't disclose and people would have been confused about.  We're saying that we are providing estimated results for the second quarter.  We saw particularly high trading levels in the first two months.  Those trading levels have started to decline, and we see them continuing to decline into July.

We then go on to say in the next sentence, picking up on this continued decline:

"We expect our revenue for the three months ending September 30, 2021 to be lower.  Why?  As a result of the decreased level of trading activity relative to the record highs in trading activity, particularly in crypto currencies during the second quarter, as well as suspected seasonality."

15

So, the Plaintiffs are alleging that there was this massive ongoing durational decline in KPI's.  Now, in fact, there was a single KPI MAU which declined for a single month in that second quarter.  Crypto currency was declining as well, as we reflect right here.  And they're saying that investors had no way to know that, in fact, this decline was underway because we had this picture of -- of growth.

Your Honor, these --

THE COURT:  Well, the MAU declined both between May and June and June and July.  So, it's two months.  Isn't that right, according to paragraph 129 of the complaint?

MR. ORSINI:  Paragraph 129 --

THE COURT:  At least that's what's cited.  But, in any event, I'm not sure how much that matters, but go on.

MR. ORSINI:  So, the -- the offering was done mid July, your Honor.  So, yes, it did decline in June.  It declined in June from May, right.  So, there was one month of decline, one full month of decline before we did the IPO in July.  But -- but the point --

THE COURT:  And the IPO came out on July 30.

MR. ORSINI:  Yes.

THE COURT:  So, what's the date of --

MR. ORSINI:  It became -- it became effective on July 30.  The registration statement was -- was filed a few days before that.

16

So, there had been -- there was -- there was one full month of decline, i.e., June.  And that decline did continue during the month of July, although the month of July, while it was close to the end, wasn't over yet.  And you don't actually know what your monthly active users are going to be until the --

THE COURT:  Okay.  This is an important point for time marking here.  When we talk about a misstatement as of the, you know, effective date, would it be the date of filing, which is a few days before July 30th, before quarter -- before that month data came out?

MR. ORSINI:  Well, yes, your Honor.  The -- the document needs to be accurate as of that date, but the time period here is critical because, you know, remember, what they're claiming is under 303, that there was some ongoing long-term trend.

THE COURT:  No, no, no, no.  I understand that about length of time.  I'm asking a more simple question. Is the judgment that we're supposed to make and the expectation of what's to be included in the analysis of whether there's misleading or not or material omission, is that to be judged by the information available as of, what, July 26th, 27th, 28th, which means -- I think that means it would not have included the information all the way in July. It would only include the June information.

17

MR. ORSINI:  Well, but we did -- we did explain that it was continuing to decline into July, your Honor, in the section I just read.

THE COURT:  No, I understand that, but -- but the Plaintiff's theory about, you know, what should have been disclosed, I'm trying to understand should July results have been disclosed?  Is it possible that July results, along with June results, would have been known as of the time of the filing of the -- the offering document?

MR. ORSINI:  Is it possible that July result -- I'm sorry, your Honor.  Can you repeat the question one more time?

THE COURT:  Would the July results have been known to be in -- you know, as of the time of the filing?

MR. ORSINI:  No, because the filing was before the end of July.  So, we had some sense as to what was going on during the month, but we didn't have July results yet because July was still underway.

THE COURT:  So, there are sort of daily -- I mean, you have dashboards?  There's some information you can get, for instance, on AUC's -- let's say on July 20th, you could -- you'd know how the first 20 days went?

MR. ORSINI:  Well, you -- you would have some idea how the first 20 days are going, your Honor.  But -- but, in fact, the -- the AUC is calculated at the end of the month,

18

right, based upon certain information.  MAU will be based on how many active users you have at any point in the month. So, you know, it's possible that you have a significant number of active users at the end of the month, and that's going to change what your MAU is for that month.

So, like some -- you know, many indicators, perhaps you have some sense as to what's happening during the month, but you won't actually know that month's results until the month is completed, and that was exactly what the Court was saying in the -- in the Turksell (phonetic) case in the Southern District of New York, your Honor, which was, you know, strikingly similar in terms of timing.  They -- they -- it was also a second quarter.  They did an IPO a few weeks into July, and what the Court explained there was there's no obligation to disclose sort of partial month results on an immediate realtime interim basis, including because doing so would throw the entire SEC disclosure regime into -- out of whack because of the specific periods that the SEC requires and because that would create a field day potentially for other potential claims, because you're sitting there trying to guess with precision what's going to happen during the rest of the month, right.

