1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    PHILIP GOLUBOWSKI,                        Case No.  21-cv-09767-EMC

8                    Plaintiff,

9          v.                                  ORDER GRANTING DEFENDANTS'
                                               MOTION TO DISMISS WITH LEAVE
10   ROBINHOOD MARKETS, INC., et al.,          TO AMEND

11                   Defendants.               Docket No. 78

12

13

14          Plaintiffs Aimee Sodha and Vinod Sodha ("Plaintiffs") filed suit against Defendants

15   Robinhood Markets, Inc. ("Robinhood" or "the Company"), certain senior executives and

16   directors of Robinhood (Vladimir Tenev, Jason Warnick, Baiju Bhatt, Jan Hammer, Paula Loop,

17   Jonathan Rubinstein, Scott Sandell, and Robert Zoellick), and the underwriters (Goldman Sachs &

18   Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Citigroup Global Markets Inc.,

19   Wells Fargo Securities, LLC, Mizuho Securities USA LLC, JMP Securities LLC, KeyBanc

20   Capital Markets Inc., Piper Sandler & Co., Rosenblatt Securities Inc., BMO Capital Markets

21   Corp., BTIG, LLC, Santander Investment Securities Inc., Academy Securities, Inc., Loop Capital

22   Markets LLC, Samuel A. Ramirez & Company, Inc. and Siebert Williams Shank & Co., LLC).

23   Docket No. 75 ("FAC").  Plaintiffs assert claims under Sections 11, 12 and 15 of the Securities

24   Act of 1933 ("the Securities Act") alleging that the registration statement and prospectus for

25   Robinhood's July 30, 2021 initial public offering ("IPO") contained false and misleading

26   statements and omissions.  Now pending before the Court is Robinhood's Motion to Dismiss

27   Plaintiffs' First Amended Complaint.  Docket No. 78 ("MTD").

28

United States District Court
Northern District of California

1    For the following reasons, the Court **GRANTS** Robinhood's Motion to Dismiss **WITH**

2    **LEAVE TO AMEND**.

3    ## I.    FACTUAL AND PROCEDURAL BACKGROUND

4    A.    Factual Background

5    Robinhood is a financial services company headquartered in Menlo Park, California.  FAC

6    ¶ 2.  The company provides a trading platform on computers and mobile devices for retail

7    investors.  FAC ¶¶ 558–61.  Robinhood is a commission-free broker that earns revenue through a

8    "pay for order flow" practice, where it primarily earns revenue by routing customer transactions

9    on its app to market makers in exchange for payments.  FAC ¶¶ 62–69.  The "pay for order flow"

10   practice accounted for 75% of Robinhood's revenue in 2020.  FAC ¶ 69.

11   Plaintiffs assert that the "pay for order flow" practice has been extensively criticized by the

12   Securities and Exchange Commission, due to brokers' incentives to route customers' trades to

13   market makers who pay more, even if those market makers have worse spreads.  FAC ¶¶ 69–70.

14   A "spread" is the difference between the bid prices (i.e., the price investors are willing to purchase

15   at) and ask prices (i.e., the price investors are willing to sell at) for the securities.  FAC ¶ 65.  In

16   December 2020, the SEC charged Robinhood for its misstatements that failed to disclose the

17   firm's receipt of payments from trading firms for routing customer orders to them and for failing

18   to satisfy its duty to seek the best reasonably available terms to execute its customer orders.  FAC

19   ¶ 71.  Robinhood paid $65 million to settle.  FAC ¶ 174.

20   Plaintiffs allege that Robinhood has experienced 70 outages or disruptions on its trading

21   platform between January 1, 2020, and November 30, 2020.  FAC ¶ 75.  For example, on March 2

22   and 3, 2020, when the Dow Jones Industrial Average experienced the then-largest point gain in its

23   history, the Robinhood platform collapsed when the market opened and was inoperable for over a

24   day.  FAC ¶ 76.  Plaintiffs allege that Robinhood's help center was also inadequate in addressing

25   customer concerns.  FAC ¶ 77.  On July 30, 2021, Robinhood conducted an initial public offering

26   ("IPO") and offered 55 million shares of common stock to the public at a price of $38 per share

27   for proceeds of over $2 billion.  FAC ¶ 3.  Prior to the IPO, Robinhood released the Registration

