1    Deborah Clark-Weintraub (*pro hac vice*)
2    Thomas L. Laughlin, IV (*pro hac vice*)
     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
3    The Helmsley Building
     230 Park Avenue, 17th Floor
4    New York, NY 10169
     Telephone: 212-233-6444
5    Facsimile: 212-233-6334
     dweintraub@scott-scott.com
6    tlaughlin@scott-scott.com

7    *Counsel for Lead Plaintiffs Vinod Sodha and*
8    *Amee Sodha and the Proposed Class*

9    [Additional Counsel on Signature Page.]

10

11                **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13   PHILIP GOLUBOWSKI, Individually and on      Case No. 3:21-cv-09767
     Behalf of All Others Similarly Situated,
14
                                  Plaintiff,
15
                                                  **SECOND AMENDED CLASS ACTION**
16            v.                                  **COMPLAINT**

17   ROBINHOOD MARKETS, INC., VLADIMIR
     TENEV, JASON WARNICK, BAIJU BHATT,
18   JAN HAMMER, PAULA LOOP, JONATHAN            <u>JURY TRIAL DEMANDED</u>
     RUBENSTEIN, SCOTT SANDELL, ROBERT
19   ZOELLICK, GOLDMAN SACHS & CO. LLC,
     J.P. MORGAN SECURITIES LLC,
20   BARCLAYS CAPITAL INC., WELLS FARGO
     SECURITIES, LLC, MIZUHO SECURITIES
21   USA LLC, JMP SECURITIES LLC,
     KEYBANC CAPITAL MARKETS INC.,
22   PIPER SANDLER & CO., ROSENBLATT
     SECURITIES INC., BMO CAPITAL
23   MARKETS CORP., BTIG, LLC,
     SANTANDER INVESTMENT SECURITIES
24   INC., ACADEMY SECURITIES, INC., LOOP
     CAPITAL MARKETS LLC, SAMUEL A.
25   RAMIREZ & COMPANY, INC., and SIEBERT
     WILLIAMS SHANK & CO., LLC,
26
                                  Defendants.
27

28

1    Lead Plaintiffs Vinod Sodha and Amee Sodha ("Lead Plaintiffs") make the following

2  allegations, individually and on behalf of all others similarly situated, by and through Lead

3  Plaintiffs' counsel, upon information and belief, except as to those allegations concerning Lead

4  Plaintiffs, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief are

5  based upon, *inter alia*, counsel's investigation, which included, among other things, review and

6  analysis of:  (i) regulatory filings made by Robinhood Markets, Inc. ("RHM," together with its

7  subsidiaries, "Robinhood" or the "Company") with the United States Securities and Exchange

8  Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the

9  Company; (iii) analyst reports and media reports; and (iv) interviews with former employees and

10  contractors of Robinhood, as well as other publicly available information about the Company.

11  Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth

12  herein after a reasonable opportunity for discovery.

13                    **NATURE AND SUMMARY OF THE ACTION**

14    1.    Lead Plaintiffs bring this federal class action under §§11, 12, and 15 of the

15  Securities Act of 1933 ("Securities Act") against:  (i) Robinhood; and (ii) certain of the Company's

16  senior executives and directors (the "Individual Defendants") who signed the Registration

17  Statement, effective July 28, 2021, issued in connection with the Company's initial public offering

18  (the "IPO" or the "Offering"), and the underwriters of the Offering (the "Underwriter

19  Defendants").  Lead Plaintiffs allege that the Registration Statement and Prospectus (collectively,

20  the "Offering Documents") contained materially false and misleading statements and omitted

21  material information that was required by law to be disclosed.  Defendants are each strictly liable

22  for such misstatements and omissions (subject only to the Individual and Underwriter Defendants'

23  ability to establish a "due diligence" affirmative defense).

24    2.    Robinhood is a financial services company headquartered in Menlo Park,

25  California.  It is primarily known for its brokerage services, which customers typically access

26  through an app installed on their mobile devices.

27

28

3.      On or about July 30, 2021, Robinhood used the Offering Documents to conduct one of the largest IPOs of 2021.  The Offering Documents represented that Robinhood was successfully executing its strategy of making investing available to a previously untapped market – small and non-traditional investors who previously could not access the securities markets.  According to the Offering Documents, this strategy had driven enormous growth and had left Robinhood well-positioned to continue growing.  As proof of concept, the Offering Documents contained reams of historical performance data evidencing the Company's growth each quarter from 2019 through Q1 2021, along with estimated preliminary results for Q2 2021, the quarter that ended about a month before the IPO.  Pursuant to the Offering Documents, Robinhood and the other Defendants offered 55 million shares of common stock to the public at a price of $38 per share (the "Offering Price") for gross proceeds of over $2 billion.  However, the Offering Documents affirmatively presented a state of affairs that differed in a material way from the one that actually existed at the time of the IPO.

4.      By the time of the Offering, Robinhood's core fundamentals had changed, altering its growth trajectory.  During the periods in which it had posted the historical financial results touted in the Offering Documents, Robinhood's largest source of revenue was fees earned on its customers' conventional trading of stocks and options.  In the months preceding the Offering, however, Robinhood's business had become dominated by fad trading in so-called "meme" stocks, including GameStop, and a cryptocurrency that literally began as a joke – Dogecoin, which was named after an internet meme centered around the image of a Shiba Inu dog.  While these fads had fueled a temporary spike in trading volume that benefited Robinhood in Q1 and Q2 2021, as detailed herein, they had not laid a foundation for continued growth, and when they ended months before the Offering, Robinhood's financial prospects deteriorated.

5.      For months ahead of the IPO, the negative impact of this fundamental shift in Robinhood's business was evident from data available to Defendants in real time but was not disclosed in the Offering Documents.  In Q2 2021, revenue from equities trading, which historically had accounted for approximately one-third of Robinhood's transaction-based revenue,

was just $52 million, less than in every quarter since Q1 2020, and down an astounding 61% from $133.3 million in Q1 2021. Further, trading volume in equities in July 2021 was just $73 billion, one-third less than in June 2021 and 15% below the monthly average for Q2 2021.

6. At the same time, by the time of the IPO, cryptocurrency trading, which had displaced equities and options trading as the main driver of Robinhood's revenue, accounting for more than half of transaction-based revenue in Q2 2021, had cratered, declining 90% in the two months before the Offering. Between May and June 2021, Robinhood lost $97 billion in cryptocurrency trading volume, a decline of 76% in a 30-day period, and then it lost an additional $17 billion in cryptocurrency trading volume in July. Although cryptocurrency trading volumes were down across the industry during these months, the declines experienced by Robinhood far exceeded those in the industry as a whole. Moreover, although the Offering Documents contained a breakdown of Robinhood's historical transaction-based revenue by type of trading (*i.e.*, equities, options, cryptocurrency), the estimated preliminary results for Q2 2021 included in the Offering Documents did not include such a breakdown, leaving investors in the dark with respect to the sea-change in the fundamentals of Robinhood's business.

7. During this period, Key Performance Indicators ("KPIs") that the Offering Documents touted as significant business metrics – Monthly Active Users ("MAU"), Assets Under Custody ("AUC"), and Average Revenue Per User ("ARPU") – were declining as well. Specifically, (i) between May 2021 and July 2021 (*i.e.*, in the two months preceding the IPO), MAU, which Robinhood stated was positively correlated with the performance of revenue and other KPIs, had declined by 19%, or 4.6 million users; (ii) AUC fell 7% from $102 billion in June 2021 to $94.7 billion in July 2021, and but for a one-time bump in June 2021, had been deteriorating since May; and (iii) ARPU had also fallen dramatically from $137 million at the end of March 2021 to $111.7 million as of June 30, 2021, an 18% drop, to $65 million at the end of September, another 41% decline. These undisclosed declines were unusual as demonstrated by the historical financial information disclosed in the Offering Documents. At the same time, growth

in Net Cumulative Funded Accounts ("NCFA"), which the Offering Documents depicted as growing exponentially year-over-year and in Q1 2021, had stalled.

8.      The truth began to emerge on October 27, 2021, when Robinhood announced its Q3 2021 results revealing sharp declines in revenue and KPIs, causing the Company's stock price to drop sharply.  Jim Cramer commented that the earnings call made him "depressed" because "if you read the conference call, you'd think it was a fad . . . and if it's a fad, well what can I say? They've got a lot of people, 22 million, but they don't have a lot of money in their accounts."  The market learned more about the dismal state of Robinhood's strategy in the following months as the Company continued to report declining KPIs and revenue.  Commenting on the trend in January 2022, JP Morgan concluded that Robinhood is "***a growth company without the growth***." [Emphasis added.]

9.      As shown in the below chart, the Company's shares have traded as low as $6.81 per share since the IPO, representing a decline of more than 82% from the Offering Price of $38.



10.      By this action, Lead Plaintiffs, on behalf of themselves and other members of the Class (defined below) who also acquired Robinhood's shares pursuant and traceable to the Offering, now seek to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*(a)(2), and 77o, respectively.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §22 of the Securities Act, 15 U.S.C. §77v.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the acts and transactions giving rise to the violations of law complained of herein occurred, in part, in this District, including the dissemination of false and misleading statements into this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

**A.     Lead Plaintiffs**

15.     Lead Plaintiffs purchased shares of the Company's common stock that were issued pursuant and traceable to the Registration Statement and Offering and were damaged thereby.

**B.     Defendants**

**1.     The Company**

16.     Defendant Robinhood is a Menlo Park, California-based company that provides a vehicle through which people can buy and sell stocks, ETFs and cryptocurrencies.  Incorporated under the laws of the state of Delaware, Robinhood maintains its principal executive offices at 85 Willow Road, Menlo Park, California 94025.  Robinhood's common stock is listed on the NASDAQ under the ticker symbol "HOOD."

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

### 2.    The Individual Defendants

17.    Defendant Vladimir Tenev ("Tenev") is, and was at all relevant times, Co-Founder, Chief Executive Officer ("CEO"), and President of Robinhood, as well as a director on the Company's Board of Directors (the "Board").    Defendant Tenev reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

18.    Defendant Jason Warnick ("Warnick") is, and was at all relevant times, Robinhood's Chief Financial Officer ("CFO").    Defendant Warnick reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

19.    Defendant Baiju Bhatt ("Bhatt") is, and was at all relevant times, Co-Founder and Chief Creative Officer of Robinhood, as well as a director on the Board.    Defendant Bhatt reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

20.    Defendant Jan Hammer ("Hammer") is, and was at all relevant times, a director on the Board.    Defendant Hammer reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

21.    Defendant Paula Loop ("Loop") is, and was at all relevant times, a director on the Board.    Defendant Loop reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

22.    Defendant Jonathan Rubenstein ("Rubenstein") is, and was at all relevant times, a director on the Board.    Defendant Rubenstein reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

23.    Defendant Scott Sandell ("Sandell") is, and was at all relevant times, a director on the Board.    Defendant Sandell reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

24.    Defendant Robert Zoellick ("Zoellick") is, and was at all relevant times, a director on the Board.    Defendant Zoellick reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

25.    Defendants Tenev, Warnick, Bhatt, Hammer, Loop, Rubenstein, Sandell, and Zoellick are collectively referred to herein as the "Individual Defendants."

