JOHN T. JASNOCH (CA 281605)
HAL CUNNIGHAM (CA 243048)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Lead Plaintiffs Dr. Vinod Sodha*
*and Dr. Amee Sodha, and the Proposed Class*

[Additional Counsel on Signature Page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP GOLUBOWSKI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ROBINHOOD MARKETS, INC., VLADIMIR TENEV, JASON WARNICK, BAIJU BHATT, JAN HAMMER, PAULA LOOP, JONATHAN RUBENSTEIN, SCOTT SANDELL, ROBERT ZOELLICK, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., WELLS FARGO SECURITIES, LLC, MIZUHO SECURITIES USA LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., PIPER SANDLER & CO., ROSENBLATT SECURITIES INC., BMO CAPITAL MARKETS CORP., BTIG, LLC, SANTANDER INVESTMENT SECURITIES INC., ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC, <br><br> Defendants. | Case No. 3:21-cv-09767 <br><br> **LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO ROBINHOOD DEFENDANTS AND UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

        A.    The Undisclosed Declines in KPIs and Significant Sources of Revenues .......................................................................................................3

        B.    The Offering Documents' Material Untrue Statements ...........................6

LEGAL STANDARD................................................................................................................9

ARGUMENT.............................................................................................................................9

    I.    PLAINTIFFS HAVE ADEQUATELY STATED SECURITIES ACT CLAIMS .........................................................................................................9

        A.    The SAC Provides the Necessary Contextual Allegations Demonstrating that the Offering Documents Were Materially Untrue and Misleading.............................................................................9

        B.    The Offering Documents' Material Untrue Statements and Omissions Portrayed a State of Affairs at Odds with the True Condition of Robinhood's Business .......................................................12

        C.    Defendants Had a Duty to Disclose the Material Adverse Trends Impacting Robinhood's Revenues at the Time of the IPO and to What Extent They Might Reasonably Be Expected to Materially Impact Future Revenues ............................................................16

        D.    Defendants Violated Their Disclosure Duties Under Item 105 ................17

        E.    The Offering Documents' Disclosures Do Not Foreclose Plaintiffs' Claims .................................................................................19

        F.    Defendants' Risk Warnings Were Themselves Materially False and Misleading.................................................................................22

    II.    PLAINTIFFS HAVE STATED A CLAIM FOR CONTROL PERSON LIABILITY.............................................................................................25

CONCLUSION........................................................................................................................25

Lead Plaintiffs' Memo. of Law in Opp. to Robinhood Defendants' Mot. to Dismiss the Second Amended Class Action Complaint
Case No. 3:21-cv-09767

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ashkroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................................9

*Berg v. Velocity Fin., Inc.*,
    No. 2:20-cv-6780, 2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .............................................14

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..................................................................................................22

*Boston Ret. Sys. v. Uber Techs., Inc.*,
    No. 19-cv-0636, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...............................................22

*City of Birmingham Relief and Ret. Sys. v. Acadia Pharms., Inc.*,
    No. 3:21-cv-00762, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ..........................................8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ....................................................................................................9

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020) .....................................................................................23

*Feit v. Leasco Data Processing Equip. Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) ..........................................................................................12

*Franchi* v. *SmileDirectClub, Inc.*,
    No. 3:19-cv-00962, 2022 WL 4594575 (M.D. Tenn. Sep. 30, 2022) ........................12, 13, 16

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .....................................................................................16

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .....................................................................................12

*Gart v. Electroscope, Inc.*,
    24 F. Supp. 2d 969 (D. Minn. 1998) .......................................................................................13

*Gerneth v. Chiasma, Inc.*,
    No. 16-11082, 2018 WL 935418 (D. Mass. Feb. 15, 2018) ....................................................18

*In re Apple Inc. Sec. Litig.*,
    No. 19-CV-02033, 2020 WL 2857397 (N.D. Cal. June 2, 2020) ...............................12, 15, 22

*In re Coty, Inc. Secs. Litig.*,
    No. 14-cv-919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ................................................11

*In re DDi Corp. Sec. Litig.*,
   No. 03-cv-7063, 2005 WL 8157394 (C.D. Cal. Jan. 7, 2005) ..................................................11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013) ...................................................................10, 13, 17, 19

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 (N.D. Cal. 2020) ...............................................................................9, 13

*In re Progenity, Inc.*,
   No. 20-cv-1683, 2021 WL 3929708 (S.D. Cal. Sept. 1, 2021) ................................................14

*In re Restoration Robotics, Inc. Secs. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019) ................................................................................17

*In re SeaChange Int'l Inc.*,
   No. CIV.A. 02-cv-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004) ....................................13

*In re Turkcell Iletism Hizmetler A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) ......................................................................................13

*In Re Twitter, Inc. Sec. Litig.*,
   No. 16-CV-5314, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ............................................15

*In re Violin Memory Sec. Litig.*,
   No. 13-CV-5486, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ..............................................9

*In re Vivendi, S.A. Secs. Litig.*,
   838 F.3d 223 (2d Cir. 2016) .................................................................................................12

*In re Vocera Commc'ns Inc. Sec. Litig.*,
   No. C-13-3567, 2015 WL 603208 (N.D. Cal. Feb. 11, 2015) .................................................11

*Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*,
   847 F.2d 186 (5th Cir. 1988) ...............................................................................................12

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ...............................................................................................13

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) .................................................................................................19

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ...............................................................................................22

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999) ....................................................................................17

*Mingbo Cai v. Switch, Inc.*,
   No. 2:18-CV-01471, 2019 WL 3065591 (D. Nev. July 12, 2019) ..........................................18

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 Fed. App'x 10 (2d Cir. 2011).............................................................................................15

*Osher v. JNI Corp.*,
   256 F. Supp. 2d 1144 (S.D. Cal. 2003).....................................................................................11

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) ................................................................................................16

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012).......................................................................................................9

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   No. 18 Civ. 9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ...........................................19

*Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard
   Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..................................................................................................12

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
   707 F.3d 95 (1st Cir. 2013)........................................................................................................18

*United States v. Smith*,
   155 F.3d 1051 (9th Cir. 1998) ..................................................................................................10

*Westley v. Oclaro Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012) ......................................................................................23

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 8(a)(2).................................................................................................................................9
   Rule 9(b) ...................................................................................................................................12
   Rule 12(b)(6)...............................................................................................................................9

17 C.F.R.
   §229.105....................................................................................................................................18

**OTHER AUTHORITIES**

*Robinhood's Fate Now Rests With Dogecoin*, THE MOTLEY FOOL (Sept. 9, 2021,
   at 8:59 AM), https://www.fool.com/investing/2021/08/25/robinhoods-fate-
   now-rests-with-dogecoin/ ..........................................................................................................2

**PRELIMINARY STATEMENT**

By the time of its initial public offering ("IPO"), Robinhood's business bore little resemblance to the one that had produced the historical financial data touted in the Offering Documents. Prior to Q1 2021, over 90% of Robinhood's transaction-based revenue was generated by its customers' conventional trading in equities and options. ¶56.[1]  Beginning in Q1 2021, however, Robinhood's business became dominated by fad trading in meme stocks and cryptocurrencies, particularly Dogecoin, at the same time existing customers were exiting the platform due to pervasive customer service and security issues. ¶¶70-71. By Q2 2021, the last quarter before the IPO, the majority of Robinhood's revenue was derived from cryptocurrency trading, in particular Dogecoin, which by then accounted for 62% of Robinhood's cryptocurrency trading revenue. ¶¶6, 84. Although Robinhood temporarily benefited from the meme stock and Dogecoin fads in the two quarters before the IPO, as Defendants concede, by April 2021, these events were over, and key business metrics had turned decidedly negative. For example, in Q2 2021, revenue from equities trading fell to its lowest level since Q1 2020, just $52 million, compared to $70.6 million in Q2 2020 and $133.3 million in Q1 2021, and comprised just 12% of Robinhood's transaction-based revenue. ¶¶5, 83. In addition, equity trading volume in July 2021 was just $73 billion, one-third less than in June 2021, and 15% below the monthly average for Q2 2021. ¶83. At the same time, cryptocurrency trading volumes, which Robinhood had become dependent upon for the majority of its transaction-based revenue, fell an unprecedented 90% between May and July 2021, far exceeding declines in the industry as a whole. ¶¶6, 84-86. Unsurprisingly, these stark, pre-IPO declines in two of the Company's three sources of transaction-based revenue were accompanied by significant declines in three Key Performance Indicators (KPIs), including Monthly Active Users (MAU), which Robinhood touted as positively correlated with the performance of revenue. ¶¶7, 98-106.

---

[1]    All "¶" or "¶¶" citations herein are to the Second Amended Class Action Complaint ("SAC"). *See* ECF No. 92.

No reasonable investor reading the Offering Documents could have known that cryptocurrency and equity trading activity had cratered in the months prior to the IPO portending substantial declines in revenues and KPIs in Q3 2021 and future periods.  Instead of full and fair disclosure of the foregoing facts, the Offering Documents provided what were, at best, misleading half-truths.  For example, although the Offering Documents acknowledged that Robinhood had benefitted from the meme stock and Dogecoin fads in Q1 and Q2 2021, neither the enormous magnitude of that benefit in Q1 2021, nor the substantial adverse impact of the end of these events on trading activity beginning in Q2 2021 was disclosed.  ¶¶107-31.  Although the Offering Documents stated that Robinhood expected revenue and the rate of growth in KPIs to be lower in Q3 2021 "as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during [Q2 2021]" (¶¶114, 121), at best, these disclosures hinted at only "a modest reversion from April and May peaks." Def. Mem. at 21.  Indeed, although it was provided for other periods, the Offering Documents omitted a breakdown of Robinhood's revenue by type of trading for Q2 2021, which would have revealed the startling decline in revenue from equities trading and Robinhood's dependence on cryptocurrency trading to drive growth.

In view of the foregoing, Defendants' argument that the Offering Documents were fully transparent and not misleading and that any reasonable investor considering purchasing Robinhood stock in the IPO would have understood the impacts the meme stock and Dogecoin events had, and were reasonably likely to have, on the Company's business is meritless.  Indeed, these assertions are belied by the reactions of analysts and the market to Robinhood's post-IPO disclosures.  For example, following the release of Robinhood's final Q2 2021 results, including its breakdown of transaction-based revenue by type of trading, THE MOTLEY FOOL noted the heightened risk to investors from Robinhood's "accelerating shift away from the roaring options and equity trading businesses [it was] best known for, and into cryptocurrencies – especially [Dogecoin]," which "signal[ed] that Robinhood's customers [were] foregoing safer investments in favor of pure speculation in the crypto markets."  Anthony Di Pizio, *Robinhood's Fate Now Rests With Dogecoin*, THE MOTLEY FOOL (Sept. 9, 2021, at 8:59 AM),

https://www.fool.com/investing/2021/08/25/robinhoods-fate-now-rests-with-dogecoin/.

Moreover, notwithstanding Defendants' claims of transparency, Robinhood's Q3 2021 results announced on October 26, 2021, including steep quarter-over-quarter declines in net revenue (-35%), transaction-based revenue (-41%), revenue from equities trading (-61%), and revenue from cryptocurrency trading (-78%), were deeply disappointing and well below consensus estimates, causing its share price to tank.  ¶¶133-40.

As explained in detail herein, contrary to Defendants' contention, the contextual financial data summarized above, which was added in the Second Amended Complaint, is more than sufficient to give rise to a plausible inference that the Offering Documents were materially untrue and misleading.  Defendants' arguments to the contrary ignore these new factual allegations, mischaracterize Plaintiffs' claims, and misstate Defendants' disclosure obligations.  Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The Undisclosed Declines in KPIs and Significant Sources of Robinhood's Revenues

Robinhood is an online broker.  ¶52.  Its core product offering is its retail investing platform which provides investors with the ability to trade U.S. listed stocks and ETFs, ADRs and, through a subsidiary, cryptocurrencies.  ¶53.  Robinhood primarily earns revenue by routing its customers' orders to market makers in return for consideration.  ¶54.  This transaction-based revenue, known as "payment for order flow" (PFOF) for equities and options trading, and "Transaction Rebates" for cryptocurrency trades, comprise the majority of Robinhood's revenue.  *Id*.  As highlighted in the Offering Documents, except for Q4 2019, Robinhood's net revenue and transaction-based revenue had increased every quarter from Q1 2019 through Q1 2021.  ¶55.

In the year before the IPO, 90% of Robinhood's transaction-based revenue came from its customers' conventional trading of stocks and options.  ¶56.  Unlike in the historical periods highlighted in the Offering Documents, however, by the time of the IPO, this was no longer true. Instead, in Q1 and Q2 2021, Robinhood's business had become dominated by fad trading in meme

3

stocks such as Gamestop and the novel cryptocurrency Dogecoin. ¶¶4, 82. These fads drove a temporary spike in trading volume and revenue from equities and cryptocurrency trading and obscured ongoing customer defections fueled by the Company's inadequate internal controls, including with respect to fraud prevention. ¶¶4, 82-84, 87-97. However, the meme stock and Dogecoin fads did not lay a foundation for continued growth, and when they ended months before the IPO, Robinhood's financial prospects deteriorated. *Id*.

Indeed, for months ahead of the IPO, it was clear not only that the elevated levels of PFOF and Transaction Rebates from the meme stock event and Dogecoin rally would not continue, but that transaction-based revenue from equities and options trading had declined precipitously. ¶83. In this regard, PFOF from equities and options trading was down 34.5% quarter-over-quarter from $331 million in Q1 2021, to just $216.6 million in Q2 2021. *Id*. This represented a decline from Q4 2020's $222 million as well. *Id*. Although PFOF from options trading had declined by double digits (16.8%), most alarming was the cratering of PFOF from equities trading to a level far below the historical periods reported in the Offering Documents. *Id*. As a share of transaction-based revenue, PFOF from equities trading, which historically stood at 33%, fell to just 12% in Q2 2021, and at $52 million was not only a staggering 61% lower than the $133.3 million reported for Q1 2021, but the lowest amount of PFOF that Robinhood had earned from equities trading since Q1 2020. *Id*. Importantly, this undisclosed decline coincided with the end of the meme stock event and a serious erosion of Robinhood's customer base due to an array of issues, including poor customer service, platform outages and inadequate security. ¶¶72-77, 87-97. Further, information available to Defendants at the time of the IPO indicated that this downward slide in PFOF from equities trading was an ongoing trend. In this regard, trading volume in equities in July 2021 was one-third less than in June 2021 and 15% below the monthly average for Q2 2021. ¶83.

The negative implications of this steep drop-off in PFOF from equities trading for the IPO, if it had become known to investors, was obvious. Tellingly, however, ***although the Offering Documents provided a breakdown of Robinhood's transaction-based revenue by type of trading (i.e., equities, options, cryptocurrency) for historical periods reported in the Offering***

4

***Documents, this information was not disclosed for Q2 2021 leaving investors completely in the dark with respect to the cratering of transaction-based revenue from equities trading and Robinhood's new dependence on cryptocurrency trading to drive revenue growth.*** ¶6. By Q2 2021, Transaction Rebates from cryptocurrency trading accounted for 52% of Robinhood's transaction-based revenue, in particular, trading in Dogecoin, which was responsible for 62% of cryptocurrency trading revenue. ¶84.

Also undisclosed, and even more ominous for investors contemplating purchasing shares of Robinhood in the IPO, was the fact that the undisclosed pre-IPO decline in PFOF from equities and options trading in Q2 2021 coincided with a steep decline in cryptocurrency trading volume. Although cryptocurrency trading had surged between January and May 2021 on the strength of the Dogecoin rally, the end of the rally was followed by a steep decline. ¶¶6, 78-85. In this regard, between May and June 2021, Robinhood lost $97 billion in cryptocurrency trading volume, a decline of 76% in a 30-day period, and then lost an additional $17 billion in cryptocurrency trading volume in July, representing a further 56.67% decline from the already depleted June 2021 figure. ¶85. In all, in June and July 2021, Robinhood lost $114 billion in cryptocurrency trading volume, a decline of 90% in a two-month period. *Id.* Although cryptocurrency trading volumes were down across the industry during these months, the declines experienced by Robinhood far exceeded those in the industry as a whole. ¶86.

Not surprisingly, the steep decline in Robinhood's prospects, presaged by the cratering of PFOF from equities trading and cryptocurrency trading volume, was also reflected in the KPIs that the Offering Documents touted as significant business metrics – *i.e.*, MAU, Assets Under Custody (AUC), Average Revenue Per User (ARPU) and Net Cumulative Funded Accounts (NCFA). ¶¶98-106. In this regard:

- Between May 2021 and July 2021 (*i.e.*, in the two months preceding the IPO), MAU, which Robinhood stated was positively correlated with the performance of revenue and other KPIs, had declined by 19%, or 4.6 million users, consistent with a loss of customers and/or reduced customer engagement coinciding with the end of the meme stock and Dogecoin fads and Robinhood's declining prospects. ¶¶98-99.

5

- AUC had fallen 7%, from $102 billion in June 2021 to $94.7 billion in July 2021 and, but for a one-time bump in June 2021, which the Company attributed to "exceptionally strong interest in trading, particularly in cryptocurrencies," had been deteriorating since April. ¶¶103-05.

- ARPU had fallen dramatically from $137 as the end of March 2021 to $111.70 as of June 30, 2021, an 18% drop, and had certainly declined in July as well given the unprecedented declines in trading volumes Robinhood had experienced in June and July. ¶¶100-02. Indeed, for the quarter ended September 30, 2021, ARPU was just $65, another 41% decline. ¶102. Tellingly, although the Offering Documents provided preliminary estimates of other KPIs for the just completed second quarter ended June 30, 2021, they did not do so for ARPU, which would have revealed the deterioration in Robinhood's core business. ¶101.

- Moreover, growth in Net Cumulative Funded Accounts (NCFA), which the Offering Documents depicted as growing exponentially year-over-year and in Q1 2021, had stalled. *Id.*

The undisclosed declines in these KPIs were unusual as demonstrated by the historical financial information disclosed in the Offering Documents. ¶¶99, 103. For example, Robinhood had rarely, if ever, experienced back-to-back months of declining MAU of similar magnitude to what occurred in June and July 2021. ¶99. Similarly, the decline in AUC preceding the IPO stood in stark contrast to the consistently rising AUC that occurred prior to July 2021. ¶103.

The foregoing evidence of the steep downturn in Robinhood's business in the months before the IPO was entirely omitted from the Offering Documents. Instead, the Offering Documents told a story of enormous and consistent growth using reams of historical performance data from 2019 through Q1 2021, along with some carefully curated estimated data for Q2 2021, all of which portrayed a state of affairs at odds with Robinhood's business fundamentals in the months leading to the IPO.

**B.    The Offering Documents' Material Untrue Statements**

In addition to the foregoing material omissions, the Offering Documents also contained numerous materially untrue statements. For example, the Offering Documents largely attributed Robinhood's revenue growth in 2019, 2020, and Q1 2021 to the same factors, specifically, an increase in NCFA, "which resulted in higher daily average revenue trades in options, equities and cryptocurrencies" as well as "increased interest in personal finance and investing, low interest rates

and a positive market environment, especially in the U.S. equity markets." ¶¶110-13. In fact, however, Robinhood's revenue growth in Q1 2021 was driven primarily by the meme stock event, which by Defendants' own admission was "essentially over" by early February (Def. Mem. at 4), and trading in Dogecoin. The Offering Documents' vague reference to increased interest in "several high-profile securities and cryptocurrencies," in describing Q1 2021 results, did nothing to cure the misleading impression left by this omission as the magnitude of the impact of the meme stock event and cryptocurrency trading on Robinhood's revenue growth in Q1 2021 was not disclosed. ¶113.

Similarly, the Offering Documents attributed the strong estimated preliminary results for Q2 2021 to an increase in NCFA "and increased trading activity related to options and cryptocurrencies, and relatively flat equities trading, relative to the three months ended June 30, 2020." ¶114. However, this was misleading because it suggested that revenue from equities trading was increasing, or at least stable, when, in fact it was lower in Q2 2021 than it had been in every quarter since Q2 2020. ¶83. In addition, although the Offering Documents stated (i) that "[t]rading activity [in Q2 2021] was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021;[2] (ii) that it remained at similar levels into the early part of the third quarter;" and (iii) that Robinhood "expect[ed] [its] revenue for [Q3 2021] to be lower, as compared to [Q2 2021], as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during [Q2 2021], and expected seasonality" *id.* at ¶114, these statements were untrue and misleading because they implied that after a temporary spike in the first two months of Q2 2021, trading activity had returned to pre-meme stock and Dogecoin levels. In fact, revenue from equities trading had declined to levels far below those that had prevailed prior to the meme stock event. ¶83. In addition, these statements gave no indication of the staggering magnitude of the decline which occurred in equities and cryptocurrency trading in

---

[2]    In their brief, Defendants misleadingly suggest that this disclosure related to the meme stock event. *See* Def. Mem. at 5. But, of course, the meme stock event was over long before Q2 2021 by Defendants' own admission. *Id.* at 4.

7

the months preceding the IPO.[3]  Further, the statement suggesting that Q3 2021 revenue would be lower due to "seasonality", was untrue and misleading because the end of the meme stock event and Dogecoin rally and precipitous decline in revenues from equities trading activity was actually to blame.

The Offering Documents' statements concerning KPIs were also materially untrue and misleading.  While touting historical growth in KPIs, the Offering Documents also included preliminary estimates of KPIs for Q2 2021 showing continued growth which Defendants attributed to "an increase in new users joining [Robinhood's] platform, driven by general market interest in trading." ¶¶119-21.  In fact, however, by the end of Q2 2021, KPIs were not on a growth trajectory due to the end of the meme stock event and Dogecoin rally and the erosion of Robinhood's customer base caused by the Company's service and security issues.  ¶¶98-106.  Numerous generalized risk warnings contained in the Offering Documents were untrue and misleading for the same reason.  *See* ¶¶123-26.

Defendants used the untrue and misleading Offering Documents to conduct the IPO, which was priced at $38 per share and raised gross proceeds of over $2 billion, one of the largest IPOs of the year.  Since then, Robinhood's shares have traded far below the IPO price as the adverse facts and conditions that existed prior to and at the time of the IPO leaked into the market.[4]

---

[3]    For this reason, the numerous generalized risk factors in the Offering Documents concerning the potential implications of changes in cryptocurrency trading volumes on Robinhood's platform were also materially untrue and misleading.

[4]    Plaintiffs do not object to the Court taking judicial notice of the SEC filings, earnings call transcripts, and media reports cited in Defendants' brief for the purpose of showing that the information contained in them was available to the market.  However, at times, Defendants cite these documents to demonstrate the truth of assertions of fact contained within them, which is improper.  *See City of Birmingham Relief and Ret. Sys. v. Acadia Pharms., Inc.*, No. 3:21-cv-00762, 2022 WL 4491093, at *2 (S.D. Cal. Sept. 27, 2022).  Thus, for example, this Court may not take judicial notice of Robinhood's Q2 and Q3 2021 Earnings Call Transcripts for the truth of Defendants' contention that the decline in Robinhood's stock price in the second half of FY 2021 and FY 2022 was consistent with overall declines in retail investor trading throughout the markets and macroeconomic trends.  *See* Def. Mem. at 8.

**LEGAL STANDARD**

Securities Act claims are governed by the notice pleading standard of Fed. R Civ. P. 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 624 (9th Cir. 2017). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashkroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, the Court should accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See*, *e.g.*, *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 765 (N.D. Cal. 2020).

**ARGUMENT**

**I.    PLAINTIFFS HAVE ADEQUATELY STATED SECURITIES ACT CLAIMS**

**A.    The SAC Provides the Necessary Contextual Allegations Demonstrating that the Offering Documents Were Materially Untrue and Misleading**

In dismissing the First Amended Complaint ("FAC") with leave to amend, this Court held that Plaintiffs had "fail[ed] to allege that Robinhood made misleading representations by omission regarding [the declines in Robinhood's KPIs and cryptocurrency trading volume] and the Company's potential future performance." ECF No. 90 at 10-11. In this regard, the Court acknowledged that Plaintiffs had alleged undisclosed declines in cryptocurrency trading and certain KPIs in the months before the IPO, but held that they had failed to "provide contextual information that would show the declines to be unusual and indicative of larger future trends," noting that "[w]ithout historical data to show that the May to July 2021 declines in MAU or ARPU were exceptional and out of line with past fluctuations, that data is not so extraordinary as to mandate specific out-of-quarter disclosure." *Id*. at 12.[5] In addition, the Court held that Plaintiffs

---

[5]    Contrary to Defendants' contention (Def. Mem. at 21), the Court did not hold that a one or two-month decline cannot constitute a trend within the meaning of Item 303. To the contrary, the Order notes that courts have declined to dismiss alleged violations of Item 303 on this basis. ECF No. 90 at 16 (citing *In re Violin Memory Sec. Litig.*, No. 13-CV-5486, 2014 WL 5525946, at *15

9

Lead Plaintiffs' Memo. of Law in Opp. to Robinhood Defendants' Mot. to Dismiss the Second Amended Class Action Complaint
Case No. 3:21-cv-09767

had "fail[ed] to explain how the May to July 2021 decline in cryptocurrency trading was unique to Robinhood rather than a general trend which would have been known by the public and any reasonable investor." *Id.* Further, the Court held that "although not particularly robust," the risk warnings in the Offering Documents were "sufficient to negate a claim of misleading omissions" ***in the absence of the foregoing allegations***. *Id.* at 14. Plaintiffs' Item 303 claim was dismissed for the same reasons. *Id.* at 16 (citing insufficient "contextual allegations establishing the recent declines in question [were] historically extraordinary and represent present conditions."). However, the Court granted Plaintiffs leave to amend because it could not conclude that Plaintiff were unable to allege "specific contextual information demonstrating that the decline in KPI and cryptocurrency trading levels in the two to three months before the filing of the Offering Documents were extraordinary and indicative of larger future trends known to the management or through which management should have known would have a material impact on future performance and which were not adequately disclosed." *Id.* at 20.

Contrary to Defendants' contention, the SAC provides the necessary contextual information demonstrating that the known declines in Robinhood's key business metrics in the months before the IPO were alone, and collectively, extraordinary, indicative of future trends, and likely to have a material impact on the Company's future performance such that their omission rendered the Offering Documents materially false and misleading. In this regard, the SAC alleges, among other things, that:

- PFOF from equities trading had cratered in Q2 2021 due to the end of the meme stock event and an exodus of customers due to service and security issues, falling to just $52 million, ***the lowest it had been since Q1 2020***. ¶¶77-83, 87-97.

- In the lead-up to the IPO, two of Robinhood's three sources of transaction-based revenue – trading in equities and cryptocurrencies – had declined dramatically portending a substantial drop in revenue for the Company in future periods. Cryptocurrency trading had declined 90% in the two months before the IPO far

(N.D. Cal. Oct. 31, 2014). In any event, Defendants' contention has been repeatedly rejected. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 n.26 (S.D.N.Y. 2013); *see also United States v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998) ("We have never held – nor even hinted – that forward-looking information or intra-quarter data cannot, *as a matter of law*, be material. Nor has any other court for that matter, at least to our knowledge.").

exceeding the declines for the industry as a whole and, after posting the lowest level of PFOF from equities trading since Q1 2020 in Q2 2021, trading volume in equities in July was one-third less than in June 2021. ¶¶83-86.[6]

- MAU declined 19% between May and July 2021, a highly unusual occurrence as Robinhood had rarely, if ever, experienced back-to-back months of declining MAU of similar magnitude. ¶¶98-99.[7]

- Except for a one-time bump in June 2021, which the Company attributed to "exceptionally strong interest in trading, particularly in cryptocurrencies," Robinhood's AUC had been declining since April 2021, a decline that stood in stark contrast to the consistent increases in AUC that had occurred in previous periods. ¶¶103-05.

- ARPU had fallen from $137 as the end of March 2021 to $111.70 as of June 30, 2021, an 18% drop, and had certainly declined in July as well given the unprecedented declines in trading volumes Robinhood had experienced in June and July. Indeed, for Q3 2021, ARPU was just $65, a decline of approximately 42% from the prior quarter and a decline of 52.5% since Q1 2021.[8]

Alone and certainly in combination, these developments were extraordinary and, as of the IPO, reflected persistent, adverse trends in Robinhood's business that portended a material decline in Robinhood's revenue in Q3 2021 and future periods.[9] Indeed, perhaps the best evidence of this

---

[6]    Thus, contrary to Defendants' contention (Def. Mem. at 20), the SAC pleads facts supporting an inference that Robinhood's revenues fell in July 2021 prior to the Offering, specifically, steep declines in both equities and cryptocurrency trading volumes following the end of the meme stock and Dogecoin events. This is all that the Order required.

[7]    Defendants' contention (Def. Mem. at 19) that investors were aware that MAU had declined in June because "June results were disclosed in the Offering Documents," is meritless as the Offering Documents did not disclose monthly MAU figures for Q2 2021.

[8]    Defendants' assertion that "Plaintiffs plead *no* details about . . . ARPU after March" (Def. Mem. at 20), is patently false. *See* ¶¶100, 102. Likewise, Defendants' argument that the SAC must be dismissed because Plaintiff have not alleged *monthly,* as opposed to *quarterly* ARPU figures, is baseless. Robinhood did not report ARPU on a monthly basis. However, given the unprecedented decline in trading volumes in July, it is more than a reasonable inference that ARPU, which had declined 18% from Q1 to Q2 2021 and another 42% from Q2 2021 to Q3 2021, continued to decline in July as well.

[9]    Defendants' cited authorities are inapposite. *See In re Coty, Inc. Secs. Litig.*, No. 14-cv-919, 2016 WL 1271065, at *6-7 (S.D.N.Y. Mar. 29, 2016) (Allegation of decline in revenue in June when offering was June 12 insufficient.); *In re Vocera Commc'ns Inc. Sec. Litig.*, No. C-13-3567, 2015 WL 603208, at *3 (N.D. Cal. Feb. 11, 2015) (8.4% shortfall in bookings and $1.8 million revenue shortfall versus internal projections was not "a meaningful pattern of disappointing sales."); *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1161 (S.D. Cal. 2003 (allegation not backed up with any data or figures deemed insufficient); *In re DDi Corp. Sec. Litig.*, No. 03-cv-7063, 2005 WL 8157394, at *20 (C.D. Cal. Jan. 7, 2005) (Plaintiff failed to plead alleged "precipitous loss of business" with the necessary particularity required by Rule 9(b).).

11

is Defendants' choice not to include in the Offering Documents its usual breakdown of Robinhood's transaction-based revenue by type of trading (*i.e.*, equities, options, cryptocurrency) for Q2 2021, thereby leaving investors completely in the dark with respect to the steep decline in PFOF from equities trading in the quarter.[10]

**B.    The Offering Documents' Material Untrue Statements and Omissions Portrayed a State of Affairs at Odds with the True Condition of Robinhood's Business**

By failing to disclose the ongoing declines in PFOF from equities trading, equities and cryptocurrency trading volumes and KPIs, the Offering Documents "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (internal quotations and citations omitted).[11]  Moreover, it is black letter law that an issuer may not speak in half-truths. *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).  Once Defendants undertook to make statements, "'they [were] obligated to speak truthfully and to make such additional disclosures as [were] necessary to avoid rendering the statements made misleading.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2010); *see also In re Apple Inc. Sec. Litig.*, No. 19-CV-02033, 2020 WL 2857397, at \*11 (N.D. Cal. June 2, 2020) ("'[L]iteral truth is not the standard for determining

---

[10]    Likewise, although the Offering Documents provided preliminary estimates of other KPIs for the just completed second quarter ended June 30, 2021, they did not do so for ARPU, which would have revealed the deterioration in Robinhood's core business.  Defendants argue the omission of a preliminary estimate of ARPU was immaterial because investors could have calculated it themselves from other information provided in the Offering Documents.  Def. Mem. at 17 n.16.  However, burying the facts, or giving them less than significant emphasis, can deprive investors of the "full and fair disclosure" mandated by the Securities Act.  *See*, *e.g.*, *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 203 (5th Cir. 1988) ("[E]mphasis and gloss can, in the right circumstances, create liability under . . . [S]ection 11 of the 1933 Act."); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 565 (E.D.N.Y. 1971) (Disapproving disclosures which, while technically accurate, were "calculated to communicate as little of the essential information as possible while exuding an air of total candor.").

[11]    Defendants' argument that Robinhood's accurate historical financial data cannot support a Securities Act claim "is not particularly relevant" because Plaintiffs' contention is that it "provide[s] the basis (context) for (rather than [itself] constitut[ing]) alleged misrepresentations." *Franchi* v. *SmileDirectClub, Inc.*, No. 3:19-cv-00962, 2022 WL 4594575, at \*12 (M.D. Tenn. Sep. 30, 2022).

12

whether statements . . . are misleading'. . . .  Even if a statement is 'technically accurate', a party may be obligated to disclose additional 'adverse information that cuts against the positive information' if it chooses to tout the positive data."); *Facebook*, 986 F. Supp. 2d at 511 (Discussion in "generalized and indefinite terms . . . fail[s] to constitute sufficient disclosure where [the company] knew of the certainty of the trends at the time of the IPO.").[12]

Having filled the Offering Documents with financial data showing quarter-after-quarter of enormous, and practically uninterrupted, growth over a period of years, Defendants were not free to omit that Robinhood had experienced extraordinary and material downturns in key drivers of its revenue and KPIs in the months preceding the IPO.  *See Franchi*, 2022 WL 4594575, at *13 (Fact that trends in three financial metrics had reversed in the quarter ongoing at the time of the offering was data "a reasonable investor would consider . . . to be important to the overall picture such that the prospectus was 'materially incomplete' without the quarter-in-progress data.").[13]  For

[12]      In contrast, and unlike here, in *In re Lyft Inc. Secs. Litig.*, 484 F. Supp. 3d 758, 773 (N.D. Cal. 2020), cited in the Order at 12, "Plaintiff [could not] point to any specific anticipated loss or internal happenings that Defendant should have disclosed in the Registration Statement ahead of its first quarter reporting."

[13]      Citing *In re Turkcell Iletism Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001), Defendants argue that the magnitude of the declines in certain KPIs – AUC and NCFA – do not qualify as "extraordinary" and, therefore, Defendants' failure to disclose them was not misleading. In *Turkcell*, however, plaintiff alleged only a 9% drop **in a single financial metric**.  *Id*. at *12. Here, the declines in AUC and NCFA cannot be viewed in isolation as they coincided with undeniably extraordinary decreases in other metrics.  Defendants' other authorities are also inapposite.  In *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 211, 216 (5th Cir. 2004), the court held that defendants' accurate statement of the increase in natural gas prices during a specified time period was not misleading even though the price fluctuated during that period, noting that "[n]atural gas prices are listed in daily papers."  In *Gart v. Electroscope, Inc.*, 24 F. Supp. 2d 969, 974 (D. Minn. 1998), the court held there was no material adverse trend requiring disclosure when revenue in the quarter in question was 23% **higher** than the immediately preceding quarter. Finally, in *In re SeaChange Int'l Inc.*, No. CIV.A. 02-cv-12116, 2004 WL 240317, at *14-15 (D. Mass. Feb. 6, 2004), the court concluded there was no misleading omission because there had been no showing that the issuer was in possession of non-public information showing that results for the quarter in which the IPO occurred would be an extreme departure from the range of results that could be anticipated based on publicly available information.  In this regard, the court noted that although results for a particular segment were below expectations, overall results exceeded prior projections.  *Id*.  Here, in contrast, Robinhood's Q3 2021 results were deeply disappointing in all respects, as the steep declines in PFOF from equities trading and equities and cryptocurrency trading volumes portended at the time of the IPO, and the Company announced that quarterly results for Q4 2021 would be even worse.  ¶134.

13

this reason, Defendants' contention that there was no material omission because the estimated Q2 2021 results included in the Offering Documents "baked in all of the information Robinhood had at the time" (Def. Mem. at 20), is unavailing. While those estimated results may have "accurately predicted revenue to within 1%" (no surprise since they were issued nearly a month after the close of the quarter), with the meme stock and Dogecoin events having ended by April 2021, lurking beneath the surface were significant, undisclosed adverse trends in PFOF from equities trading, equities and cryptocurrency trading volumes, and KPIs, which portended a significant decrease in Robinhood's transaction-based revenue in Q3 2021.[14]

The Offering Documents' material untrue statements, including materially untrue and misleading risk warnings, furthered the misleading impression of Robinhood's business at the time of the Offering created by the foregoing material omissions. *See*, *supra*, Statement of Facts (B); *see*, *infra*, I(F). In this regard, the Offering Documents identified the same factors as driving Robinhood's revenue growth in Q1 and Q2 2021 as in previous periods, when, in fact, by the time of the Offering, revenue from equities trading had fallen to levels not seen since Q1 2020, and Robinhood's revenue had become thoroughly dependent on highly volatile cryptocurrency trading volume, which was in steep decline prior to the Offering.[15] Thus, for example, the Offering Documents' assertion that the strong estimated preliminary results for Q2 2021 were the result of an increase in NCFA "and increased trading activity related to options and cryptocurrencies, and relatively flat equities trading, relative to the three months ended June 30, 2020," ¶114, was untrue and misleading because a reasonable investor could conclude that "relatively flat equities trading" meant that revenue from equities trading were increasing, or at least stable, when, in fact it was

---

[14] Unlike in this case, in both *In re Progenity, Inc.*, No. 20-cv-1683, 2021 WL 3929708, at *12 (S.D. Cal. Sept. 1, 2021), and *Berg v. Velocity Fin., Inc.*, No. 2:20-cv-6780, 2021 WL 268250, at *6 (C.D. Cal. Jan. 25, 2021), cited by Defendants, the courts found that the Registration Statements disclosed the negative trends the plaintiffs claimed were omitted.

[15] Although Defendants highlight Robinhood's disclosure that 17% of its total Q1 2021 revenue was derived from transaction-based revenue earned from cryptocurrency trading activity (Def. Mem. at 13) this disclosure did not reveal the fundamental change in Robinhood's core business that had occurred by the time of the IPO when Transaction Rebates accounted for the majority of Robinhood's transaction-based revenue and PFOF from equities trading had fallen to an historic low.

14

lower in Q2 2021 than it had been in every quarter since Q2 2020. *See Apple*, 2020 WL 2857397, at *11 ("[W]here a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors."); *In Re Twitter, Inc. Sec. Litig.*, No. 16-CV-5314, 2020 WL 4187915, at *11-12 (N.D. Cal. Apr. 17, 2020) (Statement that "'DAU to MAU ratios in the quarter were *similar* to what they were by market relative to [previous disclosure on] Analyst Day'" was misleading because reasonable jury could conclude that subsequent 3% decline in DAU/MAU ratio was not similar in light of disclosed relationship between DAU/MAU ratio and revenue.).

Defendants' argument that "[t]here is no contradiction between relatively flat equities trading activity between two periods and a decline in revenue from equities trading" is disingenuous. Def. Mem. at 24. Leaving aside Defendants' convoluted calculations in support of this assertion, some of which (ironically) are based on the very breakdown of revenue by trading type that the Offering Documents omitted for Q2 2021 (*see id*. at 24-25), Defendants' argument ignores that the Offering Documents cited relatively flat equities trading activity as a reason for Robinhood's projected *increase* in *revenue* in Q2 2021. Of course, any doubt with respect to the correlation between supposedly flat equities trading activity and equities trading revenue in Q2 2021 could have been cured by simply including in the Offering Documents the usual chart breaking down transaction-based revenue by type of trading.

In sum, the foregoing materially untrue statements and omissions in the Offering Documents left investors contemplating purchasing shares in Robinhood's IPO with an impression of a state of affairs that differed in a material way from the one that actually existed in the months before the IPO. As a result, when the truth was eventually disclosed, Robinhood's stock price declined dramatically from the IPO price. This decline further undercuts Defendants' claim that the Offering Documents were transparent with investors about Robinhood's prospects and had adequately disclosed all information concerning the fundamental changes in its business model in the months before the IPO. *See*, *e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 16 (2d Cir. 2011) (citing 'precipitous decrease' in share price that occurred after

15

disclosure of truth as evidence of materiality); *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("[S]ignificant stock drop further supports an inference of materiality."). Therefore, Defendants' motion to dismiss the SAC on the grounds that the Offering Documents did not contain material untrue statement and omissions must be denied.

### C.    Defendants Had a Duty to Disclose the Material Adverse Trends Impacting Robinhood's Revenues at the Time of the IPO and to What Extent They Might Reasonably Be Expected to Materially Impact Future Revenues

Disclosure of the reversal in Robinhood's fortunes was also mandated by Item 303 of Regulation S-K. As the Court instructed in *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002):

> Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects.

297 F.3d at 1191-92.[16] There can be no serious dispute that the steep decline in PFOF from equities trading to levels far below those recorded in the preceding four quarters, ***including the three quarters that preceded the meme stock event***, was an extraordinary change that was required to be disclosed under Item 303, especially since it coincided with a 90% decline in cryptocurrency trading in the two months before the IPO and notable declines in three KPIs (MAU, AUC and ARPU). Numerous courts have held that plaintiffs have pleaded a material omission under Item 303, under similar circumstances. *See*, *e.g.*, *Franchi*, 2022 WL 4594575, at *10 (holding that allegations of "sudden downward trends" in three financial metrics in quarter in which IPO

---

[16]    Defendants' reliance on *Oxford* is misplaced. In *Oxford*, the issue was whether Item 303 required the defendants to disclose six weeks of disappointing prescription data for a new drug. Although the Eleventh Circuit found this fact pattern was not present in the case, it observed that "[i]f booming Niaspan sales had carried Kos for the previous several reported quarters but suddenly and significantly declined, a potential investor could be [misled] by those reported results unless Kos disclosed the importance of Niaspan and discussed the downward trend in Niaspan sales. That is the type of situation Item 303(a)(3)(ii) was designed to address." *Oxford*, 297 F.3d 1182.

16

occurred were sufficient to plead a material omission under Item 303); *Facebook*, 986 F. Supp. 2d at 512 (holding that there was a duty to disclose under Item 303 material negative impact to revenue evident in internal projections prepared ten days before offering); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (holding that Item 303 required disclosure of known declining sales trend that occurred in the same quarter as the offering).[17]

Defendants' argument that the alleged declines in KPIs were not "known as required under Item 303" (Def. Mem. at 21), is unavailing. In this regard, Defendants contend that because "[a]ll of the June and July KPI figures that Plaintiffs allege constituted undisclosed declines were . . . *increases* relative to March figures" and "Robinhood disclosed [that] April and May saw particularly high levels of activity driven by external factors," "Robinhood management could not possibly have known that the June and partial July results were an 'observed pattern that accurately reflects a persistent condition.'" *Id.* (quoting *In re Restoration Robotics, Inc. Secs. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019). However, these KPI declines did not occur in a vacuum, but instead coincided with a 60% decline in PFOF from equities trading from Q1 to Q2 2021, to the lowest it had been since Q1 2020, and a 90% decline between May and July in a second of Robinhood's three sources of transaction based-revenue, cryptocurrency trading volume. Under these circumstances, the inference that this entire pattern reflected a persistent condition portending a material decline in revenue in future periods as opposed to "a modest reversion from April and May peaks" (Def. Mem. at 21), is overwhelming.

### D.    Defendants Violated Their Disclosure Duties Under Item 105

As this Court noted, "Item 105 requires disclosure of 'the material factors that make an investment in the registrant or offering speculative or risky.'" ECF No. 90 at 15 (quoting 17 C.F.R. §229.105). It "is intended 'to provide investors with a clear and concise summary of the material

---

[17]    Defendants' argument (Def. Mem. at 16) that because the meme stock and Dogecoin events had ended by the time of the IPO there was no persistent condition to be disclosed is disingenuous. The persistent condition that existed before and at the time of IPO that Defendants failed to disclose was the cratering of trading volumes in equities and cryptocurrencies that was decimating Robinhood's revenue and the related declines in KPIs. As the decisions cited above recognize, this is the very situation Item 303 was intended to address.

17

risks to an investment in the issuer's securities.'" *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) (quoting "Securities Offering Reform," SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004)).  An issuer violates Item 105 when its risk disclosures present risks as contingent when they have already come to fruition.  *See Gerneth v. Chiasma, Inc.*, No. 16-11082, 2018 WL 935418, at *4-5 (D. Mass. Feb. 15, 2018) (Plaintiff alleged violation of Item 503 because risk warnings concerning possible FDA rejection of new drug application in the offering documents failed to disclose "that the FDA had already stated its disagreement with the Phase 3 trial design" by the time of the offering.); *Mingbo Cai v. Switch, Inc.*, No. 2:18-CV-01471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) ("[S]pecific risks arising from [issuer's] new sales strategy . . . along with its potential effects on revenue" was "precisely the type of risk that [I]tem 503 requires issuers of securities to disclose.").

Here, as in *Gerneth* and *Mingbo*, although the Offering Documents contained pages of contingent risk warnings, including that fluctuations in the price of various cryptocurrencies ***could*** negatively impact trading volumes, these risks had already come to pass.  Thus, the Offering Documents violated Item 105.  Further, the Offering Documents failed to disclose the following substantial risks that made an investment in Robinhood stock speculative and risky:  (i) that cryptocurrency trading now constituted the majority of Robinhood's transaction-based revenues, a whopping 52% in Q2 2021, up from 21% in Q1 2021;[18] (ii) that the novel Dogecoin accounted for a majority (62%) of Robinhood's transaction-based revenue from cryptocurrency trading in Q2 2021;[19] (iii) that cryptocurrency trading volume had declined by 90% in the two months prior to the IPO, a rate of decline that far exceeded that of the market as a whole (¶¶84-86); and (iv) that these risk factors were already impacting Robinhood's business and revenues and were likely to do so in Q3 2021 and future periods.  *See* I(F), *infra*.  Absent these disclosures, a reasonable investor could have been misled by the general, contingent risk warnings concerning volatility

---

[18]  *See* ECF No. 97-4 at 144 (reflecting $87 million and $420 million in cryptocurrency and total transaction-based revenue in Q1 2021); ECF No. 97-5 at 47 (reflecting $233 million and $451 million in cryptocurrency and total transaction-based revenue in Q2 2021).

[19]  *See* ECF No. 97-5 at 106.

18

included in the Offering Documents. *See Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 Civ. 9848, 2020 WL 5757628, at \*7 (S.D.N.Y. Sept. 27, 2020) ("'[T]he inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid.'").

**E.  The Offering Documents' Disclosures Do Not Foreclose Plaintiffs' Claims**

Defendants argue that Plaintiffs' claims fail because Robinhood disclosed its business had been impacted by the meme stock events and heightened cryptocurrency trading in coins like Dogecoin. Def. Mem. at 10-15. This argument fails as well.

The Offering Documents' mere mention of meme stocks and heightened cryptocurrency trading was not sufficient to satisfy Item 303. Even if these statements could be considered the identification of a trend (they cannot), "Item 303 requires more than the mere identification of trends that were occurring in the defendant's business." *Facebook*, 986 F. Supp. 2d at 509. ***Item 303 requires an issuer to disclose whether, and to what extent, the particular known trend, event or uncertainty might reasonably be expected to materially impact future revenues***. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011); SEC Release No. 33-6835, "Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures," 54 Fed. Reg. 22427, at 22430 (May 24, 1989) ("[I]f management is unable to determine that a material effect . . . is not reasonably likely to occur," then "MD&A disclosure of the effects of [the known trend, development or uncertainty], quantified to the extent reasonably practicable, would be required."). There is no such disclosure in Robinhood's Offering Documents. *See Facebook*, 986 F. Supp. 2d at 512 ("[W]hile Facebook made significant disclosures . . . [they] did not denote the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues . . . [and] investors reading Facebook's disclosures had no way of knowing what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend."). Thus, neither the fact that these events were public knowledge, nor that the Offering Documents mentioned them defeats Plaintiffs' Item 303 claim.

Lead Plaintiffs' Memo. of Law in Opp. to Robinhood Defendants' Mot. to Dismiss the Second Amended Class Action Complaint
Case No. 3:21-cv-09767

Recognizing this, Defendants argue that they "disclosed the ramifications (both positive and negative) of the meme stock events for its business." Def. Mem. at 11. However, an examination of the disclosures cited by Defendants shows this is not the case. For example, Defendants cite the Offering Documents' disclosure that in Q1 2021, "[i]ncreased interest in personal finance and investing **and several high-profile securities and cryptocurrencies, encouraged an** *unprecedented number of first-time retail investors* to become our users and begin trading on our platform." Def. Mem. at 11 (quoting Prospectus at 144). However, while this statement can be read as suggesting the meme stock event had a positive impact on Robinhood's Q1 2021 results, no investor reading this statement had any way of knowing (i) the magnitude of its impact in Q1 2021; or (ii) that the end of the meme stock event in February 2021, along with the erosion of Robinhood's customer base due to service and security issues, had sent its PFOF from equities trading in Q2 2021 plummeting to the lowest level seen since Q1 2020; or (iii) that trading volumes in equities had continued to slide in July 2021; or (iv) that these events were likely to have a material adverse impact on future periods including Q3 2021, the quarter in which the IPO occurred.

Equally misplaced is Defendants' reliance on the Offering Documents' disclosure that "[t]rading activity [in Q2 2021] was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter." *See* Def. Mem. at 11 (quoting Prospectus at 31). Although Defendants suggest that this statement informed investors that the positive effect of the meme stock event had abated in Q2 2021, this statement was about cryptocurrency trading, not equities trading, and so it said nothing about the impact (positive or negative) of the meme stock event at all.[20] Moreover, even if this disclosure could be read as suggesting that the end of the meme stock event had negatively impacted Q2 2021

---

[20]    This is confirmed by the fact that the disclosure described the pattern of cryptocurrency trading volume in Q2 2021 and the beginning of Q3 2021. As alleged in the SAC, cryptocurrency trading volume was $76 billion in April 2021, $127 billion in May 2021, and just $30 billion in June 2021, before falling to $13 billion in July 2021. ¶¶84-85.

results (it cannot), the clear implication of this statement was that Robinhood had experienced only "a modest reversion from . . . peaks that were themselves unprecedented," *see* Def. Mem. at 21, when, in fact, equities trading had plunged to a level not seen since Q1 2020.[21]

The Offering Documents also failed to disclose the extent to which the decline in cryptocurrency trading volume might reasonably be expected to materially impact Robinhood's future revenues. As they did with respect to the meme stock event, Defendants argue that Robinhood explained the implications of the Dogecoin fad to its business. *See* Def. Mem. at 13-14. Not so.

As an initial matter, while Robinhood did disclose that the percentage of its revenue derived from cryptocurrency trading, especially Dogecoin, had increased in Q1 2021 compared to Q4 2020, the Offering Documents did not disclose that the Company's dependence on cryptocurrency trading, particularly Dogecoin, had grown exponentially in Q2 2021. As noted above, since the Offering Documents omitted the usual breakdown of Robinhood's transaction-based revenue by type of trading for Q2 2021, investors had no way of knowing that Transaction Rebates from cryptocurrency trading now constituted the majority of Robinhood's transaction-based revenues, a whopping 52% in Q2 2021, up from 21% in Q1 2021. *See infra* p. 19 fn 18. ECF No. 97-4 at 144; ECF No. 97-5 at 47.[22] Nor were investors aware that the percentage of Robinhood's transaction-based revenue from cryptocurrency trading attributable to Dogecoin had skyrocketed from 34% in Q1 2021 to 62% in Q2 2021. *See* ECF No. 97-5 at 106. In addition, investors were unaware that cryptocurrency trading volumes had cratered in the last month of the quarter coinciding with the end of the Dogecoin rally and had continued to decline in July. ¶¶84-85. Thus,

---

[21] The Offering Documents' disclosures relating to increased deposit requirements imposed by its regulator, Robinhood's decision to prevent its customers from purchasing certain meme stocks on its trading platform for a time, and the resulting negative media attention, customer dissatisfaction, litigation and regulatory and U.S. Congressional inquiries and investigations were inadequate for the same reasons. *See*, *e.g.*, Def. Mem. at 11 (citing Prospectus at 42-43, 206-07).

[22] For this reason, Defendants' argument that "there was no undisclosed impact on Robinhood's business from the meme stock events" because Robinhood's net revenues increased in Q2 2021 (Def. Mem. at 12) is meritless. Although net revenue increased in Q2 2021, that increase was driven by a substantial rise in Transaction Rebates from cryptocurrency trading in April and May 2021, not PFOF from equities trading which had fallen substantially.

21

although an investor might have anticipated a decline in cryptocurrency trading volume on Robinhood's platform (and revenue from Transaction Rebates) in Q3 2021, due to the end of the Dogecoin rally (Def. Mem. at 14-15), without knowing that Robinhood's dependence on cryptocurrency trading, and Dogecoin in particular, had increased exponentially in Q2 2021, an investor did not have any reason to anticipate a decline in cryptocurrency trading volume of the magnitude experienced by Robinhood in the two months prior to the IPO or the material impact that decline was reasonably likely to have on Robinhood's Q3 2021 revenue, especially in light of the simultaneous collapse in PFOF from equities trading.[23]

### F.    Defendants' Risk Warnings Were Themselves Materially False and Misleading

Defendants also cite various risk warnings in support of their contention that the Offering Documents were not materially false and misleading.  However, these risk warnings were themselves misleading because the risks warned of had already occurred.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Defendants also argue that reasonable investors wouldn't have been misled because federal regulations warned them that [the company's] customers might issue stop-work orders . . . .  But learning that stop-work orders ***might*** be issued is quite different from knowing they were ***in fact*** issued.  One indicates a risk, the other a certainty.  It goes without saying that investors would treat the two differently."); *Apple*, 2020 WL 2857397, at *17 ("[W]hen the risks have already materialized, disclosing them 'in the abstract'

---

[23]    For these reasons, Defendants' argument that any reasonable investor" would have understood that Robinhood would experience a disproportionate decline in cryptocurrency trading revenue in June and July because investors knew that Dogecoin accounted for 34% of Robinhood's cryptocurrency trading volume in Q1 2021 and that the price and trading volume of Dogecoin had declined between May and July (Def. Mem. at 14-15) is unavailing. Moreover, Defendants' truth-on-the-market argument fails for three additional reasons.  First, "the defense is less applicable to registration statements, IPOs, and Section 11 claims, where the stock price has been set privately [and] the public market has necessarily not had the opportunity to factor in information it may have into the share price." *Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).  Second, the defense is not available at the motion to dismiss stage because it is a method of refuting materiality, an intensely fact-specific inquiry.  *Id.* And third, "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008).

22

while omitting that they have 'already come to fruition' is misleading."); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 536 (S.D.N.Y. 2020) ("Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized.").[24]

For example, Defendants erroneously cite the following risk warnings as disclosing risks to Robinhood's business from the meme stock events: (i) that there was uncertainty with respect to whether "the unprecedented number of new users" would behave the same as "prior cohorts;" (ii) that "[a]ny significant loss of customers or a significant reduction in their use of [Robinhood's] platform could have a material impact on [the Company's] trading volumes and revenues;" and (iii) that Robinhood faced a variety of risks to its business from market volatility. *See* Def. Mem. at 11-12. Defendants' arguments based on these risk factors are meritless because it was already the case that (i) customers using Robinhood's platform to trade meme stocks were not behaving in the same manner as conventional customers, (ii) Robinhood had already lost significant customers and/or had suffered a significant reduction in its customers' use of the Company's platform that was having a material, negative impact on Robinhood's business, and (iii) Robinhood's business was being materially impacted by the volatility created by the meme stock event.

The risk warnings related to cryptocurrency trading cited by Defendants were similarly misleading. *See* Def. Mem. at 13-14. For example, demand for Dogecoin had already declined precipitously by the time of the IPO, rendering the cited risk warnings referring to this as a mere possibility false and misleading. *See* Def. Mem. at 13-14 (quoting Prospectus at 79). The same is true with respect to the warning that the markets for cryptocurrencies are volatile and that fluctuations in cryptocurrency prices could negatively impact trading volumes. *Id*. at 14 (quoting Prospectus at 78). Finally, the warning that "resistance to and non-acceptance of cryptocurrencies" could impact Robinhood's ability to attract and retain customers (Def. Mem. at 14 (quoting

---

[24] Defendants' argument that its risk warnings were forward-looking and are protected by the bespeaks caution doctrine fails. Statements about purportedly future risks that have already come to pass are not forward-looking and, in any event, Robinhood did not include meaningful cautionary language informing investors of the declines in key financial metrics that had already occurred. *See Westley v. Oclaro Inc.*, 897 F. Supp. 2d 902, 917-19 (N.D. Cal. 2012).

Prospectus at 60-61), did nothing to disclose the ongoing risks to Robinhood's business from declining cryptocurrency trading volumes, especially given the outsized importance of Transaction Rebates from such trading as a source of revenue in the quarter leading to the IPO.

Finally, Defendants cite the disclosure that Robinhood "expect[ed] revenue for the three months ended September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30, 2021, and expected seasonality." Def. Mem. at 22-25 (quoting Prospectus at 31). Specifically, Defendants argue that the Court previously ruled that this warning of "absolute declines" in cryptocurrency trading was "sufficient to negate a claim of misleading omissions." *Id*. at 22 (quoting Order at 13). However, this mischaracterizes the Court's Order. In the Order, the Court characterized these warnings as "not particularly robust" but found them "sufficient to negate" the claims in the prior complaint *because "the recent trends of decline . . . as alleged were not clearly remarkable" in the absence of "contextual information that would show the declines to be unusual and indicative of larger future trends*." Order at 12, 14. As discussed *infra*, the additional allegations in the SAC demonstrate that the declines in several of Robinhood's key metrics alone, but especially in combination, were clearly remarkable. Thus, Defendants' contention that "Plaintiffs have added nothing to their allegations that would alter the Court's decision this go-round" (Def. Mem. at 22), is meritless. In addition, as discussed *infra*, the disclosure cited by Defendants does nothing to convey the magnitude of the anticipated decline in Robinhood's revenue from the expected decline in cryptocurrency trading or whether it was reasonably likely to be material and, as a result, it did not provide the disclosure required by Item 303. Indeed, as noted *infra* and as Defendants themselves concede, although it forecasts a quarter-over-quarter decline in revenue, this disclosure, at best, suggests a "modest reversion" from recent "peaks that were themselves unprecedented" rather than the persistent downturn the metrics portended. Moreover, the disclosure's reference to "seasonality" as a reason for the expected quarter-over-quarter decline in revenue from Q2 2021 to Q3 2021 is untrue and misleading as there was no indication of a seasonal

pattern of decline in customers, trading volumes or revenues impacting the third quarter.[25] *See* ¶110 (chart reflecting Robinhood's quarterly revenues for 2019 and 2020).

The disclosure that Robinhood expected a comparison of KPIs from Q3 2021 and Q3 2020 to show lower year-over-year growth in KPIs from Q12021 (Def. Mem. at 23) also does not defeat Plaintiffs' claims. As the Court observed in the Order, "it may be argued that this disclosure was inadequate to warn investors of an absolute decline in KPIs because it speaks to a decline in ***growth rates*** which is different from a decline in absolute terms." Order at 13. Further, Robinhood's warnings that its operating metrics had fluctuated from quarter to quarter and that the circumstances that had accelerated growth in Q2 2021 "may not continue" (Def. Mem. at 23), were themselves misleading as these events had come to pass.

## II.    PLAINTIFFS HAVE STATED A CLAIM FOR CONTROL PERSON LIABILITY

Defendants' only challenge to Plaintiffs' claim for violation of Section 15 of the Securities Act is that Plaintiffs have failed to plead a primary violation. *See* Def. Mem. at 25. Since Defendants' arguments for dismissal of Plaintiffs' Section 11 and 12(a)(2) claims fail, their motion to dismiss Plaintiffs' Section 15 claim should be denied as well.

### CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:  July 11, 2023                   Respectfully Submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub (admitted *pro hac vice*)
Thomas L. Laughlin, IV (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

---

[25]      Indeed, the only mention of seasonality with respect to any of these metrics in the Offering Documents was an expectation that Robinhood would see more new customers in the first calendar quarter. *See* ¶118. Further, quarterly financial data for the prior two years included in the Offering Document shows no seasonal decline in revenues from the second to third quarter. ECF No. 97-2 at 155. The only other mention of seasonality in the Offering Documents concerned proxy rebate revenue, a minor revenue source. *Id*.

Telephone: 212-233-6444
Facsimile:  212-233-6334
Dweintraub@scott-scott.com
tlaughlin@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (CA 281605)
Hal Cunningham (CA 243048)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Lead Plaintiffs Dr. Vinod Sodha and Dr. Amee Sodha and Proposed Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs Dr. Vinod Sodha and Dr. Amee Sodha*

Lead Plaintiffs' Memo. of Law in Opp. to Robinhood Defendants' Mot. to Dismiss the Second Amended Class Action Complaint
Case No. 3:21-cv-09767

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.


                                         *s/ Deborah Clark-Weintraub*
                                         Deborah Clark-Weintraub

Lead Plaintiffs' Memo. of Law in Opp. to Robinhood Defendants' Mot. to Dismiss the Second Amended Class Action Complaint
Case No. 3:21-cv-09767