ANTONY L. RYAN (*pro hac vice*)
KEVIN J. ORSINI (*pro hac vice*)
BRITTANY L. SUKIENNIK (*pro hac vice*)
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019-7475
Tel:    (212) 474-1000
Fax:    (212) 474-3700
Email: aryan@cravath.com
          korsini@cravath.com
          bsukiennik@cravath.com

MARK R. CONRAD (CA Bar No. 255667)
LIZ KIM (CA Bar No. 295277)
**CONRAD | METLITZKY | KANE LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel:    (415) 343-7100
Fax:    (415) 343-7101
Email: mconrad@conmetkane.com
          lkim@conmetkane.com

Attorneys for ROBINHOOD MARKETS, INC.,
VLADIMIR TENEV, JASON WARNICK,
BAIJU BHATT, JAN HAMMER, PAULA
LOOP, JONATHAN RUBINSTEIN, SCOTT
SANDELL AND ROBERT ZOELLICK

[*Additional parties and counsel in the signature
block below.*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PHILIP GOLUBOWSKI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROBINHOOD MARKETS, INC., ET AL.,<br><br>                    Defendants. | CASE NO. 3:21-CV-09767-EMC<br><br>**ROBINHOOD DEFENDANTS AND UNDERWRITER DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Judge:          Hon. Edward M. Chen<br>Hearing Date:  October 26, 2023<br>Time:           1:30 P.M. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...............................................................................................................1

ARGUMENT .....................................................................................................................3

I.    Plaintiffs Have Failed To State a Claim with Respect to the Nondisclosure of Preliminary Data Concerning Robinhood's Revenue Mix in the Months Immediately Preceding the IPO. .....................................................................................3

      A.    Plaintiffs Fail To State a Claim Based on Nondisclosure of the Specific Composition of Robinhood's Trading Revenue During Q2 2021. ..........................4

            1.    Robinhood Disclosed That Its Q1 and Q2 2021 Results Were Driven by the Unusual Meme Stock Events and the Cryptocurrency Frenzy, and That the Impact of Those Events Had Already Ebbed. .....................................................................................5

            2.    Robinhood's Q2 2021 Equity and Cryptocurrency Trading Results Were Not Historically Extraordinary When Compared to the Proper Reference Periods. ...........................................................9

      B.    Plaintiffs' Item 105 Claim Fails. ..........................................................................11

II.   Plaintiffs Fail To State a Claim Based on Nondisclosure of Intra-Quarter KPI Results. .........................................................................................................................13

III.  Plaintiffs Have Abandoned All Other Allegations. ............................................................15

IV.   Plaintiffs' Claims Should Be Dismissed With Prejudice. ...................................................15

CONCLUSION .................................................................................................................15

CERTIFICATE OF SERVICE .............................................................................................17

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ...............................................................................................................................12

*Gart v. Electroscope, Inc.*, 24 F. Supp. 2d 969 (D. Minn. 1998).......................................9, 10, 14

*Gerneth v. Chiasma, Inc.*, No. 16-cv-11082, 2018 WL 935418 (D. Mass. Feb. 15, 2018) ..............................................................................................................................12

*In re Aldus Sec. Litig.*, No. 92-cv-885, 1993 WL 121478 (W.D. Wash. Mar. 1, 1993) ..................7

*In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758 (N.D. Cal. 2020) ......................................................3

*In re Pivotal Sec. Litig.*, No. 3:19-cv-3589, 2020 WL 4193384 (N.D. Cal. July 21, 2020) ..............................................................................................................................12

*In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242 (N.D. Cal. 2019)....................13

*In re SeaChange Int'l Sec. Litig.*, No. 02-cv-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004) ........................................................................................................................14

*In re Textainer P'ship Sec. Litig.*, No. 05-cv-969, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) ........................................................................................................................6, 11

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001) .......4, 10, 14

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) .........................................5, 7, 8

*Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004)..................................................12, 14

*Lefter v. Yirendai Ltd.*, No. 16-cv-6437, 2017 WL 2857535 (C.D. Cal. June 20, 2017) ..............................................................................................................................10

*McGlamry v. Transmeta Corp.*, No. 04-cv-2475, 2005 WL 2216951 (N.D. Cal. July 25, 2005) ..............................................................................................................................15

*Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-1471, 2019 WL 3065591 (D. Nev. July 12, 2019) ..............................................................................................................................12

*Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191 (N.D. Cal. 2014) ........................................................15

*Osher v. JNI Corp.*, 256 F. Supp. 2d 1144 (S.D. Cal. 2003) .........................................................11

*Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009)................................................6, 11

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

**Other Authorities**

17 C.F.R. § 229.105 ................................................................................................... *passim*

17 C.F.R. § 229.303 ................................................................................................... *passim*

GME Historical Data, NASDAQ, available at https://www.nasdaq.com/market-activity/stocks/gme/historical (last accessed July 31, 2023)........................................................5

Matt Levine, "Robinhood's Investors Have Fun," Bloomberg (July 2, 2021), available at https://www.bloomberg.com/news/newsletters/2021-07-02/robinhood-ipo-filing-is-a-lesson-in-meme-finance-kqmkzfxc (last accessed July 31, 2023)........................................................................................................8

Nicole Lyn Pesce, "Google's 2021 Year in Search: AMC and GME stocks, Dogecoin, stimulus checks and shortages dominated queries," MarketWatch (Dec. 11, 2021), available at https://www.marketwatch.com/visual-stories/the-top-10-news-stories-of-2021-according-to-googles-year-in-search-01640280649 (last visited July 31, 2023)........................................................................8

Robinhood Monthly Metrics (Released with Q2 2022 Form 10-Q, available at https://s28.q4cdn.com/948876185/files/doc_downloads/Monthly/March-2022-Metrics.pdf (last visited July 31, 2023)) ..............................................................10

"Year in Review: A Look Back at the Biggest News of 2021," Wall Street Journal (Dec. 19, 2021), available at https://www.wsj.com/story/a-look-back-at-the-biggest-news-of-2021-28c7c827 (last visited July 31, 2023)........................................5

**INTRODUCTION**

After three complaints and a full round of motion to dismiss briefing (and argument) that resulted in the dismissal of the First Amended Complaint ("FAC"), Plaintiffs pivot to yet another new theory of the case in their Opposition to Defendants' motion to dismiss the Second Amended Complaint ("SAC"). Plaintiffs' latest argument is that despite Robinhood's disclosure of preliminary estimated results for Q2 2021 in the Offering Documents that ended up being correct to within 1%, Robinhood somehow misled investors by not *also* disclosing, prior to the end of the quarterly reporting period, a change in the composition of its trading revenue that quarter. That is, Plaintiffs allege that as compared to the first quarter of 2021, Robinhood's revenue was more concentrated in cryptocurrency trading than equities trading and that Robinhood was required to disclose specific details about this change. This new theory fails, as do Plaintiffs' attempts to repeat theories that the Court already rejected in dismissing the FAC.

*First*, in the FAC, Plaintiffs tried to allege that Robinhood had misled investors by failing to disclose an alleged decline in certain key performance indicators ("KPIs") in the months before the IPO. In dismissing that claim, the Court explained that Robinhood had no duty to disclose preliminary or intra-quarter results unless those results were "historically extraordinary." (Order at 16.) That was true both with respect to Plaintiffs' misstatement claims and their omission claims under Item 303. (*Id*. at 12, 14, 16.) Because Plaintiffs' latest theory is simply a new variation of the intra-quarter disclosure argument—*i.e.*, that Robinhood should have disclosed the change in its mix between equities and cryptocurrency revenue during Q2 2021—the SAC can survive only if Plaintiffs can satisfy the "historically extraordinary" test this Court has already applied. They cannot do so.

As explained below, Plaintiffs try to satisfy the "historically extraordinary" test with respect to their new theory by comparing Robinhood's results in the almost two months before the IPO (June and part of July 2021) to the time period immediately before that (that is, Q1 2021 and early Q2 2021). But that is a misleading comparison, and Robinhood told its investors exactly that in the Offering Documents. Robinhood extensively disclosed that its Q1 2021 results, along with the preliminary estimates for Q2 2021, were driven by two remarkable events:

CASE NO. 3:21-CV-09767-EMC                     REPLY ISO MOTION TO DISMISS

the meme stock craze of Q1 2021, which quickly (and very publicly) died down, and the short-lived spike in cryptocurrency trading, particularly in a meme coin called Dogecoin, that started in the first two months of Q2 2021 and was followed by a very public crash towards the end of the quarter. Those temporary spikes featured prominently in Robinhood's Offering Documents, not to mention the news, putting investors on notice of this highly unusual behavior in the months leading up to the IPO. When those fads faded, Robinhood accurately predicted in the Offering Documents that its extraordinary growth during the first half of 2021 likely would not continue into the following quarters. Robinhood's disclosures properly warned investors of the change in its revenue composition from the first to the second quarter of 2021 and that they should not expect the results from the first five months of the year to continue after the IPO.

When Robinhood's Q2 2021 results are compared to preceding periods that did *not* include the short-lived meme stock and cryptocurrency fads—rather than artificially compared to the immediately preceding period—it is obvious that the undisclosed preliminary revenue details were not historically extraordinary. The decline in equities trading in Q2 2021, following the end of the meme stock events, simply returned equities trading volume on Robinhood's platform to the level where it had been in the prior year—approximately 2.9 million revenue-generating trades per day on average. And the decline in cryptocurrency trading in June and July 2021, following the Dogecoin peak of April and May, left cryptocurrency trading volumes on Robinhood's platform at a level that remained over twenty times *higher* than any time before 2021. Plaintiffs have therefore alleged neither a misleading omission nor an undisclosed trend under Item 303, and their claims based on the preliminary Q2 2021 results fail. (*See* Section I.A.) Likewise, because Robinhood's risk disclosures regarding cryptocurrencies were accurate, Plaintiffs' Item 105 claim fails. (*See* Section I.B.)

*Second*, Plaintiffs repeat the same failed allegations from the FAC regarding short-term declines in KPIs, specifically that monthly active users declined in the months before the Offering (June and the partial month of July 2021) and that assets under custody declined in the month of July 2021. Because Plaintiffs have added nothing to those allegations, their claims based on nondisclosure of intra-quarter KPI metrics again fail. (*See* Section II.)

2

*Third*, Plaintiffs have abandoned all their other allegations, which relate to Robinhood's business strategy, customer service, outages and security.  (*See* Section III.)

*Fourth*, this is Plaintiffs' third complaint, drafted with the benefit of the Court's guidance.  Despite that, they again fail to state a claim.  They have had plenty of opportunities to plead a claim, and the Complaint should be dismissed with prejudice.  (*See* Section IV.)

**ARGUMENT**

**I.     Plaintiffs Have Failed To State a Claim with Respect to the Nondisclosure of Preliminary Data Concerning Robinhood's Revenue Mix in the Months Immediately Preceding the IPO.**

In dismissing Plaintiffs' claims in the FAC that Robinhood was required to disclose declines in certain KPI metrics in the final weeks before the IPO, the Court held that an issuer has no duty to disclose results outside the normal quarterly reporting cycle unless those results are "historically extraordinary."  (Order at 16; *see id.* at 14.)[1]  That is because there is generally no duty to report interim results.  Accordingly, the Court concluded it is not *misleading* to omit preliminary or intra-quarter results unless those results represent a historically extraordinary deviation from the disclosed quarterly results.  (*Id.* at 12, 14.)  The Court also explained that declines of only a few months cannot constitute a *trend* under Item 303 unless those declines were "historically extraordinary."  (*Id.* at 16; *see also id.* at 12, 20.)  Finally, the Court noted that "general trends" that are not "unique to Robinhood" or would have been "known by the public and any reasonable investor" do not meet the "historically extraordinary" bar.  (*Id.* at 12.)

In Opposition, Plaintiffs do not challenge the high bar the Court set for whether, and when, an issuer must disclose results outside the ordinary quarterly reporting cycle.  That is unsurprising, since the Court's holding comports with a well-established reluctance by courts to require disclosures outside regular reporting periods.  *See, e.g.*, *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 773 (N.D. Cal. 2020).  As one court explained, the "disclosure structure set out by the SEC [requires disclosures of quarterly results within 45 days of the end of the quarter] and the case law recognizes how unworkable and potentially misleading a system of instantaneous

---

[1] The KPIs at issue are monthly active users ("MAU"), assets under custody ("AUC"), average revenue per user ("ARPU") and net cumulative funded accounts ("NCFA").

3

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

disclosure out[side] the normal reporting periods would be." *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001).

Plaintiffs' newest theory is that Robinhood failed to disclose in the Offering Documents a change in the composition of its revenues. Plaintiffs do not contest that Robinhood disclosed its Q1 2021 results along with preliminary estimates of its overall Q2 2021 results (including all revenues). (Prospectus at 25, 30.) They concede that the Q2 2021 estimates turned out to be correct to within 1%. (Opp. at 14.) They also do not contest the fact that the Q2 2021 revenue breakdown was not due until Robinhood's Form 10-Q would be filed in August, weeks *after* the Offering. Nonetheless, Plaintiffs argue Robinhood should have disclosed that preliminary Q2 2021 results indicated that a higher proportion of revenues stemmed from cryptocurrencies, and less from equities, than in Q1 2021. (*Id.* at 10-11, 19-21.) That claim, premised only on preliminary results not due to be reported until the later Q2 2021 Form 10-Q, thus turns on whether Plaintiffs can allege the results were "historically extraordinary." As discussed in Section I.A below, they cannot. They also cannot establish that Robinhood was required to disclose those granular results under Item 105, which is discussed in Section I.B below.

A.    Plaintiffs Fail To State a Claim Based on Nondisclosure of the Specific Composition of Robinhood's Trading Revenue During Q2 2021.

Plaintiffs' argument that Robinhood's Q2 2021 revenue composition change—*i.e.*, how its revenue broke down between equity, options and cryptocurrency trading—was historically extraordinary is based entirely on a comparison of those results to the immediately preceding time period. However, as Robinhood explained to its investors in the Offering Documents, such a comparison would make no sense. That is because the time periods immediately preceding the two months before the IPO were themselves highly unusual, as a result of two widely publicized events: the meme stock trading frenzy in Q1 2021 and the cryptocurrency boom of early Q2 2021. As Robinhood disclosed to its investors, those events—along with the positive impact they had on Robinhood's results in Q1 and the beginning of Q2 2021—had already ebbed by the two months before the IPO. (*See* Section I.A.1.) When the results that Plaintiffs claim should have been disclosed are compared to relevant time periods—*i.e.*, periods not affected by the

4

meme stock and cryptocurrency fads (as Robinhood explained in the Offering Documents was the proper comparison)—they are far from "historically extraordinary," and Plaintiffs' claim fails. (*See* Section I.A.2.)

### 1. *Robinhood Disclosed That Its Q1 and Q2 2021 Results Were Driven by the Unusual Meme Stock Events and the Cryptocurrency Frenzy, and That the Impact of Those Events Had Already Ebbed.*

Robinhood's disclosures in the Offering Documents regarding the meme stock events and cryptocurrency frenzy demonstrate that there was nothing misleading about not also including details about its preliminary Q2 2021 trading revenue composition, and why no disclosure of that information was required by Item 303. Robinhood's disclosures made clear that (a) equities trading surged in Q1 with the meme stock events and ebbed in Q2 2021 when they ended, and that (b) cryptocurrency trading peaked in early Q2 with the meme coin Dogecoin, declined toward the end of Q2, and was expected to remain at lower levels in Q3 2021. While Plaintiffs complain that Robinhood did not estimate the size of the impact of those events (Opp. at 19-22), Robinhood had no obligation to do so. *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (issuers are not required to quantify every disclosure).

**Meme stock events.** Robinhood disclosed in the Offering Documents that it experienced "high trading volume and account sign-ups" in Q1 2021 (Prospectus at 37, 139), as well as "unprecedented market volatility" in that time (*id.* at 42-43, 206-207). Moreover, the extreme trading volumes in the stock market—which are publicly available[2]—were so widely reported that they ultimately became one of the biggest news stories of the year.[3]

Robinhood also made abundantly clear the implications of those events for its business. Robinhood disclosed that the "[i]ncreased interest in personal finance and investing and several high-profile securities and cryptocurrencies[] encouraged an unprecedented number of first-time

---

[2] Trading in GameStop, for example, peaked in January at over 788 million shares traded in a single day—over 15 times the daily average the previous month. GME Historical Data, NASDAQ, available at https://www.nasdaq.com/market-activity/stocks/gme/historical (last accessed July [28], 2023).

[3] *See, e.g.*, "Year in Review: A Look Back at the Biggest News of 2021," Wall Street Journal (Dec. 19, 2021), available at https://www.wsj.com/story/a-look-back-at-the-biggest-news-of-2021-28c7c827 (last visited July 28, 2023).

5

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

retail investors to become [Robinhood] users." (SAC ¶ 112 (quoting Prospectus at 149); *see also* Prospectus at 206.) Those disclosures were more than adequate to inform investors that the Q1 results, including the revenue mix, were not ordinary, especially in view of the publicly known, market-wide movements of which investors were amply aware. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("[I]t would be unreasonable to require every [issuer] to chronicle the historical performance of the New York Stock Exchange . . . ."); *In re Textainer P'ship Sec. Litig.*, No. 05-cv-969, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005) ("One ordinarily would expect that investors in a limited partnership whose sole assets were shipping containers would be aware of general trends in the market for such containers").[4]

Likewise, Robinhood disclosed that the meme stock craze *ended* in Q1 2021, that its impacts on Robinhood had faded by Q2 2021 and, therefore, that investors should *not* expect the Q1 results to set a new baseline for Robinhood's performance going forward. Specifically, Robinhood made clear that the closest comparison for its Q2 2021 equities trading results was not the inflated levels of the immediately preceding quarter, but the far lower levels of the previous year. As Robinhood explained to its investors, equities trading volume in Q2 2021 was "relatively flat" as compared to Q2 2020. (Prospectus at 31.)[5] Thus, at the time of the Offering, investors knew that the proper benchmark for Q2 2021 equities trading volume was not Q*1* 202*1* volume (the comparison Plaintiffs draw), but rather Q*2* 202*0* volume. Robinhood had not disclosed Q2 2020 trading volumes (because Robinhood then was not yet a public company), but

_____

[4] Plaintiffs argue that it is irrelevant that investors knew about the meme stock and cryptocurrency spikes from public reports (which was in addition to Robinhood's disclosures). (Opp. at 22 n.23.) That is wrong. It is proper to consider public knowledge for the purpose of determining whether a reasonable investor would have been misled by Robinhood's disclosures. *See Rubke*, 551 F.3d at 1162-63 ("[I]t is pointless and costly to compel firms to reprint information already in the public domain."). Likewise, public knowledge is appropriately considered when determining whether results are historically extraordinary, as opposed to general trends "known by the public and any reasonable investor." (Order at 12.)

[5] This was confirmed by the final Q2 2021 data disclosed a few weeks later in the Form 10-Q. DARTs for equities were 1.3 million for Q1 2020, 2.1 million for the six months ended June 2020, 5.1 million for Q1 2021, and 4.0 million for the six months ended June 2021. (Prospectus at 144; Q2 2021 Form 10-Q at 47.) This means DARTs for equities were 2.9 million for each of Q2 2020 and Q2 2021. (For 2020, 2.1 million over six months is the average of 1.3 million in Q1 and 2.9 million in Q2; and for 2021, 4.0 million over six months is the average of 5.1 million in Q1 and 2.9 million in Q2.)

6

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

it *had* disclosed Q*1* 2020 data as part of its year-over-year comparison between Q1 2020 and Q1 2021. Those results showed 1.3 million daily average revenue-generating trades ("DARTs") for equities. (*Id* at 144.) Robinhood had also disclosed that equities DARTs for the full year 2020 were 2.2 million. (*Id.* at 149.) Investors' closest benchmarks for equities trading in Q2 2021, therefore, were 1.3 and 2.2 million. Those figures represented steep drop-offs from the Q1 2021 figure of 5.1 million that Robinhood disclosed. (*Id.* at 144.) As it turned out, the *actual* DARTs figure for Q2 2021 (2.9 million) was *higher* than the Q1 2020 and full-year 2020 benchmarks. In other words, investors were warned to expect a *steeper* decline than ultimately occurred. Moreover, Robinhood explicitly tied the spike in trading activity to expected absolute declines in future revenues. Citing the unusually high trading activity of the preceding months, Robinhood stated: "***We expect our revenue for the three months ending September 30, 2021 to be lower***, as compared to the three months ended June 30, 2021." (*Id.* at 31.) Robinhood thus amply disclosed the drop-off in equities trading from Q1 to Q2 2021.

Plaintiffs quibble with Robinhood's supposed failure to disclose the "magnitude of [the] impact." (Opp. at 20.) But an issuer is not required to quantify with precision the impact of every event that has impacted its business in the past, nor the extent to which a change might affect its business in the future. *See Worlds of Wonder*, 35 F.3d at 1419 (issuer was not required to estimate the proportion of a change in its revenues that was due to temporary factors, nor "the precise extent of [an] anticipated revenue drop"); *In re Aldus Sec. Litig.*, No. 92-cv-885, 1993 WL 121478, at *6 (W.D. Wash. Mar. 1, 1993) ("Aldus had no duty to reveal the specific amount of projected amortization cost increases."). Investors were on notice that Robinhood's second and third quarter 2021 equities trading revenues would be substantially lower than those of the first quarter, and no additional disclosures were required.

**Cryptocurrency frenzy.** Robinhood also disclosed the rise in Dogecoin and other cryptocurrencies in the second quarter of 2021. On multiple occasions, Robinhood reiterated the "record highs in trading activity, particularly in cryptocurrencies," that characterized Q2 2021. (Prospectus at 31, 137.) And indeed, that phenomenon was publicly known and covered at

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

length in the news at the time.[6]  For example, Dogecoin's temporary rise, already gaining steam in Q1 2021, accelerated in Q2.  (*See* Ex. A.)  From March to May, Dogecoin trading volume in the market at large increased tenfold.  (*See id.*)  Investors had ready access to this data.  (*Id.*)

Once again, Plaintiffs suggest that Robinhood did not disclose the projected *impact* of that heightened Dogecoin trading on its business.  (Opp. at 20.)  Once again, they are wrong.  In noting the existence of the fad in the Prospectus, Robinhood highlighted *in particular* the rise in Dogecoin revenues:  "A substantial portion of the recent growth in our net revenues earned from cryptocurrency transaction is attributable to transactions in Dogecoin."  (Prospectus at 79.)  When Robinhood disclosed that revenue from Dogecoin had risen from $500,000 in Q4 2020 to $30 million in Q1 2021, market watchers understood the implications for Q2 2021 revenues:

> Six percent of Robinhood's revenue came from Dogecoin trading in the first quarter of this year, and that *wasn't the quarter when Dogecoin was a huge meme*.  How much did Robinhood make trading Dogecoin in the second quarter of 2021, the one that ended on Wednesday?  Was it . . . hundreds of millions of dollars?[7]

And, as the Court has recognized, Robinhood alerted investors to "absolute declines" in cryptocurrency revenue in July 2021, the time period immediately before the Offering.  (Order at 13-14.)  Contrary to Plaintiffs' contentions (Opp. at 21), Robinhood had no duty to precisely quantify the projected impact of these changes.  *Worlds of Wonder*, 35 F.3d at 1419.

The net result is that investors were on notice that Robinhood's Q2 2021 estimated results embedded the reversion from the meme stock frenzy on the one hand, and the effects of the Dogecoin frenzy on the other.  Armed with Robinhood's disclosures, publicly available measures, and an accurate estimate of Robinhood's total revenue, investors had all the information they needed to understand the nature of Robinhood's performance during this time period, including the fact that the performance boosts caused by the meme stock and crypto fads were not expected to continue.  No investors were misled.

---

[6] Nicole Lyn Pesce, "Google's 2021 Year in Search: AMC and GME stocks, Dogecoin, stimulus checks and shortages dominated queries," MarketWatch (Dec. 11, 2021), available at https://www.marketwatch.com/visual-stories/the-top-10-news-stories-of-2021-according-to-googles-year-in-search-01640280649 (last visited July 28, 2023).

[7] Matt Levine, "Robinhood's Investors Have Fun," Bloomberg (July 2, 2021), available at https://www.bloomberg.com/news/newsletters/2021-07-02/robinhood-ipo-filing-is-a-lesson-in-meme-finance-kqmkzfxc (last visited July 28, 2023) (ellipses in original).

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

### 2. *Robinhood's Q2 2021 Equity and Cryptocurrency Trading Results Were Not Historically Extraordinary When Compared to the Proper Reference Periods.*

These same disclosures refute the notion that Robinhood's preliminary Q2 2021 revenue composition was "historically extraordinary." Plaintiffs make this argument by myopically focusing only on results from Q1 2021 and the beginning of Q2 2021. But that makes no sense. As explained in the Prospectus, the proper way to assess whether the preliminary Q2 2021 results were "historically extraordinary" is to compare them to the periods from the prior year, before the meme stock frenzy and cryptocurrency spikes. (Order at 12.) That comparison demonstrates that the revenue breakdown for Q2 2021 (not yet disclosed in the preliminary results in the Offering Documents) were not "historically extraordinary" because they fit comfortably in the range that Robinhood achieved the previous year. *Gart v. Electroscope, Inc.*, 24 F. Supp. 2d 969, 974 (D. Minn. 1998) (finding no intra-quarter duty to disclose results in the range achieved by the company the preceding year). They also reflect declines that tracked general market movements, "which would have [been] known by the public and any reasonable investor" and thus cannot be historically extraordinary such as to require atypical disclosure. (Order at 12.)

*First*, Plaintiffs have not alleged a historically extraordinary decline in equities trading. Plaintiffs allege Q2 2021 equities trading revenue of $52 million. (Opp. at 10.) To argue that this result was "historically extraordinary," Plaintiffs compare it to the all-time *high* of $133.3 million the prior quarter (Q1 2021), when the meme stock events occurred. (*See id.* at 17.) But, as described in the preceding section, Robinhood disclosed and explained to investors that the right comparison was not to the atypical results of Q1 2021 when the meme stock frenzy was in full effect, but instead to Robinhood's *historical* results from before the bubble. When the appropriate comparison to historical results is made, the $52 million for equities revenue is middle of the range. Robinhood disclosed that it earned $31.6 million in equities trading revenue in Q1 2020. (Prospectus at 144.) For the full year 2020, Robinhood's quarterly equities trading revenue averaged $62.8 million. (*See id.* at 149.) Indeed, before the meme stock craze, Robinhood's highest equities trading revenue in any quarter *ever* was $80 million. (*See id.*; Ex. 3, Q2 2021 Form 10-Q; Ex. 4, Q3 2021 Form 10-Q.) The $52 million Robinhood earned

9

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

from equities trading in Q2 2021 falls comfortably within that range, and is therefore not "historically extraordinary." *Gart*, 24 F. Supp. 2d at 974; *Turkcell*, 202 F. Supp. 2d at 13.

*Second*, Plaintiffs have not alleged a historically extraordinary decline in cryptocurrency trading between Q1 and Q2 of 2021—in fact, they have not alleged *any* decline. Cryptocurrency revenues *increased* from $87 million in Q1 2021 to $233 million in Q2 2021 during the Dogecoin events—which, as discussed above, Robinhood disclosed. (SAC ¶¶ 115, 134.) Plaintiffs cannot rest a securities claim for failure to disclose preliminary results on the premise that Robinhood did not disclose how *good* its Q2 2021 results were. Plaintiffs argue that the higher cryptocurrency trading revenue "portended a significant decrease in Robinhood's transaction-based revenue in Q3 2021." (Opp. at 14.) That claim conflates Robinhood's duty to disclose past events (under Item 303 and the misleading omission standard) with its duty to disclose future risks (under Item 105). As explained in Section I.B below, Robinhood disclosed the risk of a decline in Q3 2021 and was not required to estimate its exact magnitude. *Lefter v. Yirendai Ltd.*, No. 16-cv-6437, 2017 WL 2857535, at *7 (C.D. Cal. June 20, 2017).

Plaintiffs similarly fail to allege that the results that Robinhood observed when cryptocurrency trading began to decline at the end of Q2 and beginning of Q3 differed significantly from those that Robinhood had achieved historically, let alone "extraordinarily." As with equities revenue, Plaintiffs argue that these decreased cryptocurrency revenues were historically extraordinary only by comparing the volumes of $30 billion and $13 billion in June and July to the all-time high of $127 billion in May 2021. (SAC ¶¶ 84, 131.) What Plaintiffs conveniently omit is that Robinhood's June and July results were entirely consistent with historical precedents prior to the cryptocurrency fad that Robinhood disclosed (and the market knew about). For example, cryptocurrency trading volume in March 2021 was $16 billion— around the same as in July, and *half* as much as in June.[8] Indeed, Robinhood's revenues from cryptocurrency trading for the full Q3 2021, well past the Offering, turned out to be $51 million (SAC ¶ 134), which was nearly *double* Robinhood's revenues from cryptocurrency trading for

---

[8] Robinhood Monthly Metrics (Released with Q2 2022 Form 10-Q, available at https://s28.q4cdn.com/948876185/files/doc_downloads/Monthly/March-2022-Metrics.pdf (last visited July 31, 2023)).

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

*all of 2020* ($26.7 million).  In context, the June and July results were far from "historically extraordinary" declines.

Third, with respect to both equities and cryptocurrencies, Plaintiffs fail to allege any facts suggesting that the alleged declines were "unique to Robinhood rather than a general trend" in the market at large.  (Order at 12.)  As explained in Section I.A.1, Q1 2021 saw a market-wide peak in meme stock trading, followed by a fall in Q2.  Robinhood's Q2 2021 equities trading revenues mirrored that fall.  Meanwhile, Q2 2021 also saw a rise in cryptocurrency trading generally (and Dogecoin specifically).  Robinhood's Q2 2021 cryptocurrency trading revenues tracked that rise.  And, when cryptocurrency trading fell across the market in June and July 2021, Robinhood's cryptocurrency trading volume likewise fell.  (*See* Ex. A.)  Plaintiffs' assertion that Robinhood's declines "far exceeded those in the industry as a whole" (SAC ¶ 6) is conclusory and is "not back[ed] up . . . with any data or figure."  *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1161 (S.D. Cal. 2003).  Because they did no more than mirror the market at large, Robinhood's results in the months before the IPO were not "historically extraordinary" for this additional reason.  (Order at 12); *Rubke*, 551 F.3d at 1163; *Textainer P'ship*, 2005 WL 3801596, at *6.

      B.      <u>Plaintiffs' Item 105 Claim Fails.</u>

Plaintiffs do not state a claim for a violation of Item 105.  (Opp. at 17-18.)  In the Order, the Court rejected substantially the same allegations recycled in the SAC that Robinhood failed adequately to disclose risk factors regarding cryptocurrency trading.  The Court explained that Item 105 requires disclosure only of "the material factors that make an investment in the registrant or offering speculative or risky" and that the Offering Documents "warned of 'Risk Factors' in cryptocurrency trading."  (Order at 15-16.)  Plaintiffs fail to allege new facts in the SAC to alter the Court's conclusion.

Instead, Plaintiffs argue that Robinhood violated Item 105 by failing to disclose the exact percentages of its Q2 2021 transaction-based revenues that were derived from cryptocurrency trading and Dogecoin or that Robinhood experienced declines in cryptocurrency trading volume in the first few weeks of Q3 2021.  (Opp. at 18.)  Plaintiffs' argument suffers from the same fundamental defect as their FAC—namely that Item 105 requires disclosures of *risk factors*.

11

Risk factors are the underlying factors that could *cause* material future adverse events (such as the risk that fluctuations in the prices of cryptocurrencies could negatively impact trading volumes), not present performance indicators (such as a decline in cryptocurrency trading volume in July 2021). *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183-84 (2d Cir. 2014) (affirming dismissal of Item 105 claim, then known as Item 503(c), where company disclosed underlying risk factor without details of existing facts).[9]

Moreover, as the Court previously found, Robinhood disclosed the significance of cryptocurrency trading to its business and the risks associated with declining trading volumes in cryptocurrencies generally and Dogecoin specifically. (*See* Order at 13-16.) Indeed, Robinhood explicitly disclosed that it had experienced declines in late Q2 and early Q3 due to reduced cryptocurrency trading, and that it expected those declines to continue. Robinhood explained:

> Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last weeks of the quarter ended June 30, 2021, and remained at similar levels into the early third quarter. ***We expect our revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relatively to the record highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30, 2021***, and expected seasonality. . . . We anticipate the rate of growth in these Key Performance Metrics will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities.

(Prospectus at 31.)[10] Those disclosures satisfied Item 105. *See In re Pivotal Sec. Litig.*, No. 3:19-cv-3589, 2020 WL 4193384, at *8 (N.D. Cal. July 21, 2020) (dismissing Item 105 claim

---

[9] It is therefore unsurprising that none of the cases Plaintiffs cite holds that fluctuations in metrics are risk factors. *See, e.g.*, *Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-1471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (company disclosed only "boilerplate risk factors"); *Gerneth v. Chiasma, Inc.*, No. 16-cv-11082, 2018 WL 935418, at *4-5 (D. Mass. Feb. 15, 2018) (company warned only of possible FDA rejection of new drug application without disclosing that the FDA had expressed disagreement with drug trial design).

[10] Plaintiffs argue that this disclosure was itself misleading because it attributed part of the expected quarter-over-quarter decline to seasonality. (Opp. at 24-25.) But Plaintiffs "allege nothing to suggest the incorrectness, much less the impropriety, of such attribution." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 220 (5th Cir. 2004).

CASE NO. 3:21-CV-09767-EMC                REPLY ISO MOTION TO DISMISS

where risks were disclosed).  Plaintiffs' Item 105 claim therefore fails again.

## II.    Plaintiffs Fail To State a Claim Based on Nondisclosure of Intra-Quarter KPI Results.

In their Opposition, Plaintiffs largely abandon any standalone claim that Robinhood had a duty to disclose intra-quarter KPI metrics.  Instead, Plaintiffs now suggest that management should have concluded from those KPIs that declines in revenue from equities and cryptocurrency trading were trends under Item 303.  (Opp. at 16.)  That makes no sense.

As Robinhood explained in its Motion (Mot. at 18-20), Plaintiffs have alleged no new facts regarding Robinhood's KPIs.  As the Court previously noted, those allegations show that "many of the KPIs did not decline in the alleged period."  (Order at 11.)  To the contrary, AUC *increased* from May to June and NCFA remained flat.  (*Id.*)  Plaintiffs also continue to ignore that Robinhood disclosed MAU, AUC and NCFA for June 2021 in the Offering Documents.  (Prospectus at 30.)  As for July (the month of the Offering), MAU, AUC and NCFA all represented *increases* from March 2021.  (*Compare* Prospectus at 133 *with* SAC ¶¶ 98, 103 and 106.)  These inconsistent fluctuations could not have informed management of an "observed pattern that accurately reflects persistent conditions of the particular registrant's business environment" as is necessary to establish a trend under Item 303.  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019).  Indeed, the Court previously rejected Plaintiffs' arguments that the KPI declines were trends under Item 303.  (Order at 16.)

Plaintiffs also pay lip service, in a footnote, to their previously rejected claim that Robinhood had a duty under Item 303 to disclose the alleged intra-quarter KPI declines themselves.  (Opp. at 13 n.13.)  Yet Plaintiffs have failed entirely to provide any context that could render these unremarkable allegations "historically extraordinary," as the Court held they must to trigger an intra-quarter disclosure duty.  (Order at 12.)  Instead, Plaintiffs argue that the KPI fluctuations were significant because they "did not occur in a vacuum" and were accompanied by declines in equities and cryptocurrency trading revenue.  (Opp. at 17.)  But the Court already considered and rejected the same factual allegations when considering the FAC.  (Order at 12, 16.)  In fact, precisely because the declines in KPIs and Robinhood's trading

CASE NO. 3:21-CV-09767-EMC                REPLY ISO MOTION TO DISMISS

revenues were consistent with declines in meme stock and cryptocurrency trading at large, those declines would have—at most—confirmed to management the fact that fad-induced reversions were "essentially over" (SAC ¶ 77) and therefore would not have informed management of any persistent conditions at the time of the IPO. Courts have consistently rejected a duty to disclose comparable or larger intra-quarter declines for the same reason. *See, e.g.*, *Kapps*, 379 F.3d at 211-13, 216, 218; *Turkcell*, 202 F. Supp. 2d at 13; *Gart*, 24 F. Supp. 2d at 974; *In re SeaChange Int'l Sec. Litig.*, No. 02-cv-12116, 2004 WL 240317, at \*14-15 (D. Mass. Feb. 6, 2004).

Plaintiffs' efforts to distinguish these cases are meritless. (Opp. at 13 n.13.) Plaintiffs argue that *Kapps* found no intra-quarter duty to disclose a 60% decline in gas prices only because those prices "are listed in daily papers." *Kapps*, 379 F.3d at 216, 218. Plaintiffs' supposed distinction ignores that stock and cryptocurrency prices and volumes are *also* publicly available. Moreover, the *Kapps* court indicated that it would have reached the same conclusion even if the information were not public. *Id*. at 216. *Kapps* is therefore on all fours. Likewise, Plaintiffs argue that *Turkcell* involved a 9% drop in only one financial metric. They omit that the metric in question was *operating income*, a direct indicator of cash flows. *Turkcell*, 202 F. Supp. 2d at 13. The KPIs that Plaintiffs allege declined inform cash flows indirectly at best. Plaintiffs note that in *Gart*, the undisclosed quarterly revenue figure "was 23% **higher** than the immediately preceding quarter" (Opp. at 13 n.13)—yet they too allege only *increases* in KPIs relative to the previous quarter. Lastly, Plaintiffs argue that *SeaChange* is distinguishable because in that case, even though "results for a particular segment were below expectations," the issuer's overall results for the quarter exceeded prior projections. *Id.* They contend that this case differs because Robinhood's Q3 2021 results were "disappointing in all respects." *Id.* But, four weeks into the quarter, Robinhood did not *have* Q3 2021 results. Plaintiffs allege that Robinhood had partial July KPIs—but once again ignore that those had *increased* relative to the prior quarter, making Robinhood's undisclosed July KPIs no more "disappointing" than those in *SeaChange*.

In a final effort to state a claim, Plaintiffs argue that it was misleading for Robinhood to disclose that "it expected growth rates of KPIs to *decline* significantly in future periods" (Order at 12) because Robinhood supposedly failed to disclose that downturns had already begun.

14

CASE NO. 3:21-CV-09767-EMC                    REPLY ISO MOTION TO DISMISS

(Opp. at 25.)  The Court rejected substantially the same allegations in its prior decision, holding that "Robinhood did not suggest that the growth in KPIs would continue; in fact it suggested the opposite." (Order at 14.)  That is because Robinhood expressly disclosed declines by the time of the IPO.  As explained above (pp. 7-8, 12), Robinhood told investors multiple times that trading activity, including in cryptocurrencies, had fallen from "record highs" to "levels more in line with prior periods during the last few weeks of" Q2 2021 and that Robinhood "expect[ed its] revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021." (Prospectus at 31.)  In light of Robinhood's disclosures of absolute, ongoing declines, it could not possibly have been misleading to further caution that it "may not continue to grow on pace with historical rates" and that it expected "the growth rates in revenue, MAU, AUC and [NCFA] to decline in future periods, and [that] such declines could be significant" (*id.* at 37).  Plaintiffs' KPI allegations therefore cannot support a claim.

**III.   Plaintiffs Have Abandoned All Other Allegations.**

Plaintiffs do not defend their claims regarding Robinhood's business strategy, customer service, outages or security and dismissal should be with prejudice.  *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1205 (N.D. Cal. 2014).  As the Court previously held, such claims are meritless because Robinhood's statements of corporate optimism are non-actionable.  (Order at 18-20.)

**IV.   Plaintiffs' Claims Should Be Dismissed With Prejudice.**

The SAC represents Plaintiffs' third attempt to plead a viable securities claim.  On that third attempt, despite having the benefit of the Court's clear guidance, Plaintiffs have once more failed to state a claim.  In view of the SAC's clear deficiencies, outlined in Robinhood's motion, Plaintiffs in the Opposition *yet again* changed tack.  Still, their claims remain meritless.  Plaintiffs have had plenty of opportunities to plead a securities claim.  Further amendment would be futile, and the case should be dismissed with prejudice.  *McGlamry v. Transmeta Corp.*, No. 04-cv-2475, 2005 WL 2216951, at *2 (N.D. Cal. July 25, 2005).

<u>**CONCLUSION**</u>

For these reasons, the Court should dismiss Plaintiffs' Complaint without leave to amend.

15

Dated:  July 31, 2023                                    /s/ Mark R. Conrad

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

**CONRAD | METLITZKY | KANE LLP**
Mark R. Conrad (CA Bar No. 255667)
Liz Kim (CA Bar No. 295277)
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone:  (415) 343-7100
Facsimile:  (415) 343-7101
mconrad@conmetkane.com
lkim@conmetkane.com

*Attorneys for the Robinhood Defendants*


                                    /s/ Alexander K. Talarides

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

James N. Kramer
Alexander K. Talarides
405 Howard Street
San Francisco, California 94105
Telephone: (415) 773-5700
Facsimile:  (415) 773-5759
Email:      jkramer@orrick.com
            atalarides@orrick.com

- and -

Darrell S. Cafasso (*Admitted Pro Hac Vice*)
Jennifer Keighley (*Admitted Pro Hac Vice*)
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Facsimile:  (212) 506-5151
Email:      dcafasso@orrick.com
            jkeighley@orrick.com

*Attorneys for the Underwriter Defendants*

16

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.


Dated:  July 31, 2023                                          */s/ Liz Kim*
                                                                           Liz Kim
                                                                (CA Bar No. 295277)

17