**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen

PHILIP GOLUBOWSKI,            )
                              )
          Plaintiff,          )
                              )
   VS.                        )   **NO. 21-cv-09767 EMC**
                              )
ROBINHOOD MARKETS, INC., et   )
al.,                          )
                              )
          Defendants.         )
_____)

San Francisco, California
Tuesday, November 21, 2023

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM:**

For Movants:  Sodhas

                    SCOTT & SCOTT
                    The Helmsley Building
                    230 Park Avenue, 17th Floor
                    New York, NY 10169
              BY:   **DEBORAH CLARK-WEINTRAUB**
                    **ATTORNEY AT LAW**

For Robinhood Defendants:

                    CRAVATH, SWAINE & MOORE, LLP
                    825 Eighth Ave.
                    New York, NY 10019-7475
              BY:   **KEVIN J. ORSINI**
                    **ANTHONY L. RYAN**
                    **ATTORNEYS AT LAW**

REPORTED BY:  Rhonda L. Aquilina, RMR, CRR, CRC
              CSR No. 9956, Official United States Reporter

**APPEARANCES cont'.d**

For Robinhood Defendants:

                      CONRAD, METLITZKY, KANE, LLP
                      Four Embarcadero Center, Suite 1400
                      San Francisco, CA 94111
           BY:  **ELIZABETH ANN KIM**
                      **ATTORNEY AT LAW**

For underwriter defendants:

                      ORRICK, HERRINGTON & SUTCLIFFE LLP
                      The Orrick Building
                      405 Howard Street
                      San Francisco, California  94105
           BY:  **JAMES NEIL KRAMER**
                      **ATTORNEY AT LAW**

Tuesday - November 21, 2023                                   9:22 a.m.

P R O C E E D I N G S

---o0o---

THE CLERK:  The Court will now be hearing the case Golubowski versus Robinhood Markets, Inc. et al, case number 21-9767.

Counsel, please state your appearance for the record, beginning with the plaintiff.

MS. WEINTRAUB:  Deborah Clark-Weintraub from Scott & Scott for the plaintiff.

THE COURT:  All right.  Thank you, Ms. Weintraub.

MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini and Anthony Ryan from Cravath, Swaine & Moore for the Robinhood defendants.

THE COURT:  All right.  Thank you, Mr. Orsini.

MS. KIM:  Good morning, Your Honor.  Liz Kim of Conrad, Metlitzky, Kane on behalf of the Robinhood defendants.

THE COURT:  All right.  Thank you, Ms. Kim.

MR. KRAMER:  And good morning, Your Honor.  Jim Kramer from Orrick, Herrington & Sutcliffe on behalf of the underwriter defendants.

THE COURT:  All right.  Thank you, Mr. Kramer.

All right.  So what's new is the question here that might change the outcome from the last order I issued.  And as I stated before, to the extent that the case is about failure to

disclose historically extraordinary information that warranted an out-of-quarter disclosure, the question is whether or not these new allegations or additional allegations reach that level.

And there are new allegations about, for instance, the MAO having been back-to-back months, which was at least unprecedented that the equities and options trading fell significantly and that the cryptocurrency trading volume decreased, exceeded that in the industry, and therefore there are sort of multiple financial indicators that are -- would arguably indicate such an alarming or extraordinary circumstance that warranted the out-of-quarter reporting.

Is that a fair summation or maybe I should ask Ms. Weintraub to tell me if I missed something here.

**MS. WEINTRAUB:** Yes, Your Honor. I mean, there's a few more things, but those were the main additional items that we added to the Second Amended Complaint in order to give the contextual framework that we believed Your Honor's order sought, so those by and large are the main items.

**THE COURT:** Okay. Thank you.

So I think the comeback to that -- and I want you to respond -- if you look at it in the larger context that, yeah, these are big trends, but they are coming from this big spike, you know, based on the meme trading and the extraordinary, you know, the sales or activity with respect to crypto.

And then if you look at it in a larger context, go back to 2020, for instance, you see that the numbers are not that far out of whack.  They're not historically, in a broader sense, that extraordinary.

So the PFOF for Q2 was one-and-a-half percent less than what it was for Q4 of 2020.

The equities-only trading revenue for Q2 at 52 million was not out of range, which in 2020 spanned from 31.6 million to 80 million.

And then if you'll look at some of the key performance indicators, it was actually an increase in NAU and AUC compared to the first quarter of 2021.

So although there was this huge drop, if you kind of narrow that snapshot in time, if you broaden that snapshot the counterargument is that it's not that far out of whack.

And so I'd like you to respond to that.  Why doesn't that sort of indicate that this was not that extraordinary, that what was extraordinary was the blip before the decline and not the decline itself.

**MS. WEINTRAUB:**  Well, I think, Your Honor, that argument is predicated on the notion that this offering warned investors not to rely on what went on in the first and second quarters of 2021.  That's certainly not the case.

The performance metrics for those periods -- well, for the first quarter was included in the prospectus.  There were

estimated results provided in the -- for the second quarter of 2021, although we argue that those were misleading given what they omitted.

And, you know, the notion that somehow Robinhood went to market with this $2 billion offering in 2021 portraying itself as a growth company but telling the market they weren't going to grow any more than they had in 2020 is just fanciful, Your Honor.  I mean, that's not how it played out in the market.

If you look at how securities analysts, what their consensus estimates were for Q3 2021, they certainly weren't based upon what was stated in the prospectus and what they knew about what had happened with the meme stock events and Dogecoin, predicting that Robinhood would have had revenues that matched what they had or in the range of what they had in 2020.  Indeed, the consensus estimates for Q3 were over $400 million in revenue, so somewhere between what had occurred in Q2 2021 and Q1 2021.

So the -- it's clear that the people who are reading this prospectus and evaluating Robinhood in the market were not looking for revenue in the 2020 range.

And also with respect to the equities trading, you know, the equities trading revenue in Q2 2021 was $52 million.  That was the lowest amount of revenue from equities trading that Robinhood had achieved since Q1 2020.  Thereafter, you know, throughout 2020 equities trading revenue was increasing and was

$80 million in the 4th quarter of -- the 4th quarter of 2020. So the notion that somehow the 52 million was one-and-a-half percent off, you know, what it had been at the end of to 2020 is just not accurate.

THE COURT: All right. Let me hear the response to that. There's going to be questions about whether or not, you know, the investing public would have known about the peak that was caused by the meme trading and Dogecoin and could not have reasonably expected that those factors which fed into the '21 numbers were going to continue.

But let me hear what the response is to the argument that Robinhood basically portrayed a high-growth projection, and that to use 2020 as a performance -- as a performance indicator is misleading.

MR. ORSINI: Yes. Thank you, Your Honor. Good morning. Kevin Orsini from Cravath for the Robinhood defendants.

So, Your Honor, I think the reality is that if you look at the disclosures themselves, there is nothing that plaintiffs can point to that Robinhood disclosed that was rendered misleading by these alleged omissions. Remember, that's the issue here, right? As the Court summarized in the prior order, the disclosures that they want intra quarter would only be disclosable if it rendered something we said misleading.

And the fundamental theory is that we were portraying to

investors some unbridled growth rate that in reality we knew would not continue, and, therefore, investors expected this growth rate to continue going forward, and they ended up getting a very different company.  And, Your Honor, that's just simply not true, and it's not sustainable based upon what we actually disclosed.

If you step back for a second, recall that the primary complaint here is we didn't disclose key performance indicators.  And if you actually look at the prospectus, the very first substantive page of the prospectus, which is on -- it's docket 78-2, page 15, the first substantive figures we disclose are a series of what Robinhood called "Key Figures," and those key figures include all of these performance indicators that plaintiff say are so critical.

And, for example, it discloses net cumulative funded accounts of 18 million.  It discloses MAU of 17.7 --

THE COURT:  Do you want to share screen, so we can all see that?  That might make sense.

MR. ORSINI:  Oh, boy.

THE COURT:  Or is that too big of a task to --

MR. ORSINI:  No, no, no, I know how to do that.  If you'll give me one moment, Your Honor, I can actually pull up the electronic version of this.

THE COURT:  Yeah, that way we can all sort of see what you're talking -- be all literally on the same page here.

PROCEEDINGS

**MR. ORSINI:** This is -- now you're really testing me, Your Honor.

**THE COURT:** Okay.

**MR. ORSINI:** Bear with me one second. I'm just pulling up the PDF, Your Honor.

Here we go. Okay. Now, let me see if I can share screen here. Share screen.

Are you able to see my screen, Your Honor?

**THE COURT:** Yep.

**MR. ORSINI:** Okay. So this is Exhibit 2 to my declaration that we filed in connection with the motion to dismiss, the motion to dismiss the amended complaint. And so this is the prospectus, and you see it's a bunch of sort of pretty graphics and advertising.

**THE COURT:** You might want to hit the enlarge, the full page button up there at the right there.

**MR. ORSINI:** Yes, I'm happy to do that. Is that better?

**THE COURT:** Yeah, better. Thank you.

**MR. ORSINI:** So this is the first substantive page of the prospectus, Key Numbers. And you see here NCFA, MAU, AUC.

**THE COURT:** Yeah.

**MR. ORISINI:** This is the first thing we say to investors about what they ought to be expecting from our business. Remember the Q2 figures were still preliminary.

And the plaintiffs allege that the truth became known to the investing marketplace in the third quarter, which was the first full quarter after the IPO, and it was at that point that the bottom fell out, and it really undermined the notion that there was going to be continued growth.

But, in fact, Your Honor, if you look at what actually was disclosed in Q3, which I can also pull up here, Your Honor, if you just give me one second, you'll see --

THE COURT:  So these are Q1?

MR. ORSINI:  These are as of March -- the month ended March, so for some of them they're the March figures themselves, for others they are the cumulative effect of Q1.

And so just to put it in context, Your Honor, this would be after the short-squeeze bubble had already peaked and burst. That was in the end of January, very beginning of February, and it's before the real runup on crypto and the Dogecoin fad that started shortly thereafter and then burst about two months into the second quarter.

And so if you look at this, you see the numbers are 18, 17.7, and 81 billion.

And so if I then, Your Honor -- I'm just going to minimize this.  If we go to -- if we go to our 10Q, this is Exhibit 4 to my declaration, Your Honor, just to show the Court and everybody else, Exhibit 4, this is our form 10Q for the third quarter.  I can maximize this.

Can you see that, Your Honor?

**THE COURT:**  Yeah, that's better.

**MR. ORSINI:**  Okay.  And so if I -- let me just find the page, because I have written notes to myself.  It's on page 45.

I hope this is not making anybody dizzy.

So here, Your Honor, are the key performance metrics. This is the third quarter, first full quarter after our IPO when they say the truth that the bottom had dropped out became known.

And what you actually see, Your Honor, is that each of these key performance metrics is actually higher.  There was actually growth between Q1, the March numbers that we disclosed as the key metrics, and Q3 when they claim the bottom dropped out.

And so the only way, Your Honor, that they're able to argue that there was some sort of historically extraordinary decline during that intra quarter period immediately preceding the IPO, that is the month of June and effectively a partial month of July, is by comparing those declines:  Two bubbles, two peaks, right?  There was the Gamestop short-squeeze saga back in January.  There's now a movie about that.  It was one of the biggest media events or news events of 2021, where trading levels were black swan events that had never been seen before, and then the crypto bubble in the beginning of the

second quarter -- again, very well known to the marketplace.

And so what plaintiffs are arguing is: Well, as you were coming down from those bubbles in your preliminary results in the second quarter you were seeing a historically extraordinary decline, and you should have told the world that. But, Your Honor, that's comparing apples to oranges and, in fact, itself would have been affirmatively misleading. Because if we had disclosed what plaintiffs want, which is this decline from historic peak, it would have suggested a decline that actually didn't match if you look at times when the company was operating in the ordinary course of business in ordinary markets. It can't be that failure to disclose the specific intra quarter numbers coming off a bubble somehow means that you've misled investors. And that's particularly true here, Your Honor, because of what we did tell investors.

And so if the Court will bear with me for one second while I still have my screen share, I'll go back to the prospectus.

So if we go back to the prospectus, which again is Exhibit 2 to my declaration, Your Honor, and I go down to our preliminary results that were disclosed for Q2, what you see here, and this is on page 30, we'll start with page 30 of the prospectus. And, Your Honor, the docket is 78-3, page 52. These were the estimated preliminary results, of course preceded, as the Court noted in the Order, by forward-looking statement disclosures, and we show what we estimate Q2 will be.

By the way, we're spot-on, it was within 1 percent.

And if you look at this next page, you see that we explain what's going on in this paragraph where my little cursor is. Can you see the cursor?

**THE COURT:** Yeah, can you enlarge that?  Right now you're in a small font.

**MR. ORSINI:** I can, Your Honor, yes.  Is that better?

**THE COURT:** A little bit.  The whole screen for some reason it's very small.  There.  There you go.

**MR. ORSINI:** Okay.  Great.  So this is on page 31 of the prospectus, Your Honor.  We start off by saying what we expect to report revenue-wise for the three months ended June 30th.  We explain that this is an increase year over year.

Again, you know, throughout this prospectus we're making it clear to investors they need to compare year over year, not June -- not second quarter to first quarter, because first quarter was, by all reports, by all disclosures extraordinary and not something any reasonable investor would have expected to continue.

We say in the second sentence that the expected increase is primarily driven by this increase in NCFA and increased trading activity related to options and cryptocurrencies, and relatively flat equities trading activity relative to the prior year.

So what are we saying there?

They have this argument that we somehow weren't disclosing to investors that we were seeing a shift in mix more towards crypto and away from equities.  This sentence refutes that. And there's other issues I'll point you to, Your Honor, disclosures I'll point you to.

But what this sentence says very clearly is:  The expected increase is driven by increased trading activity related to options and cryptocurrencies and relatively flat equities.  In other words, our equity trading volume was flat in the second quarter of 2021 as compared to 2020, but crypto was going up and options are going up.

We then explain that trading activity right here, Your Honor, (indicating) was particularly high during the first two months of the 2021 period, i.e., May and June when you had the crypto bubble, returning to levels more in line with prior periods during the last few weeks of that second quarter and at similar levels into the early part of the third quarter.  So there was a bubble and it started declining at the end of the second quarter and into the third quarter, that's what we disclosed.

We then say very clearly:  Not a story of unbridled growth.  We expect the revenue for the three months ending September 30 to be lower as compared to the second quarter.  So we expect, and we're telling our investors we expect, our numbers will go down.

Now, we didn't disclose specifically what our expectations were for the third quarter of 2021.  There's no obligation to do that under the securities laws, as the Court knows.

So then if you also, Your Honor, look at what does this mean in terms of equity trading volume being roughly the same as the prior year period?

If we go to page 149 of the prospectus --

If I knew how to do this more directly I would, Your Honor, so, sorry, just bear with me.

Okay.  Page 144, actually, and let me make this bigger now.

How is that, Your Honor?

**THE COURT:**  If you could make that a little bigger.

Okay.  Good.

**MR. ORSINI:**  Yeah.  So this is page 144 of the proxy, Your Honor.  You see that we're discussing there are two different metrics here:  There's transaction-based revenues, and then there's trading volume.  Of course revenue turns on a combination, as we disclose elsewhere, of trading volume and the spread on those trades.

And what we say is:  Our daily average revenue trades for the quarter -- this is for the second quarter -- for options, equities and cryptocurrencies increased.  I'm sorry.  This is the first quarter.  This is the options numbers here (indicating) showing 188 percent increase.  This is the

equities trading volume (indicating).

So what you're seeing here is that in Q1 of 2020, we are telling our investors trading volume for equities was 1.3 million.

In Q1 of 2021, when you're having this extraordinary, unprecedented, not-expected-to-be-repeated short squeeze trading volume, it was 5.1.

And so what we're telling investors is look back at 2020. We said that above, right? Look back at 2020. Do not look at the first quarter of 2021 about equities trades, look at the prior year. And the closest data that we had at that time that was disclosed was the Q1 trading volume of 1.3 million for equities.

And ultimately you see this massive increase during the short squeeze spike. But what this is telling investors is if Q1 was 1.3, and as we say in our papers the full year of 2020 was 2.2, any reasonable expectation is that Q2 of 2020, when there wasn't a short squeeze, when there wasn't a black swan trading event would have been trading volume far below in equities what we were seeing even in the first quarter of 2020.

So we're pointing the investors back to the prior years, because, Your Honor, that's what makes sense. You don't compare where you are to unprecedented spikes that are never expected to continue.

Certainly the alleged failure to disclose the exact

magnitude of the decline is not something that rendered any statement we made actually misleading.  Remember, their story is we'd tell people we'd be growing from that base.  No, we didn't.  We told them the opposite.

THE COURT:  All right.  Thank you.  That's helpful.

MR. ORSINI:  May I make one more -- can I just share one more point, Your Honor?

THE COURT:  Quickly, because I need to move on.  I want to hear --

MR. ORSINI:  With respect to crypto, if we go to page 79, and this relates to their mix argument, if we go to page 79 of the prospectus -- these are in the risk factors which Your Honor cited.  I missed it.  Here we go, page 79 on crypto, these are the risk factors.  And what you see is, again, a disclosure about growth.

Can you see this, Your Honor?

THE COURT:  Yeah.

MR. ORSINI:  We are showing right here Q1, which of course is before the real crypto bubble itself as the whole world knew when we disclosed.  Q1:  17 percent of total revenue was crypto compared to 4 percent from the three months ended December 2020.

So they say investors couldn't have known about this spike.  We showed them here a significant spike in the crypto revenue as in the first quarter which preceded, preceded the

massive bubble where we've already disclosed they then reached record highs in crypto trading volume, Your Honor.

So I think for all these reasons the notion that there was some historically extraordinary decline is simply showing that there was a reversion from peaks that were themselves historically extraordinary, which we explained to investors.

And so I'll stop sharing now, Your Honor.

THE COURT:  All right.  Thank you.  If you could take that back and let me hear from Ms. Weintraub.

You have that plus the fact that the drivers were obviously public, the home meme trading, the Doge currency, and all that sort of stuff.  I mean, those were no secret what was going on in the market.

So, again, when you look at the order of context, how do we find kind of extraordinary indicators that would warrant out-of-quarter reporting?

MS. WEINTRAUB:  Your Honor, may I go back to the beginning of what Mr. Orsini was saying about the KPIs to begin with?

THE COURT:  Yeah.

MS. WEINTRAUB:  He put up the page, and I apologize I'm not as technically facile as Mr. Orsini so I can't put it up myself, but he began by putting up I think it was page 13 of the prospectus, which was the KPIs for Q1 2021.  Of course the registration statement of the prospectus also contained

estimated KPIs for Q2 2021.  And if you compare those KPIs, or at least the ones they chose to disclose, which were net cumulative funded accounts, monthly active users and assets under custody, you'll see that the Q3 numbers declined from the Q2 numbers reported in the prospectus.

That's the first point I want to make about the KPIs.

The second point I want to make is that the defendants, Robinhood, chose not to disclose an estimated KPI for ARPU, you know, average revenue per user, for the second quarter.  Even though they had done so for every other period discussed in this prospectus, they decided to exclude past average revenue per user or an estimate for that for the second quarter.  And the reason why is because the numbers were going down, and if they had disclosed that, investors would have seen that.

So as alleged in the complaint, ARPU was increasing prior to the offering, right?  And this was back before any of these events occurred.  It was $101.90 in Q3 2020.  It went up to $106.47 in Q4 2020, and then it was $137 in Q1 2021.

In Q2 2021, the quarter they chose to omit from the prospectus, ARPU was $111.70, so a significant decline.

And of course in the third quarter, Q3, it was $65.  $65.  So --

**THE COURT:**  Let me ask you, the Q2 is not out of line compared to the two numbers you just gave me for Q3, Q4 of 2020.

**MS. WEINTRAUB:**  But, Your Honor, it's a downward -- it's a downward movement, and the revenue --

**THE COURT:**  Downward movement, I don't know if that's a downward trend, is it, so extraordinary that it has to be -- remember, that's the test.  It's not everything.  It's got to be that warrants.  It's a trend, but that shows a big peak.  It went up from 106 to 137 from Q4 to Q1 and then down to 111 in Q2.  I don't know if you could say that's a trend.  If anything, it shows Q1 looks like a blip.

**MS. WEINTRAUB:**  But, Your Honor, it's also going down into Q3, and they knew that because they knew what was happening to the revenue.  Don't forget the equities revenue for the second quarter, this is the quarter before the offering, that quarter was done.  Even though the official financial statements weren't issued yet, that quarter was done 28 days before this offering.  They knew that the equities revenue was down substantially, substantially even from the pre-- the pre-2021 levels.

In Q2 2020, which Mr. Orsini is arguing you should compare the numbers to the prior quarter for the prior -- for that quarter for the prior year, Q2 2020 equities revenue was $70.6 million, and Q2 2021 is $52 million.  That's a substantial decline, and it's significant that the defendants didn't disclose this anywhere in the prospectus.

For every other financial period they talked about in that

prospectus they disclosed the breakdown of the transaction-based revenue by the type of trade, and they didn't do that with respect to Q2.  Why?  Because it would have shown this enormous decline, this cratering of revenue from equities trade, and the overreliance of Robinhood at this point on cryptocurrency trading for generating revenue.

In the prospectus, they gave these figures for the cryptocurrency and Dogecoin issues.

**THE COURT:**  All right.  Let me get a quick response from Mr. Orsini on the average revenue per user that there was not only a drop, it wasn't reported for Q2, but by the time of the IPO it was evident that there was more than just a one-quarter blip, that it was really dropping very quickly and on a more sustained basis.

**MR. ORSINI:**  So, Your Honor, average revenue per user is obviously an accounting convention, and the accounting results weren't finalized yet, as counsel just admitted.  We didn't yet have our audited financial statements, and so we therefore didn't have the ARPU in a reliable fashion that could be disclosed, unlike the other metrics which are not revenue-based and are therefore not accounting based.

And ultimately, again, I ask:  What is it that that alleged non-disclosure rendered misleading in the financial statements?  Ms. Weintraub's argument continues to be, well, there's other information we could have disclosed, but it

didn't render anything misleading.

And on the equities revenue point, Your Honor, as we set forth in our brief, the $52 million-dollar number that was for Q2 is right in the range of what we saw from the preceding year, which was 30ish million dollars for the first quarter of 2020, and over the course of the year averaged 60.

And of course, Your Honor, revenue is going to fluctuate based upon the stock market fluctuations.  Because, as I said before, equity revenue is driven by two metrics:  It's driven by trading volume, which we told the world was flat as between Q2 2021 and Q2 2020, and the spread on the transactions that were occurring in equities, and that's something that's going to go up and down and fluctuate based upon the market, as we explained extensively in our risk factors, Your Honor.

**THE COURT:**  All right.  So you're saying that with respect to the average revenue per user, that was something that could not have been reported as opposed to chose not to be reported?

**MR. ORSINI:**  It was something that was a revenue-based figure, and therefore you need the audited financials for, and that is ultimately I think the reason it wasn't disclosed. It's not some pernicious decision, as Ms. Weintraub is suggesting.

And, again, Your Honor, even if it had been disclosed, we also disclosed elsewhere what is average revenue per user?

Average revenue per user is how much we're making per person on our platform.

We disclosed elsewhere in the prospectus that we had a very significant number of new signups during the first quarter of the year in particular, and that we could not project that our new customers, who were new to the platform, would have the same trading patterns as our preexisting customers. And, again, this is all in the context of a massive short squeeze in the first quarter that brought, through social media attention and otherwise, millions of people into the marketplace and onto our platform.

THE COURT: Where was the disclosure about a lot of new signups and not being able to --

MR. ORSINI: I'll find that pin cite for you, Your Honor. I can give it to you before we finish.

MS. WEINTRAUB: Your Honor, can I respond about the average revenue per user?

THE COURT: Yeah.

MS. WEINTRAUB: The company managed to give an estimate of revenue for the second quarter of 2021, without audited financial statements. So it's unclear to me why they couldn't have given an estimate of average revenue per user on that basis.

And when the briefs came in, the only reason defendants gave for not putting average revenue per user for the second

**PROCEEDINGS**

quarter in their prospectus was that investors could just figure it out for themselves.

So, Your Honor, I would submit that there was no need to get the audited --

THE COURT: Well, let me ask you still, still, the cases you rely upon are cases where there's a trend, there are multiple indicators that indicate -- and here you've selected one that you allege is suspect because that's the one downward one that they didn't disclose, but that's just one.

MS. WEINTRAUB: No, Your Honor, that isn't just one, respectfully. I mean, we just talked about the revenue from equities trading. That was another one that was on a downward --

THE COURT: No, the question is whether there was a trend, whether there was a trend there sufficiently extraordinary, not just a downward, but one not attributable to what the other side says was a one-time bubble.

MS. WEINTRAUB: Your Honor, nowhere in this prospectus did Robinhood say don't pay any attention to our first and second quarter results. This is a one-time bubble, beware, we're going back to 2020 revenue levels.

THE COURT: Well, they didn't say those words, but there's some disclosures that indicate that, and it was -- it seems to me it's common knowledge among investors that there were some things on there, like the meme trading.

**UNITED STATES COURT REPORTERS**

**MS. WEINTRAUB:**  Yes, yes, Your Honor, but securities analysts, who are pretty sophisticated at reading offering documents, who were aware of the meme stock events and were aware of the Dogecoin issues, nevertheless did not give a consensus estimate of $200 million for revenue for Q3.  They gave a consensus revenue estimate of over $430 million.

The reason that -- the reason Robinhood put this topline revenue number of over $560 million in this prospectus was in order to juice this offering.  This offering would not have gone to market or it wouldn't have gone to market at this price if investors had been apprized that this company was seeing a 2-month downward movement in cryptocurrency volume, which by then they were so dependent on.

Mr. Orsini cited the Q1 -- the disclosures in this prospectus with respect to how much cryptocurrency trading revenue, what percentage of the revenue that was for Q1 2021. Those numbers changed dramatically, Your Honor.

**THE COURT:**  Well, they changed dramatically because of what happened right after that in terms of the explosion, at least the short-term explosion in cryptocurrency trading.

Oh, I think she froze there.

Well, Mr. Orsini, why don't you respond to the fact that the analysts appear to have overshot based on the information; isn't that an indicator of something material happening here and not less than full disclosure?

**MR. ORSINI:** I don't believe so, Your Honor. Those consensus estimates came out, you know, well after the IPO.

Should I stop, Your Honor, it looks like we just lost Ms. Weintraub.

**THE COURT:** Oh, yeah, let's see if she can get back on.

**MR. ORSINI:** I found the other site as well, but I'll also wait til she comes back, Your Honor.

**THE COURT:** All right.

**THE CLERK:** I'm promoting her back in now, Your Honor.

**THE COURT:** Okay. Thank you.

**THE CLERK:** You're welcome.

**MS. WEINTRAUB:** Apologies, Your Honor. I'm not sure what happened.

**THE COURT:** All right. Yeah, I think you just froze out there. You were talking about --

**MS. WEINTRAUB:** Yes, Your Honor, I was talking about the cryptocurrency, reliance on cryptocurrency in the second quarter.

And let me just step back for a minute, Your Honor, because, yes, everybody knew that these events were occurring in the market. But, again, investors, all investors knew about Robinhood's reliance on cryptocurrency trading revenue. And revenue from the trading of Dogecoin in particular was what was told to them in the prospectus, and what was told to them was

the situation in Q1 2021.  By Q2 2021, that had changed dramatically.  As a percentage of total revenue, cryptocurrency trading revenue was 17 percent in Q1 2021.  That number had risen to 41 percent in Q2 2021.

And with respect to Dogecoin in particular, in Q1 2021, Dogecoin accounted for 34 percent of Robinhood's cryptocurrency trading revenue.  By Q2, it accounted for 61 percent.  The majority of Robinhood of cryptocurrency trading revenue was coming from Dogecoin in Q2.  Investors had no way of knowing that, and they had -- even though they knew these things were going on in the market, the only -- the only thing they could take into account in evaluating how were these events impacting Robinhood was how important were they to Robinhood.  And they knew how important they were in Robinhood in Q1, but they didn't know how enormously more important they were to Robinhood in Q2, and that's because Robinhood didn't disclose it, deliberately.

**THE COURT:**  Was this unusual that Dogecoin would constitute in that same quarter for anyone else doing this kind of brokerage or trading, that Dogecoin would rise in terms of percentage of revenue it was responsible for?  That wasn't unique to Robinhood, was it?

**MS. WEINTRAUB:**  Well, I don't know, Your Honor.  It depends on what the customers of any particular company are doing.

But, again, investors had no way of knowing that Dogecoin had become so, so vital to the cryptocurrency trading revenue, and in particular they didn't know it -- at the same time they didn't know that revenue from equities trading was coming down. This was information that for every other period, financial period in the prospectus, the company had disclosed.  They disclosed revenue by type of trading so that you would show the mix, where is the revenue coming from, but they didn't.

The only financial period for which they didn't make that disclosure in the prospectus was Q2, because they knew if they did the investors would see that the company's revenue had become much, much more volatile.  Equities trading was down, options trading revenue was down, and cryptocurrency trading activity was declining at a time when the company was dependent on cryptocurrency trading for 41 percent of its revenue.  This was material information, Your Honor, that was omitted, but required to be disclosed in order to make the statement that Robinhood made regarding Q2 2021 estimated revenues not misleading.

Just disclosing the topline number, everybody thought things were going gangbuster.  But if you look at the under-the-hood number, there were very serious adverse trends.

**THE COURT:**  All right.  I'm going to give you the last word, Mr. Orsini.  I'd like you to address, number 1, sort of the idea that it was not -- since revenues were estimable, why

not the average revenue per user, and even about the audited statement, what about the analyst, consensus analyst, doesn't that indicate something misleading here?

And then finally, with respect to the lack of information about the mix and how the Dogecoin situation perhaps was unique to Robinhood that it should have been disclosed.

**MR. ORSINI:** So working backwards, Your Honor, Ms. Weintraub said there's no way investors could have known how much we were relying on Dogecoin, that's absolutely false.

If you look at page 79 of the prospectus, which is on page 103 of document 78-2, we say specifically, and this is the same paragraph I was showing Your Honor earlier: While we currently support a portfolio of 7 cryptocurrencies, I'm going to paraphrase, for the first quarter, 34 percent of our crypto transaction revenue was attributable to Dogecoin as compared to 4 percent in the 4th quarter of 2020. That is before the Dogecoin fad even spikes, as anybody who is paying attention knew.

So Ms. Weintraub is just simply wrong when she says we didn't tell people that we were highly relying on Dogecoin, point number 1.

Point number 2, Your Honor, going back to the beginning, ARPU, could we have provided a range of estimates for ARPU without the audited financial statements? Possibly. But the ultimate point is we couldn't be sure what that number was

because it was an accounting revenue-based convention before the audited financial statements were done.

But, again, Your Honor, stepping back, Ms. Weintraub is right, that there were details about Q2 we didn't disclose, and that was the only period for which we didn't disclose it. Why? Because the Court held in its prior Order we weren't obligated to. It was an out-of-cycle disclosure unless it rendered something misleading, which could only be the case under Your Honor's rubric if it was extraordinarily historically extraordinary. That's an extra "extraordinary." And the reality is, Your Honor, for all of the reasons I've said, it's just not there.

And with respect to the consensus estimates, some of them were before the IPO, some of them were after. The reality was this was an incredibly volatile marketplace at the time. We were still seeing the decline of the crypto bubble. And ultimately that's part of the reason the company didn't give forward-looking guidance for Q3, and that even with respect to Q2, it explained that that guidance was something that needed to be taken with some caution because it was forward-looking.

So the fact that the consensus estimate was missed, maybe ultimately that could go to a materiality question, if there's something that was itself misleading, but Ms. Weintraub has not identified and could not identify anything that was misleading.

And the final point, Your Honor, Ms. Weintraub said we put

the big number out there, the headline number for Q2 out there so we could tell everybody things were going gangbuster. Then why did we say immediately after that the revenue would go down in the following year? We disclosed Q2 estimates because that's what you do in these types of documents, but we said they were estimates.

And my final point, Your Honor, is simply to go back to -- give you the pin cite for the point about the new customers. I can share my screen if you want or I can just tell you where it is, whichever you --

THE COURT: Why don't you just tell me where it is.

MR. ORSINI: It's actually on the same page, page 31 of the prospectus, which was docket 97-4. No, that's not right.

Yeah, it's page 31 of the prospectus, Your Honor.

THE COURT: Okay.

MR. ORSINI: Where we say in the last paragraph on the page that the increase in the key performance metrics we noted resulted primarily in an increase of new users joining our platform because of general market interest. And then there's a carryover paragraph at the bottom of 31 into 32 that makes the point I made before, Your Honor, that we saw strong growth during the first 6 months in new customers, but we don't know over the long term how they will perform.

So, Your Honor, just in sum, especially given the rubric

PROCEEDINGS

the Court set out in the prior order, there was nothing historically extraordinary about any declines during the end of the second quarter without which our disclosures would be rendered misleading.  It was simply a reversion to the meme from the bubble.  It's the opposite of the scenario of *In Re Apple* which the Court cited where someone was touting a bubble driven by throttling as indicative of future performance.  We did the opposite here, Your Honor.

THE COURT:  All right.  Thank you.

I will take the matter under submission.  Thank you, counsel.

MR. ORSINI:  Thank you, Your Honor.  Have a great Thanksgiving.

THE COURT:  You too.

(proceedings adjourned at 10:10 a.m.)

---oOo---

UNITED STATES COURT REPORTERS

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, November 30, 2023

_____

Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter