UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PHILIP GOLUBOWSKI, | Case No.  21-cv-09767-EMC   (EMC) |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| ROBINHOOD MARKETS, INC., et al., | |
| Defendants. | Docket No. 97 |

Plaintiffs Amee Sodha and Vinod Sodha ("Plaintiffs") filed suit against Defendants Robinhood Markets, Inc. ("Robinhood" or "the Company"), certain senior executives and directors of Robinhood (Vladimir Tenev, Jason Warnick, Baiju Bhatt, Jan Hammer, Paula Loop, Jonathan Rubenstein, Scott Sandell, and Robert Zoellick), and the underwriters (Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Wells Fargo Securities, LLC, Mizuho Securities USA LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., Piper Sandler & Co., Rosenblatt Securities Inc., BMO Capital Markets Corp., BTIG, LLC, Santander Investment Securities Inc., Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc. and Siebert Williams Shank & Co., LLC).  Docket No. 75 ("FAC").  Plaintiffs assert claims under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") alleging that the registration statement and prospectus for Robinhood's July 30, 2021, initial public offering ("IPO") made false and misleading statements and omissions.  The Court previously granted Robinhood's Motion to Dismiss Plaintiffs' First Amended Complaint, with leave to amend.  Docket No. 90.  Now pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Second

United States District Court
Northern District of California

Amended Complaint.  Docket No. 97 ("MTD").

For the following reasons, the Court **GRANTS** Defendants' Motion to Dismiss **WITHOUT LEAVE TO AMEND.**

## I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      Overview

1.      Robinhood

Robinhood is a financial services company headquartered in Menlo Park, California. Docket No. 92 ("SAC") ¶ 2.  The company provides a trading platform wherein its customers engage with the financial markets through an application and user interface.  SAC ¶¶ 2, 53. Robinhood's primary customer base is retail investors, many of whom are first-time investors.  *Id.* ¶ 53.  Namely, Robinhood's core product offerings include ability to trade in United States Stocks and Exchange Traded Funds ("EFTs") and American Depository Receipts ("ADRS") and to trade cryptocurrencies.  *Id.*  Robinhood is a commission-free broker that earns revenue through a "payment for order flow" ("PFOF") practice, where it primarily earns revenue by routing customer transactions on its app to market makers in exchange for payments.  *Id.* ¶ 54.  For cryptocurrency trading, the consideration Robinhood earns is called "Transaction Rebates."  *Id.*  Collectively, these earnings are referred to as "transaction-based revenue."  *Id.*  Transaction-based revenue accounted for the majority of Robinhood's revenue (75% in FY 2020 and 80.5% in January through March (Q1) 2021).  *Id.*

2.      Robinhood's IPO

On July 30, 2021, Robinhood conducted an initial public offering ("IPO") and offered 55 million shares of common stock to the public at a price of $38 per share for proceeds of over $2 billion.  SAC ¶ 3.  Prior to the IPO, Robinhood released the Registration Statement and Prospectus (collectively, the "Offering Documents").  SAC ¶ 1; MTD, Ex. 1 (Registration Statement); Ex. 2 (Prospectus).  Plaintiffs allege that the Offering Documents contained materially false and misleading statements and omitted material information that was required by law to be disclosed in violation of §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") and Items 105 and

1   303 of applicable SEC Regulations (Reg. S-K).  SAC ¶¶ 1, 131-32 .

2         3.      The meme stock and Dogecoin events

3         Robinhood's IPO came on the heels of a series of events in early 2021 that have come to

4   be publicly known as the "meme stock" and "Dogecoin" events.  Specifically, from mid-January

5   to early February, the prices of GameStop Corp. ("GME"), AMC Entertainment Holdings, Inc.

6   ("AMC") and certain other stocks skyrocketed. SAC ¶ 72.  The frenzy took off in part because of

7   retail investors banding together in places like Reddit (under the subreddit r/WallStreetBets), to

8   squeeze short-sellers who had bet against these companies.  *Id.*  To illustrate the extent of this

9   event, the stock of AMC jumped 300% on one day alone, and Bed Bath & Beyond's shares rose

10   43% the same day.  *Id.* ¶ 75.  The price of GME also skyrocketed.



19   *Id.*

20         Plaintiffs allege that the meme stock event ended, and the stocks "fell from their

21   unprecedented January highs," and trading volume declined below "extraordinary levels" seen

22   during the event.  *Id.* ¶ 77.  By the time the meme stock event waned, the company began seeing a

23   huge pick up in the trading of a cryptocurrency, the Dogecoin.  *Id.* ¶ 79.  Specifically, the price of

24   Dogecoin skyrocketed in April after it gained "cult status" on Reddit's WallStreetBets message

25   board.  *Id.* ¶¶ 79-80.  The spike lasted from January to May 2021, wherein Robinhood experienced

26   a large increase in cryptocurrency trading on the platform, increasing its revenue from trading of

27   the currency alongside the Dogecoin event.  *Id.* ¶¶ 78-82.  To illustrate how substantial the

28

United States District Court
Northern District of California

Dogecoin event was, during that time, the value of the Dogecoin increased from half of a cent to 73 cents at its height. *Id.* ¶¶ 79, 81. All in all, Robinhood experienced a 50% quarter-over-quarter increase in revenue from equities and options trading from Q4 2020 to Q1 2021 and an increase in revenue from cryptocurrency trading from $12 million in Q4 2020 to $87.5 million during the initial stage of the Dogecoin rally. *Id.* ¶ 82. Plaintiffs describe these amounts as "all-time highs" for the company. *Id.* However, these trading volumes in "meme stocks" fell after the unprecedented highs in early Q1 as the trading craze subsided, and the large spike in cryptocurrency trading surrounding Dogecoin likewise fell throughout Q2 2021. *Id.* ¶¶ 77, 84.

B.  <u>Procedural History</u>

Plaintiffs filed their original class action complaint on December 17, 2021, under §§ 11, 12, and 15 of the Securities Act. Docket No. 1. After the lead plaintiffs were appointed, Plaintiffs filed a First Amended Complaint. Docket No. 75 ("FAC"). Plaintiffs alleged that the Offering Documents filed in connection with Robinhood's IPO contained materially false and misleading statements and material omissions. FAC ¶ 1.

On August 18, 2022, Robinhood filed a motion to dismiss the FAC. Docket No. 78 ("MTD"). Robinhood argued that none of its business strategy statements or risk factor statements were false or misleading, and that the Offering Documents accurately disclosed Robinhood's financial performance. MTD at 10–25.

The Court granted Robinhood's MTD with leave to amend. Docket No. 90. The Court determined that the Plaintiffs failed to plead a violation of Section 11 or Section 12(a) of the Securities Act. *Id.* at 8-17, 19-20. Specifically, Plaintiffs did not allege inaccuracies in the Key Performance Indicators ("KPIs") that Robinhood reported. *Id.* at 10. Plaintiffs alleged that the Defendants had access to intra-quarterly results that showed a decline in its KPIs in months leading up to the company's IPO that were inconsistent with the KPIs reported in the Offering Documents. *Id.* at 6. However, as a general matter, Defendants had no obligation to disclose incomplete intra-quarterly results (May to July 2021) because SEC regulations do not require the disclosure of interim quarterly results. *Id.* at 11 (citations omitted). Rather, disclosure would only be required where disclosing the intra-quarterly results would be "necessary to make the

United States District Court
Northern District of California

statements made, in light of the circumstances under which they were made, not misleading." *Id.*
at 11 (citations omitted). The Complaint did not "provide contextual information that would show
the [out-of-quarter] declines to be unusual and indicative of larger future trends." *Id.* at 11.
"Without historical data to show that the May to July 2021 [KPI declines] were exceptional and
out of line with past fluctuations, that data is not so extraordinary as to mandate specific out-of-
quarter disclosure." *Id.* at 12. And further, while the complaint alleged a large decline in trading
of cryptocurrency, the allegations did not show that Robinhood suffered unique declines compared
to a general trend in the industry which would have been known by the public and any reasonable
investor. *Id.*

Additionally, Robinhood disclosed future risks and downward trends of the metrics that
they published, negating liability via omission. *Id.* Namely, Robinhood warned in its Offering
Documents that historical data of KPI growth was not necessarily indicative of future
performance; in fact, Robinhood reported that it expected growth rates of KPIs to decline
significantly in future periods. *Id.* The Court also found that Plaintiffs failed to state a claim
under the Act based upon allegations that Robinhood mispresented its business strategies. The
Court reasoned that such statements are vague statements of corporate optimism which are not
actionable under the Act. *Id.* at 18.

Accordingly, the Court found that Plaintiffs failed to state a claim under §§ 11 and 12 of
the Securities Act for omitting intra-quarterly reports showing downward trends in KPIs. *Id.* at
20. The Court granted leave to amend to add allegations stating a claim, for example:

> [A]llegations of specific contextual information demonstrating that
> the decline in KPI and cryptocurrency trading levels in the two to
> three months before the filing of the Offering Documents were
> extraordinary and indicative of larger future trends known to the
> management or through which management should have known
> would have a material impact on future performance and which were
> not adequately disclosed.

*Id.*

Thus, for Plaintiffs to have successfully amended their complaint, they needed to provide
allegations giving specific contextual information demonstrating the decline in KPI and

United States District Court
Northern District of California

cryptocurrency trading levels for Robinhood specifically in the 2-3 months before the filing of the Offering Documents (May to July 2021) were extraordinary and indicative of a larger future trend sufficient to trigger out-of-quarter and intra-quarter reporting.

C.    Updated allegations in the SAC

     1.    First Amended Complaint

As described above, in Plaintiffs' (now dismissed) FAC they alleged that the company issued an IPO based upon a revolutionary strategy of focusing on young and non-traditional investors.  FAC ¶¶ 3-13.  The Registration Statement became effective on July 28, 2021, and the company's IPO was priced at $38, and the final Prospectus for the IPO was filed on July 30, 2021 (the "Offering Documents").  FAC ¶¶ 88-91.  Plaintiffs alleged that the company represented in the Offering Documents that it would focus on safety and reliability, needs of small investors, and radical feedback.  *Id.* ¶¶ 3-13, 92-128.  However, by the time the company issued its IPO, Plaintiffs alleged it had abandoned those principles and was failing to cater to the needs of its investors as shown in its security issues, failure to react to customer feedback, issues with fraud, and disruption to its platforms.  *Id.* This failure in strategy, Plaintiffs argue, was reflected in Robinhood's data, *i.e.*, its declining KPI metrics from May to July 2021, in contrast to its steadily positive KPIs in the year prior.  *Id.* ¶¶ 5-8, 129-139.  Those KPIs were omitted from the Offering Documents.  *Id.*

Namely, the FAC alleged that the Offering Documents reported positive KPIs from December 31, 2019, through December 31, 2020.  FAC ¶¶ 5-8.  Specifically, Robinhood's Monthly Active Users ("MAU") steadily increased.  *Id.* ¶ 5.  As did its total revenue, assets under custody ("AUC") and net cumulative funded accounts.  FAC ¶¶ 6-8.  However, in the few months from May 2021 to July 2021, just before the IPO, these metrics started declining.  Specifically:

- MAU declined by 4.6 million users between May 2021 and July 2021 (a 19% decline), FAC ¶ 129;  (11.62% between May and June and 8.45% between June and July 2021).
- Total cryptocurrency trading volume declined by $97 billion in from May to June 2021 (a 76% decline) and $17 billion in July 2021 (an additional 56.67% decline), FAC ¶ 131–32.
- AUC declined by $7.3 billion from June 2021 to July 2021 (a 7% decline), FAC ¶ 135.

- ARPU (average revenues per user) declined from $137 to $65 between March 2021 and September 2021 (a 53% decline), FAC ¶ 134.  The Court notes that September 2021 is beyond the effective date of the Offering Documents.

Plaintiffs alleged that Robinhood had the ability to analyze its performance data immediately through the data platform Looker and that executives discussed the declining performance at the weekly all-hands meetings.  FAC ¶¶ 12–13, 87, 108, 118–19.  However, Robinhood did not disclose this data in its Offering Documents which included its company strategy that had since been abandoned, rendering the Offering Documents misleading.

       2.    <u>Second Amended Complaint</u>

In Plaintiffs' Second Amended Complaint, they allege that Robinhood's Offering Documents were misleading because they misrepresented the company's state of affairs as it existed at the time of the IPO.  SAC ¶¶ 1–10.  Namely, Robinhood allegedly represented the company was successfully executing a strategy of making investing available to an untapped market of small and non-traditional investors.  *Id.* ¶¶ 1–7.  To this end, Robinhood included historical performance data in its Offering Documents to evidence that it had been driving growth and was positioned to keep on growing.  *Id.*  However, by the time of the IPO, Robinhood's "core fundamentals" allegedly changed.  *Id.* ¶ 4.  Specifically, in 2021 Robinhood's largest source of revenue "was no longer fees from its customers' conventional trading in stocks and options, as it had been previously."  SAC ¶ 108.  Rather, Robinhood's revenue shifted to being driven by "speculative, fad-trading in meme stocks and the novelty cryptocurrency Dogecoin."  *Id.*  This change in fundamentals was not viable, as was represented by its declining intra-quarterly reports. *Id.* In other words, its fundamentals changed in that: (1) Robinhood's source of revenue shifted leading up to the IPO and this was not disclosed in the Offering Documents; and (2) the negative nature of this fundamental shift was evident from data available to Defendants in real time (intra-quarterly reports) that it did not disclose.  *Id.* ¶¶ 4–6.

In this vein, Plaintiffs allege that a chart identifying historical quarterly net and transaction-based revenue from Q1 2019 through Q1 2021, and statements made about that revenue, along with a chart identifying sources of transaction-based revenue through Q1 2021 are untrue or

rendered misleading because they omitted material facts.  SAC ¶¶ 110–13, 15.  Plaintiffs also allege that tables included in the Offering Documents reflecting growth in Net Cumulative Funded Accounts (NCFA) and Monthly Active Users (MAU) from 2014 though Q1 2021 and 2017 through Q1, respectively, were rendered false or materially misleading because Robinhood's core fundamentals had changed (*i.e.*, its revenue composition changed and its KPIs were declining) and specifically because MAU, ARPU and AUC declined prior to the IPO. *Id.* ¶¶ 119, 122.  Plaintiffs also allege that statements made regarding risk factors and/or warnings were inadequate or false and misleading. *Id.* ¶¶ 127-30.  Specifically, Plaintiffs allege the following information was known to Defendants but was not included in the Offering Documents, rendering the above misleading.

a.   <u>Shift in composition of revenue</u>

Plaintiffs allege that revenue from cryptocurrency trades became the company's main source of revenue by the time of the IPO, but investors were unaware of this because there was no breakdown of revenue type for the Q2 preliminary metrics, as opposed to prior quarters.  SAC ¶ 6.  In Q1, revenue from cryptocurrency trading rose to 21% of all revenue.  *Id.*  ¶ 57.  Prior to Q1 2021, a majority of the company's revenue came from the conventional trading of stocks, equities, and options.  *Id.* ¶ 56.

b.   <u>Intra-quarterly reports regarding revenue and trading volumes and KPIs</u>

Plaintiffs allege that equities revenue and trading volume dropped significantly from Q1 to Q2.  Specifically, equities trading revenue declined 61%, when before it was one third of all transaction-based revenue.  SAC ¶ 5.  And further, equities trading volume declined 33% from June 2021 to July 2021.  *Id.*  Further, cryptocurrency revenue and trading volume dropped 90% from Q2 to the beginning of Q3.  SAC ¶¶ 6, 84.  Plaintiffs allege that as to revenue, aside from one quarter in Q4 2019, revenue mostly grew quarter-over-quarter from Q1 2019 to Q1 2021. *Id.* ¶ 55.

Plaintiffs allege that there were declines in KPIs, specifically in MAU, AUC, and ARPU, from Q2 to Q3 that were not disclosed in the Offering Documents and that these drops were "unusual" compared to historical financial information.  SAC ¶ 7. Plaintiffs also allege that each of the KPIs when viewed in conjunction with the other drops in KPIs and alongside the reduction in revenue were material.  SAC ¶¶ 7, 99, 103, 105.

United States District Court
Northern District of California

- <u>MAU (Monthly Active Users)</u>: Plaintiffs allege that MAU dropped about 19% from May to July, including an 11.65% decline from May to June and an additional 8.45% decline from June to July. SAC ¶¶ 7, 98-99. Plaintiffs allege that the MAU drops were "highly material" because the decline was "considerable" and that they were "highly unusual" because Robinhood had "rarely, if ever, experienced back-to-back months of declining MAU of similar magnitude." *Id.* ¶ 99.



- <u>AUC (Assets Under Custody)</u>, which is the sum of the fair value of equities, options, cryptocurrency and cash held by users in their accounts, had declined 7% from June to July and, aside from a bump in June, had been declining since May.  SAC ¶¶ 7, 103-104. Plaintiffs allege that this decline stood "in stark contrast to the unbroken string of rising AUC that occurred prior to July 2021." *Id.* ¶ 103.



9

- <u>ARPU</u> (Average Revenue Per User) dropped nearly 20% from Q1 to the end of Q2.  *Id.* ¶¶ 7, 100.  Although the Offering Documents provided preliminary estimates of KPIs for Q2, they did not do so for ARPU.  *Id.* ¶ 101.



- <u>NCFA (Monthly Net Cumulative Funded Accounts):</u> NCFA reflecting customer base and usage remained largely flat from May through July 2021.  *Id.* ¶¶ 7, 106.



## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the

claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### III.       DISCUSSION

A.       Section 11 and 12(a)(2) liability

Section 11 of the Securities Act ("Section 11") imposes liability on Defendants if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). "No scienter is required for liability under § 11." *In re Daou Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005). Section 12(a)(2) of the Securities Act establishes liability for persons who offer or sell securities by means of prospectuses or oral communications that include untrue or misleading statements or omissions. *See id.*; *see also Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *7 (N.D. Cal. Jan. 5, 2011). Claims under Sections 11 and 12(a)(2) of the Securities Act contain roughly parallel elements; scienter is likewise not required for liability under Section 12(a)(2) of the Act. *See Rafton*, 2011 WL 31114, at *6.

Plaintiffs' Second Amended Complaint abandons claims that Robinhood's Offering Documents were false or misleading because they misrepresented its business strategy (as alleged in the FAC). Instead, as stated above, Plaintiffs assert a new theory, arguing that the Offering

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    Documents were rendered false or misleading because (1) the pre-IPO declines in KPIs and

2    declines in sources of revenues were undisclosed and misrepresented by the Offering Documents;

3    and (2) investors were left in the dark regarding composition of the company's revenue (skewing

4    more heavily toward "fad-trading"), violating item 105 of the Act.  Opp. to MTD at 3-8.  These

5    arguments are addressed in turn below.

6         1.    KPI, revenue, and trading volume disclosures

7         Plaintiffs argue that the Offering Documents misrepresented Robinhood's financials, as

8    represented by the trading volume on the platform, revenue from trading, and key performance

9    indicators ("KPI") metrics.  Opp. to MTD at 9–15.  Specifically, they argue that while the Offering

10   Documents included data showing quarter-after-quarter growth, Defendants' omission of

11   "extraordinary and material downturns in key drivers of its revenue and KPIs in the months

12   preceding the IPO" rendered the Offering Documents misleading.  *Id.* at 13.

13        Plaintiffs do not allege that the Offering Documents include inaccurate reports of historical

14   financial data, i.e., the data reports through the first quarter of 2021.  *See generally* SAC.  As

15   explained in the Court's prior order dismissing the First Amended Complaint, "a company's

16   statements are 'inactionable' if they 'merely restate accurately reported historical information.'"

17   Docket No. 90 (quoting *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv05558,

18   2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) (cleaned up)).[1]  For example, the Offering

19   Documents accurately presented historical KPI data for 2019 and 2020 and the first quarter of

20   2021. SAC ¶ 119.  And the Offering Documents included quarterly net and transaction-based

21   revenue for 2019 through the first quarter of 2021.  *Id.*  ¶ 110.  Plaintiffs did not, and do not allege

22   falsity of the historical data.  *See generally id.*  Plaintiffs  allege, however, that this historical data

23   and statements made about future performance were rendered misleading by omission of revenue,

24   trading volume, and KPI reporting from the second and third quarter of 2021 which showed

25   _____

26   [1] The same is true for statements made that "tout" accurate financial data. *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) (internal citations and quotations

27   omitted) (rejecting the argument that a firm misrepresented when it "touted" accurate financial results without exposing the downside impacts on growth because "disclosure[s] of accurate

28   historical data accompanied by general statements of optimism and failure to disclose internal forecasts of future performance are not actionable").

declines in the business.  SAC ¶¶ 109–122.

As explained in the Court's prior order, the Securities Act requires that "a registration statement include financial statements only if they are more than 135 days old.  Further, SEC regulations give companies 45 days after the end of a quarter to report quarterly results and do not generally require the disclosure of interim quarterly results."  Docket No. 90 (Order granting Def's MTD the FAC ("MTD Order") at 11 (citing *City of Warren Police & Fire Ret. Sys. v. Natera Inc.*, 46 Cal. App. 5th 946, 954 (2020) (cleaned up)).  In other words, a company need not include a quarterly report in a registration statement unless that quarter ended less than 45 days before the IPO, and the company has additional time to submit underlying financial statements.  *See id.*

The Initial Public Offering occurred on July 30, 2021, after the Registration Statement was deemed effective on July 28, 2021.  SAC ¶¶ 3, 68.  Accordingly, Robinhood was not obligated to disclose the results of the quarter ending in June (Q2 2021) until mid-August; and the interim results for the third quarter, i.e., July (first month of Q3 2021) were also not obligated to be disclosed until mid-November.  However, an omission claim does arise when disclosure of information is "necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (internal quotations and ellipses omitted). The speaker must have "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* at 1278 (citation omitted).  To this end, and as previously explained by the Court, inclusion of such out-of-quarter or intra-quarterly reports are only rendered necessary to the extent that they reflect declines so extraordinary as to be unusual and indicative of larger future trends when viewed in context of the company's historical data.  MTD Order at 11-13 (citing *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033- YGR, 2020 WL 2857397, at *9 (N.D. Cal. June 2, 2020); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d at 773).

     a.   <u>Insufficiencies in the prior complaint</u>

Regarding the FAC, the Court found that Plaintiffs' allegations about omitted financial metrics did not satisfy the "historically extraordinary" standard.  *Id.*  The omitted information was in the wrong timeframe, did not reflect declines in several performance metrics, and, where

United States District Court
Northern District of California

declines existed, the complaint lacked sufficient context to show that the decline was extraordinary relative to the company's historical performance. *See id.* Specifically, although the FAC alleged that revenue from the entire third quarter declined relative to the previous quarter, this did not address the relevant time period—i.e., the months leading up to the filing of the Offering Documents on July 28, 2021. *Id.* As to allegations regarding revenue for the second quarter, the revenue decline from just one quarter could have been merely "seasonal or aberrational." *Id.* As to the KPIs, the allegations showed certain KPIs did not decline in the alleged period (Assets Under Custody "AUC" increased in June 2021 before decreasing in July, and Net Cumulative Funded Account "NCFA" remained flat). *Id.*

The Court recognized that Plaintiffs did include allegations showing a decline in the Monthly Active Users "MAU," Average Revenue Per User "ARPU," and crypto trading volume. *Id.* However, Plaintiffs failed to provide contextual information to show why those declines were extraordinary relative to the company's historical data, i.e., that they were indeed unusual and/or otherwise indicative of larger future trends. *Id.* (citing *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033- YGR, 2020 WL 2857397, at *9 (N.D. Cal. June 2, 2020); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d at 773)). As to the cryptocurrency trading, Plaintiffs also "fail[ed] to explain how the May to July 2021 decline in cryptocurrency trading was unique to Robinhood rather than a general trend which would have been known by the public and any reasonable investor." *Id.* All in all, the Court explained that the Plaintiffs would need to amend their complaint to show why the data was so historically extraordinary as to render an intra-quarterly disclosure necessary.

            b.    New allegations contextualizing declines

Plaintiffs argue that their amended complaint includes sufficient contextual information to show that the declines in omitted financials were "extraordinary and indicative of larger future trends known to the management" requiring disclosure. MTD Opp. at 9-12. Defendants argue that the omitted information was not extraordinary, and no such disclosure was required. *See* Reply at 13-15. The Court finds Plaintiffs fail to state a claim on this basis because much of the complaint restates allegations previously dismissed by the Court as insufficient to state a claim, and the new allegations, when viewed against the proper baseline (the pre-frenzy company

financials), do not reflect results so extraordinary as to warrant out-of-quarter disclosure.

Many of the allegations in the Second Amended Complaint are restatements of allegations already provided in the First Amended Complaint, though sometimes adding details. *See, e.g.*, SAC ¶ 100 (quantifying that the decline in ARPU previously alleged ($137 in Q1 to $111.70 in Q2), amounted to a 20% decline). The repeated allegations include: that MAU declined 19% from May to July 2021. (FAC ¶ 129; SAC ¶¶ 7, 98-99); AUC declined 7% from Q1 2021 to Q2 2021, aside from a bump in AUC in June 2021 (FAC ¶ 135; SAC ¶¶ 7, 103-104); ARPU declined nearly 20% from the first to second quarter of 2021 (FAC ¶ 134; SAC ¶¶ 7, 100); NCFA remained flat through May, June, and July 2021 (FAC ¶ 138, ¶¶ 7, 106); Cryptocurrency trading volume declined 76% in June 2021 and an additional 56.67% drop in July--90% in total.  (FAC ¶¶ 12, 131–32; SAC ¶¶ 84, 130).

Plaintiffs now add the following allegations.  Plaintiffs allege the decline in MAU was "highly unusual"[2] because Robinhood had "rarely, if ever, experienced back-to-back months of declining MAU of similar magnitude" (i.e., 11.65% and 8.45% respectively).  SAC ¶¶ 98-99. Plaintiffs also add the allegation that a 7% AUC decline from June (last month of Q2) to July (first month of Q3), aside from the one-time bump in June, stands "in stark contrast to the unbroken string of rising AUC that occurred prior to July 2021."  *Id.* ¶ 103.  Plaintiffs allege that these declines in KPIs were extraordinary and indicative of future trends when viewed in context of each other and the declines in revenue and trading volume.  SAC ¶¶ 99, 105.  Plaintiffs also allege that, in addition to the decline in revenue from crypto trading that was previously alleged, FAC ¶ 133, revenue from equities and options trading also fell from Q1 (January to March) to Q2 (April to June) by 34%. SAC ¶ 83.  Plaintiffs also add that, in addition to the fall of the cryptocurrency volume previously alleged, FAC ¶ 131, equities trading volume fell (33% decline from Q2 (April to June) to early Q3 (July to September)).  SAC ¶ 83.  Plaintiffs also add that the Robinhood

---

[2] Adding the label "highly unusual" alone does not help Plaintiffs' claim as this would be merely a conclusory allegation. *See Wilkins v. California*, No. 20-CV-1939, 2022 WL 2834291, at *1 & n.1 (N.D. Cal. July 20, 2022) (Chen, J.) (discussing the difference between conclusory and factual allegations).

United States District Court
Northern District of California

cryptocurrency trading volume decrease in June at a rate of 40% and 31.5% in July far exceeded the fall experienced by the industry as a whole which was due to a regulatory crackdown in China. SAC ¶ 86 & n.2.

These added allegations (even accepted as true) are insufficient to state a claim that the out-of-quarter reports were so extraordinary, unusual, or indicative of larger future trends as to warrant disclosure.

On the one hand, the cases that the parties cite in their briefs on this issue stand for the principle that simultaneous declines in *multiple* financial indicators could render disclosure of out-of-quarter reports necessary.  For example, in *Kapps v. Torch Offshore, Inc.* 379 F.3d 207, 219 (5th Cir. 2004), in determining that a 60% decline in gas prices did not warrant disclosure, the court found it relevant that there was no simultaneous negative impact on revenue along with the price drop—making it reasonable to view the decline as an anomaly, showing fluctuation but not a pattern of decline.  This implies that, conversely, the presence of a simultaneous revenue drop could require disclosure.  *See id.*  In *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.,* 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001), in determining that a 9% drop in income for the company was not sufficiently extreme so as to warrant disclosure, the court noted that there was no drop in any other financial indicator, suggesting there was no "known trend" to disclose.  And in *Franchi v. SmileDirectClub, Inc.,* 633 F. Supp. 3d 1046, 1069-1071 (M.D. Tenn. 2022) the court found that out-of-quarter reporting disclosure was indeed warranted where three financial metrics indicated a downward trend in the business leading up to the IPO (though the court did not explicitly state that it was the compounding nature that rendered disclosure necessary).  *See id.*  This line of cases would suggest that the decline in KPIs, trading volume, and revenue—when view collectively, could warrant disclosure.

However, the omitted data that Plaintiffs point to does not show a persistent decline in multiple financial metrics when viewed against the proper baseline.

As *Kapps* instructs*,* the declines Robinhood experienced in the second and third quarter of 2021 should be viewed not myopically, but in context of the unprecedented spike that Robinhood experienced in its business earlier that year because of the "fad-trading" events. *See* 379 F.3d at

211-13, 216, 218.  In *Kapps*, the court held that a 60% drop in the price of natural gas in the months leading up to the IPO was not so extraordinary as to require out-of-quarter disclosures. *See id.*  In determining that disclosure was not warranted, the court considered the fact that, before the drop in price from $10 to $4.50, there was a sharp increase in prices (from $2 to $10).  *Id.* at 211.  When the decline was viewed in context of the preceding sharp increase, the decline was better seen as a correction to the previous spike and not a downturn in the business.  *See id.* at 211-13.  The same is true here.  By Plaintiffs' own account, Robinhood experienced an extreme and unprecedented spike in business in early 2021 because of the meme stock and Dogecoin events.  SAC ¶¶ 4, 72-73, 76-77, 82.  Specifically, from January to February 2021 Robinhood experienced a nearly 50% increase from the previous quarter in trading revenue, resulting in part from the meteoric rise of GameStop stock, AMC stock (which, for example, jumped 300% in one day on January 27), and Bed Bath & Beyond stock.  *Id.* ¶¶ 72-77, 82.  And from January to May 2021, Robinhood experienced a spike in cryptocurrency trading on the platform, increasing its revenue from trading of the currency alongside the Dogecoin event.  *Id.* ¶¶ 78-82.  To illustrate how substantial the Dogecoin event was, during that time, the value of the Dogecoin increased from half of a cent to 73 cents at its height.  *Id.*  ¶¶ 79, 81.  And cryptocurrency revenue increased from $12 million to over $85 million.  *Id.* ¶ 82.

Accordingly, the proper question is not how financials leading up to the IPO compare to the financial metrics during the immediately preceding fad-trading spike, but how they compare to the company's historical performance, i.e., financials for a longer period.  This comparison places the prior unprecedented spike and the subsequent decline in proper context.

i.      Equities and options trading

When viewed against the pre-spike numbers, these declines are modest or non-existent.  Specifically, while revenue from equities and options trading (payment for order flow or "PFOF") fell from $331 million in Q1 2021 to $216.6 million in Q2 2021 (34.5%), the Q2 number was just 1.5% less than the PFOF revenue in Q4 2020 ($222 million).  SAC ¶ 83.  Plaintiffs have not cited, nor is the Court aware of, any case finding such a small decline to be extraordinary.  In a similar vein, the equities-only trading revenue for Q2 2021 ($52 million) fell within the range of typical

equities revenue for the company—which, beginning in 2020, spanned from $31.6 million to—setting aside the meme stock event—to a high of $80 million.  *See* Prospectus at 144, 149; MTD Ex. 3, Q2 2021 Form 10-Q; Ex. 4, Q3 2021 Form 10-Q.  In other words, the options and equities trading metrics that Plaintiffs argue were extraordinary enough to require disclosure were in-line with the company's historical performance, setting aside the unprecedent meme stock event.

ii.   Key Performance Indicators

In turning to the KPIs, although there were declines from June to July in the KPIs, Robinhood actually experienced an *increase* in MAU and AUC compared to the first quarter of 2021.  Specifically, for the months ended March 31, 2021, there were 17.7 million MAU (compared to 19.5 million in July and 21.3 million in June).  *Compare* Prospectus at 133 *with* SAC ¶ 98.  AUC also increased in July compared to Q1 ($94.7 billion vs. $80.9 billion).  *Compare* Prospectus at 133 *with* SAC ¶ 103.  Accordingly, the MAU and AUC metrics more accurately reflect historical fluctuations as opposed to an "observed pattern" that would warn the management of persistent trends necessary to warrant disclosure.  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) (internal citations and quotations omitted) (finding a single decline insufficient to require out-of-quarter disclosure).

Moreover, Plaintiffs cannot complain that investors were in the dark about these metrics for June, as Robinhood disclosed MAU and AUC metrics for June 2021 in their Offering Documents.  Prospectus at 136.  Plaintiffs also do not point to any authority for the proposition that a back-to-back decline in MAU in June and July necessarily renders a decline extraordinary.  *See* Opp. at 9-11.  Given that the back-to-back declines occurred immediately after a large spike in the company's business, these declines again reflect not an unprecedented declining trend warranting disclosure, but more likely a correction back to normal levels.  *See Kapps*, 379 F.3d at 211-13, 216, 218 (decline in metric should be considered in context of preceding spike).[3]

---

[3] Plaintiffs also suggest that it was misleading for Robinhood not to provide preliminary estimates of ARPU for Q2 2021. SAC ¶ 101. But ARPU is calculated from quarterly revenue and NCFA, *see* Prospectus at 28, which were each disclosed for Q2 in the Offering Documents, *id.* at 30, so a reader could determine the Q2 decline in ARPU.  *See In re Netflix, Inc. Sec. Litig.*, No. C 04-2978, 2005 WL 3096209, at *9 (N.D. Cal. Nov. 18, 2005) (dismissing claims where data allowed

United States District Court
Northern District of California

iii.    Cryptocurrency trading volume

In regard to trading volume, plaintiffs also add allegations that the decline in cryptocurrency trading volume Robinhood experienced from the end of Q2 to Q3 far exceeded the fall experienced by the industry as a whole.  SAC ¶ 86 & n.2.  Specifically, Plaintiffs add that the industry experienced downturns of 40% in June and 31.5% in July 2021 due to regulatory crackdowns in China.  *Id.* ¶ 86 & n.2.  Robinhood, on the other hand, saw a 76% decline in trading volume from May to June and another 56% decline from June to July.  *Id.* ¶¶ 85-86.  Robinhood argues that Plaintiffs assertion that Robinhood's declines "far exceeded those in the industry as a whole" (SAC ¶ 6) is "conclusory" and "not backed up with any data or figure," Reply at 11 (citations omitted).  But this is not persuasive as Plaintiffs do include facts regarding relative declines that support their allegation (*see* SAC ¶ 86 & n.2).  Still, the trading volume that Robinhood saw in June and July, as substantial as they were, fell in line with its historical metrics.  Specifically, the low in July 2021 of $13 billion in trading volume was within the normal range of trading when compared to the March 2021 (pre-Dogecoin spike) trading volume of $16 billion.[4]  Additionally, following the IPO, the trading volume increased to $22 billion in August 2021, and then leveled off in September 2021 at $16 billion.[5]  It is difficult to say that the decline in trading volume in July 2021 was representative of a persistent downward trend when, in the following month, the trading volume rose again and then leveled out by September to pre-Dogecoin spike numbers.  This appears to represent, if anything, fluctuations back to the mean.

All in all, the metrics available to Robinhood regarding the PFOF revenue, trading volume, AUC, and MAU do not reflect, in proper context, an extraordinary or persistent decline in its business; the metrics show increases in MAU and AUC from the months prior to the decline followed by the leveling off after a huge and unprecedented spike.  And while Plaintiffs allege that

investors to calculate allegedly omitted information). Further, the Court already determined that the decline in ARPU was not exceptional or out of line with past fluctuations.  MTD Order at 12.

[4] *See Robinhood Monthly Metrics* (Released with Q2 2022 Form 10-Q), available at https://s28.q4cdn.com/948876185/files/doc_downloads/Monthly/March-2022-Metrics.pdf (last visited January 21, 2024).

[5] *Id.*

United States District Court
Northern District of California

the declines were "highly material" because they "coincide[ed] with the end of the meme stock and Dogecoin fads," SAC ¶ 99—it is precisely that additional context which renders the declines as *not* indicative of an extraordinary downward trend as to mandate out-of-quarter reporting.

iv. <u>Impact of risk warnings and disclosures</u>

In addition to the fact that Robinhood's metrics do not show a historically extraordinary decline warranting out-of-quarter disclosures, Robinhood also properly disclosed future risks and downward trends of the metrics.  *See, e.g.*, Prospectus at 37.  As the Court previously explained in its last order granting Defendant's motion to dismiss, *see* MTD Order at 12-13, under the "bespeaks caution" doctrine, "a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994) (internal citations and quotations omitted).  While "blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim," "precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus" do not constitute a misrepresentation.  *Id.* at 1414.

As to the potential for downward trends in KPIs and revenue rates, among other warnings including in the Prospectus, Robinhood reported that it expected its growth rates in these metrics to decline significantly in the future:

> We have grown rapidly over the last few years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance. In particular, since March 2020, we have experienced a significant increase in revenue, MAU, AUC and Net Cumulative Funded Accounts.
>
> . . .
>
> The circumstances that have accelerated the growth of our business may not continue in the future, and *we expect the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts to decline in future periods, and such declines could be significant*.
>
> . . .
>
> We anticipate the rate of growth in these Key Performance Metrics [i.e., Net Cumulative Funded Accounts, MAUs, and Assets Under

> Custody (AUC)] *will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021…* due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities.

SAC ¶¶ 121, 123, 125, Prospectus at 31, 37.  As the Court previously explained, these disclosures were not misrepresentations on their own, notwithstanding that they indicate a slowing of growth as opposed to a decline in metrics.  MTD Order at 13-14.  Importantly, with respect to the downturns in cryptocurrency trading and revenue, a major factor in the decline of Robinhood's KPIs, the company warned of the possibility of absolute declines:

> The prices of cryptocurrencies are extremely volatile. Fluctuations in the price of various cryptocurrencies may cause uncertainty in the market and could negatively impact trading volumes of cryptocurrencies, which would adversely affect the success of RHC's business, financial condition and results of operations.
>
> …
>
> The cryptocurrency markets are volatile, and changes in the prices and/or trading volume of cryptocurrencies may adversely impact RHC's growth strategy and business. In addition, while we have observed a positive trend in the total market capitalization of cryptocurrency assets historically, driven by increased adoption of cryptocurrency trading by both retail and institutional investors as well as continued growth of various non-investing use cases, historical trends are not indicative of future adoption, and it is possible that the adoption of cryptocurrencies may slow, take longer to develop or never be broadly adopted, which would negatively impact our business, financial condition and results of operations.
>
> . . .
>
> For the three months ended March 31, 2021, 17% of our total revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months year ended December 31, 2020. While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020. As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, RHC's business may be adversely affected, and growth in our net revenue earned from cryptocurrency transactions may slow or decline, if the markets for Dogecoin deteriorate or if the price of Dogecoin declines, including as a result of factors such as negative perceptions of Dogecoin or the increased availability of Dogecoin on other cryptocurrency trading platforms.

United States District Court
Northern District of California

SAC ¶¶ 128-30, Prospectus at 78-79.  These warnings are significant when viewed in context of the company's financials before, during, and after the Dogecoin spike.  *See, e.g.*, *Worlds of Wonder*, 35 F.3d at 1418-19 (finding that the issuer was not required to estimate the proportion of a change in its revenues that was due to temporary factors, nor "the precise extent of [an] anticipated revenue drop"); *In re Aldus Sec. Litig.*, No. 1993 WL 121478, at *6 (W.D. Wash. Mar. 1, 1993) ("Aldus had no duty to reveal the specific amount of projected amortization cost increases.").[6]

Accordingly, these disclosures are not actionable in and of themselves for failure to predict with exact certainty the level of downturns the company would face under the bespeaks caution doctrine.  More importantly, the disclosures, if anything, served to put investors on notice that Robinhood's trading revenues would be substantially lower in the second and third quarters of 2021 than in the first quarter of 2021.

2.   Item 303

Plaintiffs relatedly argue that Robinhood's failure to disclose the metrics regarding KPIs, trading volume, and revenue violated Item 303 of Regulation S-K.

Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  MTD Order at 20; 17 C.F.R. § 229.303(b)(2)(ii).  A "trend" under Item 303 is an "observed pattern that accurately reflects persistent conditions of the particular registrant's business environment."  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) (internal citations and quotations omitted).  Accordingly, the inquiry to discern if a "trend" exists warranting disclosure under Item 303 is akin to the inquiry under Section 11 generally in determining whether out-of-quarter disclosures were extraordinary enough to require disclosure.  As explained above, the

---

[6] To this end, the Court previously rejected identical allegations that the risk disclosures were in and of themselves misleading because those statements used contingent language such as "may" or "could" when those events had already come to pass given that the complained-of omissions were not historically extraordinary requiring disclosure.  *Compare* FAC ¶¶ 158-161 *with* SAC  ¶¶ 127-130; *accord* MTD Order at 9, 16-18.  The same is true here.

1    complained-of omissions were not so persistent as to require disclosure.

2        The cases cited by Plaintiffs in opposition do not warrant a different result.  In *Franchi*,

3    2022 WL 4594575, at *10, the court there determined that the sudden downward trend in three

4    financial metrics in the quarter warranted out-of-quarter disclosure. However, as explained above,

5    the complained-of metrics do not actually show a significant decline in multiple financial metrics

6    for the company, but a correction back to the company's pre-spike numbers.  Section III.A.1.b.

7        *In re Facebook, Inc. IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 487, 511-

8    13 (S.D.N.Y. 2013) is distinguishable, as there, the court found that the omitted information

9    required disclosure not because of its content, but because of the company's internal reaction to

10   the metrics it had in-hand at time of the IPO.  Specifically, in *Facebook*, the company had seen a

11   change in the number of Daily Active Users on the desktop version of the website (compared to

12   increasing mobile usage) leading up to the IPO.  *Id.* at 511.  This was material because the

13   company derived revenue from advertisements for desktop users.  *Id.*  The court was primarily

14   persuaded that this constituted a material adverse trend that needed to be disclosed in the IPO

15   because Facebook's senior leadership was adamant that the change warranted making emergency

16   calls to a select group of investors, namely underwriters and institutional investors (the "Syndicate

17   Analysts"), before the IPO.  *Id.* at 513-14.  The court reasoned that if the decline was serious

18   enough to "warrant emergency calls" then that supported the claim that it was a trend under Item

19   303.  *Id.*  The decline in desktop users occurred during the second quarter of 2012, resulting in

20   lower revenue projections, and this was exacerbated by the decision in the same quarter that

21   reduced the average amount of ads displayed to users on some pages.  *Id.* at 500.  Because of this,

22   the company cut its internal revenue projects by 8.3% for the quarter and remainder of the year.

23   *Id.* at 500-501.

24       Notably, Facebook's most senior executives determined that the change was so significant

25   that it warranted disclosure to the Syndicate Analysts.  *Id.* at 501.  For example, the treasurer sent

26   an email to employees with the subject line "Q2 estimates from analysts IMPORTANT PLS THIS

27   MORNING." *Id.* at 501.  And the treasurer stated that the Morgan Stanley bankers immediately

28   needed to see the "q2-q4 by quarter revenue estimates from the analysts for whom we have

United States District Court
Northern District of California

detailed models." *Id.* at 501. Thereafter, the executives stated that Facebook needed to provide the new revenue figures to the Syndicate Analysts so they could revise models based on the new information and provide to the company's largest potential investors. *Id.* On one of these calls, the treasurer stated:

> I wanted to make sure you saw the disclosure we made in our amended filing. The upshot of this is that we believe we are going to come in [on] the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure. **A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence.** **_As you can see from our disclosure, the trend is continuing._** You can decide what you want to do with your estimates, our long term conviction is unchanged, but in the near term we see these trends continuing, hence our being at the low end of the $1,100 + $1,200 range.

*Id.* at 502 (emphasis added). In short, in *Facebook*, there was a significant trend, not a correction, and management knew and acknowledged it as such. Here, there was what appears to be a correction and not a sustained trend. And there is no allegation that executives internally recognized and understood that the metrics they had at the time of the IPO constituted a persistent downward trends warranting modifications of future projections. *In re Facebook* is inapposite.

In a similar vein, Plaintiffs also raised at the motion hearing that these declines in KPIs must have been significant, because sophisticated analysts, based on information available to them, were not expecting Robinhood's business to decline as significantly as it did in late 2021. But Plaintiffs point to no authority that analysts being incorrect about the future of a business necessarily evidences that omitted information was historically extraordinary.[7] Unfulfilled predictions of analysts alone do not retrospectively establish historically extraordinary information that mandates out-of-the-ordinary disclosures.

In summation, the complained of declines were not historically extraordinary when viewed in context of the company's overall financials (as opposed to the unprecedented spike in early

---

[7] This is particularly true given that Robinhood operates in the volatile market of cryptocurrency, which, as warned of in the IPO documents and as is generally known to investors, is especially vulnerable to unexpected ebbs and flows of trading. It is not outlandish that analysts might be unable to predict every downturn in a business; this market is unpredictable.

2021).  Further, Robinhood made adequate disclosures of risk that, under the bespeaks doctrine, do not trigger liability under Item 105.  These disclosures further put investors on notice of the possibility of downward trends.  Accordingly, the Court dismisses Plaintiffs' claims under Section 11 premised upon omissions of declines in KPIs, revenue, and trading volume.

B.    Change in Composition of Revenue

Plaintiffs also argue that Robinhood violated disclosure duties under Item 105 of the regulations requiring disclosure of "the material factors that make an investment in the registrant or offering speculative or risky."  Opp. at 17-22; 17 C.F.R. §229.105.  Specifically, Plaintiffs allege that the Offering Documents did not properly disclose the extent to which the business had become "dominated by fad trading in so-called meme stocks such as GameStop and the novelty cryptocurrency Dogecoin."  SAC ¶¶ 3, 5-7, 70.  Robinhood argues that in light of the publicly available information regarding the fad-trading events and the information in the Offering Documents, Plaintiffs have failed to state a claim.  MTD at 10-12; Reply at 4-9.

As Robinhood notes, these trading events were amongst the biggest news stories of the year.  *See, e.g.*, *Year in Review: A Look Back at the Biggest News of 2021*, Wall Street Journal (Dec. 19, 2021), *available at* https://www.wsj.com/story/a-look-back-at-the-biggest-news-of-2021-28c7c827 (last visited November 12, 2023); Nicole Lyn Pesce, *Google's 2021 Year in Search: AMC and GME stocks, Dogecoin, stimulus checks and shortages dominated queries*, MarketWatch (Dec. 11, 2021), *available at* https://www.marketwatch.com/story/googles-2021-year-in-search-amc-and-gme-stocks-dogecoin-stimulus-checks-and-shortages-dominated-queries-11638950486 (last visited November 12, 2023); Stan Choe, *Dogecoin has its day; cryptocurrency is latest 'meme' craze*, AP News (Apr. 20, 2021), *available at* https://apnews.com/article/cryptocurrency-technology-business-8462b437bb9ddaf821e49aff7a2bc5d6 (last visited November 12, 2023).[8]  And Robinhood included information about the volatility regarding the trading frenzies—including lawsuits filed

---

[8] Plaintiffs do not object to the Court taking judicial notice to the media reports cited in Defendants' brief for the purpose of showing that the information contained in them was available to the market.  Opp. at 8 n.4.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

against Robinhood and congressional inquiries—in its Offering documents.  Prospectus at 42-43, 53-54, 56, 206-207.  Robinhood also disclosed the existence of bubbles from the meme stock event and information about the Dogecoin event in the Offering Documents.  *See, e.g.*, Prospectus at 42-43, 206-207 (meme stock events); Prospectus at 79 (Dogecoin event).  Plaintiffs appear to acknowledge the highly publicized nature of these  events in their complaint.  *See, e.g.*, SAC ¶¶ 70-85.  Accordingly, a reasonable investor would have been aware of the meme stock and Dogecoin events in early 2021; these events, also disclosed in the Offering Documents, cannot support a securities claim.  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (explaining that it is axiomatic that there can be no omission claim when the allegedly undisclosed information was in the public domain before the IPO).

Plaintiffs argue that, notwithstanding this publicly available information, Defendants had a duty to disclose that the company's dependency on cryptocurrency trading and particularly on Dogecoin trading had grown in Q2 2021.  Opp. at 21.  Specifically, Robinhood provided preliminary revenue results for Q2 2021, but did not provide a breakdown of the transaction-based revenue *by type* for that quarter.  *Id.*  Accordingly—investors did not know that cryptocurrency trading revenue increased to 52% of its total trading revenue, up from 21% in Q1 2021.  And investors were likewise unaware, Plaintiffs argue, that the cryptocurrency trading that was attributable to Dogecoin trading increased from 34% in Q1 to 62% in Q2 2021.  *Id.*  Plaintiffs summarize this theory:

> [A]lthough an investor might have anticipated a decline in cryptocurrency trading volume on Robinhood's platform (and revenue from Transaction Rebates) in Q3 2021, due to the end of the Dogecoin rally . . . without knowing that Robinhood's dependence on cryptocurrency trading, and Dogecoin in particular, had increased exponentially in Q2 2021, an investor did not have any reason to anticipate a decline in cryptocurrency trading volume of the magnitude experienced by Robinhood in the two months prior to the IPO or the material impact that decline was reasonably likely to have on Robinhood's Q3 2021 revenue, especially in light of the simultaneous collapse in PFOF from equities trading.

*Id.* at 22.

Defendants rebut that there is no Item 105 violation here because Item 105 requires disclosure of risk factors, not present performance indicators.  Reply at 3-4.  Defendants cite to

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) for the proposition that the company need only disclose underlying risk factors, i.e., factors that could cause material future adverse events and not present performance indicators. *Id.* However, this case is not analogous. In *City of Pontiac*, the court considered whether Item 105 (then known as Item 503(c)) was violated where the defendant company was involved in a cross-border tax scheme. *City of Pontiac*, 752 F.3d at 183. The company disclosed that the DOJ was investigating the company regarding the scheme, but Plaintiffs argued that the defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme to satisfy Item 105. *Id.* at 183-84. The court found that there was no obligation to disclose "uncharged, unadjudicated wrongdoing," as "disclosure is not a rite of confession." *Id.* at 184. Accordingly, by disclosing involvement in multiple legal proceedings indicating potential exposure to defense costs, UBS complied with obligations under the Securities Act. *Id.* Here the disclosure Plaintiffs identify would not have been an admission of wrongdoing in regard to an ongoing legal investigation, but rather, a shift in revenue source which in and of itself would not be a confession. *City of Pontiac* does not insulate the Defendants from liability.

Still, it is difficult to see how a reasonable investor would be unaware of the potential risk for Robinhood's business caused by a decline in cryptocurrency trading, and specifically Dogecoin, given the disclosures made. Robinhood specifically disclosed the significance of cryptocurrency trading to its business and risks associated with the declining trading volumes:

> Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter. ***We expect our revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30, 2021***, and expected seasonality. . . . We anticipate the rate of growth in these Key Performance Metrics will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities.

United States District Court
Northern District of California

Prospectus at 31 (emphasis added).  Robinhood also stated:

> A ***substantial portion of the recent growth in our net revenues earned from cryptocurrency transactions is attributable to transactions in Dogecoin***.  If demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on our platform, our business, financial condition and results of operations could be adversely affected.

Prospectus at 79 (emphasis added).

To add to this disclosure, the magnitude of the Dogecoin trading was described.  Investors were on notice of the fact that Robinhood's business had substantially shifted to rely more on cryptocurrency trading and more acutely, Dogecoin in Q1 2021.  Specifically, Robinhood disclosed that a disproportionate fraction of its cryptocurrency volume in Q1 (34%) was composed of trades in Dogecoin.  *Id.*  That disclosure was picked up and widely reported in the media.  For example, one Business Insider article had a headline reading: "Robinhood says dogecoin accounted for 34% of its cryptotrading revenue in the 1st quarter and lists declining interest in the meme token as a risk in its highly anticipated IPO filing."  Emily Graffeo, *Robinhood says dogecoin accounted for 34% of its crypto-trading revenue in the 1st quarter, and lists declining interest in the meme token as a risk in its highly anticipated IPO filing*, Business Insider (July 2, 2021), *available at* https://www.businessinsider.in/stock-market/news/robinhood-says-dogecoin-accounted-for-34-of-its-crypto-trading-revenue-in-the-1st-quarter-and-lists-declining-interest-in-the-meme-token-as-a-risk-in-its-highly-anticipated-ipo-filing/articleshow/84048671.cms (last visited November 16, 2023).[9]  Additionally, the price of Dogecoin is publicly available information, meaning investors would be aware of price volatility.  *See In re SeaChange Int'l Inc.*, 2004 WL 240317, at *14-15 (D. Mass. Feb. 6, 2004) (considering public availability of information in determining whether statements made were misleading).

The Court previously held that the disclosures by Robinhood were sufficient to make a reasonable investor aware of the significance of cryptocurrency trading to Robinhood's business and risks associated with declines in Dogecoin and cryptocurrency.  *See* Docket No. 90 at 15-16.

---

[9] Plaintiffs again do not oppose the Court taking judicial notice of media reports, so long as not for the truth asserted therein. Opp. at 8 n.4.

United States District Court
Northern District of California

1    Nothing changes that determination.

2           Namely, authority cited by Plaintiffs do not present a good reason to reconsider that

3    finding.  For example, *Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-1471, 2019 WL 3065591, at *5-6

4    (D. Nev. July 12, 2019) does not support Plaintiffs' case.  There, the court determined that

5    Plaintiffs stated a Section 11 claim premised upon a failure to disclose the company's switch in its

6    sales strategy to focus on hybrid cloud solutions, which presented new complications and required

7    engineering.  *Id.*  The offering documents there discussed that hybrid cloud solutions could present

8    a remarkable growth opportunity but did not disclose the shift in business to focus on that strategy.

9    *Id.*  Here, the shift in types of trading occurring on Robinhood's platform does not reflect a shift in

10   Robinhood's business strategy, but a change in user behavior unprompted by Robinhood.  In that

11   sense, there was no shift in strategy to report.  Additionally, here, unlike in *Mingbo Cai*, investors

12   were made aware of the shift.  Specifically, Robinhood disclosed its revenue breakdowns from Q1

13   2021, showing an increase in revenue from cryptocurrency trading, thus putting investors on

14   notice that the company was becoming more heavily reliant on this form of trading than in the

15   past.  *See* SAC ¶ 115.  And further, Robinhood explicitly disclosed that cryptocurrency transaction

16   revenue was accounting for an increased portion of its total revenue, and particularly, that

17   Dogecoin was a large percentage of that increase.  Prospectus at 79.  Robinhood stated:

18              For the three months ended March 31, 2021, 17% of our total
                revenue was derived from transaction-based revenues earned from
19              cryptocurrency transactions, compared to 4% for the three months
                year ended December 31, 2020. While we currently support a
20              portfolio of seven cryptocurrencies for trading, for the three months
                ended March 31, 2021, 34% of our cryptocurrency transaction-based
21              revenue was attributable to transactions in Dogecoin, as compared to
                4% for the three months ended December 31, 2020.
22

23   *Id.*  So unlike in *Mingbo Cai* where investors were unaware of the shift in business, Robinhood

24   disclosed that its business had shifted toward cryptocurrency trading—and even more acutely—to

25   Dogecoin trading in particular.  And Robinhood provided information as to the magnitude of that

26   trading.  While the proportion of that revenue continued to increase in the following quarter,

27   investors were made aware of the change in revenue sources for the company that had already

28   occurred.  *Mingbo Cai* is inapposite.

United States District Court
Northern District of California

1    At bottom, the "the inquiry can be boiled down to whether the Offering Documents were

2    accurate and sufficiently candid." *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 CIV. 9848

3    (PGG), 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020).  Robinhood repeatedly explained that

4    there is volatility in the cryptocurrency market and in the price of Dogecoin, and that a

5    "substantial portion" of its revenue was derived from Dogecoin trading. To this end, Robinhood

6    provided a by-type revenue breakdown for Q1 2021 that showed a large percentage of its revenue

7    derived from cryptocurrency trading.  Given these disclosures, including that Robinhood's model

8    had begun to shift to rely more heavily on non-traditional trading by Q1 2021, the Court finds that

9    Robinhood was sufficiently candid on this issue; the reasonable investor would not have been in

10   the dark about the shift.  Further, the market was well aware of industry-wide declines in

11   cryptocurrency trading by the time of the IPO; a reasonable investor would be on notice that a risk

12   of declines in trading of this currency may continue into the next quarter.  And given that

13   Robinhood disclosed that cryptocurrency trading accounted for an increasingly large percentage of

14   its overall trading volume, a reasonable investor would understand Robinhood might see declines

15   in trading of this currency at a higher rate than other trading companies in the market.

16   Plaintiffs also argue that the "pages of contingent risk warnings" regarding the volatility in

17   cryptocurrencies were insufficient or misleading in and of themselves because the warnings were

18   phrased as contingencies when "these risks had already come to pass."  Opp. at 18.  This argument

19   is also not availing.

20   As explained in the Court's prior Motion to Dismiss Order, and for the reasons stated

21   therein—the forward-looking statements are not actionable here.  MTD Order at 12-13 (citing *In*

22   *re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413-14 (9th Cir. 1994)).

23   Regarding the information already known to Robinhood at that time—i.e., downturns in

24   trading volume and revenue or KPIs—as explained above, the omitted information was not

25   indicative of larger future trends making disclosure appropriate.  This renders cases cited by

26   Plaintiffs inapposite.  Specifically, in *Gerneth v. Chiasma, Inc.*, No. 16-cv-11082, 2018 WL

27   935418, at *4-5 (D. Mass. Feb. 15, 2018), the court found that the disclosures were insufficient to

28   satisfy Item 105 (then 503).  There, the drug company included language stating risk factors

1   regarding regulatory approval of a drug the company was seeking to be approved, including that

2   the drug could be delayed, and that the FDA may disagree with the design of the clinical trials.  *Id.*

3   However, Plaintiffs alleged that by the time of the IPO the FDA had already stated its

4   disagreement with the trial design for the drug by that time.  *Id.* at *4.  The court found that this

5   omission rendered the disclosures inadequate under Item 503.  *Id.* at *4-5.

6          The circumstances here are not so stark.  In *Gerneth*, the company was in possession of

7   information (FDA disapproval of the drug) that would clearly dictate whether the "risk" would

8   come to pass or not (FDA approval or disapproval of the drug).  *Id.* at *4.  Here, Robinhood was

9   aware of some declines in its business metrics but did not know whether the declines would persist

10  into the future—i.e., the subject of the risk warning.  This is because, as explained above, the

11  declines known to Robinhood at the time of the IPO were not so historically extraordinary as to be

12  indicative of larger future trends.  Thus, unlike in *Gerneth* where the omitted fact was highly

13  indicative as to whether the risk would come to pass (indeed *had* come to pass), the omitted facts

14  known to Robinhood were less probative as to what would happen in the future. *See id. Gerneth* is

15  thus inapposite.

16          In sum, considering Defendant's extensive disclosures of the volatility of cryptocurrency

17  trading and Dogecoin in particular, the disclosures reflecting Robinhood's shift in composition of

18  its revenue that had already commenced as of Q1 2021 (including specific information showing

19  the size of that shift as of that quarter), and information known to the market at this time regarding

20  the "fad-trading" events that were likely to continue for some time, Plaintiffs have failed to state a

21  claim based on the company's shift in revenue.

22  C.   Claims Under Section 15

23          Section 15 of the Securities Act makes "controlling persons" jointly and severally liable

24  for violations of Sections 11 or 12 committed by persons they control.  15 U.S.C. § 77o(a).  A

25  Section 15 claim may be sustained only if there is an underlying primary violation.  *Howard v.*

26  *Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because Plaintiffs' SAC fails to allege

27  such a violation, as described above, the Section 15 claim must be dismissed.

28

D.      Leave to Amend

Where amendment is futile, the Court need not grant leave to amend.  *See, e.g.*, *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). Here, Robinhood has already had a second bite at the apple in trying to allege additional facts to show that the pre-IPO declines needed to be disclosed.  *See* FAC; Docket No. 90 (dismissing Plaintiffs' First Amended Complaint).  Yet, the more context that Plaintiffs have added about Robinhood's business metrics and financials, the less it seems that the complained-of declines were so extraordinary as to warrant disclosure. Because the Court cannot identify allegations that Plaintiffs could add to their complaint at this juncture to render their claims viable, the Court finds that amendment would be futile; leave to amend is not warranted in this case.  *See Saul*, 928 F.2d at 843.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' Section 11, 12(a) and 15 claims **WITHOUT LEAVE TO AMEND**.

**IT IS SO ORDERED**.

Dated: January 24, 2024

_____
EDWARD M. CHEN
United States District Judge