And I think here, your Honor, even if it's an interesting academic question as to whether or not there was some level of information we could have provided in July, I

19

come back to we did, right.  We said that the trading activity was continuing to decrease during the first couple of weeks of that month.  That was, frankly, more than was required, right.  But it is something that puts any reasonable investor on notice that the trend has been downward in trading activity at the time of the IPO, not upward.

THE COURT:  All right.  So, let me ask -- I understand your point.  Let me ask you what were the third quarter results?  How much lower were they than the second quarter?

MR. ORSINI:  So, the third quarter results were -- in terms of the financial results, your Honor, or --

THE COURT:  Yeah, the -- the revenue.

MR. ORSINI:  Let me pull that up, your Honor.  Just bear with me one second.  Three hundred and sixty-four million dollars, your Honor.

THE COURT:  All right.  So, there was a -- quite a steep decline from second quarter?

MR. ORSINI:  Second quarter was $565 million.  Second -- third quarter was roughly $200 million lower, your Honor, yes.

THE COURT:  Okay.  Well, that's not in the complaint, is it?  Let me ask the Plaintiff.

MS. CLARK-WEINTRAUB:  Yes, it is, your Honor.

THE COURT:  Is it?  Where -- where?

MS. CLARK-WEINTRAUB:  Yes.  It's in paragraph 165.

THE COURT:  One sixty-five?

MS. CLARK-WEINTRAUB:  Yes, sir, third sentence.

(Pause.)

THE COURT:  Is revenue available -- I guess it is -- by month to management or by day or how does that work?

MS. CLARK-WEINTRAUB:  I would assume so, your Honor.  But, obviously, we haven't had discovery at this point.  Typically, large corporations such as this carefully track their revenue.  They have dashboards, as your Honor mentioned, which track it on a daily, weekly, and on a monthly basis.

And, you know, if I can just address some of the points that Mr. Orsini made in --

THE COURT:  Yeah.  And, in particular, his citation to the offering document which specifically says expect some drop.

MS. CLARK-WEINTRAUB:  Yes, your Honor.  And -- and I think you have to carefully look at those statements, and those statements were, at best, half truths.  They're important because they show that Defendants knew as of the time of the offering that the decline in crypto trading volume and the decline in KPI's were having an impact on revenue, not only in the second quarter but that that impact

was going to continue into the third quarter as we just confirmed that it did.

But if you look at the statements, no reasonable investor -- and that's the standard -- looking at those two sentences that Mr. Orsini read to your Honor would have any idea that crypto trading volume which, again, was the thing that had been driving Robinhood's revenue growth, had declined 90 percent, 90 percent, in the 60 days before this offering.  Those sentences, moreover, say nothing at all about declining KPI's, including monthly active users, which is positively correlated to revenues.  But, even if you look more closely at those statements and what they say about the impact of crypto trading volume on revenue, all it says is that -- one thing it does is it doesn't only blame this expected lower amount of revenue in the third quarter on a decline in crypto trading revenue or any other kind of trading activity.  It also points to seasonality as a possible cause of this lower expected revenue, and the statements talk about trading levels returning -- or trading activity returning to levels in some unspecified prior period.

THE COURT:  Where is that?

MS. CLARK-WEINTRAUB:  Reading that sentence, your Honor --

THE COURT:  Counsel, where -- where is the return

22

language?  Is that in the same section?

MS. CLARK-WEINTRAUB:  Yes.  It's in the same sentences that Mr. Orsini read to your Honor, the first sentence of which was:

"Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods" -- doesn't say what periods -- "during the last few weeks of the quarter ended June 30th, 2021, and remained at similar levels into the early part of the third quarter," right.

So, they don't specify what prior periods they're talking about.  They could -- a reasonable investor reading that could think they were talking about Q1 2021 when crypto currency trading volumes were still robust, albeit it at lower levels than --

THE COURT:  Are you contending that the statement that trading activity "remained at similar levels into the early part of the third quarter" was either false or misleading?

MS. CLARK-WEINTRAUB:  I'm sorry, your Honor.  Can you say that one more time?

THE COURT:  Are you contending that the statement

23

that trading activity remained at similar levels into the early part of the third quarter, to quote, was that false and misleading?

MS. CLARK-WEINTRAUB:  What we're alleging, your Honor, is that the -- this sentence does not give an investor sufficient information to understand the magnitude of the decline in the business that had occurred at this point.

THE COURT:  I understand --

MS. CLARK-WEINTRAUB:  We agreed --

THE COURT:  I understand -- Counsel, I understand that's what you're saying about the last sentence that we had talked about.  I'm talking about the previous sentence, the penultimate sentence that says "Creating activity is particularly high," blah, blah, blah, "then returned to levels more in line and remained in similar levels into the early part of the third quarter."

Is that statement true or false in your view, just that statement?

MS. CLARK-WEINTRAUB:  Well, it -- it's vague, your Honor, as to what they mean.  But to the extent the meaning of that sentence was that the crypto trading levels had declined, yes, that was a true statement as all of the numbers bear out, and it continued to decline throughout the third quarter.

24

The point I was trying to make, your Honor, is that by saying that trading activity is returning to earlier levels, the company is completely unspecific about what periods they're talking about, and there were earlier periods when crypto trading activity was much higher than what it was in the last several weeks of June and into July and continuing through the third quarter.  So, no reasonable investor reading these two sentences would have any idea that crypto trading volume had just fallen off a cliff.

And, again, these sentences say nothing about KPI's, nothing at all.  And, although Mr. Orsini keeps saying, you know, the Plaintiffs have only alleged a one-month decline in one KPI, he's totally ignoring July, which, as your Honor is aware, was almost complete at the time of the registration effective -- statement effective date, was complete at the time of the IPO.  The Defendants certainly knew by that point in time that crypto trading volumes and all of these KPI's had were in decline at the time of the offering, and investors had no idea about that based upon what was in the offering documents.

Do you know what date the -- the offering statement was filed?  I know the effective date was July 30th.  When was it actually sent in or filed or whatever?

MS. CLARK-WEINTRAUB:  I believe it was the 28th.

THE COURT:  All right.  And your position is that

25

whenever that date is, whether it's the 27th, 28th, 29th, management had within its knowledge what was going on with the crypto trading volume in July?

MS. CLARK-WEINTRAUB:  Yes, your Honor.  Yes, your Honor.  They don't even -- the Defendants don't even dispute that.  I mean, if -- if they didn't -- if they didn't understand that the crypto trading volumes and the KPI's had seriously declined -- or, I'm, sorry.  Let me withdraw that.

If they hadn't known that the crypto trading volumes were in serious decline at the time of the offering, they never would have put this ambiguous statement into the offering documents.  By putting this ambiguous statement into the offering documents, they were trying -- they were trying to avoid liability, but it is so incomplete that it misleads investors.

THE COURT:  I -- all right.  So, your -- your position is that although there's been a disclosure, it was still a misleading disclosure.  It hinted at maybe some problem like, oh, there might be a high tide, but it didn't predict -- it didn't say anything about the tidal wave that was going to come?

MS. CLARK-WEINTRAUB:  Exactly, your Honor.  And, you know, the Turksell case, really -- even though the Defendants cite it, it really supports our view there because the Court acknowledged in the Turksell case that

26

disclosure of interim financial results has been mandated by courts when the interim results represent an extreme departure from the range of results which could have been anticipated based on the currently available information in the offering documents.  And, while in <u>Turksell</u>, those circumstances didn't exist because the Plaintiff had only alleged a nine percent decline in one financial metric, they certainly exist in this case where we're talking about a 90 percent decline in the trading activity that had driven the growth in the company to this point and also corresponding declines in these key performance indicators which are performance indicators of revenue.

THE COURT:  Do you allege that -- do you allege that these KPI declines were unprecedented?  If you look at the longer range of vicissitudes over the say several years, let's say, in the -- with respect to the MAO -- MAU's?

MS. CLARK-WEINTRAUB:  Well, your Honor, prior to -- prior to this period, the period before the offering that we've -- the complaint is focused on, those statistics had been for the most part increasing during the company's history, during the -- based on the historical information in the offering documents, but --

THE COURT:  Have there been any -- have there been any, historically, prior declines from time to time?

MS. CLARK-WEINTRAUB:  I'd have to check that, your

Honor.  I don't have that in front of me.

THE COURT:  And -- and you're -- and I think it sounds like you're placing primary interest on the more disastrous decline when it comes to crypto trading volume.

MS. CLARK-WEINTRAUB:  Well, we're placing emphasis on both.  There's a disastrous decline in crypto trading volume, but there's also a very significant decline in the monthly active users, which is a very important indicator, positively correlated with revenues.  That had declined by 19 percent between May of 2021 and July of 2021.  They had lost 4.6 million users during that time frame.

THE COURT:  And yet --

MS. CLARK-WEINTRAUB:  The --

THE COURT:  -- it appears that Net Cumulative Funded Accounts, the NCFA, stayed constant during this time.

MS. CLARK-WEINTRAUB:  There was a slight decline I believe, your Honor, in that -- in that --

THE COURT:  Right, but relatively flat.  So, what does that tell us?  I mean --

MS. CLARK-WEINTRAUB:  Well, your Honor, the average revenue per user had fallen dramatically.  That had been 137 million at the end of March 2021.  By the end of June, it was 111 million, an 18 percent drop.  By the end of the third quarter, it was 65 million, which was a 41 percent drop since the first quarter.  The assets under custody had

28

also fallen seven percent, and it was --

THE COURT:  Can you explain to me, give me a little 101 course on finance?  What is the difference between AUC and NCFA?  What are those two indicators?  Can you describe those -- define those?

MS. CLARK-WEINTRAUB:  Yes.  According to the offering documents, the AUC, the Assets Under Custody, was the sum of the fair value of all equities, options, crypto currency, and cash held by users in their accounts net of any margin balances as of the period end.

THE COURT:  Yeah.  And what about NCFA?  How's that different?

MS. CLARK-WEINTRAUB:  Yes.  The -- the net cumulative funded accounts -- well, net funded account was -- was a Robinhood account into which a user would make a deposit or a money transfer during the relevant period, and the net fund -- the net funded accounts was the total of the net -- I'm sorry.  The NCFA was the total of the Net Funded Accounts from inception to the period end.

THE COURT:  So, funded accounts are like -- is that like --

MS. CLARK-WEINTRAUB:  Customer accounts.

THE COURT:  Customer cash accounts or some kind of -- not -- not the equities?  Is that the difference?  That's more like the money market or some kind of CD or something

29

like that or -- that's what I'm trying to understand. What's the difference between AUC and NCFA?  That's what I'm trying to -- I know it's kind of elementary, but I should make sure I understand the difference.

MR. ORSINI:  So, your Honor, I'm happy to help with that.

THE COURT:  All right.  Help me.

MR. ORSINI:  Yeah.  So, AUC is as counsel described it.  It's assets under custody.  So, it's the sum of the fair value of all the various assets that are under custody by Robinhood.

NCFA is a measure of the net cumulative funded accounts that looks at, okay, how many accounts were funded with an initial deposit.  So, someone signs up and wants to trade and they make an initial deposit of cash during the period being measured.  You then back out any of those accounts that went to a zero or negative balance during the time being measured.

THE COURT:  All right.  So, it sounds like those are kind of like cash accounts, that is, what is funded with Robinhood?

MR. ORSINI:  Yeah.  So, if I open up my Robinhood app on my phone and, you know, I download the app and I become a Robinhood customer and I deposit $100 because I want to start trading, right, that's going to be a new

30

account that has been funded because I put $100 into the account to start trading.  And then it will be counted under NCFA if and only if I maintain something above a zero balance during that time.

THE COURT:  All right.  So, if you use that $100 and you buy stock or an option or something, that could go to zero, but then that -- the assets under the AUC gets augmented by what ever you purchase.  That's an asset under -- under custody?

MR. ORSINI:  Correct.  Correct, your Honor.

THE COURT:  All right.  Thank you.  At least that's -- at least I understand one thing here.

So -- so, what's your response to the argument, Mr. Orsini, that, yeah, there was a disclosure but it wasn't exactly a complete disclosure because it didn't -- it didn't hint at the disaster floating out there?

MR. ORSINI:  Well, my first response, your Honor, is it's completely overstating with -- even with the benefit of hindsight, what actually happened and what, in fact, a reasonable investor should have understood in context.  You know, we're talking about disclosures -- the filing date, your Honor, just to be precise, was July 25th.  It became effective July 28th.  So, we're sitting there on July 25th, right, three weeks into the beginning of this new quarter, right.  We -- we can't know where the quarter's going to go.

31

This is a very volatile business, as we explained at length in our risk disclosures.  But we still did a very good job of telling people in the language I've read -- and I'll point you to a couple of other places -- in the prospectus that we were seeing declines.

Now, in terms of falling off the cliff, your Honor, and the ambiguity about prior periods, if we talk about the KPI's, okay, remember, MAU had declined for one month, one full month, and it had declined a bit in July, okay.  It ended in July at 19.5, and --

THE COURT:  What ended in 19.5?

MR. ORSINI:  MAU did, your Honor.

THE COURT:  Okay.

MR. ORSINI:  As compared to an MAU at the end of June of 21.3 and in May of 24.1.  But 19.5 is still higher than it was in March of 2021, even where it finished.  We couldn't have known where it was going to finish in the third quarter.  It finished at the end of September at 18.9, still higher than March of 2021, right.  The same is true with respect to NCFA.

Where did we -- where were we at the end of July?  We were at 22.4, as compared to the estimated 22.5 for June and 22.3 for May.  Where did we end in September?  Twenty-two point three, right, still higher than we had been in March and an equivalent to May, the second quarter period.  The

same is true with respect to AUC, your Honor.

So, the -- the notion that there was this radical cliff that we fell off and we could know and be completely prescient as to where we land on that cliff, it just blinks at reality, and that's not the disclosure standard either.

And if you -- if you look again, your Honor, at the disclosures we made, page 155 of the proxy statement, which is using the numbers at the top, your Honor, page 177, right.  These are the results that the investors are charged with reading.

THE COURT:  Okay.  Hold on.  Let me pull the documents here.  Okay.  Which page of the -- the disclosure?

MR. ORSINI:  Using the filing -- the docket number, your Honor, page 177 of 389.

THE COURT:  Okay.  Let me -- 177, all right.  Okay.  I'm looking at it.

MR. ORSINI:  And you see, you know, the revenue numbers for the quarters going back to 2019, and what you see is, you know, it's pretty consistent in the 200's for the year of 2020.  Then it jumps for March of 2021.  And then there was the second quarter that, as we disclosed, estimated record trading amounts, and we said that we expected our revenue to return more in line with prior quarters.  And we ended up, as I said earlier, your Honor, at 360.

33

My screen just went black.  Do you still have me?

THE COURT:  I mean, I -- I'm looking at it.  This chart goes to March 31, right, 2022?

MR. ORSINI:  That's right, your Honor.  And the earlier page we had looked at disclosed our preliminary estimated results for the second quarter, which was in the range of 5 -- 55, 60.  So -- so, the investors saw, when you look at the total mix of information what our financial results had been pretty consistently.  We disclosed to them that we expected a number of 560'ish, because there's a range that we provide, for the second quarter.  We explain that that estimated result is a function of record trading during the first two months that had already begun to decline.  And that, of course, already bakes in the crypto decline.  It bakes in the MAU's for the full month of June, and we say to our investors we expect that going forward, we don't know what we're going to be for the end of the third quarter sitting there in July, but for the third quarter, we expect our numbers to be more in line with prior quarters.

This context gives an investor everything he or she reasonably needs to understand that the story counsel's trying to paint is just not true.  There is no legal basis for the disclosure under 105 or 303, and counsel's now arguing that our statement -- our accurate financial statements, right, it was true that we expected a certain

34

range of revenue for quarter two, and we hit that.  It was true that we disclosed certain quarterly performance metrics that reflected the decline, and those were dead on what we ended up hitting when we disclosed the financial results. It was true, as counsel conceded, that we were saying we were seeing a decline in trading activity, including crypto. And counsel said, yeah, but you also say expected seasonality.  There's no allegation that that was false. There's no allegation that we didn't believe expected seasonality would have --

THE COURT:  Well, but it's the magnitude that's the question.  And your come back to that, well, if you look at the magnitude, it was sort of mitigated by the -- the reference to, you know, Q3 might look like prior months or prior quarters and prior quarters were way below the first two quarters of -- of 2021.  They were in the 200's.  And, so, the drop from 565 to 364 is not -- as big as that is, is not that far off the mark from saying, well, we expect things to drop to something to return to prior --

MR. ORSINI:  That's right, your Honor.  That's part of it.  The other part of it is that we specifically say the decline is I crypto trading levels in that sentence. We don't say exactly how much.  I agree with that.  We don't.  We weren't obligated to.  We're giving directional estimates in July of where we think we might end in three

35

months.  We disclose extensively in the risk factors that crypto is incredibly volatile and that in particular during the periods preceding the IPO, our revenue had been driven heavily by crypto trading volume.  And we even disclose that there was one crypto currently in particular, Dogecoin, which made up -- which was a bit of a fad, your Honor, at the time, and everybody who was in the marketplace knew that, that Dogecoin made up a very significant portion of -- of our revenue.

So, this is on, your Honor, page 101 of Exhibit 2 if we look at the numbers on the top.

THE COURT:  What page?

MR. ORSINI:  Page 101, your Honor.

(Pause.)

THE COURT:  Yes.

MR. ORSINI:  This is a risk factor about crypto currency, and this reflects how volatile it is and also reflects the heavy indexing in Dogecoin.  And the other point I'll make, your Honor, is that anybody who was a reasonable investor investing in Robinhood, seeing the historical patterns, seeing our accurate projections as to where we're going to be in the second quarter, seeing our disclosure accurately, that we projected decreased revenue at a number we couldn't predict with -- you know, it's not hindsight -- with foresight to know exactly where we would

36

land.

Also, as we noted in our briefing, your Honor, the whole marketplace knew that crypto was falling off a cliff at that point.  We cited at least one article the Court can take judicial notice of.

So, when we're talking about the total mix of information, right, we didn't know exactly where crypto was going to go in the coming months.  We didn't know exactly where crypto would go in the coming years.  What we disclose is it was very volatile.  The training activity had declined specifically related to crypto.  And, as a result, we expected our revenue to drop, to be more in line with prior periods.  We disclosed the prior periods, and our revenue actually turned out to be very much in line with those prior periods.

So -- so, counsel can construct by hindsight this notion that we had to disclose all of these other detailed metrics.  There's no basis for that in the law, and to now say that our statement that was entirely accurate was misleading because we didn't also disclose specific details about crypto, for example, I don't think there's a single case that supports that proposition, your Honor.

THE COURT:  Let me ask you about referencing the earlier months.  Let's see, where is that paragraph again?

MR. ORSINI:  That was back, your Honor, on page --

37

THE COURT:  Fifty-five?

MR. ORSINI:  It's page 53.

THE COURT:  Fifty-three?

MR. ORSINI:  Yes, page 53 using the docket page numbers.

THE COURT:  Where's that, the -- what I'm looking for is that -- is -- is the narrative about the --

MR. ORSINI:  Yes.

THE COURT:  -- was expecting.  I don't see it on that.

MR. ORSINI:  If you're on page 53 using the numbers on top, your Honor --

THE COURT:  Yeah.

MR. ORSINI:  -- the first paragraph for the three months ended June 30, 2021, right, it's -- it's halfway down.  Right, we start the paragraph by giving our expected revenue for the second quarter, right, and we explain that it  is a significant increase above the prior year period, June 30, 2020.

THE COURT:  Yeah.  Hold on a second.  Is this 78-2?

MR. ORSINI:  Seventy-eight dash three, your Honor.

THE COURT:  Oh.  All right.  No wonder.

MR. ORSINI:  That may be why, your Honor.

THE COURT:  That's why.  I've got the wrong one

38

again.  Okay.  So, go to page 53 of 275?

MR. ORSINI:  That's right.

(Pause.)

THE COURT:  Okay, 53.

MR. ORSINI:  Fifty-three of three eight nine.

THE COURT:  Of 389?

MR. ORSINI:  Yes.  I'm looking at document 78-3, your Honor, and the numbers on top say page 53 of 389.

THE COURT:  Okay.  Okay.  There it is.  It says:

"Trading activity is particularly high in the first two months, returning to levels more in line with prior periods during the last few weeks of the quarter ending June 30, 2021 and remain at similar levels into the early part of third quarter."

So, you're saying that the reference to more in line with prior periods as a forecast as to what the last few weeks of quarter two and then the rest of quarter three are going to look like were in effect referencing this historical numbers at around the 200 plus million?

MR. ORSINI:  Absolutely, your Honor, because are the prior periods, right, because it starts by saying the first two months of the period, i.e., April and May.  So, by definition, when it says it then decreased, returning to

39

levels more consistent with prior periods, it's prior periods that precede that second quarter.

THE COURT: Yeah. All right. I get it. So, I'll let you elaborate -- or I'll let you comment on that further elaboration, Ms. Weintraub that there's now some context to what prior periods we're referring to, and that gives a hint to the reader that it's not going to stay up in the 560 plus, it's going to look more like, you know, two, three hundred million, which it was.

MS. CLARK-WEINTRAUB: Well, prior periods includes March -- the period ended March 31, 2021, and the transaction based revenue at that point was 420 million. So, lower than second quarter but still much -- much higher than what the trading volumes were suggesting at the time.

You know, this is a motion to dismiss, you know. And a reasonable investor reading this would not have necessarily ignored the quarter ended March 31, 2021 and just looked at prior quarters.

But the other point, your Honor, is that, as you discussed with Mr. Orsini, the second (Zoom glitch) talks about the expectation that revenue would be lower in the third quarter doesn't only point to crypto currency trading activity being lower but also seasonality. So, an investor reading this -- reading this disclosure would have no idea how much of that -- how much that lower revenue expectation

40

was predicated on seasonality as opposed to lower trading volumes.  You know, obviously, Robinhood is a -- has pitched itself as a growth company, right.  That's -- that was its whole pitch to investors.  So, even though Mr. Orsini was trying to belittle the declines in things like MAU from earlier in the year through the second quarter and into the third quarter, when those numbers came out, the market reacted extremely negatively to this.  And I would direct your Honor to you know, paragraph starting at 165 in the complaint where analysts talk about the results being significantly below expectations, with lower MAU's, declining ARPU, disappointing Q4 guidance, no uptick in net new funded accounts.  So, while -- while NCFA did not decline as much as the other metrics, the fact that the accounts weren't increasing was a -- was a red flag to the market, and there was a very negative stock price reaction as a result of the announcement of these -- of these results in the third quarter, and revenue was far below what expectations were.

So -- and the decline in crypto trading volume that Robinhood experienced, as we allege in paragraph 166, was far more than the 35 percent reduction in total crypto trading volume that had taken place across the industry.  So, this notion that everybody knew that, you know, crypto trading was declined and was in the market already, well,

41

the market may have known that there was some decline in crypto trading volume but not -- not the decline that had occurred at Robinhood.  And, again, those numbers were stark as of the time of the offering, 90 percent decline in -- in 60 days.  I mean, it -- your Honor, it would turn the -- the Securities Act regime, which requires full and fair disclosure on its head, to say that a company could come to the market to raise $2 billion from investors while sitting on this kind of negative financial data which was crucial to investors' ability to evaluate the prospects of this company and whether or not they wanted to be investors in this company, whether they wanted to take the risk involved in buying stock in this --

THE COURT:  So, what was -- what was not disclosed in the offering document that warned of risk factors in crypto currency trading?  What --

MS. CLARK-WEINTRAUB:  Well --

THE COURT:  What wasn't disclosed by that warning?

MS. CLARK-WEINTRAUB:  Well, warning that crypto currencies were volatile and that, you know, they were dependent on Dogecoin and if Dogecoin went away, their business would be effective, those kind of forward-looking warnings are false and misleading when the company then has in its possession information showing that they were being negatively impacted at that time.  That's what they didn't

42

disclose, and that's what they were required to disclosed.

THE COURT:  Is there an assertion --

MS. CLARK-WEINTRAUB:  We're not alleging --

THE COURT:  Is there an assertion that what was being experienced by Robinhood at that time were due to factors not identified in the risk factor list?

MS. CLARK-WEINTRAUB:  I'm sorry.  Can you say that one more time, your Honor?

THE COURT:  Are you asserting that what was causing the great losses in crypto currency trading experienced by Robinhood were due to factors not qualitatively identified in the risk factor disclosure?  I understand your argument historically is always you got to -- if it's a disaster and it's already a given fact, you got to -- I understand that argument.  But what I want to know is, more precisely, are you saying that the risk factor listing was incomplete?

MS. CLARK-WEINTRAUB:  Well, we're alleging the risk factors were false, the ones we've called out in the complaint, for the reasons I just stated, because those risks had come to pass at the time.  You know, qualitatively, you know, they -- the risk factors, you know, did talk about crypto currency.  They did talk about, you know, market issues and other factors.  But what they didn't say was that these things are impacting our business right

43

now in a material way.  They said, you know, for example, with respect to something like their systems, you know, we have all sorts of confidential witness allegations in our complaint talking about how Robinhood had inadequate security systems and how they had inadequate customer service and support and how those factors were driving away customers and leaving them to close accounts.

THE COURT:  I understand that.  I'm talking about -- what I'm trying to get at is so your argument is that the current impact was not disclosed, not that --

MS. CLARK-WEINTRAUB:  That --

THE COURT:  -- that list of risk factors was not comprehensive enough?

MS. CLARK-WEINTRAUB:  Well, when you say comprehensive enough, I mean, to me it's not comprehensive if it wasn't disclosing that they were being impacted at that time.

THE COURT:  Right.  That's --

MS. CLARK-WEINTRAUB:  But to the extent --

THE COURT:  That's what your claim is.  You're not saying that, well, the risks to crypto currency is A, B, and C, but there was D as a risk factor out there, some kind of market force or something that they completely ignored?  That's not the argument?

MS. CLARK-WEINTRAUB:  No.

44

THE COURT:  The argument is that, yeah, they said all these things, but what they didn't tell you is that this is happening right now.  It's already happened.

MS. CLARK-WEINTRAUB:  Yes.  That's correct, your Honor.

THE COURT:  All right.  So, let me -- I'm going to have to conclude, but let me give Orsini the last -- Mr. Orsini the last work.

It's a -- you know, it's the magnitude here.  You know, if it was just a slight decline on something, maybe that's not material.  Why isn't materiality a fact question here?  They're saying that this -- one of these major indicators was a huge blow up and that exceeded what was being warned about and why -- why isn't that a factor that at least goes to the next stage?

MR. ORSINI:  Because the duty to disclose is not, affirmatively not a duty to disclose all material information, right.  I can cite to the Court 30 cases that say that in the Ninth Circuit.  The question is whether or not there's an independent duty to disclose the allegedly omitted facts.

So, Ms. Weintraub just conceded away their section 105 -- their item 105 argument, right, based on the Court's questions.  We disclosed all of the risk factors.  Okay.  So, item 105 cannot and does not give rise to a disclosure

45

obligation here.

Item 303, similarly, cannot and does not give risk to any disclosure obligation here.  Respectfully, your Honor, I do think the law is pretty clear that a trendlit, which is what we had here, a trendlit, is not sufficient under item 303 to require disclosure, and that also doesn't even get to the point that we make, your Honor, in the brief to which counsel has no response during this argument that the item 303 disclosure requirements relate only to the required financial statements which are the financial statements for the preceding periods.

So -- so, then the question becomes now they've shifted again to, Well, yeah, you disclosed it, but it was misleading, right.  And -- and Ms. Weintraub suggested, Well, you know, I was arguing that the reasonable investor ought to ignore the -- the first quarter of 2021.  Not true.  Not true at all.  Right.  The first quarter of 2021 was $420 million.  We came in at 360.  We couldn't have known exactly where we were going to come in at the time that we filed the prospectus.

What we also know, as I went through before, your Honor, is that the actual KPI's, the actual KPI's, by the end of the third quarter were still above what those KPI's had been at the end of the first quarter.  What they were was lower than they had been in the second quarter, which is

46

exactly what we disclosed was going to happen, right.  The securities laws do not require a company to disclose every single business event.  And -- and one example, your Honor, is the Matrix case from the United States Supreme Court, which is 563 U.S. 27.  Disclosure is only required if there's an affirmative obligation under 105 or 303, for example, which they can't make out here, or because we said something that itself is misleading if we don't say something else.

And -- and we really are dancing on the head of a pin here, your Honor, to claim that the specific disclosures on page 53 of 389 were misleading, especially when read in context, right.  We said trading activities were down and they would continue to go down.

What counsel is complaining about is that even though we disclosed preliminary estimated financial results for the second quarter, which turned out to be spot on, and reflected that significant decrease in crypto trading, even though we disclosed estimated results that were spot on, even though we disclosed KPI's that were spot on, even though we disclosed that we expected the KPI's and the revenue to go down, that's not enough.  We needed to get into the nitty gritty of crypto in particular.  There is no such disclosure obligation under the law, your Honor.  And, in context, nothing here was misleading.

47

THE COURT:  All right.  Let me -- let me -- I'll give you the last word, Ms. Weintraub.  What I want to know is your legal position on the source of the duty to disclose here.  I have an interpretation from your opponent that 101 only requires the listing of material factors and 303 requires a -- a more sustained trend and that absent those two items, that there's only affirmative duty to say something, if you say something positive that is misleading, kind of a half truth.

MS. CLARK-WEINTRAUB:  Yes, your Honor.  So, quick -- very quickly, on 105, we vehemently disagree with Mr. Orsini's position that a listing of false and misleading risk factors was -- would satisfy their obligation to disclose substantial risks under 105.  They cite the Lyft case.  You know, I would recommend -- or I would commend that to -- to your Honor to read in that case, specific risk factors regarding sexual assaults by Lyft drivers, the failure to disclose those specific risks, that they were happening at the time Judge Gilliam found to be a -- a violation of item 105.

Item 303, as we discussed earlier, there is no magic period of time as to when a trend or uncertainty is long enough to be --

THE COURT:  What about the --

MS. CLARK-WEINTRAUB:  -- disclosed --

48

THE COURT:  -- argument -- what about the argument that 303 only applies to the mandated financial statements and there's no more duty beyond that?

MS. CLARK-WEINTRAUB:  No, your Honor.  I mean, I would -- I would recommend the Di Maria case, the Second Circuit's decision in Di Maria, which was cited in the Defendants' brief, and also Judge Sweet's decision in the Facebook case which was cited by -- cited in our brief. Both those cases have held that there is a duty to disclose interim financial information if the requirements of any SEC rule, including item 303, is -- are met.  And under item 303, you have to show that there was something that was known to management.  Again, the Defendants don't even dispute that they knew these trends, and you also have to show that there would be a material impact, and there's no question here, your Honor, as we've discussed for the last hour or so, that these adverse trends had a material adverse impact on the company, and the Defendants knew that they were going to have a material adverse impact on the company.

And, again, Mr. Orsini keeps going back to the actual KPI's at the end of the third quarter and that they weren't so bad.  The market had a very different view of what those KPI's told investors about the company at that point in time.  And, so, I think the market's reaction is also very persuasive and powerful evidence that these disclosures were

49

materially false and misleading.

And, of course, your Honor, as I said at the beginning of my argument, we are not -- we are not saying that there aren't misstatements in the complaint -- or statements in the complaint that were misleading in the absence of disclosure.  We're saying that as well.

THE COURT:  All right.  I'm going to terminate the hearing.  We've been at it now for a long time, but this has been helpful.  I will take the matter under submission.

Thank you.

ALL:  Thank you, your Honor.

(Proceedings adjourned at 4:18 p.m.)

50

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, February 7, 2023

*Echo Reporting, Inc.*