28   Statement and Prospectus (collectively, the "Offering Documents"), effective July 28, 2021.  FAC

United States District Court
Northern District of California

¶ 1; Docket No. 78-2 Exh. 1 (Registration Statement); Exh. 2 (Prospectus).  The Registration Statement first describes Robinhood's company mission, revenue model, and future goals:

> Our mission is to democratize finance for all.
>
> Robinhood was founded on the belief that everyone should be welcome to participate in our financial system. We are creating a modern financial services platform for everyone, regardless of their wealth, income or background.
>
> . . . We use technology to deliver a new way for people to interact with the financial system. We believe investing should be familiar and welcoming, with a simple design and an intuitive interface, so that customers are empowered to achieve their goals. We started with a revolutionary, bold brand and design, and the Robinhood app now makes investing approachable for millions.
>
> . . .
>
> *Built for People*. Customer feedback is at the heart of product development at Robinhood. In the early days, our founders would walk the campus of Stanford sharing product and design ideas and gathering real-time feedback. Today, we continue this tradition in a programmatic way, seeking customer perspectives to inform our priorities and inspire our innovation. We want to understand our customers and their expectations, ambitions, fears and challenges. Their insights help us focus on what is important and this approach enables us to expand our offering centered on their needs. Many of our customers are new to investing, and we are encouraged to see them taking their first steps toward wealth creation. We have replaced confusing jargon with simplicity and slang. Our tools are delightful and engaging.
>
> . . .
>
> *Future Vision*. Our vision is for Robinhood to become the most trusted and most culturally relevant money app worldwide. We innovate at the epicenter of finance, technology and access for all. As we look to the future, we want to help Robinhood customers manage all aspects of their financial lives in one place. We envision them moving seamlessly between investing, saving and spending all on the Robinhood platform. When we check our email, there is a go-to app. When we need a map, there is a go-to app. We envision a world in which Robinhood is that go-to app for money. We believe people want to build financial independence and have the tools and ability to own their financial well-being. We look forward to being our customers' single money app that enables them to achieve those goals.

Registration Statement at 1–4.  The document then describes "Trends in Our Favor" (including "Technology is Transforming Customer Expectations" and "Increasing Participation in the Financial Markets and the Rise of Fintech Companies") and "Our Opportunity."

Registration Statement at 4–5.  The Registration Statement also includes consolidated historical financial and operating data for the fiscal years ended December 31, 2019, and December 31, 2020, as well as the first and second quarters of 2021.  *See* Registration Statement at 24.  For these two years, Robinhood's key performance indicators ("KPIs") increased, as summarized in a series of a charts (visuals generated by Plaintiffs) as follows:



FAC ¶ 5 (monthly active users).



FAC ¶ 6 (revenue growth).

///

///

///

///

///

///



FAC ¶ 7 (total assets under custody).



FAC ¶ 7 (total assets under custody, by asset type).



FAC ¶ 8 (net cumulative funded accounts).

However, in the months from May 2021 to July 2021, just before the IPO, some of these KPI metrics started declining.  Specifically, Plaintiffs allege:

United States District Court
Northern District of California

5

- MAU declined from 24.1 million users in May 2021, to 21.3 million users in June 2021, to 19.5 million users in July 2021 (an approximately 19% decline), FAC ¶ 129;

- ARPU declined from $137 in March 2021, to $65 in September 2021 (an approximately 53% decline), FAC ¶ 134;

- AUC rose from $98.5 billion in May 2021, to $102.0 billion in June 2021, then declined to $94.7 billion in July 2021 (an approximately 7% decline), FAC ¶ 135;

- NCFA remained level at 22.3 million in May 2021, to 22.5 million in June 2021, to 22.4 million in July 2021, FAC ¶ 138;

- Cryptocurrency trading volume declined from $127 billion in May 2021, to $30 billion in June 2021, to $13 billion in July 2021 (an approximately 90% decline), FAC ¶¶ 131–32;

- Revenue declined from $565 million in June 2021, to $365 million in September 2021 (an approximately 35% decline), FAC ¶ 165.

These May 2021 to July 2021 metrics were not reported in the Offering Documents.  Plaintiffs allege that Robinhood had the ability to analyze its performance data immediately through the data platform Looker and that executives discussed the declining performance at the weekly all-hands meetings.  FAC ¶¶ 12–13, 87, 108, 118–19.

After the IPO, on October 26, 2021, Robinhood reported 3Q21 results, including further declines in MAU, lower revenue, and worse KPI data.  FAC ¶ 165.  Financial analysts reported by Robinhood's results were "significantly below expectations" and the company could be a "fad." FAC ¶¶ 14, 165.  The shares dropped from the offering price of $38 per share to a low of $6.87 per share.  MTD at 13.



///

///

1    Plaintiffs allege that Robinhood "was not successfully generating massive growth by

2  executing its strategy," "completely abandoned its stated principles," "undermin[ed] [small

3  customers'] decision-making process through app features designed to trigger rapid trading that

4  generated fees for Robinhood at the expense of investors," and "exposed inexperienced customers

5  to more complex and dangerous trading products, such as options and margin trader."  FAC ¶¶

6  10–11.

7  B.    Procedural History

8    Plaintiffs filed their original class action complaint on December 17, 2021, under §§ 11,

9  12, and 15 of the Securities Act.  Docket No. 1.  After the lead plaintiffs were appointed, Plaintiffs

10  filed a First Amended Complaint.  Docket No. 75 ("FAC").  Plaintiffs alleged that the Offering

11  Documents filed in connection with Robinhood's IPO contained materially false and misleading

12  statements and material omissions.  FAC ¶ 75.

13    On August 18, 2022, Robinhood filed a motion to dismiss the FAC.  Docket No. 78

14  ("MTD").  Robinhood argues that none of its business strategy statements or risk factor statements

15  were false or misleading, and that the Offering Documents accurately disclosed Robinhood's

16  financial performance.  MTD at 10–25.  This motion is now pending before this Court.  *See also*

17  Docket No. 81 ("Opp. to MTD"); Docket No. 83 ("Rep. to MTD").

18             **II.    LEGAL STANDARD**

19  A.    Motion to Dismiss for Failure to State a Claim (Rule 12(b)(6))

20    Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

21  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

22  complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

23  Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's

24  decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

25  U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the

26  claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

27  Cir. 2014).  The Court "accept[s] factual allegations in the complaint as true and construe[s] the

28  pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

United States District Court
Northern District of California

7

*Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not

simply recite the elements of a cause of action [and] must contain sufficient allegations of

underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

*Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

content that allows the court to draw the reasonable inference that the Defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III.  DISCUSSION

A.    Claims Under Section 11 or Section 12(a)

   Section 11 of the Securities Act imposes liability on Defendants if "any part of the

registration statement . . . contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein not

misleading."  15 U.S.C. §77k(a).  "No scienter is required for liability under § 11."  *In re Daou*

*Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005).  Section 12(a)(2) of the Securities Act establishes

liability for persons who offer or sell securities by means of prospectuses or oral communications

that include untrue or misleading statements or omissions.  *See* 15 U.S.C. § 77(a)(2).  *Rafton v.*

*Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *7 (N.D. Cal. Jan. 5, 2011).

Claims under Sections 11 and 12(a)(2) of the Securities Act contain roughly parallel elements.  *Id.*

at 6.  "[T]he heightened pleading standards of the PSLRA [Private Securities Litigation Reform

Act] do not apply to Section 11 claims."  *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 765 (N.D.

Cal. 2020) (citing *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009)).

   Plaintiffs claim that, in the pre-IPO Offering Documents, Robinhood misrepresented both

(1) the pre-IPO KPI decline and (2) the customer-centric business strategies at Robinhood.  Opp.

to MTD at 2.  The Court discusses both types of statements as follows.

   1.    KPI Disclosures

   Plaintiffs argue that the Offering Documents misrepresented Robinhood's financials, as

represented via the cryptocurrency trading levels and key performance indicator ("KPI") metrics, including the monthly active users ("MAU"), the assets under custody ("AUC"), the net cumulative funded accounts ("NCFA"), and the average revenues per user ("ARPU").  Opp. to MTD at 21–24.  Plaintiffs argue that Robinhood only reported KPI growth in 2019 and 2020 without disclosing KPI decline in the three-month period of May to July 2021.  Opp. to MTD at 21.  Although the Offering Documents made qualitative statements of *potential* KPI and cryptocurrency trading level decline, Plaintiffs contend these statements were framed only as a "contingent possibility" and did not sufficiently disclose that the metrics had *already begun to drop* in May to July 2021.  Thus, according to Plaintiff, the Offering Documents made "untrue statement of a material fact or omi[ssion]" which violated Section 11 and 12.

However, as described in greater detail below, Plaintiffs' FAC failed sufficiently to plead that Robinhood's KPI disclosures contained any false or misleading statements, because Robinhood accurately reported historical data (2019 and 2020).  The FAC does not allege that the decline of KPIs in May, June, and July (up to July 28, 2021, the date the Offering Documents were filed) were historically extraordinary.  Moreover, the FAC included warnings regarding future growth (for 2021 onwards).

///
///
///
///
///
///
///
///
///
///
///
///

First, Plaintiffs do not allege that the Offering Document inaccurately reported historical financial data. A company's statements are "inactionable" if they "merely restate accurately reported historical information." *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558, 2018 WL 4181954, at \*5 (N.D. Cal. Aug. 31, 2018) (cleaned up). Here, Plaintiffs do not allege that Robinhood inaccurately reported historical KPI data. The Offering Documents accurately presented the historical KPI data for the full years of 2019 and 2020 and the first two quarters of 2021. For instance, the Offering Documents represented that the MAU (monthly active users) had increased from 4.3 million to 11.7 million to 17.7 million to 21.3 million users between 2019 and 2020 and the first quarter of 2021, as shown in the charts below:





FAC ¶ 149. Plaintiffs make no allegations that any of this historical KPI data is false.

Second, with regards to Robinhood's failure to alert the public about the decline that began midway in the second quarter into the first portion of July 2021, Plaintiffs fail to allege that Robinhood made misleading representations by omission regarding this data and the potential

future performance of KPIs.  As a general matter, the Securities Act requires that "a registration statement include financial statements only if they are more than 135 days old.  Further, SEC regulations give companies 45 days after the end of a quarter to report quarterly results and do not generally require the disclosure of interim quarterly results."  *City of Warren Police & Fire Ret. Sys. v. Natera Inc.*, 46 Cal. App. 5th 946, 954 (2020) (cleaned up).  However, liability attaches "when an issuer's failure to include a material fact has rendered a published statement misleading."  *Id.* (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)).  Accordingly, an omission claim "arises only when disclosure is necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  *Retail Wholesale & Dep't Store Union Local 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (internal quotations and ellipses omitted).  The speaker must have "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Id.* at 1278 (citation omitted).

Although the FAC alleged that revenue from the third quarter ending in September 2021 declined from that reported for the second quarter, FAC ¶ 165, the FAC does not allege that revenues for the first 28 days of July (when the Offering Documents were filed) fell precipitously from the prior months.  Furthermore, revenue for the second quarter may be seasonal or aberrational.  The FAC provides no allegations as to the quarterly revenues for 2019 and 2020 that resulted in yearly revenues of $278 million and $957 million, respectively.  Prospectus at 25.

As to the other KPIs, many of the KPIs did not decline in the alleged period.  Indeed, the FAC shows that AUC actually increased in June 2021 and before decreasing in July 2021, FAC ¶ 135.  NCFA remained flat.  FAC ¶¶ 138, 149 ("Robinhood's net cumulative funded accounts had completely flatlined.").

To be sure, the FAC does assert a decline in MAU, ARPU, and cryptocurrency trading.  *See* FAC ¶¶ 129, 131, 149–53 (Robinhood's MAU "had been in sharp decline for months . . . [b]etween May 2021 and July 2021, Robinhood lost 4.6 million users.  It's MAU declined nearly 11.62% by June 2021 and by another 8.45% by July 2021.  Between May 2021 and July 2021, Robinhood also lost $114B in crypto trading volume.  Its crypto trading volume declined by over

76% by June 2021 and by another 56.67% by July 2021 . . . its ARPU declined by at least $25.30.").  We take these allegations in the light most favorable to Plaintiffs as the non-movant.  But even assuming these KPIs indeed declined between May and July 2021, Plaintiffs do not provide contextual information that would show the declines to be unusual and indicative of larger future trends.  Without historical data to show that the May to July 2021 declines in MAU or APRU were exceptional and out of line with past fluctuations, that data is not so extraordinary as to mandate specific out-of-quarter disclosure.  *See In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *9 (N.D. Cal. June 2, 2020) (agreeing that the defendant had a duty to disclose "information that would meaningfully contextualize" financial results); *see also In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d at 773 ("Furthermore, courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.") (citation omitted).  Plaintiffs also fail to explain how the May to July 2021 decline in cryptocurrency trading was unique to Robinhood rather than a general trend which would have known by the public and any reasonable investor.

Third, even taking all of Plaintiffs' allegations as true—that Robinhood's MAU and APRU metrics did sharply decline in May to July 2021—Robinhood arguably properly disclosed the future risks and downwards trends of these metrics.  Prospectus at 37.  Under the "bespeaks caution" doctrine, "a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994).  While "blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim," "precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus" do not constitute a misrepresentation.  *Id.* at 1414.  The Offering Documents warned that historical data of KPI growth was not necessarily indicative of future performance; in fact, Robinhood reported that it expected growth rates of KPIs to *decline* significantly in future periods:

We may not continue to grow on pace with historical rates.

> We have grown rapidly over the last few years, and therefore our
> recent revenue growth rate and financial performance should not be
> considered indicative of our future performance. In particular, since
> March 2020, we have experienced a significant increase in revenue,
> MAU, AUC and Net Cumulative Funded Accounts.
>
> . . .
>
> The circumstances that have accelerated the growth of our business
> may not continue in the future, and *we expect the growth rates in
> revenue, MAU, AUC and Net Cumulative Funded Accounts to
> decline in future periods, and such declines could be significant*.
>
> . . .
>
> We anticipate the rate of growth in these Key Performance Metrics
> [i.e., Net Cumulative Funded Accounts, MAUs, and Assets Under
> Custody (AUC)] *will be lower for the period ended September 30,
> 2021, as compared to the three months ended June 30, 2021*, due to
> the exceptionally strong interest in trading, particularly in
> cryptocurrencies, we experienced in the three months ended June 30,
> 2021 and seasonality in overall trading activities.

FAC ¶¶ 154, 156 (emphasis added).  To be sure, it may be argued that this disclosure was

inadequate to warn investors of an absolute decline in KPIs because it speaks to a decline in

*growth rates* which is different from a decline in absolute terms.

However, as to cryptocurrency trading, the Offering Documents suggested the possibility

of absolute declines:

> The prices of cryptocurrencies are extremely volatile. Fluctuations
> in the price of various cryptocurrencies may cause uncertainty in the
> market and could negatively impact trading volumes of
> cryptocurrencies, which would adversely affect the success of
> RHC's business, financial condition and results of operations.
>
> The cryptocurrency markets are volatile, and changes in the prices
> and/or trading volume of cryptocurrencies may adversely impact
> RHC's growth strategy and business. In addition, while we have
> observed a positive trend in the total market capitalization of
> cryptocurrency assets historically, driven by increased adoption of
> cryptocurrency trading by both retail and institutional investors as
> well as continued growth of various non-investing use cases,
> historical trends are not indicative of future adoption, and it is
> possible that the adoption of cryptocurrencies may slow, take longer
> to develop or never be broadly adopted, which would negatively
> impact our business, financial condition and results of operations.
>
> . . .
>
> For the three months ended March 31, 2021, 17% of our total

13

revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months year ended December 31, 2020. While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020. As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, RHC's business may be adversely affected, and growth in our net revenue earned from cryptocurrency transactions may slow or decline, if the markets for Dogecoin deteriorate or if the price of Dogecoin declines, including as a result of factors such as negative perceptions of Dogecoin or the increased availability of Dogecoin on other cryptocurrency trading platforms.

FAC ¶¶ 159–60.  These warnings, though not particularly robust, are sufficient to negate a claim of misleading omission where, as here, the recent trends of decline in some KPIs, as alleged, were not clearly remarkable.  *See Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) (citations omitted) (rejecting the argument that a firm misrepresented when it "touted" accurate financial results without exposing the downside impacts on growth because "disclosures of accurate historical data accompanied by general statements of optimism and failure to disclose internal forecasts of future performance are not actionable") (cleaned up).

The cases cited by Plaintiffs in their opposition brief—purporting to show that "allegations that a company represented that its customer base was growing or stable when, in fact, it was falling, sufficient to plead falsity," Opp. to MTD at 22—are distinguishable.  Plaintiffs point to *In re Twitter, Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2020 WL 4187915, at *9 (N.D. Cal. Apr. 17, 2020), *order clarified*, No. 16-CV-05314-JST, 2020 WL 2519890 (N.D. Cal. May 18, 2020), to show that the company's statement that "our MAU trend has already turned around" suggested a positive trend in MAU growth and was misleading because the defendants omitted the declining DAU/MAU trends.  *See* Opp. to MTD at 22.  In contrast, here, Robinhood did not suggest that the growth in KPIs would continue; in fact, it suggested the opposite—that the rate of growth of MAUs "will be lower" for at least the following few months and that cybercurrency activity in particular was subject to vicissitudes of the market.  Plaintiffs also point to *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *11 (N.D. Cal. June 2, 2020) to show that the company's statement that "iPhone sales in Greater China were increasing in 2018" is

1   misrepresentative because it is literally false.  *See* Opp. to MTD at 22.  But here, as listed above,

2   Plaintiff does not allege that Robinhood's reports of past MAU were inaccurate.

3       2.   Items 105 and 303

4       Plaintiffs further allege that Robinhood failed to satisfy its affirmative duty to disclose the

5   pre-IPO KPI declines under Items 105 or 303 of the Reg. S-K.  Opp. to MTD at 14.  Specifically,

6   Plaintiffs allege that Robinhood failed to disclose all "risk factors" under Item 105 and persistent

7   "trends" under Item 303.  Although Robinhood protests that this is a novel argument raised only in

8   Plaintiffs' opposition to the motion to dismiss, Plaintiffs' Item 105 and 303 claims properly fall

9   under the rubric of their Sections 11 and 12 claims.  *See Steckman v. Hart Brewing*, 143 F.3d

10  1293, 1296 (9th Cir. 1998) ("Allegations which state a claim under Item 303(a) of Regulation S-K

11  also sufficiently state a claim under Sections 11 and 12(a)(2).").  However, Plaintiffs failed to

12  plead with specificity that Robinhood violated either.

13      Item 105 requires disclosure of "the material factors that make an investment in the

14  registrant or offering speculative or risky." 17 C.F.R. § 229.105.  Plaintiffs allege that the Offering

15  Documents failed to disclosure major negative factors.  Opp. to MTD at 15.  But here, the

16  Offering Document warned of "Risk Factors" in cryptocurrency trading:

17          Our business and reputation may be harmed by changes in business,
            economic or political conditions that impact global financial
18          markets, or by a systemic market event.

19          As a financial services company, our business, results of operations
            and reputation are directly affected by elements beyond our control,
20          such as economic and political conditions, changes in the volatility
            in financial markets (including volatility as a result of the COVID-
21          19 pandemic), significant increases in the volatility or trading
            volume of particular securities or cryptocurrencies, broad trends in
22          business and finance, changes in volume of securities or
            cryptocurrencies trading generally, changes in the markets in which
23          such transactions occur and changes in how such transactions are
            processed. These elements can arise suddenly and the full impact of
24          such conditions can remain uncertain. A prolonged weakness in
            equity markets, such as a slowdown causing reduction in trading
25          volume in securities, derivatives or cryptocurrency markets, may
            result in reduced revenues and would have an adverse effect on our
26          business, financial condition and results of operations.

27          . . .

28          In addition, a prolonged weakness in the U.S. equity markets or in

15

United States District Court
Northern District of California

specific cryptocurrencies or equity securities or a general economic downturn could cause our customers to incur losses, which in turn could cause our brand and reputation to suffer.

FAC ¶ 158.  Moreover, as described above, Robinhood expressly disclosed that it anticipated declines in KPI growth in the near future.  *See* FAC ¶ 154 ("[W]e expect the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts to decline in future periods, and such declines could be significant."); FAC ¶¶ 159–60 ("Fluctuations in the price of various cryptocurrencies may cause uncertainty in the market and could negatively impact trading volumes of cryptocurrencies.").  Plaintiffs thus failed to plead that Robinhood did not disclose "material factors" that would make an investment in Robinhood speculative or risky.

Item 303 requires Management Discussion & Analysis of the financial statements reported in the Offering Documents.  17 C.F.R. § 229.303 (requiring new registrants to file audited balance sheets for the "two most recent fiscal years" and discuss "any material changes in financial condition from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided").  Specifically, Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Here, the parties agree that Robinhood disclosed the completed fiscal quarters for the two prior fiscal years at the time (2019 and 2020).  The parties dispute whether a few months of KPI decline starting in the second quarter of 2021 constitutes a "trend" that must be reported.  Repl. Brief at 2; *see, e.g.*, *In re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (denying the motion to dismiss because there is an "open question" about whether a decline of sales over a few months is a "trend").  As it stands, the FAC does not sufficiently allege that the declines in the May to July 2021 period "accurately reflect[] persistent conditions" of Robinhood's business because there are no contextual allegations establishing the recent declines in question are historically extraordinary and represent a present condition.  *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that *accurately reflects persistent conditions* of the particular registrant's business environment.'") (citation omitted)

United States District Court
Northern District of California

(emphasis added).  Plaintiffs' allegations are insufficient to establish a violation of Item 303.

      3.    <u>Business Strategies</u>

      Plaintiffs argue that the Offering Documents misrepresented Robinhood's overall business strategy of focusing on (i) the safety and reliability of Robinhood's trading platform; (ii) the needs of smaller investors; (iii) responding to customer problems and feedback; and (iv) a willingness to make "bold bets" that challenge the status quo, because Robinhood no longer acted to "democratize finance for all" or to "transform[] how people think about money."  FAC ¶¶ 4, 92, 141–45, 147.  In its Offering Documents, Robinhood described its core company values and future business strategy with statements that it:

- Sought to provide a "new way for people to interact with the financial system" and started "a revolutionary, bold brand and design" which made "investing approachable for millions" and "changed the landscape of retail investing," FAC ¶ 141;

- "Believe[d]" it was "well-positioned to serve an increasing portion of the population," FAC ¶ 141;

- Would "never sacrifice what's in [its] customers' long-term best interest in order to 'make [its] quarter," FAC ¶ 142;

- Sought to "empower[] a new generation of financial consumers" and committed to "maintaining strong relationships with [its] loyal customer base and earning customers' trust when they choose [Robinhood's] platform on their financial journey" including by "keeping [its] customers' accounts safe . . . promis[ing] to reimburse direct losses that happen due to unauthorized activity" and "helping [its] customers build sustainable, long-term financial success," FAC ¶ 143;

- "Believe[d]" it "built a trusted, category-defining brand" "[b]y taking a fresh, people-centric approach and creating a delightful, engaging customer experience" which "built deep, loyal customer relationships" and "[drove] customer enthusiasm and engagement, resulting in rapid adoption of [its] products," FAC ¶ 144; and

- Was "a safety-first company" which over the prior three years "made wholesale

changes to [its] infrastructure to add redundancy and capacity" to handle additional

trading volume and "increased and accelerated [its] investments in customer

support," FAC ¶ 145.

Robinhood provided sufficient disclosures of material facts such that these corporate strategy

statements do not constitute a misrepresentation actionable under the Securities Act.

First, Robinhood's Offering Documents contain only generalized statements of corporate

opinion and optimism that do not make any factual misrepresentations. As the Supreme Court

held, only statements of fact are actionable; statements of opinion that are "inherently subjective

and uncertain assessments" are not. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

*Pension Fund*, 575 U.S. 175, 186 (2015). "[A] sincere statement of pure opinion is not an 'untrue

statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."

*Id.* at 186. Here, each of Robinhood's statements that it "believed" that it was "well-positioned to

serve an increasing portion of the population," FAC ¶ 141, and "believed" that it "built a trusted,

category-defining brand," FAC ¶ 144, are pure statements of opinion. *See, e.g., Or. Pub. Emps.*

*Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (dismissing claims based on

statements that "[w]e *believe* that our track record for enrollment and revenue growth is

attributable to our offering comprehensive services") (emphasis added). Each of Robinhood's

statements that it sought to make "investing approachable for millions," FAC ¶ 141, and sought to

"empower[] a new generation of financial consumers," FAC ¶ 143, are subjective statements of

puffery and optimism. *See, e.g., id.* at 606 (dismissing claims based on statements of "puffery");

*see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing

corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-

regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly

amounts to a securities violation."). While "opinion statements can contain embedded statements

of fact, which may be read to affirm not only the speaker's state of mind but also an underlying

fact," *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605,

614 (9th Cir. 2017), Plaintiffs fail to allege that any of Robinhood's statements contain any such

embedded statements of fact.

Plaintiffs allege not that Robinhood falsely misrepresented any facts but merely that Robinhood failed to live up to its lofty opinions and goals of financial democratization, customer support, and platform reliability. But corporate ineptitude alone does not constitute a violation of the Securities Act. And it can be simultaneously true that Robinhood faced *some* customer service controversies while *overall* building a trusted brand that strove to create a positive customer service experience. Plaintiffs' argument also incorporates complaints that Robinhood should have implemented a different corporate strategy—for instance, restricting investors from "access[ing] riskier trading methods" such as "margin trading" and "option trading." Opp. to MTD at 4–5. But Plaintiffs' disagreement about how to "democratize finance" on a trading platform does not mean that Robinhood violated the Securities Act by choosing a different corporate approach. In short, the qualitative goals set forth in the Offering Documents are not specific or concrete enough to constitute a misstatement of fact, even in the face of the serious operational issues alleged in the FAC.

Second, Robinhood made substantial disclosures of material information consistent with Items 105 and 303. As explained above, Item 105 requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Here, Robinhood properly disclosed specific examples of challenges it faced in customer support and platform reliability:

> Our brand has faced challenges in recent years, including as a result of, among other things, the March 2020 Outages, the April-May 2021 Outages, the Early 2021 Trading Restrictions, the complexity of our options trading offerings and related concerns about limited customer support and controversial customer communications and displays.

Prospectus at 9, 182. Robinhood also properly disclosed all current litigation and class actions against the company, including those based on instances where unauthorized individuals accessed customer accounts:

> Security incidents have occurred in the past, and future incidents may result in unauthorized access to, loss of or unauthorized disclosure of this data, regulatory enforcement actions, litigation, indemnity obligations and other possible liabilities, as well as negative publicity. For example, from January 1, 2020 to October

United States District Court
Northern District of California

16, 2020, approximately 2,000 Robinhood customer accounts were
allegedly accessed by unauthorized users.

Prospectus at 55–56, 70.  Robinhood has properly disclosed "material factors" to its corporate

strategy and customer service pursuant to Item 105.  Item 303 requires disclosure of "any known

trends or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 29.303(a)(3)(ii).  As noted above, the recent decline in some of the KPIs in the May to

July 2021 period were not a sufficiently alleged trend.  And Robinhood's statements about its

corporate ethos and aspirational business strategies in particular are forward-looking goals, not

backwards-looking trends.  Other courts have found that such statements on intended strategies are

not "trends" which trigger disclosure obligations under Item 303.  *See, e.g.*, *In re Canandaigua*

*Sec. Litig.*, 944 F. Supp. 1202, 1210 (S.D.N.Y. 1996) ("[T]here are cognizable, definitive limits to

the disclosure required by S–K 303, and Canandaigua's discounting strategy simply does not fall

within those limits.").

The Court concludes that the Offering Documents' description of Robinhood's overall

business strategy, as alleged, do not violate Sections 11 or 12 or Items 105 or 303.

B.    Claims Under Section 15

Section 15 of the Securities Act makes "control persons" jointly and severally liable for

violations of Sections 11 or 12 committed by persons they control.  15 U.S.C. § 77o.  A Section 15

claim may be sustained only if there is an underlying primary violation.  *Howard v. Everex Sys.,*

*Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because Plaintiffs' FAC fails to allege such a violation,

as described above, the Section 15 claim must be dismissed.

C.    Leave to Amend

Because the Court cannot conclude that Plaintiffs are not able to amend the complaint to

assert additional allegations which would state a claim (*e.g.*, allegations of specific contextual

information demonstrating that the decline in KPI and cryptocurrency trading levels in the two to

three months before the filing of the Offering Documents were extraordinary and indicative of

larger future trends known to the management or through which management should have known

would have a material impact on future performance and which were not adequately disclosed),

United States District Court
Northern District of California

1    Plaintiffs are given the opportunity to amend their complaint.

2                           **IV.      CONCLUSION**

3           For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss **WITH**

4    **LEAVE TO AMEND**.  The amended complaint shall be filed within thirty (30) days from the

5    date of this order.

6           This order disposes of Docket No. 78.

7

8           **IT IS SO ORDERED**.

9

10   Dated: February 10, 2023

11

12                                                    _____

13                                                    EDWARD M. CHEN
                                                      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California