### 3.    The Underwriter Defendants

26.    The Underwriter Defendants were also instrumental in soliciting investors and in making the Robinhood shares that were offered and sold in or traceable to the IPO available to Lead Plaintiffs and the other members of the Class.  The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold in the IPO:

| Name | Number of Shares |
|------|------------------|
| Goldman Sachs & Co. LLC | 16,716,315 |
| J.P. Morgan Securities LLC | 15,671,645 |
| Barclays Capital Inc. | 6,268,680 |
| Citigroup Global Markets Inc. | 6,268,680 |
| Wells Fargo Securities, LLC | 6,268,680 |
| Mizuho Securities USA LLC | 568,040 |
| JMP Securities LLC | 426.030 |
| KeyBanc Capital Markets Inc. | 426.030 |
| Piper Sandler & Co. | 426.030 |
| Rosenblatt Securities Inc. | 426.030 |
| BMO Capital Markets Corp. | 284,020 |
| BTIG, LLC | 284,020 |
| Santander Investment Securities Inc. | 284,020 |
| Academy Securities, Inc. | 170,445 |
| Loop Capital Markets LLC | 170,445 |
| Samuel A. Ramirez & Company, Inc. | 170,445 |
| Siebert Williams Shank & Co., LLC | 170,445 |

27.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Goldman Sachs acted as a representative of all the underwriters.  Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Goldman Sachs' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Goldman Sachs conducts business in this District.

28.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  J.P. Morgan acted as a representative of all the underwriters.  J.P. Morgan also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  J.P. Morgan's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant J.P. Morgan conducts business in this District.

29.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Barclays participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Barclays' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Barclays conducts business in this District.

30.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Citigroup participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Citigroup's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Citigroup conducts business in this District.

31.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and

1    dissemination of the Company's material inaccurate, misleading, and incomplete Offering

2    Documents.  Wells Fargo participated in conducting and promoting the roadshow for the IPO and

3    paying for the expenses of the Individual Defendants who participated in the roadshow, including

4    lodging and travel, among other expenses.  Well Fargo's participation in and its solicitation of

5    offers in connection with the IPO was motivated by its financial interests.  Defendant Wells Fargo

6    conducts business in this District.

7        32.    Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the

8    Company's IPO, serving as a financial advisor for and assisting in the preparation and

9    dissemination of the Company's material inaccurate, misleading, and incomplete Offering

10   Documents.  Mizuho participated in conducting and promoting the roadshow for the IPO and

11   paying for the expenses of the Individual Defendants who participated in the roadshow, including

12   lodging and travel, among other expenses.  Mizuho's participation in and its solicitation of offers

13   in connection with the IPO was motivated by its financial interests.  Defendant Mizuho conducts

14   business in this District.

15       33.    Defendant JMP Securities LLC ("JMP") was an underwriter of the Company's IPO,

16   serving as a financial advisor for and assisting in the preparation and dissemination of the

17   Company's material inaccurate, misleading, and incomplete Offering Documents.    JMP

18   participated in conducting and promoting the roadshow for the IPO and paying for the expenses

19   of the Individual Defendants who participated in the roadshow, including lodging and travel,

20   among other expenses.  JMP's participation in and its solicitation of offers in connection with the

21   IPO was motivated by its financial interests.  Defendant JMP conducts business in this District.

22       34.    Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the

23   Company's IPO, serving as a financial advisor for and assisting in the preparation and

24   dissemination of the Company's material inaccurate, misleading, and incomplete Offering

25   Documents.  KeyBanc participated in conducting and promoting the roadshow for the IPO and

26   paying for the expenses of the Individual Defendants who participated in the roadshow, including

27   lodging and travel, among other expenses.  KeyBanc's participation in and its solicitation of offers

28

1    in connection with the IPO was motivated by its financial interests.  Defendant KeyBanc conducts

2    business in this District.

3        35.    Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter of the

4    Company's IPO, serving as a financial advisor for and assisting in the preparation and

5    dissemination of the Company's material inaccurate, misleading, and incomplete Offering

6    Documents.  Piper Sandler participated in conducting and promoting the roadshow for the IPO and

7    paying for the expenses of the Individual Defendants who participated in the roadshow, including

8    lodging and travel, among other expenses.  Piper Sandler's participation in and its solicitation of

9    offers in connection with the IPO was motivated by its financial interests.  Defendant Piper Sandler

10   conducts business in this District.

11       36.    Defendant Rosenblatt Securities Inc. ("Rosenblatt") was an underwriter of the

12   Company's IPO, serving as a financial advisor for and assisting in the preparation and

13   dissemination of the Company's material inaccurate, misleading, and incomplete Offering

14   Documents.  Rosenblatt participated in conducting and promoting the roadshow for the IPO and

15   paying for the expenses of the Individual Defendants who participated in the roadshow, including

16   lodging and travel, among other expenses.  Rosenblatt's participation in and its solicitation of

17   offers in connection with the IPO was motivated by its financial interests.  Defendant Rosenblatt

18   conducts business in this District.

19       37.    Defendant BMO Capital Markets Corp. ("BMO") was an underwriter of the

20   Company's IPO, serving as a financial advisor for and assisting in the preparation and

21   dissemination of the Company's material inaccurate, misleading, and incomplete Offering

22   Documents.  BMO participated in conducting and promoting the roadshow for the IPO and paying

23   for the expenses of the Individual Defendants who participated in the roadshow, including lodging

24   and travel, among other expenses.  BMO's participation in and its solicitation of offers in

25   connection with the IPO was motivated by its financial interests.  Defendant BMO conducts

26   business in this District.

27

28

1        38.    Defendant BTIG, LLC ("BTIG") was an underwriter of the Company's IPO,

2  serving as a financial advisor for and assisting in the preparation and dissemination of the

3  Company's material inaccurate, misleading, and incomplete Offering Documents.     BTIG

4  participated in conducting and promoting the roadshow for the IPO and paying for the expenses

5  of the Individual Defendants who participated in the roadshow, including lodging and travel,

6  among other expenses.  BTIG's participation in and its solicitation of offers in connection with the

7  IPO was motivated by its financial interests.  Defendant BTIG conducts business in this District.

8        39.    Defendant Santander Investment Securities Inc. ("Santander") was an underwriter

9  of the Company's IPO, serving as a financial advisor for and assisting in the preparation and

10  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

11  Documents.  Santander participated in conducting and promoting the roadshow for the IPO and

12  paying for the expenses of the Individual Defendants who participated in the roadshow, including

13  lodging and travel, among other expenses.  Santander's participation in and its solicitation of offers

14  in connection with the IPO was motivated by its financial interests.  Defendant Santander conducts

15  business in this District.

16        40.    Defendant Academy Securities, Inc. ("Academy") was an underwriter of the

17  Company's IPO, serving as a financial advisor for and assisting in the preparation and

18  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

19  Documents.  Academy participated in conducting and promoting the roadshow for the IPO and

20  paying for the expenses of the Individual Defendants who participated in the roadshow, including

21  lodging and travel, among other expenses.  Academy's participation in and its solicitation of offers

22  in connection with the IPO was motivated by its financial interests.  Defendant Academy conducts

23  business in this District.

24        41.    Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the

25  Company's IPO, serving as a financial advisor for and assisting in the preparation and

26  dissemination of the Company's material inaccurate, misleading, and incomplete Offering

27  Documents.  Loop Capital participated in conducting and promoting the roadshow for the IPO and

28

paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Loop Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Loop Capital conducts business in this District.

42.    Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Ramirez participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Ramirez's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Ramirez conducts business in this District.

43.    Defendant Siebert Williams Shank & Co., LLC ("Siebert") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Siebert participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Siebert's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Siebert conducts business in this District.

44.    Defendants listed in ¶¶26-43 are collectively referred to herein as the "Underwriter Defendants."

45.    Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  In addition, although not an element of Lead Plaintiffs' claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in

1  connection with the matters alleged herein and will accordingly be unable to establish a statutory

2  "due diligence" affirmative defense under the Securities Act.  Each Underwriter Defendant

3  committed acts and omissions that were a substantial factor leading to the harm complained of

4  herein.

5       46.     Each Underwriter Defendant named herein is an investment banking firm whose

6  activities include, *inter alia*, the underwriting of public offerings of securities.  As the underwriters

7  of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

8       47.     As underwriters, the Underwriter Defendants met with potential investors in the

9  IPO and presented highly favorable, but materially incorrect and/or materially misleading,

10 information about the Company, its business, products, plans, and financial prospects, and/or

11 omitted to disclose material information required to be disclosed under the federal securities laws

12 and applicable regulations promulgated thereunder.

13      48.     Representatives of the Underwriter Defendants also assisted Robinhood and the

14 Individual Defendants in planning the IPO.  They further purported to conduct an adequate and

15 reasonable investigation into the business, operations, products, and plans of the Company, an

16 undertaking known as a "due diligence" investigation.  During the course of their "due diligence,"

17 the Underwriter Defendants had continual access to confidential corporate information concerning

18 the Company's business, financial condition, products, plans, and prospects.

19      49.     In addition to having access to internal corporate documents, the Underwriter

20 Defendants and/or their agents, including their counsel, had access to Robinhood's management,

21 directors, and lawyers to determine:  (i) the strategy to best accomplish the IPO; (ii) the terms of

22 the IPO, including the price at which Robinhood's common stock would be sold; (iii) the language

23 to be used in the Offering Documents; (iv) what disclosures about Robinhood would be made in

24 the Offering Documents; and (v) what responses would be made to the SEC in connection with its

25 review of the Offering Documents.  As a result of those constant contacts and communications

26 between the Underwriter Defendants' representatives and Robinhood's management, directors,

27 and lawyers, at a minimum, the Underwriter Defendants should have known of Robinhood's

28

1  undisclosed then-existing problems and plans, and the Offering Documents' materially inaccurate,

2  misleading, and incomplete statements and omissions, as detailed herein.

3       50.     The Underwriter Defendants also demanded and obtained an agreement from

4  Robinhood under which Robinhood agreed to indemnify and hold the Underwriter Defendants

5  harmless from any liability under the Securities Act.

6       51.     The Underwriter Defendants caused the Registration Statement to be filed with the

7  SEC and declared effective in connection with the IPO, so that they, and the Individual Defendants,

8  could offer to sell, and sell, Robinhood shares to Lead Plaintiffs and other members of the Class

9  pursuant (or traceable) to the Offering Documents.

10                                    **BACKGROUND**

11      52.     Robinhood is an online broker founded in 2013.  At the time of the Offering, its

12  most significant subsidiaries were (i) Robinhood Financial LLC ("RHF"), a registered introducing

13  broker-dealer; (ii) Robinhood Securities, LLC ("RHS"), a registered clearing broker-dealer that

14  carried customer accounts exclusively for RHF; and (iii) Robinhood Crypto, LLC ("RHC").

15      53.     Robinhood markets itself almost exclusively to retail investors, many of whom are

16  first-time investors.   Robinhood's customers engage with the financial markets through an

17  application and user interface.  Robinhood's retail investing platform is its core product offering

18  and provides customers the ability to (i) trade in U.S. listed stocks and Exchange Traded Funds

19  ("ETFs"), as well as related options and American Depositary Receipts ("ADRS"); and (ii) trade

20  cryptocurrencies through RHC.  In addition, Robinhood offers Cash Management services, which

21  include Robinhood-branded debit cards.  Further, Robinhood also offers customers a monthly paid

22  subscription service called Robinhood Gold that provides customers with premium features, such

23  as enhanced instant access to deposits, professional research, Nasdaq Level II market data and,

24  upon approval, access to margin investing.

25

26

27

28

**A.** **Robinhood Primarily Earns Revenue by Routing Customer Transactions to Market Makers in Exchange for Payments**

54.     Unlike many traditional brokers, Robinhood does not charge customers a fee for executing a trade.  Rather, Robinhood is a commission-free broker that routes orders to market makers and, in exchange, receives consideration.  With respect to equities and options trading, such fees are known in the industry as "payment for order flow" ("PFOF").  With respect to cryptocurrency trading, such fees are known as "Transaction Rebates."  PFOF and Transaction Rebates (collectively, "transaction-based revenue") comprise the majority of Robinhood's revenue.  For the year ended December 31, 2020, and the three months ended March 31, 2021, transaction-based revenue accounted for 75% and 80.5%, respectively, of Robinhood's revenue.

55.     Before the Offering, Robinhood had enjoyed a virtually unbroken run of quarter-over-quarter revenue growth.  Except for the quarter ended December 31, 2019, revenues and transaction-based revenue from PFOF and Transaction Rebates had increased quarter-over-quarter in the eight quarters from Q1 2019 to Q1 2021.



56.     From Q1 2020 through Q4 2020, over 90% of Robinhood's transaction-based revenue came from its customers' conventional trading of stocks and options.  During this period,

1  PFOF from equities and options trading accounted for roughly one-third and 60%, respectively, of

2  Robinhood's transaction-based revenues.



13  57.  While the share of transaction-based revenue from equities remained stable in Q1

14  2021, Robinhood's share of transaction-based revenue from options trading dipped to 47%, as

15  Transaction Rebates from cryptocurrency trading, which had previously comprised no more than

16  5% of transaction-based revenue in any previous quarter, rose to 21%.

17  **B.  Robinhood's Key Performance Metrics**

18  58.  In addition to revenue and adjusted Earnings Before Interest, Taxes, Depreciation,

19  and Amortization ("EBITDA"), Robinhood uses (and directs the market's attention to) certain

20  "Key Performance Indicators" to evaluate its business, identify trends affecting the business,

21  formulate business plans, and make strategic decisions.  These KPIs are "Monthly Active Users

22  (MAU)," "Assets Under Custody (AUC)," "Average Revenues Per User (ARPU)," and "Net

23  Cumulative Funded Accounts ("NCFA")"

24  59.  Robinhood defines "MAU" as the number of Monthly Active Users during a

25  specified calendar month.  A "Monthly Active User" is a unique user who makes a transaction,

26  transitions between two different screens on a mobile device while logged into their account, or

who loads a page in a web browser, at any point during the relevant month.  A user need not satisfy these conditions on a monthly or recurring basis or have a Funded Account to be included in MAU.

60.    Robinhood utilizes MAU to measure how many customers interact with its products and services during a given month.  MAU does not measure the frequency or duration of the interaction, but Robinhood considers it a useful indicator for engagement.  Additionally, Robinhood represented that MAU is positively correlated with the performance of revenue and other key performance indicators.

61.    Robinhood defines "AUC" as the sum of the fair value of all equities, options, cryptocurrency and cash held by users in their accounts, net of customer margin balances, as of a stated date or period end on a trade date basis.

62.    Robinhood defines "ARPU" as total revenue for a given period (or, in the case of ARPU for a given cohort, total revenue generated by that cohort during a given period) divided by the average of Net Cumulative Funded Accounts (or, in the case of ARPU for a given cohort, the Net Cumulative Funded Accounts included in that cohort) as of the last day of that period and as of the last day of the immediately preceding period.  In the case of ARPU for a three-month period, this figure is multiplied by four to annualize the figure for comparability.

63.    Finally, a "Funded Account" is a Robinhood account into which the account user makes an initial deposit or money transfer of any amount during the relevant period, which account is designed to provide a customer with access to any and all of the products offered on Robinhood's platform.  "Net Funded Accounts" is the total number of Funded Accounts for a stated period, excluding "churned users" and including "resurrected users" as of the end of that period.  Users are considered "churned" if their accounts were previously Funded Accounts and their account balance (which is measured as the fair value of assets in the user's account less the amount due from the user) drops to or below zero dollars for 45 consecutive calendar days.  Users are considered "resurrected" if they were considered churned users during and as of the end of the immediately preceding period, and had their account balance increase above zero (and are not

considered churned users) in the current period.  Robinhood defines "Net Cumulative Funded Accounts" as the total of Net Funded Accounts from inception to a stated date or period end.

64.    Robinhood is able to track these KPIs in real-time or nearly so.  In that regard, the Offering Documents state that Robinhood tracks "certain operational metrics using internal company data gathered on an analytics platform that we developed and operate, including metrics such as MAU, AUC and Net Cumulative Funded Accounts."  The Offering Documents further state that Robinhood has focused on developing the "real-time" capabilities of its technology systems.

65.    Former employees corroborate that Robinhood's ability to analyze its performance data was instantaneous or nearly so.  For example, Confidential Witness #1 ("CW1") worked in reviewing customer analytics at Robinhood from 2018 to late 2021.  CW1 observed that Robinhood used Looker, a data platform, to track its performance data and create performance data dashboards.  Looker advertises itself as a platform that allows "for real-time dashboards for in-depth, consistent analysis."[1]  CW1 had access to some of Robinhood's Looker dashboards, including those that displayed Robinhood's MAU, customer attrition, net new customer and funded account metrics.  Moreover, CW1 as well as Confidential Witness #2 ("CW2"), a trading specialist who worked at the Company from late 2020 to August 2021, both observed that MAU and other corporate metrics were discussed by Robinhood's top officers, including Defendants Tenev and Bhatt, at weekly all-hands meetings.

**C.    Robinhood's July 30, 2021 IPO**

66.    On July 1, 2021, Robinhood filed with the SEC a draft registration statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments.

67.    On July 27, 2021, Robinhood filed its final amendment to the Registration Statement, which registered 60.5 million Robinhood shares for public sale, including 5.5 million shares that the Underwriter Defendants had the option to purchase, solely to cover over-allotments.

---

[1]    www.looker.com.

68.    The SEC declared the Registration Statement effective on July 28, 2021.

69.    On July 30, 2021, Defendants priced the IPO at $38 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

**ADVERSE FACTS THAT EXISTED AT THE TIME OF THE IPO THAT WERE NOT DISCLOSED IN THE OFFERING DOCUMENTS**

70.    By the time of the IPO, the core fundamentals of Robinhood's business had changed, altering its growth trajectory.  Contrary to the state of affairs that existed during the periods in which it had posted the historical financial information included in the Offering Documents, by the time of the Offering, Robinhood's largest source of revenue was no longer PFOF from its customers' conventional trading in stocks and options.  Instead, in Q1 and Q2 2021, Robinhood's business had become dominated by fad trading in so-called meme stocks such as GameStop and the novelty cryptocurrency Dogecoin.  While these fads had fueled a temporary spike in trading volume that benefited Robinhood in the short term, as set forth below, they had not laid a foundation for continued growth, and when they ended months before the Offering, Robinhood's financial prospects deteriorated.  Due to Robinhood's inadequate internal controls, including with respect to fraud prevention, customers were closing their accounts and leaving the platform, and Robinhood's Net Promoter Score ("NPS") (a key marketing metric that measures the number of customers willing to recommend Robinhood to others) had declined.  As a result, by the time of the IPO, Robinhood's customer base was shrinking, not growing.

71.    For months ahead of the IPO, these trends were evident in data available to Defendants in real time, showing that Robinhood's PFOF from equities trading, trading volume in equities and cryptocurrencies, MAU, ARPU and AUC were all declining while growth in NCFA had stalled, all of which contradicted the growth story portrayed in the Offering Documents.

**A.    Unusual Meme Stock and Cryptocurrency Events Drive Robinhood's Performance in Q1 and Q2 2021**

72.    In January 2021, shares of GameStop, AMC Entertainment ("AMC") and other companies whose shares were heavily shorted, surged on unprecedented volume as retail investors

banded together in places like Reddit (under the subreddit r/WallStreetBets), to squeeze short-sellers who had bet against these companies.  By driving up the share prices of these companies, the retail investors hoped to force hedge funds betting against the companies to cover their losses by buying back the shares, thereby increasing their share prices.  Single stock options were also a popular choice of retail investors looking to participate in the squeeze, and volumes jumped to previously unseen highs in January 2021.  This so-called "meme stock event" resulted in high volatility and heavy trading volume in the stocks and options in question, and, in the short term, benefited Robinhood as many of these retail traders flocked to its platform to execute their trades.

73.    The meme stock event began in earnest in mid to late January 2021.  At the close of trading on January 25, 2021, GameStop, a struggling video game retailer and one of the most shorted names in the U.S. stock market, had been traded more than any other S&P 500 stock with hundreds of millions of shares changing hands.

74.    The rally gained steam the following day after Elon Musk tweeted "Gamestonk!!" to his 42 million followers with a link to the WallStreetBets message board.  In response, GameStop's stock price, which had begun the year trading around $5, surged again with nearly 200 million shares changing hands.

75.    GameStop shares kept soaring the following day after CNBC reported that hedge fund Melvin Capital had closed out its short position in the company the prior day after taking a huge loss and requiring a cash infusion of nearly $3 billion from outside investors.  At the same time, other heavily shorted companies with troubled businesses, including AMC Entertainment and Bed Bath & Beyond, also got caught up in the frenzy.  AMC jumped 300% on January 27 alone, with more than one billion shares changing hands in its highest volume day ever.  Bed Bath & Beyond's shares rose 43% the same day.

1

2

3

4

5

6

7

8

9

10

11

12



13   76.    After hitting an all-time intra-day high on January 28, 2021, shares of GameStop

14   finally cooled as Robinhood and Interactive Brokers limited trading in the company's shares and

15   those of other heavily shorted names, to closing positions only, meaning that traders could not buy

16   up shares as the prices fell.  In addition, margin requirements on trades were also raised, making

17   it harder for traders to use leverage to load up on stocks and options.  In response, daily trading

18   volume in the shares of these companies fell sharply.  Robinhood explained that it took these

19   actions because the Depository Trust and Clearing Corporation (DTCC), the central Wall Street

20   clearinghouse, had mandated a ten-fold increase in the firm's deposit requirements in order to

21   ensure smooth settlement in trades involving the securities experiencing unprecedented volatility.

22   This forced Robinhood to raise $1 billion overnight from investors and tap credit lines to ensure it

23   could meet those requirements.

24   77.    By early February the meme stock event was essentially over as the prices of

25   GameStop, AMC and other meme stocks fell from their unprecedented January highs and trading

26   volume declined below the extraordinary levels seen in January.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

78.     However, as the meme stock phenomenon was abating Dogecoin, one of only seven cryptocurrencies that could be traded on Robinhood's platform, was taking flight.

79.     Although it ended 2020 at less than half a penny, in January 2021, Dogecoin soared more than 800% on heavy volume after gaining cult status on Reddit's WallStreetBets message board.  On February 4, 2021, trading in Dogecoin surged again after Elon Musk tweeted about it, sending Dogecoin up more than 50%.  By mid-February 2021, Dogecoin had risen more than 950% since the beginning of the year, to more than five cents per coin.

80.     In April, the price of Dogecoin skyrocketed again on heavy trading.  On April 14, 2021, Dogecoin surpassed ten cents in value for the first time, as investors geared up for the direct listing of cryptocurrency exchange Coinbase Global.  Then, on April 15, 2021, following another Elon Musk tweet, Dogecoin rallied past 25 cents for the first time on heavy volume that knocked out Robinhood's crypto trading systems for several hours.  Once trading was restored, Dogecoin kept climbing hitting a then all-time high of 44 cents on April 16, 2021.  The high volume of trading, which was up nearly 300%, once again caused Robinhood to experience sporadic crypto order failures and delayed notification for some customers.

81.     Then, on April 28, 2021, Elon Musk tweeted his upcoming appearance on Saturday Night Live (SNL), calling himself "Dogefather."  In the ten days between April 28 and Elon Musk's May 8, 2021 turn as SNL host, Dogecoin rose from approximately $0.30 to approximately $0.73.  However, the price of Dogecoin plummeted during the program after Elon Musk agreed Dogecoin was "a hustle."  Between May and July, Dogecoin's price sank by 78%, and volume plummeted.

82.     The meme stock event and Dogecoin's brief rally benefited Robinhood in the short term.  In large measure, due to these two events, Robinhood collected $331 million in PFOF in the first quarter of 2021, compared with $221 million in Q4 2020, nearly a 50% quarter-over-quarter increase.  Of these payments, $133 million (32%) came from equity trades and $198 million (47%) came from options trading.  Both amounts were all-time highs.  In addition, the initial stage of the

Dogecoin rally boosted Transaction Rebates from cryptocurrency trading to an all-time high of $87.5 million from $12 million in Q4 2020, with Dogecoin accounting for 34% of this amount.

83.    As explained below, however, by Q2 2021, it was clear not only that the heady levels of PFOF from the meme stock event would not continue, but that PFOF from equities and options trading were not growing. In Q2 2021, PFOF from equities and options trading was down 34.5% quarter-over-quarter from $331 million in Q1 2021, to just $216.6 million in Q2 2021. This represented a decline from Q4 2020's $222 million as well. PFOF from options trading had fallen from $197.9 million in Q1 2021, to $164.6 million in Q2 2021, a decline of 16.8%. Most alarming, PFOF from equities trading was just $52 million in Q2 2021, less than in every quarter since Q1 2020, and down a staggering 61%, from $133.3 million in Q1 2021. Further, equity trading volume in July 2021 was just $73 billion, one-third less than in June 2021, and 15% below the monthly average for Q2 2021.

84.    Although Transaction Rebates from cryptocurrency trading rose to $233 million in Q2 2021, an astounding 62% of this amount came from Dogecoin trades. By June 2021, however, cryptocurrency trading had collapsed. After peaking at $127 billion in May 2021, when Dogecoin was at its all-time high, cryptocurrency trading volume on Robinhood's platform cratered between May 2021 and June 2021, before declining even further in July 2021, (the month Robinhood went public) as illustrated in the graph below:



85.     Specifically, between May 2021 and June 2021, cryptocurrency trading volume fell by $97 billion, representing a decline of over 76%, in this 30-day period.  To make matters worse, cryptocurrency trading volume fell an additional $17 billion between June 2021 and July 2021, representing a 56.67% decline from its already depleted June 2021 figure.  In all, between May 2021 and July 2021, Robinhood lost $114 billion in crypto trading volume.

86.     Although cryptocurrency trading volumes were down across the industry in June 2021 (40%)[2] and July 2021 (31.5%), the decline in cryptocurrency trading volume experienced by Robinhood in these months, far exceeded that of the industry as a whole.

**B.     Customers Exit Robinhood in the Lead-up to the IPO Due to an Array of Service Issues**

87.     Former employees described a plethora of service and other issues that decimated Robinhood's customer base in the months before the IPO, including poor customer service, platform outages and inadequate security.

88.     CW1, who took part in monthly management meetings and virtual weekly all-hands meetings attended by Defendants Tenev and Bhatt, reported that Robinhood's declining MAU in the months before the IPO was discussed at those meetings.  According to CW1, declining customer satisfaction was evident in Robinhood's Net Promoter Score ("NPS"), which suffered in the months prior to the IPO, and which was a topic that was also discussed during these meetings.  The NPS represented how likely Robinhood customers were to recommend the product to others, and was seen as an important metric.  It was measured by subtracting the percentage of customers that would not recommend Robinhood from the percentage of customers that would.  This data was collected in surveys sent out to Robinhood users.

89.     Security concerns were one issue leading to customer dissatisfaction prior to the IPO that contributed to Robinhood's declining NPS.  As part of CW1's research, he sent questionnaires to customers regarding security.  CW1 reported that the responses were always "really bad."  Customers were aware that security hacks and breaches had occurred.  According to

---

[2]     Cryptocurrency trading volumes slumped in June due to a regulatory crackdown in China on bitcoin mining and lower volatility.

CWI, sometime around February 2021, Robinhood hired a "red hat" team whose job was to try and hack into Robinhood's platform to expose weaknesses. The red hat team was successful.

90.     CW1 also pointed to customer dissatisfaction with the limitations Robinhood had placed on trading in GameStop's shares as a reason for customer attrition in the months before the Offering. CW1 explained that these limitations had disadvantaged customers, causing them to lose a significant amount of money. These customers left the platform as a result negatively impacting MAU.

91.     Like CW1, CW2, attended weekly all-hands meetings with Defendants Tenev and Bhatt present. During these meetings, employees were often shown recent analyses of the Company's performance trends, including as to MAU, new customer sign-ups, customer attrition and customer complaints.

92.     CW2 recalled looking at these numbers between January 2021 and July 2021 in particular. CW2 recalls this time period specifically because it was bookmarked by the "GameStop incident," when Robinhood placed limitations on trading shares of GameStock and other companies upsetting customers, and the IPO. During this period, CW2 recalls that there was a decrease in new customers and that attrition increased. Customer complaints also increased. CW2 recalls that the decrease in new customers and increase in attrition was "a lot." At the meetings, Defendants Tenev and Bhatt stated they were unconcerned about these adverse trends.

93.     As an options trading specialist, it was CW2's job to answer customer complaints, concerns, or questions pertaining to options trades. Although options trading is highly complex, CW2 reported that Robinhood made it easy for customers who were not sophisticated traders to access options trading. As a result, it was "very easy" for customers to get in trouble. In the months before the IPO, CW2 noticed that cancellation requests increased.

94.     Confidential Witness #3 ("CW3"), a contract fraud analyst at Robinhood from mid-2020 to August 2021, reported that during this period, complaints with respect to adverse impacts from service disruptions (which went to the fraud department for analysis), and fraud complaints,

led customers to close their accounts.  According to CW3, customer losses due to these issues were discussed at weekly fraud department meetings.

95.    According to Confidential Witness #4 ("CW4"), a Robinhood customer experience team leader from August 2020 through February 2022, in the lead-up to the IPO, Robinhood was hampered by inadequate customer service that left customers frustrated and dissatisfied.

96.    According to CW4, Robinhood's customer service employees were not adequately trained.  Customer service training at Robinhood was not as comprehensive as at competitors such as Charles Schwab, which had dedicated teams to answer customer complaints on specific financial subjects.  In contrast, Robinhood only put customer representatives through basic training and did not have any dedicated teams (except for a white glove team that handled cases where there was a threatened lawsuit).  As a result, representatives often struggled to deal with complicated questions from investors, making them less productive and leading to both a backlog of, and untimely responses to, complaints.  CW4 reported that customers were often irate with how long their complaints and questions took to process and asked for their accounts to be closed.  According to CW4, these account closures were occurring in the lead up to the IPO and CW4 raised them repeatedly in management meetings.

97.    CW4 reported that in the aftermath of the GameStop incident in January 2021, during which Robinhood suspended trading of GameStop shares, Robinhood experienced a surge of customer cancellations.  Prior to GameStop, attrition was not a substantial problem.  Afterwards, there was a "huge uptick."  According to CW4, the cancellations continued at an elevated level throughout 2021 and into 2022.

**C.    Customer Attrition and the End of the Meme Stock and Dogecoin Fads Cause Robinhood's KPIs to Decline in the Months Before the Offering**

98.    Robinhood's MAU, which the Company "consider[ed] . . . a useful measure of engagement" that was "positively correlated" with the performance of revenue and other KPIs, ***was declining between May 2021 and July 2021***, as illustrated by the chart below:



99.    The percentage declines were considerable with Robinhood experiencing a nearly ***11.62% decline and an additional 8.45% decline*** between May 2021 and June 2021, and June 2021 and July 2021, respectively.  These declines were highly material as they indicated a loss of customers and/or reduced customer engagement coinciding with the end of the meme stock and Dogecoin fads and portended Robinhood's declining growth prospects.  The declines were also highly unusual for Robinhood, which had rarely, if ever, experienced back-to-back months of declining MAU of similar magnitude.

100.    Further, the Company's ARPU had declined significantly between March and July 2021, falling from an all-time high of $137 in the quarter ended March 31, 2021, to $111.70 as of the quarter ended June 30, 2021, a nearly 20% decline, as reflected below:



101.    Significantly, although the Offering Documents provided preliminary estimates of other KPIs for the just completed second quarter ended June 30, 2021, they did not do so for ARPU.

102.    Further, although Robinhood does not disclose ARPU on a monthly basis, given the unprecedented declines in trading volumes Robinhood experienced in June and July, ARPU had certainly declined in July as well.  Indeed, for the quarter-ended September 30, 2021, ARPU was just $65, a decline of approximately 42% from the prior quarter and a decline of 52.5% since Q1 2021.

103.    In addition, AUC, the sum of the fair value of all equities, options, cryptocurrency and cash held by users in their accounts (net of receivables), had also declined in the month before the IPO from $102 billion in June 2021 to $94.7 billion in July 2021.  This decline stood in stark contrast to the unbroken string of rising AUC that occurred prior to July 2021:



104.    Indeed, but for the one-time bump Robinhood experienced in June 2021, which the Company attributed to "exceptionally strong interest in trading, particularly in cryptocurrencies," Robinhood's AUC had been deteriorating for months, falling from $98.9 billion in April 2021, to $98.5 billion in May 2021, to $94.7 billion in July 2021, when the Company went public.

105.    This unusual negative trend in AUC was material in light of the decline in PFOF from equities trading, plummeting trading volume with respect to equities and cryptocurrency, and declining MAU and ARPU.

106.    Moreover, the fact that Robinhood's customer base and usage, as measured by "Net Cumulative Funded Accounts," remained almost flat throughout May, June, and July 2021, the three months preceding the Offering, also undermined the growth story painted by the historical financial information included in the prospectus:



**THE MATERIALLY FALSE AND MISLEADING OFFERING DOCUMENTS**

107.    The Offering Documents used to effectuate Robinhood's IPO, as well as the road show talking points and script used in conjunction with presenting the road show PowerPoint presentation for the IPO, contained untrue or misleading statements of material fact and/or omitted to state facts necessary to make the statements made therein not materially misleading or incomplete in violation of the Securities Act.

108.    Specifically, the Offering Documents misleadingly portrayed a state of affairs at odds with Robinhood's business fundamentals in the months leading to the IPO.   In 2021, Robinhood's largest source of revenue was no longer fees from its customers' conventional trading in stocks and options, as it had been previously.   Instead, since at least the start of the year, Robinhood's revenue had been driven by speculative, fad-trading in meme stocks and the novelty

cryptocurrency Dogecoin.  While these fads resulted in a short-term increase in PFOF and Transaction Rebates in Q1 and Q2 2021, as set forth above, they had not laid a foundation for continued growth, and when they ended months before the Offering, Robinhood's financial prospects deteriorated.

109.    Nevertheless, the Offering Documents emphasized Robinhood's historical growth prior to 2021, without disclosing the sea-change in its business that had occurred in 2021, including the interim financial results and declining KPIs that evidenced this material change in Robinhood's core fundamentals and contradicted the growth story portrayed in the Offering Documents.

110.    For example, the Offering Documents provided the following chart of historical quarterly net and transaction-based revenue for the period Q1 2019 through Q1 2021:

| (in thousands) | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mar. 31, 2019 | Jun. 30, 2019 | Sept. 30, 2019 | Dec. 31, 2019 | Mar. 31, 2020 | Jun. 30, 2020 | Sept. 30, 2020 | Dec. 31, 2020 | March 31, 2021 |
| Revenues: | | | | | | | | | |
| Transaction-based revenues | $33,851 | $44,800 | $48,841 | $43,339 | $95,631 | $187,413 | $201,807 | $235,282 | $ 420,439 |
| Net interest revenues | 11,533 | 15,618 | 21,946 | 21,542 | 24,016 | 39,998 | 50,406 | 63,017 | 62,497 |
| Other revenues | 10,772 | 11,314 | 6,693 | 7,284 | 7,903 | 16,800 | 17,317 | 19,243 | 39,238 |
| Total net revenues | 56,156 | 71,732 | 77,480 | 72,165 | 127,550 | 244,211 | 269,530 | 317,542 | 522,174 |

111.    Commenting on this information, the Offering Documents stated:

Transaction-based revenues have generally increased sequentially in each of the periods presented, other than the fourth quarter of 2019, *due to growth in our user base which resulted in higher trading volume on a per-user basis.  In the first half of 2020, we saw a significant increase in the number of new accounts opened by first-time investors, as a result of increased interest in personal finance and investing, low interest rates and a positive market environment, especially in the U.S. equity markets.  Throughout the remainder of 2020 and the first quarter of 2021, we maintained substantial growth in our user base, retention, engagement and trading activity metrics, as well as gains and periodic all-time highs achieved by the equity markets.*  (p. 156.)

112.    The Offering Documents also touted the year-over-year growth in transaction-based revenue from the year ended December 31, 2019 through the year-ended December 31, 2020 as follows:

Transaction-based revenue increased by $549.3 million, or 322%, for the year ended December 31, 2020, compared to the year prior. ***The increase was driven by a 143% increase in Net Cumulative Funded Accounts, which resulted in higher daily average revenue trades . . . in options, equities and cryptocurrencies. . . . Increased interest in personal finance and investing, low interest rates and a positive market environment, especially in the U.S. equities markets, encouraged an unprecedented number of first-time retail investors to become our users and begin trading on our platform. We have seen substantial growth in our user base, retention, engagement and trading activity metrics, as well as continued gains and periodic all-time highs achieved by the equity markets***. (p. 149.)

113.    Likewise, with respect to Q1 2021, the last quarter for which results were reported prior to the IPO, the Offering Documents stated that:

Transaction-based revenues increased by $324 million, or 340%, for the three months ended March 31, 2021, compared to the year prior. ***The increase was driven by a 151% increase in Net Cumulative Funded Accounts, which resulted in higher daily average revenue trades in options, equities, and cryptocurrencies. . . . Increased interest in personal finance and investing, and several high-profile securities and cryptocurrencies, encouraged an unprecedented number of first-time retail investors to become our users and begin trading on our platform. We have seen substantial growth in our user base, engagement and trading activity metrics***. (p. 144.)

114.    Similarly, with respect to Q2 2021, which ended nearly a month before the IPO, but for which final results had not yet been reported, the Offering Documents disclosed "estimated preliminary results" as follows:

For the three months ended June 30, 2021, we expect to report revenue of between $546 million and $574 million, as compared to $244 million for the three months ended June 30, 2020, representing an increase of 129% at the midpoint of the range. The expected increase in revenue is primarily driven by a 130% increase in Net Cumulative Funded Accounts and increased trading activity related to options and cryptocurrencies, ***and relatively flat equities trading activity***, relative to the three months ended June 30, 2020. . . . ***Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter. We expect our revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30, 2021, and expected seasonality***. (p. 31, 136-37.)

115.    The Offering Documents also provided the following historical information with respect to the sources of transaction-based revenue for the years ended December 31, 2019 and December 31, 2020, and the three months ended March 31, 2020 and March 31, 2021:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands, except for percentages) | **2019** | **2020** | **% Change** |
| Transaction-based revenues | | | |
| Options | $ 110,656 | $ 440,070 | 298% |
| Equities | 50,688 | 251,200 | 396% |
| Cryptocurrencies | 9,487 | 26,708 | 182% |
| Other | - | 2,155 | NM |
| Total transaction-based revenues | $ 170,831 | $ 720,133 | 322% |

| | Three Months Ended March 31, | | |
|---|---|---|---|
| (in thousands, except for percentages) | **2020** | **2021** | **% Change** |
| Transaction-based revenues | | | |
| Options | $ 59,760 | $ 197,860 | 231% |
| Equities | 31,589 | 133,301 | 322% |
| Cryptocurrencies | 4,238 | 87,587 | 1,967% |
| Other | 44 | 1,691 | 3,743% |
| Total transaction-based revenues | $95,631 | $420,439 | 340% |

116.    The statements identified in ¶¶110-113, 115 above were untrue statements of material fact and/or omitted to state facts necessary to make the statements not materially misleading because, as detailed above, they portrayed a state of affairs that no longer reflected the fundamentals of Robinhood's business in the lead-up to the IPO.  In particular, the foregoing statements portrayed Robinhood's Q1 2021 growth as having been driven by the same factors that had propelled Robinhood's growth in previous periods, when, in fact, Q1 2021's growth was the result of the meme stock event and trading in Dogecoin, a highly speculative cryptocurrency.  By the end of Q2 2021, these fads were over (or long over), and Robinhood's PFOF from equity trading, equity and cryptocurrency trading volumes, and key KPIs were declining.

117.    In addition, the statements identified in ¶ 114 above, concerning Robinhood's estimated preliminary results for Q2 2021, were also untrue statements of material fact and/or omitted to state facts necessary to make the statements not materially misleading.  The statement that equities trading activity during the quarter was "relatively flat" relative to the three months

1    ended June 30, 2020, was untrue and/or materially misleading because PFOF from equities trading

2    for Q2 2021 was only $52 million, 26% lower than in the prior year period, and a staggering 61%

3    less than in Q1 2021.  Indeed, in Q2 2021, PFOF from equities trading was the lowest it had been

4    since Q1 2020, and represented just 12% of transaction-based revenue, less than half its historical

5    one-third share.  Further, the statement that "[t]rading activity was particularly high during the first

6    two months of the 2021 period" and had "return[ed] to levels more in line with prior periods during

7    the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early

8    part of the third quarter" was untrue and/or materially misleading for the same reason and also

9    because, as detailed above, cryptocurrency trading volume had cratered in June and July 2021 and

10    was nowhere near Q1 2021 levels.

11         118.    Finally, the statement identified in ¶114 above, that Robinhood "expect[ed] [its]

12    revenue for the three months ending September 30, 2021 to be lower, as compared to the three

13    months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record

14    highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30,

15    2021, and expected seasonality" was untrue and/or materially misleading because it gave no

16    indication of the staggering magnitude of the declines that had occurred in equities and

17    cryptocurrency trading preceding the IPO, and suggested that the expected decline was due, in

18    part, to "seasonality" when, in fact, the end of the meme stock event and speculative Dogecoin

19    rally were to blame.  Indeed, the only discussion of "seasonality" in the Offering Documents was

20    with respect to the first and second quarters.  Registration Statement at 140 ("Seasonality.  We

21    believe investment activity will vary throughout the year.  Given traditional consumer behavior,

22    we expect to see more new customers in the first calendar quarter."); *id*. at 157 ("Proxy rebate

23    revenue is impacted by seasonality with the second quarter historically the highest as that coincides

24    with a large number of shareholder meetings.").

25         119.    The Offering Documents' discussion of KPIs was untrue and/or materially

26    misleading as well.  In this regard, the Offering Documents contained the following tables

27    reflecting growing Net Cumulative Funded Accounts and MAU:

28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767





120.    The Offering Documents complemented these illustrations with the tables below.

The first shows that Robinhood's four KPIs have been increasing yearly since (at least) 2017.  The

second affirms, according to "***preliminary information currently available to management***," that

Robinhood's  Net  Cumulative  Funded  Accounts,  MAU,  and  AUC  were  each  ***continuing  to***

***increase in the current quarter*** (*i.e*., the second quarter of 2021):

| *(in millions except for ARPU)* | Year or Month Ended December 31, | | | | Three Months or Month Ended March 31, | |
|---|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2020** | **2021** |
| Net Cumulative Funded Accounts(1) | 1.9 | 3.3 | 5.1 | 12.5 | 7.2 | 18.0 |
| Monthly Active Users (MAU)(2) | 1.8 | 3.3 | 4.3 | 11.7 | 8.6 | 17.7 |
| Assets Under Custody (AUC)(3) | $   4,505.7 | $   8,359.5 | $   14,135.6 | $   62,978.5 | $   19,220.1 | $   80,932.4 |
| Average Revenues Per User (ARPU)(4) | $   37.0 | $   66.5 | $   65.7 | $   108.9 | $   82.9 | $   137.0 |

| | Three Months or Month Ended | |
|---|---|---|
| | June 30, 2020 Actual | June 30, 2021 Estimate |
| **Key Performance Metrics** | | |
| Net Cumulative Funded Accounts | 9.8 | 22.5 |
| Monthly Active Users (MAU) | 10.2 | 21.3 |
| Assets Under Custody (AUC) | $     33,422 | 102,035 |

121.     The Offering Documents also stated the following regarding Robinhood's preliminary estimates of its KPIs for Q2 2021:

> For the three months ended June 30, 2021, we expect to report Net Cumulative Funded Accounts of 22.5 million, as compared to 9.8 million for the three months ended June 30, 2020, representing an increase of 130%. For the month ended June 30, 2021, we expect to report MAU of 21.3 million, as compared to 10.2 million for the month ended June 30, 2020, representing an increase of 109%. As of June 30, 2021, we expect to report AUC of $102 billion, as compared to $33 billion as of June 30, 2020, representing an increase of 205%. ***The increase in these Key Performance Metrics resulted primarily from an increase in new users joining our platform, driven by general market interest trading.*** We anticipate ***the rate of growth*** in these Key Performance Metrics will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, ***due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities***. (p. 31, 137.)

122.     The illustrations, tables and statements identified in ¶¶119 through 121 above, were untrue and/or materially misleading because Robinhood's core fundamentals had changed since the historical periods depicted  and as detailed above, MAU, ARPU and AUC were declining prior

1   to the IPO.  Further, the statement that "***the rate of growth*** in these [KPIs] will be lower for the

2   period ended September 30, 2021, as compared to the three months ended June 30, 2021" was

3   untrue and/or materially misleading because it suggests that the KPIs were on a growth trajectory

4   at the time of the IPO, when, in fact, they were declining.  Moreover, as was the case with respect

5   to revenues (¶118, *supra*), the suggestion that the rate of growth in the KPIs would be impacted

6   by seasonality in Q3 2021, was untrue and/or materially misleading because the declines were, in

7   fact, due to the end of the meme stock event and Dogecoin rally and the widespread service issues

8   described by the CWs.

9        123.   For these same reasons, the following generalized "Risk Factors" concerning

10  Robinhood's recent growth and the potential that Robinhood "***may not continue to grow on pace***

11  ***with historical rates***," are themselves untrue and/or materially misleading, or otherwise wholly

12  inadequate:

13       ***We may not continue to grow on pace with historical rates.***

14       We have grown rapidly over the last few years, and therefore our recent revenue
         growth rate and financial performance should not be considered indicative of our
15       future performance.  In particular, since March 2020, we have experienced a
         significant increase in revenue, MAU, AUC and Net Cumulative Funded Accounts.
16       For example, for the years ended 2019 and 2020, our revenue was $277.5 million
         and $958.8 million, respectively, representing annual growth of 245%.  In addition,
17       for the three months ended March 31, 2021, during which we experienced high
         trading volume and account sign-ups as well as high market volatility, particularly
18       in certain market sectors, our revenue was $522.2 million, as compared to $127.6
         million for the three months ended March 31, 2020, and on March 31, 2021, we
19       had Net Cumulative Funded Accounts of 18.0 million, as compared to 7.2 million
         on March 31, 2020, representing growth of 309% and 151%, respectively.  The
20       circumstances that have accelerated the growth of our business **may** not continue
         in the future, and we ***expect the growth rates in revenue, MAU, AUC and Net***
21       ***Cumulative Funded Accounts to decline in future periods***, and such declines
22       ***could*** be significant.

23

24  *Id.* at 37 [Emphasis added.]

25       124.   The foregoing was false and misleading because it indicates that Robinhood was

26  still growing when, in fact, Robinhood's performance data had been cratering for months.

27

28

125.    What is more, even the Offering Documents' attempt at handicapping Robinhood's cryptocurrency growth for its upcoming quarters, suggested growth, when, in fact, cryptocurrency trading volumes had cratered.  In this regard, the Offering Documents stated that:

> Trading activity was particularly high during the first two months of the 2021 period, *returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter*.
>
> *     *     *
>
> We anticipate *the rate of growth* in these Key Performance Metrics [*i.e.*, Net Cumulative Funded Accounts, MAUs, and Assets Under Custody (AUC)] *will be lower for the period ended September 30, 2021*, as compared to the three months ended June 30, 2021, *due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021* and seasonality in overall trading activities.

*Id.* [Emphasis added.]

126.    The foregoing was false and misleading because it indicated that Robinhood's performance metrics were continuing to grow, albeit at a slower rate.  But that was not the case. Robinhood's reference to trading activity returning to a more "normal" level was also misleading in light of the fact that crypto trading declined by nearly 90% in only two months to rates that were far below those in April 2021.

127.    For these same reasons, the Offering Documents generalized "Risk Factors" concerning the potential implications of changes in the volume of cryptocurrency trading on Robinhood's platform, were themselves false and misleading, or otherwise wholly inadequate.  For example, the Offering Documents warned:

> *Our business and reputation <u>may</u> be harmed by changes in business, economic or political conditions that impact global financial markets, or by a systemic market event.*
>
> As a financial services company, *our business, results of operations and reputation are directly affected by elements beyond our control, such as* economic and political conditions, changes in the volatility in financial markets (including volatility as a result of the COVID-19 pandemic), significant increases in the volatility or trading volume of particular securities or cryptocurrencies, broad trends in business and finance, *changes in volume of securities or cryptocurrencies trading generally*, changes in the markets in which such transactions occur and changes in how such transactions are processed.  These

37

elements can arise suddenly and the full impact of such conditions can remain uncertain.  A prolonged weakness in equity markets, such as *a slowdown causing reduction in trading volume in* securities, derivatives or *cryptocurrency markets*, *may result in reduced revenues* and would have an adverse effect on our business, financial condition and results of operations.

*        *        *

In addition, *a prolonged weakness in* the U.S. equity markets or in *specific cryptocurrencies* or equity securities or a general economic downturn *could* cause our customers to incur losses, which in turn *could* cause our brand and reputation to suffer.

*Id.* at 45 [Emphasis added.]

128.    The Offering Documents also stated:

*The prices of cryptocurrencies are extremely volatile.  Fluctuations in the price of various cryptocurrencies may cause uncertainty in the market and could negatively impact trading volumes of cryptocurrencies, which would adversely affect the success of RHC's business, financial condition and results of operations.*

*        *        *

The cryptocurrency markets are volatile, and *changes* in the prices and/*or trading volume of cryptocurrencies may adversely impact RHC's growth strategy and business.  In addition, while we have observed a positive trend in the total market capitalization of cryptocurrency assets historically, driven by increased adoption of cryptocurrency trading by both retail and institutional investors as well as continued growth of various non-investing use cases, historical trends are not indicative of future adoption, and it is possible that the adoption of cryptocurrencies may slow, take longer to develop or never be broadly adopted, which would negatively impact our business, financial condition and results of operations*.

*Id.* at 79 [Emphasis added.]

129.    The Offering Documents also stated:

*A substantial portion of the recent growth in our net revenues earned from cryptocurrency transactions is attributable to transactions in Dogecoin.  If demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on our platform, our business, financial condition and results of operations could be adversely affected.*

1

For the three months ended March 31, 2021, 17% of our total revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months year ended December 31, 2020. While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020. As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, *RHC's business **may** be adversely affected, and growth in our net revenue earned from cryptocurrency transactions **may slow or decline**, if the markets for Dogecoin deteriorate or **if the price of Dogecoin declines, including as a result of factors such as negative perceptions of Dogecoin or the increased availability of Dogecoin on other cryptocurrency trading platforms*.

2

3

4

5

6

7

8

9

*Id.* at 79 [Emphasis added.]

10

130.     In fact, all of these supposed risks identified in ¶¶125 through 129 above, had

11

already come to pass. Cryptocurrency trading on Robinhood's platform in the months leading up

12

to the IPO *was down more than 90%, in large measure due to declining trading activity with*

13

*respect to Dogecoin*.

14

### THE OFFERING DOCUMENTS FAILED TO COMPLY WITH
### <u>APPLICABLE SEC REGULATIONS</u>

15

16

131.     In addition, Item 303 imposed an independent duty on Defendants to disclose in the

17

Offering Documents any known events, trends, or uncertainties that Robinhood, as of the IPO,

18

"reasonably expect[ed] [would] have a material favorable or unfavorable impact on . . . revenues

19

or income from continuing operations." The Offering Documents violated Item 303 by failing to

20

disclose the sea-change that had occurred in the make-up of Robinhood's business in the quarters

21

before the IPO, and its declining financial performance including dramatically lower PFOF from

22

equities trading, cratering trading volume in equities and cryptocurrency, and declining KPIs. At

23

the time of the IPO, these known events, trends and uncertainties were having, and were reasonably

24

likely to have, a material unfavorable impact on Robinhood's revenues and financial condition.

25

132.     Similarly, Item 105 required Robinhood to adequately describe and discuss, in the

26

"Risk Factor" section of the Offering Documents, the most significant factors that made the

27

Offering risky or speculative. The Offering Documents violated Item 105 by failing to describe,

28

if even described at all, that at the time of the Offering, Robinhood's revenues had become far more volatile than they had been historically, because the Company's primary sources of revenue in Q1 2021 and Q2 2021 were PFOF and Transaction Rebates from speculative trading in meme stocks and cryptocurrencies, primarily Dogecoin, rather than transaction-based revenue from traditional trading in equities and options.

## **ADDITIONAL FACTS DEMONSTRATING MATERIALITY**

133.    In the months following Robinhood's IPO, news concerning the aforementioned adverse facts and conditions that existed prior to and at the time of the Offering leaked out to the market.  The responses from investors and securities analysts further demonstrate the significance of the information.

134.    The market began to learn the truth that was omitted from the Offering Documents on October 26, 2021, when, after market close, Robinhood reported its financial results for the third quarter ended September 30, 2021 ("Q3 2021").  Notably, Robinhood reported that:

(a)    MAU declined 11% from 21.3 million in Q2 2021 to 18.9 million in Q3 2021;

(b)    ARPU declined 42% from $112 in Q2 2021 to $65 in Q3 2021;

(c)    AUC declined nearly 7% from $102 billion in Q2 2021 to $95 billion in Q3 2021;

(d)    Total net revenue had declined 35% from $565 million in Q2 2021 to $365 million in Q3 2021;

(e)    Transaction-based revenue declined approximately 41% from $451 million in Q2 2021 to $266.7 million in Q3 2021;

(f)    Transaction Rebates from cryptocurrency trading declined 78% from $233 million in Q2 2021 to just $51 million in Q3 2021;

(g)    PFOF from equities trading declined 61% from $133 million in Q2 2021 to just $52 million in Q3 2021, its lowest level since Q1 2020; and

(h)     PFOF from options trading declined 16.7% from $197.8 million in Q2 2021 to $164.6 million in Q3 2021.

135.    In addition, during its earnings call with securities analysts, the Company warned that it anticipated that quarterly revenues in Q4 2021 would be less than $325 million and that full-year revenue would be less than $1.8 billion.  In addition, the Company announced that it expected newly-funded accounts for the fourth quarter would be roughly in line with the disappointing 660,000 added in Q3 2021.

136.    Securities analysts were quick to characterize the quarter as "disappointing" and warned that the results were likely to be poorly received by investors.  For example, commenting on the results, Mizuho analyst Dan Dolev stated:

> With top-line results **significantly below expectations** (ours as well as consensus), **lower MAUs**, **declining ARPU**, very negative adjusted EBITDA . . . and **disappointing 4Q guidance including <u>no</u> uptick in new funded accounts**, we believe 3Q may be poorly received and we expect a negative stock reaction.

137.    In a note, Piper Sandler analyst, Richard Repetto ("Repetto"), noted that the reported $51 million in Transaction Rebates from cryptocurrency trading fell $112 million short of Piper Sandler's estimate and represented a "**far sharper drop** than the 35% reduction in total crypto trading volume across the industry."  Repetto also noted that "[f]unded accounts, MAUs, [and] AUC all declined sequentially," with "new funded accounts dropp[ing] materially to 660k in 3Q21."

138.    Financial reporters likewise viewed Robinhood's results negatively.  For example, shortly after the release of Robinhood's Q3 2021 Form 8-K, *CNBC* published an article entitled, "Robinhood shares tank as **revenue falls way short of expectations on lighter crypto trading**," noting:

> For the third quarter, total net revenue came in at $365 million, missing a Refinitiv estimate of $431.5 million.  **Revenues . . . were well below the second quarter's revenue of $565 million, which was bolstered by a massive surge in crypto trading**.

> ***Third-quarter transaction-based revenue totaled $267 million, with only $51 million coming from cryptocurrency trading. Revenue from crypto trading totaled $233 million in the second quarter, helped by interest in meme-inspired dogecoin.***
>
> *    *    *
>
> ***Net cumulative accounts dropped to 22.4 million in the third quarter from 22.5 million in the second quarter. Monthly active users totaled 18.9 million, down from 21.3 million in the second quarter.***

139. The Company's disappointing third quarter results also led CNBC anchor Jim Cramer to tell viewers during the October 27, 2021 airing of Squawk on the Street, that it appeared, "Robinhood ***is a fad***," suggesting further that the market "hit the pause button" on the so-called, "Robinhood revolution."

140. Robinhood's stock price fell $4.13 per share, or approximately 10.44%, to close at $35.44 per share on October 27, 2021.

141. On November 8, 2021, Robinhood disclosed that in the evening of November 3, 2021, an unauthorized third party socially engineered a Robinhood customer service representative to gain access to the email addresses and other personal information of millions of Robinhood customers, stating in relevant part:

> Late in the evening of November 3, we experienced a data security incident. An unauthorized third party obtained access to a limited amount of personal information for a portion of our customers. Based on our investigation, the attack has been contained and we believe that no Social Security numbers, bank account numbers, or debit card numbers were exposed and that there has been no financial loss to any customers as a result of the incident. The unauthorized party socially engineered a customer support employee by phone and obtained access to certain customer support systems. At this time, we understand that the unauthorized party obtained a list of email addresses for approximately five million people, and full names for a different group of approximately two million people. We also believe that for a more limited number of people approximately 310 in total-additional personal information, including name, date of birth, and zip code, was exposed, with a subset of approximately 10 customers having more extensive account details revealed. We are in the process of making appropriate disclosures to affected people.

*Id.* [Emphasis added.]

42

142.    This significant lapse and the impact it was certain to have on Robinhood's reputation and continued use by customers was not lost on Robinhood nor its Chief Security Officer, Caleb Sima, who quickly went into damage control, characterizing its disclosure to the entire Robinhood community as the "right thing to do," stating in relevant part: "As a safety first company, we owe it to our customers to be transparent and act with integrity.  Following a diligent review, putting the entire Robinhood community on notice of this incident now is the right thing to do."

143.    Reporters took note.  After the market closed on November 8, 2021, for example, *Vice* published an article entitled, "Robinhood Says It Was Hacked and Extorted But Nobody Lost Any Money," which recounted the story of one Robinhood customer whose information was improperly accessed by the hacker.  According to the article, Erin Gallagher, a social media and disinformation researcher, told Motherboard (*i.e.*, *Vice*) that "she previously asked Robinhood to delete her account," which "Robinhood [had] confirmed it [did] in January," but that "she received the notice saying her email address was exposed in this latest breach . . . raising questions on what data Robinhood has kept on previous users."

144.    Users also were quick to denounce the Company with many voicing their disdain on Reddit, a social news aggregator and discussion website, which had previously been a primary driver of the Company's apparent pre-IPO success.  For example, The_Count_99 wrote, "Karma for staying with hood when you knew better," tax_evading_apple expressed surprise the Company still had millions of customers, while torytechlead colorfully recommended that users stop using "this sh*tty backstabbing piece of sh*t company."

145.    The next day, *Dealbreaker*, published an article claiming that Robinhood's cybersecurity defenses "***appear to be as porous as ever***."  [Emphasis added.]  In "*Company That Wants to Guard Your Cryptos Can't Keep Your Personal Information Safe*," *Dealbreaker* wrote:

> Back in July, Robinhood raised a tidy $1.89 billion in its initial public offering.  Apparently, however, none of this money found its way to the company's cybersecurity effort, as its defenses appear to be as porous as ever.

*       *       *

Sounds like just the kind of company you'd want to entrust with your not-at-all-susceptible-to-hackers cryptocurrency fortune.

*Id.*

146.    Of all coverage, however, *Bloomberg's* November 9, 2021 report entitled, "*Why 310 of Robinhood's Cyber-Attack Victims Should Really Worry,*" put the significance of the data breach in context most succinctly, stating in relevant part, "***The company's 'safety first' maxim, oft repeated by executives, will ring hollow*** to the millions of users who are now a little more vulnerable to phishing attacks and the smaller group who'll have to be extra vigilant." *Id.* [Emphasis added.]

147.    On the same day, Robinhood also revealed it was investigating reports that "some customers are having issues with transferring money into and out of the app." "We're working to resolve this as soon as possible," the Company said on its status page in a message with a 7:06 AM PT (10:06 AM ET) time stamp. An hour later, the status page listed bank transfers as operational. Notwithstanding, Robinhood users' use of the application for their intended purposes, was yet again disrupted.

148.    Following the Company's announcement of the November 3, 2021 data breach and the November 9, 2021 disruption, as well as the publication of multiple media reports reporting on both failures, Robinhood's stock declined 3.37%, to close at $36.70 per share on November 9, 2021.

149.    The next day, *Vice* continued its coverage of the data breach by publishing an article entitled "*Robinhood Hackers Accessed Internal Tool for Removing Account Security Features, Screenshots Show,*" which included screenshots of additional information the Robinhood hackers were able to (and did) access, as well as the critical back-end account features they had the option of tampering with. Specifically, the article states and shows:

> ***The hackers*** behind the recent breach of customer data from app-based broker Robinhood ***had access to an internal tool that presented them the option of tampering with user accounts, including removing specific users' multi-factor authentication protections***, according to screenshots of the tool obtained by Motherboard.
>
> \*        \*        \*

The news highlights the potential risks that hackers can pose beyond simply stealing sensitive data. ***The screenshots of the tool also show buttons for logging a user out of their account, adding a trusted device, and blocking certain sessions from accessing the Robinhood account. The screenshots also show the hackers could view sensitive information on users, such as their balances and trades***.

[Emphasis added.]

150.    As this new information reached the market, Robinhood's stock sank further, closing on November 10, 2021 at $34.49 per share, representing a decline of 6.02%.

151.    On November 19, 2021, Deutsche Bank analyst Brian Bedell ("Bedell") opened a sell "Catalyst Call" on Robinhood before the market opened. His call was based on concerns about "near-term growth and profitability headwinds," which were mainly driven by the fact that "***the meme stock phenomenon we witnessed en masse earlier in the year was more applicable to Robinhood's recent customer growth and likely resulted in overestimation of the company's core fundamentals and growth trajectory***." In addition, he indicated that the November security breach "may drive some customer attrition" citing an investor survey in which "[s]afety and/or reputational concerns" was cited as "the main reason to switch from their primary online broker." Bedell further noted that "this could delay [Robinhood's] path to profitability and push the firm's potentially stronger growth trajectory out at least a few more quarters, which may disappoint investors and pressure shares." On November 19, 2021, the price of Robinhood's stock fell over 5%, to close at $28.99 per share. [Emphasis added.]

152.    On December 3, 2021, *SeekingAlpha* published an article entitled, "Where Will Robinhood Stock Be In 5 Years? Potentially Still Down Here," characterizing "the Q3 report [as] unequivocally a disaster." On December 3, 2021, Robinhood's stock declined 10.95%, to close at $21.55 per share.

153.    On December 8, 2021, the *Motley Fool* published an article entitled, "5 Red Flags for Robinhood Markets' Future," identifying Robinhood's "decelerating growth in users and revenue" as well as its "dependence on dogecoin," as two areas of particular concern.

154.    On December 9, 2021, the *Wall Street Journal* published an article, entitled "Robinhood's Stock Fizzles After Splashy Public Offering," which was then published in the print edition of the *Wall Street Journal* on December 10, 2021 under the headline "*Robinhood Fizzles After Hot Start*" noting how the "***slowdown in cryptocurrency trading***, particularly in the meme cryptocurrency dogecoin, ***weighed heavily on [Robinhood's] results***." [Emphasis added.]

155.    Following this news, Robinhood's shares fell another 8.12%, closing at $20.13 per share on December 10, 2021.

156.    Later, on December 15, 2021, after the markets closed, Bank of America initiated its coverage of Robinhood with an underperform rating and a price objective of $22 per share. In its initial report, Bank of America advised that the market, based on Robinhood's then-current stock price, "***may be underappreciating . . . [Robinhood's] overstated growth trajectory in 2020-21***," which was driven by the "'***meme' stock phenomenon [&] crypto appreciation***." [Emphasis added.] Bank of America expressed its concern that "***HOOD's cryptocurrency offering triggered significant growth in 1H21, but after clients realized that its crypto offering was inferior to the crypto exchanges*** (no digital wallet, less currencies) ***and the coins' rapid appreciation reversed, HOOD's momentum in crypto faded for at least a few quarters***." [Emphasis added.] Bank of America also determined that HOOD's declining cryptocurrency trading activity, "***caused HOOD to experience a deceleration in its funded accounts and [to] report significantly lower revenues as trading activity declined***," offering the following illustration to show how the decline in ARPU *began* in March 2021 (*i.e*., before the IPO):

Exhibit 3: Assets under Custody (AuC) vs. Average Revenue Per User (ARPU)
ARPU has decelerated as AuC declined

157.    Bank of America also highlighted the November security breach as an event that "damages a company's brand and could cause elevated attrition over the near-term."

158.    On December 16, 2021, Robinhood's shares declined 6.97% to close at $18.14 per share.

159.    On January 27, 2022, after the market closed, Robinhood reported its financial results for the fourth quarter and full year ended December 31, 2021 ("Q4 2021" and "FY 2021," respectively).  In its Q4 2021 earnings release, Robinhood reported another round of results that substantially missed analyst estimates: Robinhood's MAU **declined nearly** 8.5% quarter over quarter, missing estimates by 2.6 million; Robinhood's net revenues of $362.7 million fell short of the $370.9 million expected; Robinhood's transaction-based revenue of $263.9 million came in below the $269.3 million expected; Transaction Rebates from cryptocurrency trading of $48 million fell short of the $55 million expected, which also represented a decline of 5.9% quarter over quarter; and Robinhood's ARPU **declined** 1.5% quarter over quarter, missing estimates by $2.63.  Robinhood's revenue outlook for the first quarter of the year likewise came in below expectations, with the Company forecasting $340 million as compared to the $447 million analysts projected.

160.    As with Q3 2021, analysts reacted negatively to Robinhood's fourth quarter earnings release.  Hugh Tallents ("Tallents"), senior partner at management consultancy cg42, for example, told *Yahoo Finance*, "Robinhood had all of the tailwinds that you could want running up

47

to their IPO.  ***The problem that they've had is that all of those basically have unwound in the last eight to 10 months***."  In other words, Robinhood's business turned in March or May 2021, months before the IPO.  That Robinhood failed to disclose that shift so it could demand a premium for its shares during the IPO was not lost on Tallents who noted, "***They had five years of business plan success baked into that IPO price***.  Now you're starting to see it valued more like a 'fin' than a 'tech,' and that multiple isn't attractive necessarily."  [Emphasis added.]

161.    Jesse Cohen ("Cohen"), senior analyst at *Investing.com*, likewise characterized Robinhood's results as "awful."  Despite Defendant Warnick's claim during the Company's January 27, 2022 analyst call that the Company sees "nothing to suggest [its] customers are disengaging," Cohen found that Robinhood's results, "highlight the several challenges the trading platform company currently faces, ***mainly a slowdown in user growth, as well as weaker retail trading activity in stocks and crypto***."  [Emphasis added.]

162.    The financial media also recognized the significance of the continuing decline in Robinhood's cryptocurrency trading with, for example, *Bloomberg* noting that the Q4 2021 print "mark[s] a second-consecutive quarter-over-quarter decline," the *Associated Press* recognizing that "Growth ***keeps slowing***,*"* and *CNBC* observing, in an article entitled, "***Robinhood loses active users*** in the fourth quarter, forecasts weak revenue," that, "revenue from crypto ***has been declining since the second quarter of 2021***," and that "Thursday's report shows ***its continuing to decline***." [Emphasis added.]

163.    Following Robinhood's release of its 4Q 2021 earnings and the publication of numerous securities analysts' and financial reporters' views on those results, Robinhood's stock price declined approximately 6.45%, to close at $11.61 per share on January 27, 2022.

164.    Days later, on February 1, 2022, the *Motley Fool* published an article entitled, "Robinhood Stock is Down 85%, and it Could Get Worse," which, after assessing the Company's KPIs from each quarter, concludes that Robinhood's shift towards cryptocurrencies in early 2021 ***only worked for a short time***, stating in relevant part:

Late 2020 into early 2021 was a bumper period for Robinhood, as the meme-stock frenzy was driven primarily by younger investors, its target demographic . . . . ***To maintain momentum, Robinhood made a pivot from its stock and options products into cryptocurrencies***, as these assets were in high demand from its audience. ***While this worked for <u>a short period of time</u>, the company has since suffered sequential declines across most of the important financial metrics used to measure its business***. *Id.* [Emphasis added.]

| Metric | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 |
|---|---|---|---|---|
| Monthly active users | 17.7 million | 21.3 million | 18.9 million | 17.3 million |
| Assets under custody | $81 billion | $102 billion | $95 billion | $98 billion |
| Average revenue per user | $137 | $112 | $65 | $64 |
| Total revenue | $522 million | $565 million | $365 million | $363 million |

165.    By market close on February 2, 2022, Robinhood's stock had declined 4.30%, to $14.02 per share.

166.    Then, author Michael Lewis ("Lewis"), known for his non-fiction writing about Wall Street culture, quickly put a stop to the notion that Robinhood is "disrupting Wall Street," during an interview with Andrew Ross Sorkin ("Sorkin"), columnist and the founder and editor at large of *Dealbook*. According to an article entitled, "*Michael Lewis Revisits 'Liar's Poker*," printed in the *New York Times* on February 7, 2022, which covered the conversation, in response to Sorkin's question about whether Robinhood was "smashing the aisles" or otherwise "disrupting Wall Street in all kinds of ways," Lewis stated:

> ***I'm not sure what Robinhood upends*** – preserving both a fiction and the guts of a screwed up stock market without making a real dent on anything meaningful. And the fiction is that people can go into the market and systematically beat the market and you should be doing this with your money. I understand it's fun if you're treating it like a casino. It is not a very healthy one. ***I think of Vanguard as being more useful, disruptive than Robinhood, teaching people not to do that***.

*Id.* [Emphasis added.]

167.    On this news, Robinhood's shares declined 8.37%, to close on February 7, 2022 at $13.91 per share.

1    168.    The resulting poor performance of its crypto business, also led to the resignation of

2 the Company's top crypto executive Christine Brown who, during the evening of March 29, 2022,

3 announced on Twitter that she was stepping down from her role as Robinhood Crypto's COO, a

4 position she had started less than a year earlier.  Robinhood's stock declined 8.49% the next trading

5 day.

6    169.    Even Robinhood's introduction of new cryptocurrencies to its platform could not

7 distract the financial media from acknowledging the negative trends resulting from Robinhood's

8 deteriorating business as of the IPO.  For example, on April 13, 2022, the *Motley Fool* ran an

9 article entitled, "3 reasons Robinhood's addition of Shiba Inu doesn't matter," which noted not

10 only that "crypto traders have already cleared out" of Robinhood, but that "Robinhood lost traction

11 as 2021 played out," according to the following key metrics:

- The number of monthly transacting users slipped from 21.3 million in the second quarter to 18.9 million in the third quarter, and then 17.3 million in the fourth quarter.

- Average revenue per user has fallen in three consecutive quarters. Robinhood has gone from generating $137 per user during the first quarter to $64 in the fourth quarter.

- Assets under custody were lower by the end of the year than where they were at the midpoint of 2021.

  170.    The April 13, 2022 *Motley Fool* article continued:

The pressure points are everywhere.  Fewer people are trading, and people are trading less.  That's a bad look for a trading platform, and we haven't even gotten to the most problematic metric.

*Id.*

                              *        *        *

Robinhood reported transactions-based crypto revenue of $233 million in the second quarter, followed by $51 million in the third and $48 million in the fourth quarter.  Put another way, Crypto transactions revenue went from 52% of Robinhood's business in the second quarter to just 18% by the end of year.

*Id.*

171.    On this news, Robinhood's stock declined 4.29%, closing on April 14, 2021 at $11.38 per share.

172.    Then, after the market closed on April 28, 2022, the Company announced its Q1 2022 financial results, which were again disappointing.  Robinhood's MAU of 15.9 million represented an 8% decline from the previous quarter, AUC of $93.1 billion represented a 5% decline from the previous quarter, and ARPU of $53 represented an 18% decline from the previous quarter.  Robinhood's total net revenues of $299 million and transaction-based revenues of $218 million, of which crypto revenue only totaled $54 million, was likewise disappointing.

173.    In addition, Robinhood reported its KPIs on a monthly basis, showing for the first time the truth about Robinhood's fledgling business in the months leading up to the IPO.  *See supra.*

174.    As this news reached the market, the price of Robinhood's stock dropped approximately 2.78%, with shares closing on April 29, 2022 at $9.81 per share.

## CLASS ACTION ALLEGATIONS

175.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.    Lead Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Robinhood common stock issued in connection with the Company's IPO.

177.    Excluded from the Class are:  (i) Defendants; (ii) present or former executive officers of Robinhood, members of the Robinhood's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Robinhood.

178.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this

1  time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there

2  are hundreds or thousands of members in the Class. During the relevant time, millions of

3  Robinhood shares were publicly traded on the NASDAQ, a national exchange. Record owners

4  and other members of the Class may be identified from records maintained by Robinhood or its

5  transfer agent and may be notified of the pendency of this action by mail, using a form of notice

6  similar to that customarily used in securities class actions.

7    179.    Lead Plaintiffs' claims are typical of the claims of Class members, who were all

8  similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

9  Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have

10  retained counsel competent and experienced in class and securities litigation.

11    180.    Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class. Among the

13  questions of law and fact common to the members of the Class are:

14        (a)    whether Defendants violated the Securities Act;

15        (b)    whether statements made by Defendants to the investing public

16  misrepresented material facts about the business, operations, and prospects of Robinhood;

17        (c)    whether statements made by Defendants to the investing public omitted

18  material facts necessary in order to make the statements made, in light of the circumstances under

19  which they were made, not misleading; and

20        (d)    the extent of damage sustained by Class members and the appropriate

21  measure of damages.

22    181.    A class action is superior to all other available methods for the fair and efficient

23  adjudication of this controversy since joinder of all members is impracticable. Further, as the

24  damages suffered by individual Class members may be relatively small, the expense and burden

25  of individual litigation makes it impossible for Class members to individually redress the wrongs

26  done to them. There will be no difficulty in the management of this action as a class action.

27

28

<b><u>CLAIM ONE</u></b>

<b>For Violations of §11 of the Securities Act<br>(Against All Defendants)</b>

182.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

183.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Lead Plaintiffs do not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

184.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

185.    The Company is the registrant of the securities purchased by Lead Plaintiffs and the Class.  As such, the Company is strictly liable for the materially untrue and misleading statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material untrue statements and omissions of material facts necessary to make the statements therein not false and misleading, Robinhood is liable under §11 of the Securities Act to Lead Plaintiffs and the Class.

186.    The Individual Defendants each signed the Offering Documents and caused their issuance.  As such, each is strictly liable for the materially untrue statements and omissions in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that the Offering Documents were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and that the Offering Documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants

1   should have known of the material untrue statements and omissions contained in the Offering

2   Documents.  Accordingly, the Individual Defendants are liable to Lead Plaintiffs and the Class.

3       187.    The Underwriter Defendants each served as underwriters in connection with the

4   IPO.  As such, each is strictly liable for the materially untrue statements and omissions in the

5   Offering Documents and the failure of the Offering Documents to be complete and accurate, unless

6   they are able to carry their burden of establishing an affirmative "due diligence" defense.  The

7   Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the

8   truthfulness and accuracy of the statements contained in the Offering Documents.  They had a duty

9   to ensure that such statements were true and accurate, that there were no omissions of material

10  facts that would make the Offering Documents misleading, and that the Offering Documents

11  contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter

12  Defendants should have known of the material untrue statements and omissions contained in the

13  Offering Documents.  Accordingly, each of the Underwriter Defendants is liable to Lead Plaintiffs

14  and the Class.

15      188.    Defendants acted negligently in preparing the Offering Documents.  None of the

16  Defendants named in this Claim made a reasonable investigation or possessed reasonable grounds

17  to believe that the statements contained in the Offering Documents were true and complete and

18  were not misleading.  In alleging the foregoing, Lead Plaintiffs specifically disclaim any allegation

19  of fraud.

20      189.    By reasons of the conduct herein alleged, each Defendant named in this claim

21  violated §11 of the Securities Act.

22      190.    None of the untrue statements or omissions of material fact in the Offering

23  Documents alleged herein was a forward-looking statement.  Rather, each such statement

24  concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the

25  untrue statements as forward-looking statements and did not disclose information that undermined

26  the putative validity of these statements.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

191.    Lead Plaintiffs acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Lead Plaintiffs sustained damages, and the price of the Company's shares declined substantially, due to material untrue statements and omissions in the Offering Documents.

192.    This Claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

193.    By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under §11, as provided in §11(e), from the Defendants and each of them, jointly and severally.

## CLAIM TWO

### For Violations of §12(a) of the Securities Act
### (Against All Defendants)

194.    Lead Plaintiffs repeat and reallege each and every allegation contained above, as if fully set forth herein.

195.    By means of the defective Prospectus, Defendants promoted, solicited, and sold Robinhood shares to Lead Plaintiffs and other members of the Class.

196.    The Prospectus for the IPO contained untrue statements of material fact, and omitted material facts required to be stated therein, as detailed above.  Defendants owed Lead Plaintiffs, and the other members of the Class who purchased Robinhood shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the untrue statements and omissions contained in the Prospectus, as set forth above.

197.    Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could Lead Plaintiffs have known, of the material untruths and omissions contained in the Prospectus at the time Lead Plaintiffs acquired Robinhood shares.

1    198.    By reason of the conduct alleged herein, Defendants violated §12(a)(2), 15 U.S.C.

2  §77*l*(a)(2), of the Securities Act.  As a direct and proximate result of such violations, Lead

3  Plaintiffs and the other members of the Class who purchased Robinhood securities, pursuant to the

4  Prospectus, sustained substantial damages in connection with their purchases of the shares.

5  Accordingly, Lead Plaintiffs and the other members of the Class who hold Robinhood shares

6  issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for

7  their shares, and hereby tender their Robinhood shares to Defendants sued herein.  Class members

8  who have sold their Robinhood shares seek damages to the extent permitted by law.

9

**CLAIM THREE**

10

**For Violations of §15 of the Securities Act**
**(Against the Individual Defendants)**

11

12    199.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

13  fully set forth herein.

14    200.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on

15  behalf of the Class, against each of the Individual Defendants.

16    201.    The Individual Defendants were controlling persons of the Company within the

17  meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management

18  positions at, and/or directorships held at the Company, as alleged above, these Defendants invested

19  in, individually and collectively, and had the power to influence, and exercised same, over the

20  Company to cause it to engage in the conduct complained of herein.  Similarly, each of the other

21  Individual Defendants not only controlled those subject to liability as primary violators of §11 of

22  the Securities Act, as alleged above, they directly participated in controlling Robinhood by having

23  signed, or authorized the signing of, the Registration Statement and authorizing the issuance of

24  Robinhood shares to Lead Plaintiffs and members of the Class.

25    202.    As control persons of Robinhood, each of the Individual Defendants are jointly and

26  severally liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the

27

28

1 wrongful conduct alleged herein, Lead Plaintiffs and Class members suffered damages in

2 connection with their purchases of the Company's shares.

3 <u>**PRAYER FOR RELIEF**</u>

4 WHEREFORE, Lead Plaintiffs, on Lead Plaintiffs' own behalf and on behalf of the Class,

5 pray for relief and judgment as follows:

6 A.    Declaring that this action is a proper class action, pursuant to Fed. R. Civ. P. 23,

7 certifying Lead Plaintiffs as representatives of the Class, and designating Lead Plaintiffs' counsel

8 as Class Counsel;

9 B.    Awarding Lead Plaintiffs and the other members of the Class compensatory

10 damages;

11 C.    Awarding Lead Plaintiffs and the other members of the Class rescission on their

12 §12(a)(2) claims;

13 D.    Awarding Lead Plaintiffs and the other members of the Class pre-judgment and

14 post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs

15 and disbursements; and

16 E.    Awarding Lead Plaintiffs and the other members of the Class such other and further

17 relief as the Court may deem just and proper.

18 <u>**DEMAND FOR TRIAL BY JURY**</u>

19 Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiffs hereby demand a trial by jury of all issues

20 that may be so tried.

21 DATED:  March 13, 2023              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

22                                            *s/ Deborah Clark-Weintraub*
                                           Deborah Clark-Weintraub (*pro hac vice*)
23                                         Thomas L. Laughlin, IV (*pro hac vice*)
                                           The Helmsley Building
24                                         230 Park Avenue, 17th Floor
25                                         New York, NY 10169
                                           Telephone: 212-233-6444
26                                         Facsimile: 212-233-6334
                                           dweintraub@scott-scott.com
27                                         tlaughlin@scott-scott.com

28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:21-cv-09767

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (CA 281605)
Hal Cunningham (CA 243048)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-233-4565
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Lead Plaintiffs Vinod Sodha and*
*Amee Sodha and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian J. Schall  (CA 290695)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs*
*Vinod Sodha and Amee Sodha*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub